1

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MARYLAND

2

    WILLIAM C. BOND          *

3                    *

        Plaintiff    *

4                    *    Civil Action

    v.               *

5                    *    No. MJG 01-CV-2600

    KENNETH BLUM, SR.,       *

6  et al.           *

                     *

7        Defendants    *

8            * * * * * * * * *

9

10          Pursuant to Notice, the videotape

11  deposition of WILLIAM C. BOND was taken on Friday,

12  November 16th, 2001, commencing at 2:04 p.m., at

13  the law offices of Adelberg, Rudow, Dorf & Hendler,

14  LLC, 600 Mercantile Bank & Trust Building, 2

15  Hopkins Plaza, Baltimore, Maryland 21201-2927,

16  before Sharon A. Beaty, Notary Public.

17

18

19

20

21  Reported by:  Sharon A. Beaty, CSR

2

```
1  APPEARANCES:

2       ON BEHALF OF THE PLAINTIFF:

3        Howard J. Schulman, Esquire
          Schulman & Kaufman, LLC
4         100 Light Street, Suite 1330
          Baltimore, Maryland 21202
5         Telephone:  410-576-0400

6

7        ON BEHALF OF DEFENDANT MCDANIEL,
               BENNETT & GRIFFIN:
8
          William A. McDaniel, Jr., Esquire
9         Caroline A. Griffin, Esquire
          McDaniel, Bennett & Griffin
10        118 West Mulberry Street
          Baltimore, Maryland 21201-3600
11        Telephone:  410-685-3810
          Fax:  410-685-0203
12

13
         ON BEHALF OF DEFENDANTS HODGSON,
14            BLUM JR. AND BLUM SR.:

15        Gerard P. Martin, Esquire
          Martin, Snyder & Bernstein, P.A.
16        Redwood Tower, Suite 2000
          217 East Redwood Street
17        Baltimore, Maryland 21202
          telephone:  410-547-8764
18        fax:  410-547-1605

19

20

21
```

3

1  APPEARANCES:  (Continued)

2

3        ON BEHALF OF DEFENDANT WILLIAM SLAVIN:

4       Kathryn Miller Goldman, Esquire
         Astrachan, Gunst, Goldman & Thomas
5        20 South Charles Street, sixth floor
         Baltimore, Maryland 21201
6        telephone:  410-783-3526
         fax:  410-783-3530

7

8
         ON BEHALF OF DEFENDANT ADELBERG,
9            RUDOW, DORF & HENDLER, LLC

10       Andrew Radding, Esquire
         Paul A. Dorf, Esquire
11       Andrew McKinney, Esquire
         Adelberg, Rudow, Dorf & Hendler, LLC
12       600 Mercantile Bank & Trust Building
         2 Hopkins Plaza
13       Baltimore, Maryland 21201-2027
         Telephone:  410-539-5195
14       Fax:  410-539-5834

15

16  ALSO PRESENT:  Kenneth Blum, Jr. and
               Dudley F.B. Hodgson
17

18

19

20

21

4

1                 INDEX          PAGE

2 WITNESS:

3    William C. Bond

4 EXAMINATION:

5    By Mr. McDaniel              7

6    By Mr. Martin              196

7    By Mr. Radding             198

8    By Ms. Goldman             258

9    By Mr. Martin              267

10 EXHIBITS:  Retainedornot

11  1    Series of applications to purchase       21
          a regulated firearm
12
    2    Notice to Take Deposition Duces           25
13       Tecum/Schedule A to Notice of
         Deposition
14
    3    Complaint for Copyright              33
15       Infringement

16  4    Box containing photocopy of a            83
         manuscript
17
    5    AEI, Self-Portrait of a Patricide,     91
18       How I Got Away with Murder

19  6    3-4-96 letter from Mr. Bond to Mr.     158
         Blum, Sr.
20
    7    Dear Bill website printouts      166
21
    8    8-15-88 letter to Mr. Messerman      169

5

1    from Mr. Bond

2                    INDEX            PAGE

3  EXHIBITS, continued:

4  9    11-22-93 letter to Mr. Pessin from    177
       Mr. Bond
5
   10   2-2-94 letter to Mr. Pessin from      180
6      Ms. Cantor

7  11   9-29-96 letter to Mr. Pessin from     181
       Mr. Bond
8
   12   4-9-98 letter to Mr. Pessin from      184
9      Mr. Bond

10

11

12

13

14

15

16

17

18

19

20

21

6

1          THE VIDEOGRAPHER:  This video deposition

2   is being taken in accordance with Federal Rules of

3   Civil Procedure November 16th, 2001 at

4   approximately 2:04 p.m.  We're at 2 Hopkins Plaza,

5   Baltimore, Maryland.  Our stenographer is Sharon

6   Beaty, my name is Brian Barton; we are with Walls

7   Reporting.

8          The caption of the case is William C.

9   Bond, Plaintiff, versus Kenneth Blum, Junior, et

10   al., Defendants.  The party giving notice of this

11   deposition is William McDaniel.  Will the attorneys

12   please identify themselves and who they represent?

13          MR. McDANIEL:  William McDaniel for

14   McDaniel, Bennett & Griffin.

15          MS. GRIFFIN:  Caroline Griffin for

16   McDaniel, Bennett & Griffin.

17          MS. GOLDMAN:  Kathryn Goldman for

18   William Slavin.

19          MR. DORF:  Paul A. Dorf for Adelberg,

20   Rudow & Dorf.

21          MR. McKINNEY:  Andrew McKinney for

7

1  Adelberg, Rudow, Dorf & Hendler.

2        MR. RADDING:  Andrew Radding on behalf

3  of Adelberg, Rudow, Dorf & Hendler, LLC.

4        MR. MARTIN:  Jerry Martin for Blum

5  Senior, Blum Junior and Hodgson.

6        MR. SCHULMAN:  I'm Howard Schulman, I

7  represent Mr. Bond.

8        THE VIDEOGRAPHER:  Our witness is

9  William C. Bond and will now be sworn in by the

10  court reporter.

11        WILLIAM C. BOND,

12  called for examination, having been duly sworn to

13  tell the truth, the whole truth and nothing but the

14  truth, testified as follows:

15        EXAMINATION BY MR. MCDANIEL:

16    Q   Your name is William Bond; is that

17  correct?

18    A   Yes, sir.

19    Q   Mr. Bond, you were born February 2nd,

20  1964; am I right about that?

21    A   Yes.

8

1    Q   In Lexington, Kentucky?

2    A   Yes.

3    Q   When you were born your name was

4 Rovetar; is that correct?

5        THE WITNESS:  Howard, am I taking the

6 Fifth on that?

7        MR. SCHULMAN:  No, I think that's --

8    A   Yes, that's true.

9    Q   William Rovetar; is that right?

10   A   Uh-huh.

11   Q   And what was your father's name?

12       THE WITNESS:  Howard, am I taking the

13 Fifth?

14       (Discussion held off the record.)

15   A   Okay.  Merko Rovetar.

16   Q   All right.  Mr. Rovetar is deceased; is

17 that correct?

18   A   Yes.

19       MR. SCHULMAN:  I should say, if you want

20 to confer to me about the exercise of a privilege,

21 you're on a mic so that you may need to remove the

9

1   mic to ask me.

2       THE WITNESS:  Okay.  Okay.

3       Q   All right.  You murdered Mr. Rovetar in

4   what, 1987?

5       MR. SCHULMAN:  Mr. Bond is going to

6   assert his right to the Fifth Amendment.

7       MR. McDANIEL:  All right.

8       MR. SCHULMAN:  And I should state so the

9   record is clear, and it should be abundantly clear

10  through the papers in this proceeding, Mr. Bond is

11  presently charged with a crime of which the

12  manuscript, which is at issue in this case, is part

13  of the evidence as well as the background that

14  relates to this case, and he has a court date to be

15  tried on December 10th, 2001 in the Circuit Court

16  for Baltimore City as I think most of you are

17  aware, and given those parameters at this time he's

18  going to exercise his Fifth Amendment right

19  abundantly through the course of this deposition.

20      Q   All right.  Mr. Bond, you beat your

21  father, Merko Rovetar, to death with a hammer; is

10

1  that right?

2      MR. SCHULMAN:  Fifth Amendment.

3      MR. RADDING:  Can we hear the witness?

4      MR. McDANIEL:  Yeah, the witness has to

5  exercise the privilege I'm afraid, Mr. Schulman.

6  It's a personal privilege, and first of all wait

7  until my question is finished, and second of all,

8  the witness then has to exercise it.

9      MR. SCHULMAN:  Well, if that's the case,

10  then we're going to need to confer after each

11  question if I can't do that.

12      MR. McDANIEL:  You can confer away, but

13  it's his privilege, not yours, and he has to assert

14  it.

15    A   I'll take the Fifth Amendment.

16    Q   Now, you, you beat your father senseless

17  with a hammer and then stuffed his body in the

18  truck of the car; is that right?

19    A   Fifth Amendment.

20    Q   And your father was still alive when you

21  put him in the trunk of the car; is that correct?

11

1     A   I take the Fifth Amendment.

2     Q   You were subsequently arrested and

3  charged as an adult in the murder of your father,

4  Merko Rovetar; is that right?

5     A   That is incorrect.

6     Q   Tell me how that statement is incorrect,

7  Mr. Bond.

8     A   I'll continue to take the Fifth

9  Amendment.

10     Q   Do you want to take that answer back, is

11  that what you want to do?  Didn't you just --

12       MR. SCHULMAN:  That's not what he said.

13       MR. McDANIEL:  You just told me -- he

14  just answered my question.

15     Q   Didn't you just waive your Fifth

16  Amendment rights, Mr. Bond, by answering that

17  question?

18     A   No.

19     Q   You intended to assert the Fifth to that

20  question?

21     A   Yes.

12

1    Q    Just, the answer just slipped out; is

2  that right?  Did the answer just slip out?

3           (Phone ringing.)

4           MR. McDANIEL:  Please, Mr. Bond.  We're

5  in a deposition here.  I ask you to turn your phone

6  off.  Is it off?  Is it off, Mr. Bond, or are you

7  going to take the Fifth on that?

8           (No response.)

9    Q    Now, in connection with the proceedings

10  that were held in Ohio, you told a series of lies

11  under oath when you were questioned by the court;

12  is that correct?

13    A   I'll take the Fifth Amendment.

14    Q    I can't hear you, Mr. Bond.

15    A   I'll take Fifth Amendment.

16    Q    You told a fictionalized account to the

17  court while you were under oath in the hopes of

18  achieving a plea of temporary insanity, isn't that

19  right, Mr. Bond?

20    A   I'll take Fifth Amendment.

21    Q    You perjured yourself in the Ohio

13

1 proceeding, isn't that correct, Mr. Bond?

2    A   I'll take Fifth Amendment.

3    Q   Mr. Bond, have you ever been adjudged to

4 be insane?

5    A   I'll take the Fifth Amendment.

6    Q   Have you ever been adjudged to be

7 temporarily insane?

8    A   I'll take the Fifth Amendment.

9    Q   Are you taking any drugs today,

10 Mr. Bond?

11    A   I'll take the Fifth Amendment.

12    Q   Have you taken drugs in the past that

13 affected your ability to tell the truth?

14    A   I'll take the Fifth Amendment.

15    Q   Are you taking drugs today, Mr. Bond,

16 that affect your ability to tell the truth?

17    A   I'll take the Fifth Amendment.

18    Q   You've been diagnosed in the past as

19 suffering from mental disease; is that correct,

20 Mr. Bond?

21    A   I'll take the Fifth Amendment.

14

1    Q    You have entered a plea in court in

2  connection with the murder of your father of

3  temporary insanity; isn't that right, Mr. Bond?

4    A    I'll take the Fifth Amendment.

5    Q    Isn't it true, Mr. Bond, that you

6  represented to the court that you were temporarily

7  insane when you murdered your father?

8    A    I'll take the Fifth Amendment.

9    Q    As a result of the murder of your father

10  you were incarcerated in a mental institution;

11  isn't that correct, Mr. Bond?

12    A    I'll take the Fifth Amendment.

13    Q    You have repeatedly throughout your life

14  been under the care of a psychiatrist; isn't that

15  correct, Mr. Bond?

16    A    I'll take the Fifth Amendment.

17    Q    You have been under the care of a

18  psychiatrist because of various psychotic

19  conditions from which you suffer; is that right?

20    A    I'll take the Fifth Amendment.

21    Q    Mr. Bond, do you under-, did you

15

1  understand the nature of the oath you took today?

2    A   Yes.

3    Q   And what is your understanding of the

4  nature of that oath?

5    A   I think it's self-evident.

6    Q   Well, why don't you explain it to me?

7  I'd like you to explain to me your understanding of

8  what obligations the oath imposes upon you in this

9  deposition.

10              (No response.)

11    Q   Are you waiting for something, Mr. Bond?

12    A   I took the oath.  I'm taking the oath, I

13  answered the question.

14    Q   And I want you to explain to me your

15  understanding of the oath.  Are you able to do

16  that, Mr. Bond?

17              (No response.)

18    Q   Can we get a time on this, please?  Mark

19  the time when the witness -- I'll ask the question

20  again.

21          Would you please explain, Mr. Bond, your

16

1 understanding of your obligations under the oath

2 that you took today?

3    A   I'd like to confer with my attorney.

4        MR. RADDING:  Only as to privilege.

5    Q   You can only confer with your attorney

6 on grounds of privilege.

7        MR. SCHULMAN:  I think he has answered

8 the question the best he could.

9        MR. McDANIEL:  He has not answered this

10 question, Mr. Schulman.

11       MR. RADDING:  And before you prompt him,

12 Mr. Schulman, let's excuse him from the room.

13       MR. SCHULMAN:  All right.  Could you

14 step out, please?

15       THE WITNESS:  Sure.

16       THE VIDEOGRAPHER:  Off the record at

17 2:12 p.m.

18       MR. RADDING:  No, we'll stay on the

19 record.

20       MR. McDANIEL:  We stay on the record.

21       MR. SCHULMAN:  Stay on the record,

17

1  please.

2          THE VIDEOGRAPHER:  We'll stay on the

3  record.

4          (Witness left deposition room.)

5          MR. RADDING:  Mr. Schulman, don't, you

6  know, you, you're always cautioning people not to

7  prompt witnesses.

8          MR. SCHULMAN:  You're absolutely

9  correct, I should not have spoken.  I agree with

10  you.

11          MR. RADDING:  That's right.

12          MR. SCHULMAN:  I absolutely agree with

13  you.  Now --

14          MR. RADDING:  Also, also, Mr. Schulman,

15  don't nod yes or no to your client on various

16  answers, that's something else you shouldn't be

17  doing.  If you got a privilege and you want to talk

18  to him about privilege, that's fine.  Don't be

19  prompting him by gestures or words, okay?  Thank

20  you.

21          MR. SCHULMAN:  All right.  What we'll do

18

1  then in terms of this question, I mean -- I think

2  he's answered the question.

3        MR. McDANIEL:  No, he hasn't, Mr.

4  Schulman.  I asked him what does he understand his

5  obligations to be under the oath.  He has testified

6  that, he has taken the Fifth Amendment on whether

7  he's perjured himself in the past.  And I'm going

8  to ask the court to draw an adverse inference from

9  that, that he has perjured himself in the past.

10  And I want to know what his understanding of the

11  oath is today, and I think I'm entitled to know

12  that before we proceed any further.

13        MR. SCHULMAN:  Well, I think he answered

14  the question, so I mean that's --

15        MR. McDANIEL:  Well, he has not answered

16  that question.  My question is --

17        MR. MARTIN:  The answer was the oath, he

18  thinks the oath was self-evident.  We're entitled

19  to an answer that says what does he mean by that,

20  what does he mean by self-evident, what does he

21  think the oath means.  This is not rocket science,

19

1  it's a pretty easy question to answer.

2      MR. SCHULMAN:  Given counsel's proffer

3  I'm going to confer with my client concerning the

4  exercise of the privilege and I would suggest he's

5  probably going to take the Fifth Amendment.

6      THE VIDEOGRAPHER:  Do you want to go off

7  the video record?

8      MR. McDANIEL:  No.  No, leave it on.

9  Let it roll.

10      (Pause in the proceedings.)

11   Q   Okay.  Mr. Bond, you've had a chance to

12  go out of the room and talk to your lawyer; is that

13  correct?

14   A   Uh-huh.

15   Q   You have to say yes or no, please.

16   A   Yes.

17   Q   Now, would you explain to me what you

18  understand your obligations to be under the oath

19  here today?

20   A   I'm going to take the Fifth Amendment.

21   Q   Mr. Bond, you never attended college; is

20

1  that correct?

2      A    No.

3      Q    And you never finished high school; is

4  that correct?

5      A    No.

6      Q    What year -- I'm not correct, you did

7  finish high school?

8      A    I answered your question.

9      Q    Did you finish high school or not?

10     A    Yes.

11     Q    And what year did you graduate from high

12  school?

13     A    1982.

14     Q    What high school was that?

15     A    I'll take the Fifth Amendment.

16     Q    You're taking the Fifth Amendment on

17  where you went to high school?

18     A    Uh-huh.

19     Q    Yes or no, please.

20     A    Yes.

21     Q    How did you do in chemistry?  Are you

21

1  going to take the Fifth on that?

2      A    Not -- it was not my favorite subject.

3      Q    How old were you when you graduated from

4  high school?

5      A    18.

6      Q    And where were you living when you

7  graduated from high school?

8      A    I'll take the Fifth on that.

9          MR. RADDING:  Would you please speak up?

10  We're having terrible trouble at this end of the

11  table hearing.

12          (Exhibit 1  marked.)

13      Q    Mr. Bond, you have in front of you

14  what's been marked as Exhibit 1 for your

15  deposition.  Do you have that in front of you?

16      A    It appears to be.

17          MR. RADDING:  Can you please speak up?

18          THE WITNESS:  It appears to be.

19      Q    Now, Exhibit 1 is a series of photocopy

20  documents pertaining to your application for the

21  purchase of guns; is that correct?

1        MR. SCHULMAN:  I'd like to speak to

2  Mr. Bond about the exercise of the privilege.  Can

3  you take it off and go outside?

4        (Pause in the proceedings.)

5     A   I'll be taking the Fifth Amendment on

6  that.

7     Q   All right.  If you look at the last page

8  of this document, Mr. Bond, there's a series of

9  questions that appear in here.  Do you see that?

10     A   I'm taking the Fifth Amendment on it.

11  There's no point in me looking at the document.

12     Q   If you look at question number 7,

13  Mr. Bond, it asks you whether you had ever spent

14  more than 30 consecutive days in any medical

15  institution for treatment of a mental disease,

16  disorder or disorders.  Is that what that says?

17     A   I'll be taking the Fifth Amendment.

18     Q   Now, you answered no to that question;

19  isn't that right, Mr. Bond?

20     A   Fifth Amendment.

21     Q   And that was a lie, now, wasn't it,

23

1 Mr. Bond?

2      A    Fifth Amendment.

3      Q    You in fact had been confined for more

4 than 30 consecutive days to a medical institution

5 for treatment of mental disorders; isn't that

6 correct?

7      A    Fifth Amendment.

8      Q    And you executed this questionnaire that

9 we're looking at, Exhibit 1, under oath, under

10 penalty of perjury, didn't you, Mr. Bond?

11     A    Fifth Amendment.

12     Q    In question number 8 it asked whether

13 you had ever been adjudicated mentally defective or

14 have you been committed to a mental institution.

15 Do you see that?

16     A    Fifth Amendment.

17     Q    Speak up, please, Mr. Bond.

18     A    Fifth Amendment.

19     Q    You also answered no to that question,

20 didn't you?

21     A    It's a rhetorical question.

24

1    Q    It's not a rhetorical question.  I asked

2  you whether you answered no to that question.

3    A    Fifth Amendment.

4    Q    Now, in fact you had been adjudicated to

5  be mentally defective; isn't that true, Mr. Bond?

6    A    Fifth Amendment.

7    Q    And you had been confined to a mental

8  institution; isn't that right?

9    A    Fifth Amendment.

10    Q    Mr. Bond --

11        MR. RADDING:  Could you speak up?

12    Q    -- you can't be heard, you're under

13  oath, and this is a big room, there's a lot of

14  people here, you have to speak up.

15    A    Fifth Amendment.

16    Q    And that answer that you gave in

17  response to question number 8 was also false,

18  wasn't it, Mr. Bond?

19    A    Fifth Amendment.

20    Q    And you answered that question under

21  penalty of perjury as well; isn't that true,

25

1  Mr. Bond?

2     A   Fifth Amendment.

3     Q   In fact, Mr. Bond, you have repeatedly

4  given knowingly false testimony under oath; isn't

5  that right?

6     A   Fifth Amendment.

7     Q   You have given such knowingly false

8  testimony in the state of Maryland within the last

9  four years; isn't that correct, Mr. Bond?

10    A   Fifth Amendment.

11    Q   Just like you gave knowingly false

12  testimony in connection with proceedings against

13  you arising out of the murder of your father; isn't

14  that right?

15    A   Fifth Amendment.

16        (Exhibit 2  marked.)

17    Q   Mr. Bond, do you have in front of you

18  what's been marked as Exhibit 2 for your

19  deposition?  Do you?

20    A   Yes, it appears so.

21    Q   Now, Mr. Bond, if you look at the last

26

1  two pages of that, it's a list of documents that

2  you were required -- excuse me, Mr. Schulman, I've

3  got my exhibits here -- that you are required --

4        MR. SCHULMAN:  Can I turn this so I can

5  see you, please?  I can hear you better.  I would

6  like to hear you.

7        MR. McDANIEL:  Just slide it right

8  there.

9        MR. SCHULMAN:  Thank you.

10     Q   The documents you were required to bring

11  with you today; is that correct, Mr. Bond?

12     A   I'm unclear what you're asking me.

13  You're asking me to look at the page, I'm looking

14  at the page.

15     Q   And this is a listing of documents you

16  were to bring with you today; is that right?

17     A   It's a list of documents you're asking

18  me to bring today.

19     Q   And number one is the original

20  manuscript and all photocopies or other copies

21  thereof; is that correct?

27

1    A    It appears that's what it says.

2    Q    Did you bring that with you?

3         MR. SCHULMAN:  I'm going to ask the

4    witness to step out, please.

5         MR. McDANIEL:  This is a privilege

6    discussion?

7         MR. SCHULMAN:  I'm not going with him.

8         MR. RADDING:  I'm just going to object.

9         THE WITNESS:  I can't walk with all

10   these bags here.  Do you mind moving the bags,

11   please?

12        MR. McDANIEL:  Well, let me move the

13   chair back and you can go by there.

14        MR. RADDING:  No, Mr. Bond, you can go

15   around this way, there are no bags.

16        (Witness left deposition room.)

17        MR. McDANIEL:  Okay.  He's out.

18        MR. SCHULMAN:  All right.  We have

19   brought with us today a box of documents for each

20   of the parties, we have also brought a formal

21   response to the request, a Rule 34 response, and I

28

1  would suggest you might want to take a look at

2  those particular documents as well as the response.

3      MR. McDANIEL:  Well, can you pass around

4  that, what you call the Rule 34 response?

5      MR. SCHULMAN:  Yes.  Sure.

6      MR. McDANIEL:  As to the documents

7  themselves, I want to ask him what he brought in

8  response to each one of these.

9      MR. SCHULMAN:  Here's one for you.  One

10  for you.  One for you.

11      MR. MARTIN:  Kathryn right there.

12      MR. SCHULMAN:  Let me see who we got.

13  One, two, three and four.  And let me make the

14  additional statement that Mr. Bond is presenting

15  the documents enumerated in the response.

16  Additionally, I as his counsel, although I don't

17  interpret the Rule 34 request and I think that's

18  what governs this, to encompass what would be

19  documents otherwise going to be presented at trial

20  on Tuesday, but out of an abundance of caution I'm

21  presenting those documents which by and large

29

1  consist of a file that I obtained from Mrs. Bond.

2      MR. McDANIEL:  Well, Mr. Schulman, what

3  I propose, since this is all new to us, is that we

4  adjourn Mr. Bond's deposition and allow me to look

5  at these and then you can depose Mr. Blum while I

6  do that and then we can reconvene to finish

7  Mr. Bond.

8      MR. SCHULMAN:  That's acceptable.

9      MR. MARTIN:  Okay.

10      MR. RADDING:  Okay.

11      MR. SCHULMAN:  Yes.

12      MR. McDANIEL:  Well, then we will now go

13  off the record in the deposition of William Bond to

14  resume at the conclusion of the deposition of

15  Kenneth Blum, Senior.

16      THE VIDEOGRAPHER:  Off the record at

17  2:26 p.m.

18  (Videotape deposition suspended at 2:26 p.m.)

19          *****

20      THE VIDEOGRAPHER:  3:05 p.m.  We're back

21  on the record.

30

1          MR. SCHULMAN:  I'd like to make a

2   statement for the record, and I'm going to ask

3   Mr. Bond to step out while I make it.

4      (Witness left the deposition room.)

5          MR. SCHULMAN:  Actually I'm going to

6   make two statements.  The first is an observation I

7   made and I just want to diffuse any potential for

8   later issues.  But on the way back into the room

9   about three or four minutes ago I heard Kenneth

10  Blum, Junior say to Mr. Bond in a matter that

11  looked aggressive to me, don't start, and my

12  observation of Mr. Bond at that time was that he

13  was merely coming into the area here.  Now, I don't

14  want to get into issues that, you know, but it

15  appeared to me that Mr. Bond was doing nothing

16  wrong, he was doing nothing aggressive.  I just

17  want to be clear that I would like to keep those

18  two individuals apart.  I know there's no love lost

19  by Kenneth Blum, Junior.  I observed him after the

20  incident occurred with an angry look on his face,

21  and he is basically at this point a nominal party

31

1  in, given my discussions with Mr. Martin, and he's

2  in effect going to be dismissed from this case, and

3  I just don't think that --

4        MR. MARTIN:  What do you mean in effect?

5  He either is or he isn't.

6        MR. SCHULMAN:  He is going to be

7  dismissed from this case.

8        MR. MARTIN:  Okay.

9        MR. RADDING:  All right.  You made your

10  point.

11        MR. SCHULMAN:  And the letter is on its

12  way, but okay.

13        MR. RADDING:  You've made your point.

14  Can we go to the next point?

15        MR. SCHULMAN:  All right.  The second

16  point is I'm going to go out and confer with

17  Mr. Bond, but let me tell you for your own

18  organization to the extent, and obviously the

19  examination is yours to make, but he's going to

20  assert the Fifth Amendment in all areas except

21  for --

32

1        MR. RADDING:  You can keep talking.

2        MR. SCHULMAN:  The door is open,

3   Mr. Bond is standing right outside the door.  Now

4   the door is closed.  He's going to assert the Fifth

5   Amendment in most areas that I anticipate that

6   counsel is going to make inquiry except as follows:

7   The relationship with Mr. Grossbart, the

8   relationship with Mr. Pessin, as well as areas

9   relating to the details and background on the

10  manuscript, he will, if asked, identify the

11  manuscript, and in terms of questions related to

12  other documents, their existence or what he brought

13  or what he didn't bring, he's going to assert the

14  Fifth Amendment for the reasons stated in the

15  document that I've served you with called

16  Plaintiff's Response to Defendants' Request for

17  Production of Documents.

18        MR. McDANIEL:  Okay.  Can we get

19  started?

20        MR. SCHULMAN:  Yes.  Except I want to

21  tell him, you know, I'm going to confer with him

33

1  about the privilege just so that he understands.

2          MR. McDANIEL:  We're off the record.

3          THE VIDEOGRAPHER:  Off the record at

4  3:09.

5          (Pause in the proceedings.)

6          THE VIDEOGRAPHER:  3:10 p.m.  We're back

7  on the record.

8          MR. SCHULMAN:  Is this better for the --

9          THE VIDEOGRAPHER:  Yes, sir.  Thank you.

10          MR. SCHULMAN:  All right.  And he will

11  also identify the enumerated documents that have

12  been produced in terms of the ones specified in the

13  Plaintiff's Response to Defendants' Request for

14  Production of Documents.

15          (Witness returned to deposition room.)

16          MR. McDANIEL:  Back on the record.

17          THE VIDEOGRAPHER:  Back on the record.

18          MR. McDANIEL:  Would you mark this,

19  please?

20          (Exhibit 3  marked.)

21      Q   Mr. Bond, you have in front of you

34

1  what's been marked as Exhibit 3; is that correct?

2    A    Yes.

3    Q    Would you turn to the last two pages of

4  Exhibit 3?  The last two pages of Exhibit 3 are

5  photocopies of a certificate of registration with

6  the copyright office; is that right?

7    A    It appears to be so.

8    Q    And you filled -- do you recognize your

9  signature on the second page of that registration?

10    A    Uh-huh.  Yes.

11    Q    Yes or no?

12    A    Yes.

13    Q    Did you put, did you type up the

14  information that's contained on these two pages,

15  which are the last two pages of Exhibit 3?

16    A    No.

17    Q    Who did?

18    A    Frank Morgan.

19    Q    Who is Frank Morgan?

20    A    He's an attorney that works for me.

21    Q    And where is Mr. Morgan based?

35

1      A   Hodes, Ulman, Pessin & Katz.

2      Q   And then you signed the document as the

3   person registering the copyright; is that correct?

4      A   Yes.

5      Q   Did you file any documents with the

6   copyright office that require -- well, let me ask

7   you this first.  Did you deposit a copy of the

8   book, manuscript that you wrote with the copyright

9   office?  Yes or no.

10     A   Did I?

11     Q   Yes.

12     A   No.

13     Q   Did someone do it on your behalf?

14     A   Yes.

15     Q   Who did that?

16     A   Frank Morgan.

17     Q   And did Mr. Morgan or you file any

18   documents to maintain that copy of the manuscript

19   in confidence?

20     A   I don't understand the question.

21     Q   Well, you understand, don't you, Mr.

1 Bond, that by filing this document with the

2 copyright office it became a public document, don't

3 you understand that?  Can you answer my question?

4     A   I don't really know the copyright laws.

5     Q   All right.  So you don't know one way or

6 the other?

7     A   I gave it to the lawyer to handle.

8     Q   Okay.  You don't know one way or the

9 other whether by filing this manuscript with the

10 copyright office it became a public document?

11        THE WITNESS:  Can I take the privilege

12 on this?

13        MR. RADDING:  Did the reporter get that?

14        MR. SCHULMAN:  Don't, don't communicate

15 with me in the presence of opposing counsel.  You

16 see they'll be quick to jump on it.

17        Can you step out for a minute?

18        (Witness left the deposition room.)

19        MR. MARTIN:  Before you say anything,

20 can I just say, when he says something like that,

21 why don't you just tell him no, you can't take the

1 Fifth on that.  There's no possible way he could

2 take the Fifth Amendment on that question.  He can

3 either say he knows or he doesn't know.

4         MR. SCHULMAN:  I think he can take the

5 Fifth Amendment on practically anything he wants.

6         MR. McDANIEL:  Mr. Schulman.

7         MR. SCHULMAN:  But anyway.

8         MR. McDANIEL:  What's your point here?

9 There's a question pending, I'd like an answer to

10 it.  You sent the witness out of the room, now what

11 do you want to talk about?

12         MR. SCHULMAN:  One of the documents I

13 brought with me but neglected to hand you before

14 when you took a break to look at the documents was

15 the deposit, as I understand what's the deposit.

16 Now, do you want me to give it to you?  I'm just

17 trying to be cooperative.

18         MR. McDANIEL:  I want an answer to my

19 question.  When I want that I'll get to it, okay?

20         MR. SCHULMAN:  All right.

21         MR. McDANIEL:  Bring your witness back

38

1  in.

2       MR. SCHULMAN:  But I'm producing this to

3  you as part of the document production.  If you

4  want to use it, fine, if you don't --

5       MS. GOLDMAN:  Is that one copy of the

6  deposit copy?

7       MR. SCHULMAN:  It's one copy.

8       MR. McDANIEL:  Bring your witness back,

9  would you, Mr. Schulman?  Can you do that?

10       MR. SCHULMAN:  Oh, yes.  I'm sorry.

11       (Pause in the proceedings.)

12       (Witness entered deposition room.)

13       MR. McDANIEL:  We're on the record?

14       THE VIDEOGRAPHER:  Yes.

15    Q    Now, the question is, Mr. Bond, do you

16  understand that by filing that, a copy of your

17  manuscript with the depository it became a public

18  document?

19    A    I don't think it became a public

20  document.

21    Q    And why don't you think that?

39

1     A    Because it was masked when it was

2  copywritten.

3     Q    Did you file any documents with the

4  copyright office to maintain this document in

5  confidence?

6     A    Yes.

7     Q    What documents did you file?

8     A    The, the book.

9     Q    Just the book?

10    A    Right.

11    Q    Did you file any kind of form requesting

12  that the document, that the book be maintained in

13  confidence?

14    A    Frank, Frank Morgan took care of it, I

15  don't really know what the details are.

16    Q    Do you know whether any form was filed

17  on your behalf asking the copyright office to keep

18  the book confidential?

19    A    I do not know.

20    Q    Mr. Bond, I want to show you what was

21  marked at the deposition of Mr. Grossbart as

1 Exhibit Number 4 and ask you to take a look at

2 that, please.

3          MR. SCHULMAN:  Are you going to mark it

4 in this --

5          MR. McDANIEL:  No.  It's marked in Mr.

6 Grossbart's deposition as Exhibit 4.

7          MR. SCHULMAN:  Can you step out, please?

8      (Witness left the deposition room.)

9          MR. SCHULMAN:  I'm going to object in

10 that the document you're showing the witness has a

11 handwritten note that says E-X 4 --

12          MR. McDANIEL:  It was put on there by

13 the court reporter, Mr. Schulman, at the --

14          MR. SCHULMAN:  I don't know that.

15          MR. McDANIEL:  Well, she'll tell you

16 that if you ask her.  Is that right?

17          THE REPORTER:  Yes.

18          MR. McDANIEL:  Okay.

19          MR. SCHULMAN:  Could we have some other

20 identifying notation?

21          MR. McDANIEL:  Mr. Schulman, it's the

41

1  affidavit of your client.

2       MR. SCHULMAN:  I understand that, but I

3  want the record clear.  I'm not disputing what it

4  is.

5       MR. McDANIEL:  It's my record, I'll make

6  it.  If it's not clear I'll suffer the

7  consequences.  If you don't like it, you can fix it

8  on cross-examination.  You're just obstructing this

9  deposition.

10      MR. SCHULMAN:  I object.

11      THE VIDEOGRAPHER:  Off the record at

12  3:18.

13       (Pause in the proceedings.)

14      THE VIDEOGRAPHER:  3:18 p.m.  We're back

15  on the record.

16      MR. McDANIEL:  Madam Court Reporter,

17  would you hand the witness what was marked at Mr.

18  Grossbart's deposition as the affidavit as Exhibit

19  Number 4, please?

20      MR. SCHULMAN:  Objection.

21   Q   Mr. Bond, do you have in front of you

1  the affidavit of William Bond?

2     A   Yes, it appears so.

3     Q   Would you look at page 4 and tell me

4  whether that's your signature?

5     A   Yes.

6     Q   And do you have any doubt that this is

7  the affidavit you filed, a copy of the affidavit

8  you filed in this case?

9     A   No.

10     Q   Mr. Bond, in this affidavit you stated

11  that you were providing this information under the

12  penalty of perjury.  Do you see that?

13     A   Yes.

14     Q   Did you have an understanding of what

15  that meant when you, when you subscribed to this

16  affidavit under penalty of perjury?

17        MR. SCHULMAN:  I would like to confer

18  with Mr. Bond outside.

19        MR. RADDING:  On privilege issue?

20        MR. SCHULMAN:  Yes.

21        THE WITNESS:  Let's go.

43

1          THE VIDEOGRAPHER:  Off the record at

2  3:19.

3          (Pause in the proceedings.)

4          THE VIDEOGRAPHER:  3:20 p.m.  We're back

5  on the record.

6      Q   Can you answer my question?

7      A   I don't even recollect what the question

8  was.

9      Q   Mr. Bond, can you speak up?  I'm sitting

10  about 10 feet away from you and I can't hear you,

11  and there's many other people sitting further down.

12      A   Can you repeat the question, please?

13      Q   Yeah.  The question was when you

14  subscribed to this affidavit under penalty of

15  perjury what did you understand that to mean?

16      A   I don't think that's what you asked me

17  before.

18      Q   Well, you just told me you didn't

19  remember what I asked you before, Mr. Bond, didn't

20  you?  Which is it, you remember or you don't

21  remember?  You're not just playing games with me,

44

1  are you, Mr. Bond?  Are you?

2      MR. SCHULMAN:  Don't respond to his

3  question.

4    Q   Can you answer the question I just asked

5  you or do you want to take the Fifth?

6    A   I'm going to take the Fifth.

7    Q   The truth is, isn't it, Mr. Bond, that

8  you executed this affidavit without regard to the

9  penalty of perjury; isn't that right?

10    A   I'll take the Fifth Amendment.

11    Q   Isn't it true, Mr. Bond, that this

12  affidavit contains from beginning to end a series

13  of lies by you; isn't that right?

14    A   I'll take the Fifth.

15    Q   Let's look at the first page of the Bond

16  affidavit.  You state that in the mid or late

17  1980s, in paragraph 2, you retained the services of

18  Robert Grossbart, an attorney, to draft a will for

19  me and to do my income tax returns.  Do you see

20  that?

21    A   Yes.

45

1    Q    When was it you retained Mr. Grossbart

2  to do income tax returns for you?

3    A    1986.

4    Q    And was he an attorney at that time?

5    A    No.

6    Q    So when you say you retained the

7  services of Robert Grossbart, an attorney, to do my

8  income tax returns, that was false, wasn't it,

9  Mr. Bond?

10    A    No, because he continued to do the tax

11  returns when he became an attorney.

12    Q    That's not what you say here though,

13  Mr. Bond, you say you retained him.  In the mid or

14  late 1980s I retained the services of Robert

15  Grossbart, an attorney, to do my income tax

16  returns.  Isn't that what you say?  Isn't it?

17    A    That's what I say there.

18    Q    And isn't that false?  When you retained

19  Mr. Grossbart he wasn't, to do income tax returns

20  for you, he was not an attorney, was he, Mr. Bond?

21    A    When I first retained Robert Grossbart

46

1  he was an accountant.

2    Q   Right.  And your affidavit is false when

3  it says that when you, that you retained Mr.

4  Grossbart, an attorney, to do my income tax return.

5  Isn't that false, Mr. Bond?

6       MR. SCHULMAN:  Objection.

7    Q   Go ahead and answer.

8    A   Boy, that's a tough one.  That's a tough

9  one.  I mean he worked at a law firm.

10   Q   In 1986, Mr. Bond, Mr. Grossbart did not

11  work at a law firm, did he?

12   A   Oh, no, he did.

13   Q   What law firm was that?

14   A   Engel & Engel.

15   Q   When did he start there?

16   A   I don't know, but that's where I went to

17  see him.

18   Q   You never went to his accountant office?

19   A   No, that's where his office was.

20   Q   You never went to an accounting office

21  that he had elsewhere?

47

1    A    No.

2    Q    You only met with him at Engel & Engel?

3    A    Correct.

4    Q    And at Engel & Engel he did your tax

5  returns?

6    A    Yes.

7    Q    And he did them as an attorney?

8    A    Well, obviously he did them as an

9  accountant.

10    Q    Well, you say here you retained the

11  services of Robert Grossbart, an attorney, to do my

12  income tax returns.  Isn't that what you said?

13    A    It appears that's what I said.

14    Q    Well, there's no doubt that's what you

15  said, is it, Mr. Bond?

16    A    It appears there's no doubt to that.

17    Q    And you don't say here you retained

18  Robert Grossbart, an accountant, do you?  Do you?

19    A    I think it's self-evident.

20    Q    You don't say here you retained Robert

21  Grossbart, an accountant, do you, Mr. Bond?

48

1     A   I think it's self-evident.

2     Q   Would you mind answering my question yes

3 or no, please?  You don't say in this affidavit

4 that you retained Mr. Grossbart as an accountant,

5 do you?

6     A   That's correct.

7     Q   And the reason that you put in attorney

8 and not accountant is because you're trying to

9 create the false impression that Mr. Grossbart was

10 your lawyer when he did your income tax returns?

11         MR. SCHULMAN:  Objection.

12     Q   Isn't that what you're trying to do?

13         MR. SCHULMAN:  Objection.

14     A   No.

15     Q   Now, in 1986 when you say you retained

16 Mr. Grossbart to do your income tax returns he was

17 not a lawyer, correct?

18     A   That's correct.

19     Q   And when he drafted a will for you he

20 was not a lawyer; is that correct?

21     A   I don't think so.

49

1    Q   Well, why do you state here that you

2  retained the services of Robert Grossbart, an

3  attorney, to draft a will for me?  Isn't that

4  false?

5    A   Excuse me.  You just said a double

6  negative.  You said that he was, was not.  He was

7  an attorney when he did the will.  Why would I have

8  an accountant do a will?

9    Q   When was it he did the will for you,

10  sir?

11    A   I don't have it in front of me.

12    Q   Well, I think you do, Mr. Bond.  This is

13  your -- you looked at this affidavit before it was

14  filed, didn't you?

15    A   Yes.

16    Q   And you looked at the attachments to it

17  before it was filed, didn't you?

18    A   Yes.

19    Q   And you looked at the attachment that

20  says send you a bill for preparation of will and

21  marital living will?  Did you look at that?

50

1    A    Yes.

2    Q    And it's dated what day, sir?

3    A    Do you know which page that is?

4    Q    Yeah, it's right after your signature

5    page, Mr. Bond.

6    A    Okay.

7    Q    What's the date?

8    A    June 11th, 1987.

9    Q    So the will was prepared by June 11th,

10   1987, wasn't it?

11   A    Uh-huh.

12   Q    Yes or no, sir?

13   A    It appears so.

14   Q    And Mr. Grossbart was not admitted to

15   the bar at that time, was he, Mr. Bond?

16   A    I would have no knowledge of when he was

17   admitted to the bar or wasn't.  I mean it's clearly

18   on legal stationery from an attorney.

19   Q    Well, Mr. Bond, you testified under oath

20   in this affidavit that you retained an attorney to

21   draft a will for you.  Now you're telling us you

1 had no idea whether he was an attorney or not; is

2 that right?

3       MR. SCHULMAN:  Objection.

4     A   If you go to a law firm and you have a

5 guy write a will for you, you would assume that

6 he's an attorney.

7     Q   You knew that Mr. Grossbart was a law

8 student, didn't you, Mr. Bond?

9     A   I knew that he was an accountant and

10 then he was in law school and he was becoming, or

11 passing the bar or whatever you call it.

12     Q   And you knew when you had him do the

13 will for you that he had not passed the bar, didn't

14 you?

15     A   I don't think that's so.

16     Q   You have no idea when Mr. Grossbart

17 became an attorney, isn't that correct, Mr. Bond?

18     A   Well, I highly doubt I would have asked

19 him to do a legal document if I didn't think he

20 could execute it.

21     Q   Answer my question, please, sir.

1     A   I just answered it.

2     Q   You have no idea when Mr. Grossbart

3 became an attorney; isn't that correct?

4     A   Do I have any idea?  No, I do not have

5 any idea the exact date.

6     Q   Yet you stated under oath that when you

7 retained him in the mid or late '80s he was an

8 attorney, correct?  Isn't that what you said?

9     A   I'm also assuming all of you are

10 attorneys, but it could turn out you're not an

11 attorney, it's a little silly.

12     Q   It may be, Mr. Bond, but I want an

13 answer to my question.

14     A   I answered it.

15     Q   In your affidavit you stated that when

16 you retained Mr. Grossbart he was an attorney, and

17 the fact is you don't know whether he was, don't

18 you?

19     A   No, but he certainly told me he passed

20 the bar.

21     Q   Well, when did he tell you that?

1    A    In 1987 sometime.

2    Q    Before June 11th?

3    A    I couldn't tell you.

4    Q    When did you retain him to draw a will?

5    A    Well, probably before this bill came

6 out.

7    Q    And he told you before, when you

8 retained him, that he was an attorney?

9    A    I do not recollect the details of how

10 the will got done.

11    Q    Well, my question to you, Mr. Bond, is

12 whether Mr. Grossbart told you when you retained

13 him that he was an attorney, to do the will?

14    A    I do not recollect the details of the

15 will.

16    Q    Well, Mr. Bond, you swore under oath in

17 this affidavit that Mr. Grossbart was an attorney

18 when you retained him, right?  The truth is you

19 don't know whether he was or not; isn't that

20 correct?

21    A    He certainly is an attorney today.

54

1    Q   That's not my question, Mr. Bond, is it?

2  When you executed this affidavit you didn't know

3  whether Mr. Bond was an attorney, Mr. Grossbart was

4  an attorney when you retained him, did you?

5    A   I've already said he wasn't an attorney

6  when I first hired him, he was an accountant.

7    Q   Why did you say then in this declaration

8  that he was an attorney when you first hired him?

9    A   If anything it's an oversight.  He was

10  an accountant and an attorney.

11   Q   An oversight you made under oath?  Is

12  that right, Mr. Bond?

13   A   It appears so.

14   Q   Now, you go on to say in the next

15  sentence Mr. Grossbart also assisted me in

16  developing a manuscript.  Do you see that?

17   A   Uh-huh.

18   Q   Yes or no, please.

19   A   Yes.

20   Q   Now, what did you mean by he assisted

21  you in developing a manuscript?

1    A   He told me that he had a relative that

2  was an entertainment executive in California and

3  that he would be interested in pitching the story

4  to the person.

5    Q   Well, you told him that you'd murdered

6  your father, right?  You told that to Mr.

7  Grossbart?

8       MR. SCHULMAN:  Objection.

9       MR. McDANIEL:  Grounds?

10      MR. SCHULMAN:  Let's go outside.

11      THE VIDEOGRAPHER:  Off the record at

12  3:30.

13       (Pause in the proceedings.)

14      THE VIDEOGRAPHER:  3:31 p.m., we're back

15  on the record.

16    A   I'm taking the Fifth to your question.

17    Q   Well, you told Mr. Grossbart that you

18  wanted to write a book; isn't that right?

19    A   Yeah.

20    Q   And you told Mr. Grossbart that you had

21  murdered your father in Ohio?

1     A   I'm going to take the Fifth on that.

2     Q   You told Mr. Grossbart that the topic of

3 your book was your murder of your father?

4     A   I'm going to take the Fifth on that.

5     Q   You told Mr. Grossbart that you wanted

6 his help in marketing the book; isn't that right?

7     A   I'm going to take the Fifth on that.

8     Q   Now, did you retain Mr. Grossbart as an

9 attorney to help you market the book?

10     A   I'm going to take the Fifth on that.

11     Q   Did you retain --

12        MR. SCHULMAN:  Let's step outside.

13        MR. McDANIEL:  No, no.  He's -- hold on,

14 Mr. Schulman, please.  He's answered that question,

15 there's no pending question.  What do you want to

16 step outside for?

17        MR. SCHULMAN:  Ask your next question

18 then.

19     Q   Did you tell Mr., did you retain Mr.

20 Grossbart as an attorney to help you develop --

21        MR. SCHULMAN:  Oh, wait a minute, I can

1 step outside with him on that.  Let's step outside.

2        MR. McDANIEL:  Well, I haven't finished

3 my question.

4        MR. SCHULMAN:  I'm talking about the

5 last question.

6        MR. McDANIEL:  He answered it.

7        MR. RADDING:  Is this a privilege

8 discussion, Mr. Schulman?

9        MR. SCHULMAN:  Absolutely.

10        MR. McDANIEL:  He answered the last

11 question, Mr. Schulman.

12        MR. SCHULMAN:  Go on out for a second.

13      (Witness left the deposition room.)

14        MR. MARTIN:  Howard, can you have your

15 privilege discussions, like lean over to him in the

16 corner instead of going outside?

17        MR. SCHULMAN:  No, we can't do that

18 because you're all in here, we've got microphones

19 on, and --

20        MR. MARTIN:  You take the microphone

21 off, lean over in the corner and whisper.

58

1        MR. SCHULMAN:  No, I'm not going to do

2   that because it could be overheard.

3        MR. MARTIN:  Okay.

4        MR. SCHULMAN:  If you don't want me to

5   instruct the witness not to answer on the Fifth

6   Amendment, that's the way I suggest we do it,

7   that's the way I was going to do it to begin with,

8   but you don't want to do it that way so we have to

9   do it this way.  I wish I could do it that way.

10        MR. McDANIEL:  No, nobody said that.

11        MR. MARTIN:  They just don't want you to

12   do it for him.  All you need to do is turn to him

13   and say take the privilege, that's all you need to

14   do, and then he has to say that.

15        MR. SCHULMAN:  And you want to hear him

16   say that?

17        MR. RADDING:  Yes.

18        MR. MARTIN:  Yes.

19        MR. SCHULMAN:  All right.  We'll do it

20   that way.

21        MR. RADDING:  That's how it works.

59

1        MR. McDANIEL:  That's how, that's the

2  way it's always done.

3        MR. SCHULMAN:  Well, that's not the way

4  it always works, but we'll do it the way it works.

5        MR. MARTIN:  Go tell him that's what

6  we're going to do when he comes back, please.

7        MR. SCHULMAN:  Okay, we'll do it that

8  way.  We'll wait for Mr. Radding to finish his call

9  then.

10        MR. RADDING:  No, I'm getting Mr. Dorf

11  on the phone so he can listen to the rest of the

12  deposition.

13        MR. MARTIN:  What, is he in his car?

14        MR. RADDING:  He's on the way to the

15  airport.

16        MR. MARTIN:  Oh, he's on the way to

17  Florida.

18      (Discussion held off the record.)

19        THE VIDEOGRAPHER:  3:36 p.m.  We're back

20  on the record.

21        MR. McDANIEL:  Can we get the witness

60

1  back, please?

2       MR. SCHULMAN:  Sure.

3    (Witness returned to deposition room.)

4       THE VIDEOGRAPHER:  One moment, please.

5  3:37 p.m, we're back on the record.

6       MR. McDANIEL:  Is there a pending

7  question?

8    (The reporter read the record as requested.)

9    Q   Did you retain Mr. Grossbart, Mr. Bond,

10  as an attorney to assist you in developing a

11  manuscript?

12       MR. SCHULMAN:  You may answer.

13    A   Okay.  Yes.

14    Q   And how as an attorney was he going to

15  assist you in developing a manuscript?

16    A   He was going to do what lawyers do, he

17  had some contacts, he was going to protect my

18  interest, he was going to, you know, look at

19  whatever was being sold, et cetera.

20    Q   Well, what is it that lawyers do when

21  they develop a manuscript?

1    A    A lot of agents are lawyers.

2    Q    I didn't ask you that question,

3 Mr. Bond.  I asked you what it is lawyers do.

4    A    You did just ask me that question.

5    Q    I asked you what it is lawyers do when

6 they develop a manuscript.

7    A    They would try to sell it.

8    Q    Now, how is that legal representation,

9 trying to sell a manuscript?

10    A    I'm not an expert to tell you that.

11    Q    Well, you were hiring Mr. Grossbart to

12 perform legal services in connection with your

13 manuscript?

14    A    As an attorney Robert Grossbart wanted

15 to see if he could sell the manuscript.

16    Q    Well, what legal services was Mr.

17 Grossbart going to perform for you?

18    A    To see if my interests were protected,

19 to look at contracts.

20    Q    And you retained him to do that?

21    A    Uh-huh.

62

1    Q    Did you pay him?

2    A    No.

3    Q    Did he ask to be paid?

4    A    Absolutely.

5    Q    And you refused?

6    A    No, it was a contingency.

7    Q    What was your contingency arrangement

8  with Mr. Grossbart?

9    A    10, 10 percent.

10   Q    10 percent of what?

11   A    Whatever the sale would be.

12   Q    The sale of what?

13   A    Whatever he was going to sell.

14   Q    What was it he was going to sell?

15   A    The book, whatever there was.

16   Q    Was there a book when you retained him?

17   A    There was some parts of it.

18   Q    When did you retain Mr. Grossbart?

19   A    For that part of it?  1988.

20   Q    What day in 1988?

21   A    Oh, I couldn't tell you.

63

1    Q    What time of the year?

2    A    Summer.

3    Q    Where did it occur?

4    A    At his office.

5    Q    At his office at where, at what place?

6    A    At Engel & Engel.

7    Q    Prior to that had you ever revealed to

8  Mr. Grossbart that you had written a manuscript?

9    A    No.

10    Q    Prior to the meeting in 1988 had you

11  ever revealed to Mr. Grossbart you had murdered

12  your father?

13        MR. SCHULMAN:  Objection.  I'm going to

14  instruct the witness not to answer that on Fifth

15  Amendment grounds.

16    A    I'll take the Fifth.

17    Q    You take the Fifth on whether or not you

18  told Mr. Grossbart about murdering your father?

19        MR. SCHULMAN:  Take the Fifth.

20    A    I'll take the Fifth.

21    Q    You state in here that the manuscript

64

1  you wanted him to develop would be a fictionalized

2  and embellished account of my experience in Ohio as

3  a juvenile; is that what you say here?

4      A    Yes.

5      Q    And you go on to say in which I was

6  found delinquent in the death of my father; is that

7  what that says?

8      A    Which page are you on?

9      Q    The first page of your declaration, your

10  affidavit.

11      A    Okay.  Yes, that's what I say.

12      Q    So the manuscript that you were talking

13  to him about was a, an account of the murder of

14  your father; isn't that right?

15          MR. SCHULMAN:  Take the Fifth.

16      A    Take the Fifth.

17      Q    Your experience as a juvenile in which

18  you were found delinquent in the death of your

19  father, isn't that a reference in this affidavit to

20  your murdering your father?

21          MR. SCHULMAN:  Take the Fifth.

65

1    A    Take the Fifth.

2    Q    Now --

3        MR. RADDING:  I didn't hear him.  Did he

4  take the Fifth?

5    A    I took the Fifth.

6        MR. RADDING:  Go ahead, if you can speak

7  up, we're having trouble hearing you.

8    Q    Now, you just said a minute ago,

9  Mr. Bond, that you had parts of a manuscript when

10  you retained Mr. Grossbart as your attorney to work

11  on the manuscript?

12    A    I believe so.

13    Q    Okay.  Now, you state in your

14  declaration that you had not started a manuscript.

15  Do you see that?

16    A    I certainly had some, something that I

17  showed him.

18    Q    My question to you, Mr. Bond, was do you

19  see in your, in the affidavit where it says I had

20  not started a manuscript, do you see that?

21    A    Yes, I do.

66

1    Q   That's what you said under oath in your

2  affidavit, right?

3    A   It appears so.

4    Q   Well, there's no doubt about it, is

5  there, Mr. Bond, that's what you swore to, isn't

6  it?

7    A   Yes.

8    Q   All right.  And then you swore here

9  today that you had started a manuscript, correct?

10   A   Huh.  Well, it could have been just that

11  the manuscript was an idea, we could have been

12  talking about the idea.

13   Q   My question to you, Mr. Bond, was

14  whether you swore here today just a few minutes ago

15  under oath that you had already started the

16  manuscript; isn't that what you told us?

17   A   Well, I'm going to retract that.  In

18  fact, what I showed him was short stories, that's

19  what it was.  I showed him short stories and we

20  discussed what the book would be about, et cetera

21  and so forth.

67

1     Q    So you're going to take back your

2 earlier testimony under oath?

3     A    Yeah, and you helped me remember it and

4 thank you.

5     Q    When did you execute this affidavit,

6 Mr. Bond, on the 2nd of November?

7     A    Da, da, da, da, da.  It appears to be

8 so.

9     Q    Well, you keep saying it appears,

10 Mr. Bond.  That's when you did it, isn't it?

11     A    Your name is Mr. McDaniel, correct?

12     Q    (Nodding head indicating yes.)

13     A    I have gone through more papers than

14 what's on your table right now, so if I don't have

15 a perfect memory of it, photographic memory of it,

16 I'm sure you'll excuse me.

17     Q    Mr. Bond, you're looking at an affidavit

18 with your signature where you wrote in your own

19 hand November 2nd --

20     A    Yes, sir.

21     Q    -- 2001, correct?

68

1    A    Yes, sir.

2    Q    And when I asked you if you executed it

3  on that day you say it would appear so?

4    A    Yes.

5    Q    You don't have any doubt about it, do

6  you, that's when you did it, right?  Isn't that

7  right, Mr. Bond?

8    A    Yes.

9    Q    Okay.  So just two weeks ago you knew

10  you hadn't started a manuscript when you retained

11  Mr. Grossbart, correct?

12    A    Yes, sir.

13    Q    In the intervening two weeks you're

14  telling me you forgot?

15    A    Again, I will tell you that there's an

16  awful lot of things going around trying to put all

17  these documents together, and if I don't have

18  instant recall on it I'm, you know, hey.

19    Q    It's not that you're lying to us, is it,

20  Mr. Bond?

21    A    No.

69

1    Q   You don't have an understanding of the

2  oath, do you?

3        MR. SCHULMAN:  I'm going to instruct him

4  not to answer that on the Fifth Amendment grounds.

5    Q   Now, you go on to say you confined in my

6  attorney, Mr. Grossbart, about my juvenile

7  experience.  What did you tell Mr. Grossbart about

8  your juvenile experience?

9    A   I'm going to take the Fifth Amendment on

10  that.

11    Q   You also state that you told him about

12  your subsequent rehabilitation at Sheppard Pratt

13  Hospital.  Do you see that?

14        MR. SCHULMAN:  Take the Fifth.

15    A   I'm going to take the Fifth Amendment on

16  that.

17    Q   On what?

18        MR. SCHULMAN:  Wait a minute.  Go ahead

19  and answer that.

20    Q   Do you see that there?  That's what you

21  said, isn't it?

70

1     A   Yes, I said that.

2     Q   Right.  Did you tell Mr. Grossbart about

3  your subsequent rehabilitation at Sheppard Pratt?

4     A   Yes.

5     Q   What did you tell him?

6     A   I'm going to take the Fifth on that.

7     Q   All right.  Did you ask him to assist

8  you in getting information from a lawyer in Ohio?

9     A   Yes.

10     Q   And why did you ask him to do that?

11     A   He, I believe he wanted to have some

12  discussions with the lawyer in Ohio about, that

13  might help him if he was going to sell, sell the

14  story.

15     Q   Did he have such discussion?

16     A   Yeah, we had a, we had a three-way call.

17     Q   When was that?

18     A   It was in I believe 1988.

19     Q   It was you and Mr. Grossbart and who

20  else?

21     A   Gerald Messerman.

71

1    Q    And what was discussed in that call?

2    A    Getting some documents to include in the

3 book and I think some status things were checked

4 on.  I really don't recollect the substance of the

5 call.

6    Q    Was the purpose of the call so that Mr.

7 Grossbart could authenticate that you had in fact

8 murdered your father?

9        MR. SCHULMAN:  I --

10    A    I'll take the Fifth.

11    Q    Now, did Mr. Grossbart tell you that he

12 had talked to other people about perhaps selling

13 your story?

14    A    Did he tell me that?

15    Q    Yes.

16    A    I think so, yeah.

17    Q    Who did he tell you that he talked to?

18        MR. RADDING:  Mr. Schulman, I detected a

19 nod just then telling him he can answer that.  If

20 you are going to instruct him whether it's on

21 privilege or anything else, please don't do it

72

1  surreptitiously, do it so it's on the record.

2      MR. SCHULMAN:  I don't think you

3  detected a nod from me, because if you did it's a

4  fictation (sic) of your, your own imagination.

5      MR. RADDING:  No, I'm not imagining

6  anything, Schulman, I saw you nod and then he

7  answered, okay?  Please don't do that.

8      MR. SCHULMAN:  Well, you didn't see

9  that.

10      MR. RADDING:  I did.

11      MR. SCHULMAN:  I was, just a material

12  disputed fact.

13      MR. RADDING:  Just stop it.

14  A   Could you repeat the question, please?

15  Q   Yeah.  To whom did Mr. Grossbart tell

16  you he spoke?

17  A   Well, the thing with Robert Grossbart

18  was --

19  Q   I don't want to know the thing with

20  Robert Grossbart, Mr. Bond.

21  A   Well, if you want me to answer the

73

1  question --

2      Q   I want you to tell me the names--

3          MR. SCHULMAN:  You're badgering the

4  witness.

5          MR. McDANIEL:  No, I'm not.

6          MR. SCHULMAN:  Let him finish his

7  answer.

8      Q   I asked him a specific --

9          MR. RADDING:  Mr. Schulman, please don't

10  raise your voice in my offices.

11         MR. McDANIEL:  I asked him a specific

12  question.  The specific question is to whom did Mr.

13  Grossbart tell you he spoke.  That's what I want to

14  know.  And the witness started off about the

15  problem with Mr. Grossbart.

16     A   I didn't say the problem.

17         MR. McDANIEL:  I don't think he's

18  responsive.

19         MR. SCHULMAN:  He started to give an

20  answer and you cut him off.  I'm asking you to

21  allow him to finish his answer, please.

74

1    Q    Okay.  Mr. Bond, my question is to whom

2  did Mr. Grossbart tell you he spoke?

3    A    He spoke to a cousin, I believe it was a

4  cousin, I'm going to say I believe from now on so

5  you don't accuse me of lying on everything, I

6  believe he spoke to a relative of his who lived in

7  California who was somehow involved in either

8  television or movies or something like that about

9  doing some sort of, I think he was, his premise was

10  a film, I don't think he was talking about a book

11  at that point.

12    Q    What did Mr. Grossbart tell this cousin?

13    A    I don't know, I don't know what he told

14  him.

15    Q    He never reported to you what he told

16  him?

17    A    He said he talked to the guy and I think

18  he actually went out and visited him and had some

19  sort of a discussion, and I don't think that at

20  that time the person wanted to do it.

21    Q    Did Mr. Grossbart tell you why the

75

1  person didn't want to do it?

2      A   I think it had to do something with --

3  no.  I don't, I mean he told me but I don't really

4  know what it was, but it wasn't anything, it wasn't

5  anything that would make you think about it.  You

6  know, it was just like maybe he already had too

7  many projects going on or something like that.

8      Q   Did Mr. Grossbart tell you that his

9  cousin wanted authentication that you had in fact

10  murdered your father?

11      A   I don't --

12          MR. SCHULMAN:  I'm going to tell him to

13  take the Fifth.

14      A   I'll take the Fifth.

15      Q   What else did Mr. Grossbart do other

16  than talking to his cousin in an attempt to market

17  your book?

18      A   He gave some short stories to a guy

19  named Mike Sager (phonetic), who was a editor at

20  Rolling Stone Magazine.

21      Q   Mr. Bond, do you fancy yourself a

1  writer?

2  A   I don't --

3     MR. SCHULMAN:  Objection.

4  A   I don't know what the word fancy means.

5  Q   Do you consider yourself to be a writer?

6  A   I know how to write.

7  Q   Are you a writer?

8  A   At this moment?

9  Q   Yes.

10  A   No.

11  Q   Have you ever been?

12  A   At one time, yes.

13  Q   Have you ever published anything?

14  A   No.

15  Q   Have you ever tried to publish things?

16  A   Yes.

17  Q   And you've never succeeded?

18  A   No.

19  Q   Not even one of your short stories?

20  A   No.

21  Q   You've never made any money as a

77

1  so-called writer?

2     A   I don't know what so-called means.

3     Q   Well, you claimed at one time you were a

4  writer; didn't you just tell me that?

5     A   I think you told me that.

6     Q   Were you at one time in your life a

7  writer?

8     A   Yes.

9     Q   And you never made any money from it; is

10  that right?

11     A   Correct.

12     Q   You never sold a single story, right?

13     A   I've already answered the question.

14     Q   You've never published anything at all?

15     A   I've answered the question.

16     Q   Now, are you currently not employed; is

17  that correct?

18     A   I believe I answered my employment in my

19  past deposition.

20     Q   I'm not in your past deposition, Mr.

21  Bond, I'm asking you today whether you're employed?

1        MR. SCHULMAN:  I am instructing him to

2  take the Fifth.

3        MR. McDANIEL:  On whether he's --

4        MR. RADDING:  On his employment?

5        MR. McDANIEL:  On his employment?

6        MR. SCHULMAN:  Yes.

7     Q   Are you employed in illegal activities,

8  Mr. Bond?

9     A   I'll take the Fifth Amendment.

10    Q   Are you employed in drug dealing?

11    A   I'll take the Fifth Amendment.

12    Q   What did Mr. Sager say about your short

13  stories, not worth publishing?

14    A   I think he liked them.

15    Q   Did he publish them?

16    A   I don't think he was in a position to

17  publish them.

18    Q   He wasn't in a position to publish them?

19    A   No.

20    Q   What was his position?

21    A   He is a writer.

1     Q   What else did Mr. Grossbart do as your

2  attorney in connection with this manuscript?

3     A   Hmm.  I think that covers it.  I think

4  that's all he did.

5     Q   Okay.  He talked to his cousin, he sent

6  some short stories to Mr. Sager and that's it?

7     A   I think he followed up, I mean I don't

8  think either of those things were single calls, I

9  think there were several calls associated with each

10  one of them.

11     Q   The short stories you wrote didn't have

12  anything to do with your, what you call your

13  juvenile experience in Ohio, did they?

14     A   That's correct.

15     Q   So what did Mr. Grossbart do for you

16  with regard to your juvenile experiences in Ohio

17  other than speak to his cousin?

18     A   Well, he also spoke to Sager.

19     Q   But that was about short stories, right?

20     A   Well, I'm sure he spoke about the larger

21  story too.

80

1    Q   Well, why are you sure of that?  Did Mr.

2 Grossbart tell you that?

3    A   I would bet he did, I'll bet he did.

4    Q   Well, my question is what you remember,

5 Mr. Bond.

6    A   Well, it would seem to me that if he, if

7 he tried to make a pitch to one person, that he

8 would have made the same pitch to the other person,

9 but he would really have to speak about that.

10    Q   So you wanted Mr. Grossbart to find

11 someone who could publish your story about your

12 juvenile experiences?

13    A   Yes.

14    Q   You wanted him to find somebody who

15 could turn it into a movie or a TV show?

16    A   Right.

17    Q   So what you wanted Mr. Grossbart to do

18 was tell people about what you had to offer,

19 correct?

20    A   That's correct.

21    Q   And that's why you retained him, right?

81

1    A   Yes.

2    Q   And that's why you told him you'd pay

3  him 10 percent of whatever you got, right?

4    A   Yes.

5    Q   Now, on page 2 of your affidavit,

6  Mr. Bond, you state Norman Pessin became my

7  attorney.  Do you see that?

8    A   Yeah.

9    Q   You retained Norman Pessin to represent

10  you you say with regard to my manuscript; is that

11  correct?

12    A   I'm on the first line of that.  What

13  line are you on?

14    Q   Six lines down.

15    A   Okay.

16    Q   Norman Pessin also represented me with

17  regard to my manuscript; do you see that?

18    A   Yeah.

19    Q   Did Mr. Pessin bill you for the work he

20  did as your attorney regarding the manuscript?

21    A   No, he didn't.

82

1    Q    What was your arrangement with him?

2    A    Same thing with Grossbart.

3    Q    A percentage?

4    A    Uh-huh.

5    Q    Yes or no, please.

6    A    Yes.

7    Q    Do you have a letter from Mr. Pessin or

8 from you that states your arrangement with Mr.

9 Pessin?

10    A    No.

11    Q    Was there ever such a letter?

12    A    No.

13    Q    Just an oral agreement between you and

14 Mr. Pessin?

15    A    Yes.

16    Q    Now, by the time you retained -- when

17 was it Mr. Pessin became your attorney with regard

18 to the manuscript?

19    A    When did he become the attorney with

20 regard to the manuscript.  Probably, if I --

21 somewhere in the '88 to '89 range, 1988 to '89.

83

1    Q   Had you written a manuscript by that

2  time?

3    A   Well, I don't want to, I don't want to

4  tell the wrong thing here.  At a certain point

5  there was the beginning of a book, okay, and

6  whenever the beginning of the book occurred, I

7  think Pessin even before there was a beginning of a

8  book probably tried to do the same thing that

9  Grossbart did because he sent me up to New York to

10  meet with a guy named Erwin Roth, who had some sort

11  of connections with publishing, also with a guy

12  named Paul Tush, and Paul Tush was the manager of

13  Hal Linden.

14    MR. McDANIEL:  Mark this.

15    (Exhibit 4  marked.) 4

16    Q   Mr. Bond, the court reporter has marked

17  as Exhibit, is it 5?

18    THE REPORTER:  4.

19    Q   4 for your deposition a box which

20  contains a photocopy of a manuscript; is that

21  correct?

84

1    A    Should I look inside of it?  Wow.  Okay.

2    Q    Am I right?

3    A    Yes.

4    Q    Identify the manuscript inside of that

5  box, please.

6    A    That's a book I wrote.

7    Q    And what's the title of the book?

8    A    The title of this book appears to be.

9  Self-Portrait of a Patricide.

10    Q    Is there a further part of the title,

11  like How I Got Away With Murder?

12    A    No, there is not.

13    Q    It's just Self-Portrait of a Patricide?

14    A    Right.

15    Q    You took out How I Got Away With Murder?

16    A    I never put How I Got Away With Murder

17  in it.

18    Q    That was never part of the title of this

19  book?

20    A    That was with the agent, the subsequent

21  agent that I had put in there.

85

1     Q    When was this manuscript that is here as

2  Exhibit 4 written?

3     A    That would have been between '93 and

4  '94.

5     Q    Is that the latest version of your book?

6     A    Yes, sir.

7     Q    Did you give a copy of that book to

8  Norman Pessin?

9     A    Yes.

10    Q    So a copy of the manuscript which is

11  here as Exhibit 4 was given to Mr. Pessin by you,

12  correct?

13    A    Well, a copy of this one, of this

14  version of this manuscript?  I think -- it's

15  difficult to remember because Norman Pessin had

16  several copies and some he returned and one he did

17  not, so I can't really say which version of the

18  manuscript that Norman had or didn't have.

19    Q    Now, what is all this cross-hatching

20  that's on this manuscript, Mr. Bond?

21    A    It appears to be cross-hatching.

86

1    Q   Did you put it on there?

2    A   I did not.

3    Q   Do you know who did?

4    A   Yes, I do.

5    Q   Who did?

6        THE WITNESS:  I'd like to confer with my

7 attorney.

8    Q   On privilege grounds?

9    A   Yeah.

10       MR. SCHULMAN:  Let's go outside.

11       MR. McDANIEL:  Go off the record.

12       THE VIDEOGRAPHER:  Off the record at

13 3:57.

14           (Brief recess.)

15       MR. McDANIEL:  Back on the record.

16       THE VIDEOGRAPHER:  One moment.  3:58

17 p.m.  We're back on the record.

18    Q   All right, Mr. Bond, you've talked with

19 your lawyer, what do you want to say?

20    A   Frank Morgan did that.

21    Q   Why did he do it?

1     A     To keep it confident, confidential.

2     Q     How are we supposed to tell by looking

3  at this document what the text says?

4     A     You're not supposed to.

5     Q     There's no way to tell what this text

6  is, is there, sir?

7     A     I can identify it as being from, from

8  the book that was copied from.

9          MR. McDANIEL:  Mark this, please.

10          MR. RADDING:  Mr. Schulman, while that's

11  being marked I would like to call Judge Dorf.  Do

12  you have anything in the rules that prohibits Mr.

13  Dorf from listening in on the cell phone?  Can you

14  cite me the rules that you have?

15          MR. SCHULMAN:  If you want to take a

16  break I'll go back, go back to looking for that.

17          MR. RADDING:  I don't want to take a

18  break, I'm just going to dial Mr. Dorf.

19          MR. SCHULMAN:  Well, then I'm going to

20  have to take time to look at the rules.

21          MR. McDANIEL:  Mr. Schulman, I don't

88

1  think it's proper in the middle of a deposition to

2  conduct your basic legal research.

3       MR. SCHULMAN:  Well, this is the first

4  time that I have ever had a client in this position

5  where there's going to be a, either a phone

6  transmission to, on a cell phone to someone, either

7  in a car or in an airport.  I just don't think

8  that's correct.

9       MR. RADDING:  Well, what are you afraid

10  of?

11       MR. McDANIEL:  He has taken the Fifth on

12  all the incriminating stuff.

13       MR. RADDING:  What are you afraid of?

14       MR. SCHULMAN:  I think the rules provide

15  that only the parties or their attorneys are to

16  listen in or be attending their deposition.

17       MR. MARTIN:  He's a party.

18       MR. RADDING:  Mr. Dorf is a party.

19       MR. SCHULMAN:  Well, we don't know

20  where, how the transmission is being affected.

21       MR. RADDING:  You don't know if NSA is

89

1  beaming into this room right now, Mr. Schulman, you

2  don't know if the antiterrorists are listening in

3  on this office, do you, sir?  The federal building

4  is across the way.  Mr. Dorf has his own phone that

5  he is going to listen to.  Do you have any basis to

6  believe that anybody else is going in to listen to

7  it?

8         MR. SCHULMAN:  I thought the rules in

9  your office were that we wouldn't raise our voice.

10        MR. RADDING:  It's my office, it's my

11  rule.

12        MR. SCHULMAN:  That's what I thought.

13        MR. RADDING:  Do you have any reason to

14  believe, do you have any reason to believe anybody

15  else is going to listen to that call?  Do you have

16  any rule that says that Mr. Dorf can't listen on a

17  phone?

18        MR. SCHULMAN:  All right.  I would like

19  you to do this then, so we can work this out.  Get

20  Mr. Dorf on the phone, all right, see where he is,

21  confirm he's in a car --

90

1        MR. RADDING:  Well, now he's not in the

2  car.

3        MR. SCHULMAN:  All right, then where is

4  he?

5        MR. RADDING:  At the airport.

6        MR. SCHULMAN:  And where is he in the

7  airport?

8        MR. RADDING:  I have no idea.

9        MR. SCHULMAN:  Well, then we can call

10  and find out where he is.  If he's in a public area

11  I don't think he should be --

12        MR. RADDING:  With a phone to his ear?

13        MR. SCHULMAN:  You can hear from a

14  phone.  Now, I'm not trying to be technical but I

15  am concerned.

16        MR. MARTIN:  How about if you get him on

17  the phone and he says nobody else is listening,

18  it's just me.  He's a member of the bar.

19        MR. SCHULMAN:  We'll find out what he's

20  got there.  Yeah, I'll take that.

21        THE VIDEOGRAPHER:  We're still on the

91

1  record.

2         (Exhibit 5  marked.)

3         MR. McDANIEL:  All right.  We're back on

4  the record.

5     Q   Mr. Bond, you have in front of you

6  what's been marked as Exhibit 5 for your

7  deposition; is that correct?

8     A   Yes, sir.

9     Q   Take a look at Exhibit 5, if you would.

10    A   Yes.

11    Q   Look at the page which is headed AEI,

12  Self-Portrait of a Patricide, How I Got Away with

13  Murder.  Do you see that?

14    A   Do you know what page number that is?

15    Q   Well, just go in about three pages.

16    A   Okay.

17    Q   Do you see that?

18    A   Yeah.

19    Q   Take a general look at the first 25

20  pages of this exhibit.  Up to what appears as

21  chapter 1.

92

1    A    Uh-huh.

2    Q    Have you done that?

3    A    Yeah.

4    Q    Now, the first 25 pages of the exhibit

5  are different from the balance of the exhibit;

6  isn't that correct, Mr. Bond?

7    A    It's a separate document.

8    Q    The balance of this exhibit is a

9  manuscript of a book; isn't that correct?

10    A    Yes.

11    Q    It runs up through about page 600 with

12  some omissions; is that right?

13    A    That's wrong.

14    Q    Pardon?  I can't --

15    A    The word omission is incorrect.

16    Q    There are some pages missing from this

17  exhibit.

18    A    No, they're not.

19    Q    They are just improperly numbered?

20    A    No.

21    Q    Well, I go from page 396 to page 553.

93

1     A   I believe you.

2     Q   And can you tell me, Mr. Bond, can you

3  explain that to me, is that, is there any --

4     A   Explain why you're doing that?

5     Q   Explain why this exhibit goes that way.

6     A   I did not assemble this exhibit so I

7  can't understand why somebody would do this.

8     Q   Well, you just told me this exhibit

9  didn't have any omissions in it, didn't you just

10  tell me that?

11     A   Ooh, I don't know if I want to -- I mean

12  I don't know if I said that or I didn't say that,

13  but you're asking me certain questions about this.

14  I didn't put this together.  Whoever stole this

15  manuscript put it together, okay?

16     Q   Okay.  Who wrote this manuscript,

17  Mr. Bond?

18     THE WITNESS:  Don't I take a privilege

19  on that?

20     MR. SCHULMAN:  No.

21     A   I did.

94

1    Q    You wrote the manuscript which is

2 Exhibit 5?

3    A    Yes, sir.

4    Q    Now, the materials which are the first

5 25 pages of this exhibit which you say are a

6 different document were prepared by an agent on

7 your behalf; is that correct?

8    A    They were prepared in conjunction with

9 an agent.

10    Q    The agent was representing you, wasn't

11 he, Mr. Bond?

12    A    Yes.

13    Q    And these materials were prepared on

14 your behalf; isn't that correct?

15    A    Pardon me?

16    Q    These materials were prepared by the

17 agent on your behalf?

18    A    They were prepared in conjunction with

19 me on my behalf.

20    Q    Well, you saw them when they were

21 prepared, didn't you, Mr. Bond?

95

1    A    Did I see them when they were prepared.

2 To answer that question, to answer that question is

3 no, I did not see them when they were prepared.

4    Q    Did you see them after they were

5 prepared?

6    A    To technically answer your question,

7 yes, I saw them after they were prepared.

8    Q    Did you know that they were being sent

9 out on your behalf?

10    A    Not until sometime afterwards.

11    Q    Well, you hired Mr. Atchity to market

12 your manuscript; is that correct?

13    A    Yes.

14    Q    And the manuscript you hired him to

15 market is what is the balance of Exhibit 5?

16    A    Yes.

17    Q    And you sent the manuscript to Mr.

18 Atchity; is that correct?

19    A    Yes.

20    Q    And he prepared these promotional

21 materials I think as you said in conjunction with

1  you?

2    A   That's correct.

3    Q   And did you ever tell Mr. Atchity there

4  was something wrong with these promotional

5  materials?

6    A   I told Mr. Atchity that I did not

7  exactly agree with the promotional way he was

8  selling it.

9    Q   Did you tell Mr. Atchity there was

10  anything wrong with these promotional materials

11  which constitute the first 25 pages of Exhibit 5?

12    A   I don't remember, you know, whatever

13  criticisms or noncriticisms that I had

14  specifically.

15    Q   Well, why don't you take a look at them

16  and see if you can refresh your recollection about

17  what you call your criticisms or noncriticisms.

18    A   It wouldn't make any difference.

19    Q   You just can't remember what you told

20  Mr. Atchity?

21    A   I told him I wasn't happy with it.

97

1    Q   Did you tell him there were parts of

2  this promotional materials that weren't accurate?

3        MR. SCHULMAN:  I'm going to instruct the

4  witness to take the Fifth.

5    A   Yeah, I'll take the Fifth.

6    Q   Did you tell Mr. Atchity that there were

7  parts of the promotional materials that

8  misrepresented your, your text?

9        MR. SCHULMAN:  I'm going --

10   A   I'll take the Fifth.

11   Q   All right.  Let's look at the first

12  page, your Self-Portrait of a Patricide, How I Got

13  Away With Murder, do you see that?

14   A   All right.  Which page number are you

15  on?

16   Q   You have it there.

17   A   3?

18   Q   Do you have it there, Mr. Bond?

19   A   You said page 3.

20   Q   Do you have it there?  Self-Portrait of

21  a Patricide --

1     A   It's page 3, then it's --

2     Q   -- How I Got Away With Murder.  It

3  doesn't have a page number on it?

4     A   Okay.

5     Q   Do you have that in front of you?

6     A   Yeah.

7     Q   Does it say the true story of and by

8  William Bond?

9     A   Yes, it does.

10     Q   And did you tell Mr. Atchity that this

11  in fact was not a true story?

12     A   I'll take the Fifth Amendment.

13        MR. SCHULMAN:  Take the Fifth.

14     Q   Did you tell Mr. Atchity that this was a

15  fictionalized and embellished account?

16     A   I'll take the Fifth Amendment.

17     Q   Go on to look here, Mr. Bond, where it

18  says Self-Portrait of a Patricide is the true

19  unique store of a boy who with full knowledge

20  aforethought simultaneously broke the Fourth and

21  Fifth Commandments.  Would you do me a favor, Mr.

99

1 Bond, and take a look at the document?  Is that

2 what that says?

3      A   If you are reading it it must.

4      Q   Well, I'm asking you, Mr. Bond, if this

5 document says it's the true unique story of how you

6 broke the Fourth and Fifth Commandments?

7      A   I'm going to take the Fifth Amendment on

8 all further questions about the manuscript in that

9 it's being used in a criminal trial against me.

10      Q   You know what the Fifth Amendment is, do

11 you know what the Fifth Commandment is?  Do you?

12           MR. SCHULMAN:  I'm going to ask the

13 witness to leave the room.

14           THE WITNESS:  Thank you.  And I'm going

15 to use the restroom too, so I'll be a moment.

16           MR. RADDING:  I think that was more

17 information than we needed.

18      (The witness left the deposition room.)

19           MR. SCHULMAN:  I think you're abusing

20 the witness.

21           MR. McDANIEL:  That's what you sent him

100

1  out for?  Bring him back.

2      MR. SCHULMAN:  He's going to the men's

3  room now.

4      MR. McDANIEL:  Geez.  I tell you what,

5  Mr. Schulman, if you think I'm abusing the witness,

6  terminate the examination and take it to the judge.

7      MR. SCHULMAN:  No, we're just going to

8  let you videotape the rest of it.

9      MR. McDANIEL:  You're a piece of work,

10  Mr. Schulman.

11      THE VIDEOGRAPHER:  Off the record?

12      MR. McDANIEL:  No, we'll stay on the

13  record until Mr. Bond comes back from wherever he

14  went.

15      MR. RADDING:  Paul.

16      MR. DORF:  Yeah.

17      MR. RADDING:  You're on the speaker

18  phone with the assembled multitude, the same people

19  as when you left except McKinney is out of the room

20  and Mr. Bond is out of the room.

21      MR. DORF:  Okay.  Thank you.

1        MR. RADDING:  Mr. Schulman has exhibited

2  some concern.  First of all, you've got an

3  up-to-date modern digital cell phone; is that

4  correct?

5        MR. DORF:  Yes, AT&T phone.

6        MR. RADDING:  Okay.  And can you, can

7  you proceed to a place where nobody else can

8  overhear?  Mr. Schulman's afraid that you're going

9  to be in a place where other people can hear what's

10  being broadcasted.

11        MR. DORF:  I'll stay the corner until I

12  get on the plane, okay?

13        MR. RADDING:  Okay.  So you're going to

14  stay in the corner away from other persons?

15        MR. DORF:  And I don't know anybody here

16  right now.

17        MR. RADDING:  And can you mute your

18  phone so that we don't hear those announcements and

19  stuff?

20        MR. DORF:  I'll try, okay?

21        MR. RADDING:  All right.  Because the

102

1  last thing we want to hear is when a plane is

2  boarding.

3       MR. DORF:  You can mute your speaker

4  phone, turn it all the way down.

5       (Discussion held off the record.)

6       MR. SCHULMAN:  Could you ask Mr. Dorf

7  specifically where he is?

8       MR. RADDING:  Mr. Dorf, Mr. Schulman

9  would like to know specifically where you are.

10       MR. DORF:  I'm at the gate for the plane

11  to go to Fort Lauderdale.

12       MR. SCHULMAN:  You're at the gate for

13  the plane to Fort Lauderdale?

14       MR. DORF:  Yeah.

15       MR. MARTIN:  Go buy a fruit shake.

16       (Discussion held off the record.)

17            (Recess.)

18       THE VIDEOGRAPHER:  4:26 p.m.  We're back

19  on the record.

20       MR. SCHULMAN:  Should we wait for Jerry

21  Martin or --

103

1        MR. McDANIEL:  No, let's just start.

2        MR. SCHULMAN:  All right.  The first

3  thing is I had asked Mr. Radding whether he could

4  take a subpoena for Mr. Dorf, and he said he was

5  not authorized to do so.

6        MR. McDANIEL:  Mr. Schulman, this is a

7  deposition.  It's not the time to talk about

8  whether or not subpoenas have been accepted or not.

9  This is a court reporter that I have got here today

10  to do this, and I'm not going to allow you to start

11  talking about things that have nothing to do with

12  the deposition.  Whether you serve subpoenas or

13  don't serve subpoenas has nothing to do with this.

14        MR. RADDING:  Especially at X dollars a

15  page.

16        MR. McDANIEL:  Yeah.  It's just, it's

17  really not proper, Mr. Schulman.

18        MR. SCHULMAN:  Let's talk about

19  something that was about the deposition, because

20  during the break you made a statement about the

21  deposition in regard to the deposition, and my

104

1  notes reflect you say it was a bullshit lawsuit

2  about a piece of scum and then I asked you if you

3  wanted to say that on the record, so my question to

4  you now is do you want to say it on the record?

5      MR. McDANIEL:  Mr. Schulman, it wasn't

6  about the deposition, and you didn't even get

7  correct what I said.  You can't even write down

8  correctly what I said.

9      MR. SCHULMAN:  What did you say?

10      MR. RADDING:  I've got to object to

11  this, we're on the record, we're paying for these

12  pages.  If you're trying to pick an argument with

13  him, Howard, do it on your own time, would you?

14  You're wasting my time and everybody else in here.

15      MR. McDANIEL:  Let's get the witness in

16  here.

17      MR. RADDING:  We have a deposition

18  going.

19      MR. SCHULMAN:  I think it's a fair thing

20  to put that on the record.

21      MR. RADDING:  We have a deposition

105

1 going, Mr. Schulman.  Can we get your client back

2 in here and continue it?

3      MR. McDANIEL:  Get your witness in here,

4 please, Mr. Schulman.

5      MR. SCHULMAN:  All right.  It's what I

6 thought, you wouldn't say that on the record.

7      MR. McDANIEL:  Get your witness in here,

8 please.

9      MR. RADDING:  Mr. Schulman, would you

10 stop trying to provoke a fight?  This isn't the

11 schoolyard.  Get your client in here.  Geez.

12      THE VIDEOGRAPHER:  Still rolling.

13      BY MR. McDANIEL:

14  Q   All right, Mr. Bond, did you complain to

15 Mr. Atchity that the statement contained on the

16 page we're looking at, and I'd ask you again to

17 look at it, if you would, Mr. Bond.

18      A   I've already told you I'm not going to

19 answer any more questions about the book, I'll take

20 the Fifth Amendment.

21  Q   Mr. Bond, I'm going to ask you the

106

1  questions anyway, okay?

2     A   I'm taking the Fifth Amendment so I'm

3  not going to look at.

4     Q   I'd like you to look at it --

5     A   I'm not going to look at it.

6     Q    -- Mr. Bond, where it says that this is

7  a true story.

8        MR. SCHULMAN:  Take the Fifth.

9     Q   Did you complain to Mr. Atchity that

10  that was --

11     A   I'm taking the Fifth Amendment.

12     Q   Let me show you the first part of what

13  was marked as Exhibit 4 for your deposition,

14  Mr. Bond.  Would you look at that, please?

15     A   I see it.

16     Q   Would you pick it up and look at it,

17  Mr. Bond?

18     A   I can't reach it.

19        (Document tendered.)

20     A   Thanks, Howard.

21     Q   Mr. Schulman has handed it to you now,

107

1  Mr. Bond?

2     A    Uh-huh.

3     Q    Yes or no, please?

4     A    Yes.

5     Q    Now, this first part of Exhibit 4 is

6  separate from the text of your manuscript; is that

7  correct?

8     A    Yes.

9     Q    Did you also copyright that first part?

10     A    Yes.

11     Q    And the first part of Exhibit 4

12  corresponds to the first 25 pages of Exhibit 5; is

13  that correct?

14     A    I believe so.

15     Q    And in fact part of what you filed with

16  the copyright registry states that Self-Portrait of

17  a Patricide is a true unique story; isn't that

18  correct?

19     A    I'm going to take the Fifth Amendment.

20     Q    You're going to take the Fifth Amendment

21  on what the manuscript says that you filed with the

108

1 copyright registry; is that what you're doing?

2    A   I answered the question.

3       MR. SCHULMAN:  Let's talk about that.

4       THE WITNESS:  Okay.

5       MR. McDANIEL:  Off the record one more

6 time.

7       THE VIDEOGRAPHER:  Off the record at

8 4:30.

9       (Pause in the proceedings.)

10       THE VIDEOGRAPHER:  4:31 p.m.  We're back

11 on the record.

12    Q   All right, Mr. Bond, you talked with

13 your lawyer.  What do you want to say?

14       MR. SCHULMAN:  Read the question back,

15 please.

16    Q   The question is did you state in the

17 copyrighted materials that are part of Exhibit 4

18 that Self-Portrait of a Patricide is a true story?

19    A   Yes.

20    Q   Did you state that it was the true story

21 of and by William Bond?

109

1    A   Yes.

2    Q   Did you state that it was

3   autobiographical?  By that I mean the transcript of

4   the book that you filed with the copyright

5   registry?

6    A   Yes.

7    Q   Did you state that it was the

8   autobiography of a crime so heinous it is part of

9   the sacred taboos of all cultures?

10    A   Yes.

11    Q   Did you state that your book is a

12  shocking book that transcends true crime?

13    A   I think that I'm --

14    Q   Yes or no, Mr. Bond?

15    A   I think I'm going to take --

16        MR. SCHULMAN:  I'm instructing you to

17  take the Fifth.

18    A   Yeah.  Because you're going through line

19  by line of the book I'm taking the Fifth on it.

20    Q   I'm not going through the book, Mr.

21  Bond, I'm going through the promotional

110

1  materials --

2      A   Right.

3      Q   -- which you copyrighted.

4      A   Right.  And I'm going to take the Fifth

5  on that, I'm going to admit I copyrighted it and

6  that's all I'm going to say about it.

7      Q   You're not going to admit that you

8  stated it transcended true crime stories?

9      A   I'm going to take the Fifth Amendment.

10      Q   Did you state in your material that you

11  copyrighted that this was the autobiographical

12  account of how William Rovetar, now known as

13  William Bond, thought before, during and after the

14  murder of his father?

15          MR. SCHULMAN:  Take the Fifth.

16      A   I'm going to take the Fifth.

17      Q   Did you state that, in the promotional

18  materials you copyrighted, which are part of

19  Exhibit 4, that William Rovetar, an identical twin,

20  with cold premeditation murdered his father for his

21  money?

111

1     A   I'm going to take the Fifth Amendment.

2     Q   Did you state in the promotional

3  materials that you filed, that you copyrighted as

4  part of Exhibit 4, that you intended to get away

5  with murder?

6     A   I'm going to take the Fifth Amendment on

7  that and everything else to do with the promotional

8  materials.

9     Q   These promotional materials were

10  designed to sell your book to other people; isn't

11  that correct?

12     A   I'm going to take the Fifth Amendment on

13  the promotional materials.

14     Q   Did you put it in the promotional

15  materials that you registered with the copyright

16  office that after your release from a psychiatric

17  hospital you were able to collect from your

18  father's estate?

19     A   I'm going to take the Fifth Amendment.

20     Q   Did you state in the promotional

21  materials that are part of Exhibit 4 how and why

112

1  William Rovetar was able to manipulate the scales

2  of the judicial system as a subject of patricide?

3  Did you say that?

4        MR. SCHULMAN:  Take the Fifth.

5    A   I'm going to take the Fifth Amendment.

6    Q   Did you state that the book you wrote

7  was your story about a brutal murder and cover up?

8        MR. SCHULMAN:  Take the Fifth.

9    A   I'm going to take the Fifth Amendment.

10     Q   Did you state in the promotional

11  materials you filed that, with the copyright

12  office, Bill feels vindicated, to him he has just

13  gotten away with murder in the first degree with

14  little more than a slap on the wrist.  Did you

15  state that?

16        MR. SCHULMAN:  Take the Fifth.

17        MR. RADDING:  I didn't hear him.

18        MR. MARTIN:  I didn't hear it.

19     A   I'll take the Fifth Amendment.

20     Q   Did you compare your book, the

21  transcript in the promotional materials you filed

113

1 which are part of Exhibit 4, with other works of

2 nonfiction?

3    A  I'm going to take the Fifth Amendment.

4    Q  Did you compare your book, Self-Portrait

5 of a Patricide to Truman Capote's In Cold Blood?

6    A  I'm going to take the Fifth Amendment.

7    Q  You know what In Cold Blood is by Truman

8 Capote, don't you, Mr. Bond?

9    A  I'm going to take the Fifth Amendment.

10    Q  Do you know what the book Helter-Skelter

11 is, Mr. Bond?

12    A  Fifth Amendment.

13    Q  I'm sorry, Mr. Bond, I can't hear your

14 response.

15    A  I'm going to take the Fifth Amendment.

16    Q  Do you know what the book The

17 Billionaire Boys Club is?

18    A  I'm going to take the Fifth Amendment.

19    Q  Isn't it true, Mr. Bond, that in the

20 promotional materials you filed you compared your

21 book to a whole series of books that are

114

1  nonfiction; isn't that right?

2     A   I'm going to take the Fifth Amendment.

3     Q    Those books included Fatal Vision; is

4  that correct?

5     A   Fifth Amendment.

6     Q   Blind Faith; is that correct?

7        MR. RADDING:  I didn't hear an answer.

8     Q   I didn't hear an answer either,

9  Mr. Bond.

10    A   I would like to make a statement.

11       MR. SCHULMAN:  No, no, no, no, no

12  statements.  To answer your question assert the

13  Fifth Amendment.

14    A   Fifth Amendment, Fifth Amendment.

15    Q   Did you compare your book to --

16    A   Fifth Amendment.

17    Q   -- The Billionaire Boys Club, Mr. Bond?

18    A   Fifth Amendment.

19    Q   Did you compare your book to a book

20  called Cruel Doubt, Mr. Bond?

21    A   Fifth Amendment.

115

1     Q   Did you state in the promotional

2  materials that you were exploring major motion

3  pictures for your book?

4     A   Fifth Amendment.

5     Q   Were you exploring major motion pictures

6  for your book at the time you --

7     A   Fifth Amendment.

8     Q   Let me finish my question, Mr. Bond.

9  Were you exploring the possibility of making a

10  motion picture of your book?

11     A   Fifth Amendment.

12     Q   Mr. Bond, in your book, I'd like to

13  refer you to page 382 of your book.  Did you state

14  in this book that you lied to your own lawyer, to

15  the police and to the judges in Ohio in an attempt

16  to get away with an insanity defense?

17       MR. SCHULMAN:  Objection to the form of

18  the question as well as instruct the witness to

19  take the Fifth Amendment.

20       MR. McDANIEL:  What's the objection to

21  the form?

116

1        MR. SCHULMAN:  Mr. Bond, would you step

2  out?

3        THE WITNESS:  Yes.

4     (Witness left the deposition room.)

5        MR. SCHULMAN:  Objection to the form is

6  referring to this book.  Now, are you referring to

7  what's been marked as Exhibit Number 5 or, I mean

8  what is this book --

9        MR. McDANIEL:  I'll clear that up for

10  you, Mr. Schulman.  Bring your witness back.

11        MR. SCHULMAN:  Thank you.

12        THE VIDEOGRAPHER:  Do you want to go off

13  the record?

14        MR. McDANIEL:  No.

15     (Witness enters deposition room.)

16     Q   Mr. Bond, in the book you have in front

17  of you, which is Exhibit 5, did you state in there

18  that you lied to your lawyer, to the police and to

19  the court in an attempt to win out of an insanity

20  defense?

21        MR. SCHULMAN:  Take the Fifth.

117

1    A    And I'll take the Fifth.

2    Q    Did you state that in the book which is

3  part of Exhibit 4?

4         MR. SCHULMAN:  Take the Fifth.

5    A    I'll take the Fifth.

6    Q    Now, Mr. Bond, in your affidavit, which

7  is in front of you as Exhibit 4 from the deposition

8  of Mr. Grossbart, you referred to your book as a

9  fictionalized and embellished accounts of your

10  experience in Ohio.  Do you see that in paragraph

11  2?

12    A    Which?  Paragraph 2.  Yes.

13    Q    Now, that's a lie, isn't it, Mr. Bond?

14         MR. SCHULMAN:  Take the Fifth.

15    A    Take the Fifth Amendment.

16    Q    All right.  Now, isn't it true --

17         MR. SCHULMAN:  Well, strike -- no, you

18  can answer that.

19    Q    What do you want to do, Mr. Bond, do you

20  want to answer that one?

21         MR. SCHULMAN:  Well, what, are you

118

1  talking to my client?

2        MR. McDANIEL:  Yeah.

3        MR. SCHULMAN:  Would you step out?

4        (Witness left deposition room.)

5        MR. McDANIEL:  Do you want to answer

6  that question?

7        MR. SCHULMAN:  No, he's going to follow

8  my instructions.  You're not to be communicating

9  with my client.

10        MR. McDANIEL:  I'm asking him questions,

11  Mr. Schulman.

12        MR. SCHULMAN:  No, that's wrong.

13        MR. McDANIEL:  I'm asking him questions.

14        MR. SCHULMAN:  You know that's wrong.

15        MR. McDANIEL:  No, it's not wrong.

16        MR. SCHULMAN:  It's absolutely wrong.

17        MR. McDANIEL:  I'm asking him questions.

18  Why is he out of the room?  Why have you sent him

19  out of the room, Mr. Schulman?

20        MR. SCHULMAN:  Because that's, I didn't

21  want to make a speaking objection but apparently we

119

1 did that.  That's not right for you to do that.

2        MR. McDANIEL:  Mr. Schulman, bring your

3 client back, please.

4        MR. SCHULMAN:  You're not to be

5 having --

6        MR. McDANIEL:  Bring your client back,

7 Mr. Schulman.

8        MR. SCHULMAN:  You're not to be

9 conferring with my client, you can ask him

10 questions --

11        MR. McDANIEL:  Mr. Schulman, that is

12 ludicrous.  Bring your client back.

13        MR. SCHULMAN:  It's right on the point.

14        MR. McDANIEL:  It's ludicrous, Mr.

15 Schulman.

16        MR. SCHULMAN:  Right on.

17        MR. McDANIEL:  Bring your client back,

18 please.

19        (Witness enters deposition room.)

20    Q    All right, Mr. Bond, isn't it a lie when

21 you stated in your affidavit that your manuscript

120

1  was a fictionalized and embellished account?  Isn't

2  that a lie?

3      A   No.

4      Q   This manuscript that you filed with the

5  copyright office was a fictionalized and

6  embellished account; is that what you're saying?

7      A   Yes.

8      Q   Why did you file that material there

9  that we have as part of Exhibit 4 which says it's

10  true?

11      MR. SCHULMAN:  Take the Fifth.

12      A   I'll take the Fifth.

13      Q   Now, you're willing to testify that the

14  book is fictional, correct?

15      A   Yes.

16      Q   That's your position today, it's

17  fictional?

18      A   Absolutely.

19      Q   Can you point to one piece of

20  promotional material or one letter or one document

21  that says this book is fictional?

121

1     A   I'll take the Fifth Amendment.

2     Q   You can't point to one, can you?  In

3  fact you perjured yourself in this affidavit,

4  didn't you, Mr. Bond?

5     A   I'll take the Fifth Amendment.

6     Q   Now, isn't it also true, Mr. Bond, that

7  none of these manuscripts that you produced have on

8  them the words confidential, keep confidential,

9  keep secret; isn't that true?

10     A   Hmm.  I really couldn't tell you.

11  There's so many of them floating around I couldn't

12  tell what's on them.

13     Q   Look at this one.  Look at this one,

14  Mr. Bond, which is Exhibit 4, and look at the

15  promotional material and show me where it says in

16  there keep this confidential.

17     A   Well, you really can't read it because

18  of the, of the stencil on it.

19     Q   Well, you wrote it, didn't you,

20  Mr. Bond?

21     A   Yes.

122

1    Q    And you know what it says, don't you?

2    A    I don't read it every day.

3    Q    Well, can you tell me, Mr. Bond, by

4    looking at it or from your memory where it says in

5    there that this is to be kept secret or

6    confidential?

7    A    I really don't have any memory of

8    whether it does or doesn't.

9    Q    The fact is, Mr. Bond, you know that it

10   doesn't; isn't that right?

11   A    If you're going to answer for me.

12   Q    Pardon me?

13   A    You just answered for me.

14   Q    You know that it doesn't, don't you?

15   A    That's a complicated sentence.

16   Q    Well, why don't you look at this

17   exhibit, which is Exhibit Number 5.  That's the

18   manuscript that you, that you sent to Mr. Pessin;

19   is that correct?  Do you have that in front of you?

20   A    Don't I already have the same thing

21   here?

123

1    Q    You've got it in front of you?

2    A    What's the difference from this one --

3    Q    That's the same as the one I put in

4  front of you.

5    A    Okay.  Can you take it back, now?

6    Q    Yeah.  Can you tell me, Mr. Bond, where

7  in Exhibit 5 it says keep this secret, keep it

8  confidential, don't disclose it?

9    A    Not offhand.

10    Q    Look at it, Mr. Bond.

11    A    No, I'm not going to look through the

12  book right now.

13    Q    Look at the book, Mr. Bond.

14    A    Okay.

15    Q    Now, tell me where it says in there, Mr.

16  Bond --

17    A    I didn't see where it said anywhere.

18    Q    Take a more careful look.

19    A    No.

20    Q    Why not, Mr. Bond?  Why are you

21  refusing?

124

1    A    My eyes are too tired to look through

2  that, I've been reading too many documents lately.

3    Q    Mr. Bond, I want you to tell me where in

4  that book it says keep confidential.

5    A    I don't see anywhere it says it.

6    Q    In fact it doesn't say it anywhere, does

7  it, Mr. Bond?

8    A    If you're going to make it a fact.

9    Q    Mr. Bond, it doesn't say anywhere in the

10  book which is in front of you as Exhibit 5 to keep

11  the book confidential, does it?

12    A    If you say so.

13    Q    Answer yes or no, Mr. Bond.

14    A    I don't know.  That's my answer.

15    Q    Mr. Bond, the book is in front of you.

16    A    I'm not going to go through every page.

17    Q    You're under oath, you're required to

18  look at the book, Mr. Bond, and answer the

19  question.

20        MR. SCHULMAN:  Look at the book and

21  answer his question.

125

1    A    I don't see anything.

2    Q    You agree with me, don't you, Mr. Bond,

3  that the book doesn't have any indications that it

4  should be kept secret?

5    A    Sure, I'll agree with you.

6    Q    You agree with me that the book doesn't

7  have any indication that it's not to be copied, you

8  agree with that, don't you?

9    A    Yeah, I don't see a do not copy sticker

10  on it.

11    Q    And you agree with me, don't you,

12  Mr. Bond, that the book doesn't say it's not to be

13  distributed, does it?

14    A    Oh, I don't see that either.

15    Q    And you don't see any notice of

16  copyright on any of these manuscripts either, do

17  you?

18    A    I don't see any.

19    Q    You didn't ever place one on there, did

20  you?

21    A    On this, I didn't make that copy.

126

1    Q    Did you ever place a notice of copyright

2  on any copy you made?

3    A    Sure.

4    Q    Which one?

5    A    The one right there in that brown box.

6    Q    You did that in August of 2001, correct?

7    A    Somebody that works for me did it.

8    Q    Prior to August 2001 was it ever done?

9    A    I don't think so.

10    Q    You know it wasn't done, don't you,

11  Mr. Bond?

12    A    Well, I just said I don't think so.

13    Q    Now, did you tell Mr. Pessin to

14  distribute the manuscript on your behalf?

15    A    I believe he did on several occasions.

16    Q    Let me repeat my question, Mr. Bond, I

17  want you to answer my question.  Did you tell Mr.

18  Pessin to distribute the manuscript on your behalf?

19        MR. SCHULMAN:  Objection to form.

20    A    I gave Mr. Pessin a copy of a book and

21  he would do whatever he could do.  Did he before he

127

1  would send it to somebody consult with me; not

2  necessarily.

3      Q    Did you tell Mr. Pessin, Mr. Bond, I'm

4  asking you this for the third time, to distribute

5  the manuscript on your behalf?

6          MR. SCHULMAN:  Objection to the form.

7      A   I did not say those exact words.

8      Q   Well, that's what you wanted him to do,

9  wasn't it, Mr. Bond?

10         MR. SCHULMAN:  Objection to form.

11     Q   Isn't it, Mr. Bond?

12     A   You're writing my own statements for me.

13     Q   Mr. Bond, I want you to answer my

14  questions.

15     A   You're answering the questions.

16     Q   No, I'm asking questions of you,

17  Mr. Bond.

18     A   Uh-huh.

19     Q   I want you to answer the question that I

20  just asked you.

21     A   If you're asking verbatim did I ask Mr.

128

1 Pessin to do what you exactly said, no, then it's

2 not.

3    Q    Did you ask him that in so many words?

4    A    Yes, in so many words.

5    Q    And that's what you expected him to do,

6 correct?

7    A    Uh-huh.

8    Q    Yes or no?

9    A    Yes.

10    Q    You expected him to send this manuscript

11 that you wrote off to publishers; isn't that right?

12    A    Or people associated with publishers.

13    Q    You expected him to do one or the other?

14    A    Uh-huh.

15    Q    Yes?

16    A    Yes.

17    Q    You expected him to do what he could to

18 market your manuscript, correct?

19    A    Yes.

20    Q    And he did that for you, didn't he?

21    A    Yes.

129

1    Q   He sent the manuscript off to a woman at

2  Dell?

3    A   I believe that's so.

4    Q   Her name was Jacqueline Cantor; is that

5  correct?

6    A   I believe so.

7    Q   And he sent the manuscript off to a

8  Michele Lax?

9    A   I believe that's true.

10    Q   And did he send the manuscript off to

11  Mr. Atchity?

12    A   Yes, he did.

13    Q   Did he send it off to anybody else?

14    A   I really can't tell.  I don't know.

15    Q   You don't remember?

16    A   No.

17    Q   Now, you stated in your affidavit that

18  you considered the manuscript in Mr. Pessin's

19  possession to be private and confidential; is that

20  correct?

21    A   Yes.

130

1    Q   And that's true even though you told Mr.

2  Pessin to send it off to these various agents?

3    A   Yes.

4    Q   Even though he was to send it to third

5  parties you believed it was protected by some

6  privilege; is that correct?

7    A   I don't know, I don't know your

8  technical definition of that.

9    Q   Well, I want to know what you thought it

10  was protected by.

11    A   Well, for instance, if he gave the book

12  to another lawyer at, what's that guy's name who

13  died?  You know, if he gives it to a lawyer and the

14  lawyer is going to give it to somebody else it

15  seems to me that that's somehow a privileged

16  confidential type thing.

17    Q   What if he gave it to an agent like

18  Atchity?

19    A   Well, Atchity, and I, everything was

20  confidential and he returned it.  And whoever he

21  sent it to was eyes only.

131

1    Q   Mr. Atchity sent it out to other people?

2    A   That's correct.

3    Q   And you told Mr. Pessin it was not to be

4   distributed to anybody without your permission?

5    A   He would certainly discuss it with me

6   before he did something with it.

7    Q   Did you tell him it was not to be

8   distributed without your permission?

9    A   Yeah, I believe so.

10    Q   Did you write that in a letter to him or

11   you just told him that orally?

12    A   Most things between Norman and I were

13   oral.

14    Q   Now, you go on to state in paragraph 6

15   of your affidavit that this book is a highly

16   fictionalized and stylized book about your

17   experiences involving your father.  Do you see

18   that?

19    A   Uh-huh.

20    Q   Yes or no?

21    A   Wait a minute.  Which line?

132

1   Q   Page 3, paragraph 6.

2   A   Which line?

3   Q   Third line.

4   A   Uh-huh.

5   Q   Do you see that?

6   A   Yeah.

7   Q   Now, that's false, isn't it, Mr. Bond?

8   A   No.

9   Q   This book is true, isn't it?

10   A   No.

11   Q   The book is not true?

12   A   No.

13   Q   Oh, you now are going to answer the

14 question as to whether Exhibits Number 4 and 5 are

15 true or false?

16       MR. SCHULMAN:  Take the Fifth.

17   A   I'm going to take the Fifth Amendment.

18   Q   All right.  So when you state in this

19 affidavit that it's a highly fictionalized account,

20 that's a lie, isn't it, Mr. Bond?

21   A   I take the Fifth Amendment.

133

1          MR. SCHULMAN:  Well --

2     Q    Now, your purpose, Mr. Bond, in --

3          MR. SCHULMAN:  Let's confer on that one.

4          THE WITNESS:  Okay.

5          MR. McDANIEL:  He's answered the

6  question, Mr. Schulman.

7          MR. SCHULMAN:  He can retract it.

8          MR. McDANIEL:  He can retract it when

9  you cross-examine him.  That's the way it's done,

10  Mr. Schulman.

11     Q    You go on to state in your affidavit,

12  Mr. Bond, that you are now quite sensitive to the

13  contents of the works.  What do you mean by that?

14     A    I think I'm going to take the Fifth

15  Amendment on that.

16     Q    You're sensitive to the contents of

17  these works because they're true; isn't that right,

18  Mr. Bond?

19     A    I'm going to take the Fifth Amendment on

20  that.

21     Q    Mr. Bond, your purpose in bringing this

134

1 litigation is to prevent the book being used in

2 litigation involving your wife and William Slavin;

3 isn't that correct?

4    A   I'm going to take the Fifth Amendment.

5    Q   I can't hear you, Mr. Bond.

6    A   I'm going to take the Fifth Amendment.

7    Q   Okay.  You have no intention of

8 publishing this book; isn't that right, Mr. Bond?

9    A   I'm going to take the Fifth Amendment on

10 that.

11    Q   You registered this book with the

12 copyright office, you say, for the sole purpose of

13 being able to bring this case; isn't that what you

14 say?

15    A   Which line are you at with that?

16    Q   On page 3, paragraph 6, five lines from

17 the bottom.

18    A   That's certainly true.

19    Q   The only purpose you had for protecting

20 your copyright was so you could bring this lawsuit?

21    A   Well.

135

1       MR. RADDING:  I couldn't hear that

2  answer.

3       A   I said well.

4       Q   Can you answer the question?

5       A   It seems obvious.

6       Q   I don't know what's obvious or not to

7  you, Mr. Bond.  That's why I have to ask these

8  questions.

9       A   Well, if you steel something that's not

10  yours and the only remedy is to go through a

11  formality, then you have to go through the

12  formality to get the remedy.

13      Q   And you didn't, you didn't register the

14  copyright because you didn't have any intention of

15  publishing, did you?

16      A   I would say not recently.

17      Q   And you have no intention of publishing

18  this book, do you?

19      A   Most likely not.

20      Q   In fact, you can't find a publisher for

21  this book, can you, Mr. Bond?

136

1    A   I would bet that tomorrow somebody would

2  publish this book.

3    Q   Well, Mr. Bond, you've tried for years

4  to get this book published, haven't you?  Haven't

5  you?  Am I right or wrong?

6    A   Have I tried for years, that means it's

7  continuing.  No, I'm not continuing to try.

8    Q   There was a period of time over a number

9  of years where you tried to get this book

10  published, right?

11    A   That's true.

12    Q   Nobody would touch it, would they,

13  Mr. Bond?

14    A   That's not true.

15    Q   Nobody published it, did they, Mr. Bond?

16    A   I did not sell the property.

17    Q   Nobody published your book, correct?

18    A   That is correct.

19    Q   Nobody bought your book, correct?

20    A   That's correct.

21    Q   And then you gave up on trying to get it

137

1  published; isn't that right?

2     A   I wouldn't use those words.

3     Q   Well, you don't try anymore to get it

4  published; isn't that correct?

5     A  I withdrew its consideration.

6     Q   Can you repeat that answer, please?

7     A  I withdrew its consideration.

8     Q   And when did you do that?

9     A   When I met my present wife.

10    Q   When was that, Mr. Bond?

11    A   No, that's not actually true.  I think

12  that Norman did do a few what I would call minor

13  attempts after I met my wife, but for all intents

14  and purposes since 1998 I don't think I've done

15  anything on it.

16    Q   Do you have any plans to do anything on

17  it as you sit here today?

18    A   Oh, if I was going to add everything

19  that's happened since, oh, I think maybe.

20    Q   Do you have any plans, Mr. Bond, as you

21  sit here today to market this manuscript?

138

1    A    No.  No, I do not.

2    Q    Now, you said several times that the

3  book was stolen from you.  Who stole the book?

4    A    I believe a person named Dudley Hodgson.

5    Q    And how did he go about stealing the

6  book?

7    A    Well, this was part of a legal file at

8  my attorney's office and when he died I went to his

9  office and got my file from his secretary, which I

10  destroyed, and I asked the secretary at the time

11  where the manuscript was and she told me that if it

12  wasn't in the file that Norman had destroyed it, as

13  he had destroyed a lot of documents before he died.

14  He knew for some time that he was dying and he

15  didn't turn his practice over to other people.  The

16  files that he wasn't doing anything on he either

17  gave back to people or destroyed.

18    Q    Where was this office that you went to?

19    A    In the basement of his house.

20    Q    And you asked for your legal file?

21    A    Correct.

139

1     Q     And you received your legal file?

2     A     I asked for my legal file and the

3     manuscript.

4     Q     The manuscript wasn't there?

5     A     Correct.

6     Q     And why do you believe it was stolen?

7     A     Well, because it seems it was still

8     within his confidential custody and his wife didn't

9     have any right, it wasn't her property, she had, it

10    was not a gift to him or anything of the sort, and

11    it turns out, it appears she kept it as a tool to

12    use, and she sure used it, didn't she?

13    Q     Oh, you believe Mrs. Pessin has used

14    this against you?

15    A     Oh, she certainly has.

16    Q     Is she out to hurt you, Mr. Bond?

17    A     Certainly she is.

18    Q     Does she hate you?

19    A     I would say beyond a shadow of a doubt.

20    Q     All right.  And she would like to do you

21    harm, Mr. Bond?

140

1    A    Absolutely.

2    Q    And that's true also of Mr. Blum,

3 Senior?

4    A    Oh, yes.

5    Q    Mr. Blum, Junior?

6    A    Oh, definitely.

7    Q    Mr. Slavin?

8    A    Definitely.

9    Q    Mr. Hodgson?

10    A    Definitely.

11    Q    The lawyers that you've sued?

12    A    I think they're in it for the money.

13    Q    So people are either in it to hurt you

14 personally or to get money out of it, right, Mr.

15 Bond?

16    A    Yeah, I would say so.

17    Q    Do you have a lot of enemies, Mr. Bond?

18    A    I'm going to take the Fifth on that.

19    Q    What's the basis for taking the Fifth on

20 whether you have a lot of enemies?

21    A    I take the Fifth on it.

141

1    Q   Mrs. Pessin, is she a person consumed

2   with hatred for you would you say?

3    A   If she's going to be a witness in my

4   criminal trial I'm not going to make any more

5   comments about that.

6    Q   Miriam Pessin is going to testify at

7   your criminal trial?

8    A   I'm not going to make any more comments

9   about Miriam Pessin.  I'll take the Fifth

10  Amendment.

11    Q   Why is it Mrs. Pessin hates you?

12      MR. SCHULMAN:  Just take the Fifth.

13    A   Fifth Amendment.

14      MR. McDANIEL:  Pardon?

15      MR. SCHULMAN:  Take the Fifth.

16    A   I'm going to take the Fifth Amendment.

17      MR. RADDING:  Please stop shouting.

18      MR. SCHULMAN:  I just wanted to make

19  sure he heard me.

20      MR. RADDING:  Can I ask just for a

21  second, Bill, as we're allowed to under the local

142

1 rules, what's your basis for taking the Fifth on

2 that question?

3        THE WITNESS:  It --

4        MR. RADDING:  I'm not speaking to you

5 but your counsel.

6        MR. SCHULMAN:  Well, there are several

7 predicates.  As I stated earlier and I restate in

8 the Plaintiff's Response to Defendants' Request for

9 Production of Documents that you are aware that he

10 has been charged and is subject to prosecution, the

11 charges are presently pending, trial is set for

12 December the 10th in the Circuit Court for

13 Baltimore City, that he's concerned --

14        MR. McDANIEL:  Will you get to the

15 point, Mr. Schulman?  It's a simple question.

16        MR. RADDING:  I think the question was

17 why does Mrs. Pessin hate him, he took the Fifth,

18 and I'm asking the basis of the Fifth as to her

19 hatred of him.  It has nothing to do with the trial

20 in this case.

21        MR. SCHULMAN:  Well, I think it does.

143

1          MR. RADDING:  Oh, all right.  Fine.

2          THE WITNESS:  May I make a --

3          MR. SCHULMAN:  No, no, you can't say

4 anything.

5          THE WITNESS:  No, I do want to say

6 something.

7          MR. SCHULMAN:  No, no, no, don't say

8 anything.

9          THE WITNESS:  I would like to be

10 addressed formally and not by my first name.

11          MR. SCHULMAN:  All right.  Yes, and I

12 think that is the local rule of this federal court.

13          MR. RADDING:  Well, I didn't call him by

14 his first name.

15          THE WITNESS:  You said Bill.  Could you

16 read it back, please?

17          MR. RADDING:  Oh, no, Bill McDaniel.  I

18 was talking to Bill McDaniel.

19          MR. McDANIEL:  You know what, I don't

20 mind, Andy.

21          MR. RADDING:  I was not addressing you,

144

1  sir, by your first name.

2       THE WITNESS:  Excuse me.

3       MR. MARTIN:  How about Mr. Bill?

4       MR. McDANIEL:  Well, Mr. Bill to you.

5       MR. RADDING:  I'm sorry, Mr. Bill

6  McDaniel.

7       MR. SCHULMAN:  And I should also say in

8  further response, all the Fifth Amendments that he

9  has taken are in response to the pending criminal

10  proceeding that's going to be --

11       MR. McDANIEL:  You already said that,

12  Mr. Schulman.

13       MR. SCHULMAN:  -- on December 10th.

14       MR. RADDING:  When I have my chance

15  we'll discuss it, sir.

16       MR. McDANIEL:  You've already said that,

17  Mr. Schulman.

18     Q   Now, as I understand it, Mr. Bond,

19  you've withdrawn your allegation that the copy of

20  your manuscript was shown on television?

21     A   Yes.

145

1     Q    Now, you filed your affidavit on

2  November 2nd in which you said a highlighted copy

3  of the manuscript was shown on television, isn't

4  that you what you said under oath, page 4?

5     A    Page 4?  Or paragraph 4?

6     Q    Of your affidavit.

7         MR. MARTIN:  Page 4, last paragraph,

8  paragraph 7.

9     A    Yep, that's true.

10    Q    Did you bother to look at the TV --

11    A    I had seen it.

12    Q    Let me finish, Mr. Bond.  Did you bother

13  to look at the TV before you filed this under oath,

14  look at a TV, the tape of the TV show?

15    A    Time line, I mean I don't know, I don't

16  know.  When I first saw it it looked like the book

17  and seeing it a second time it was the police

18  report or something to do, some sort of charging

19  document that highlighted the title of the book,

20  but to me it seemed the same thing.

21    Q    Well, you withdraw in your claim, as I

146

1 understand it --

2    A    Yeah, is that okay?

3    Q    Can you answer my question, Mr. Bond?

4    A    Yes.

5    Q    You've withdrawn your claim as I

6 understand it relating to the television show,

7 correct?

8    A    Yes, that's correct.

9    Q    Have you withdrawn your claim for

10 statutory damages as well?

11       THE WITNESS:  Would that be

12 attorney-client privilege?

13       MR. SCHULMAN:  Answer it if you can.

14    A    Not at this time.

15    Q    What's it based on, your claim for

16 statutory damages?

17    A    I'm not an expert so I can't --

18    Q    Tell me what you think it's based on.

19 You're the plaintiff in this case, right?

20    A    I believe I have been damaged.

21    Q    How?

147

1    A   My property being taken from a

2  representative of me was wrong.

3    Q   And how has that damaged you?

4    A   Well, it's led to some criminal charges,

5  it's led to the things being brought up that I

6  didn't necessarily want brought up.

7    Q   How else has it damaged you?

8    A   The question would be how, how has it

9  not.

10    Q   No, my question really is, Mr. Bond, how

11  has it damaged you?

12    A   It's too vague.  I don't understand the

13  question.  If you can ask me specific things, fine,

14  it has not made this summer a pleasant summer, so

15  you know, you know, if you want to know does it

16  affect what kind of toilet paper do I buy, no,

17  you've got to be specific.

18    Q   Mr. Bond, how has the theft of your book

19  affected the market value of your book?

20    A   I'm not in a position to make that

21  judgment.

148

1    Q    Who is?

2    A    I don't know.

3    Q    Are you claiming that the market value

4  of your book has been affected?

5    A    I don't have any, any opinion on that at

6  the moment.

7    Q    So you're not making that claim?

8       MR. SCHULMAN:  Objection.

9    A    I'm neither making it or not making it

10  at this moment.

11    Q    Well, you're plaintiff in this case,

12  Mr. Bond, and I would like to know today whether

13  you're claiming that the use the defendants have

14  made of your manuscript has affected its market

15  value.

16    A    I really can't make a comment on that.

17    Q    Why not?

18    A    I haven't, first of all I really haven't

19  thought about it.

20    Q    Do you have any facts as you sit here

21  today that would lead you to believe that the use

149

1 the defendants have made of your manuscript has

2 affected its market value?

3    A   I just said I haven't given it any

4 thought.

5    Q   Do you have any facts, Mr. Bond, as you

6 sit here today --

7    A   If I haven't given it any thought then I

8 wouldn't have any --

9    Q   Mr. Bond, let me finish my question.

10    A   But I answered the question.

11    Q   Well, you're going to answer it again.

12 As you sit here today, Mr. Bond, do you have any

13 facts that would lead you to conclude that the

14 market value of your manuscript has been damaged by

15 anything the defendants have done?

16    A   Now I'll say I answered your question

17 already.

18    Q   Do you have any facts, Mr. Bond?

19    A   Do I have any facts?

20    Q   Right.

21    A   Hmm.  In my pocket at this moment I do

150

1 not have any facts.

2     Q    Look at your affidavit, which is Exhibit

3 4 from the Grossbart deposition.  It's the page

4 after the bill for Mr. Grossbart, which is a letter

5 dated March 19th, 1994.  Do you see that?

6     A    Uh-huh.

7     Q    This is from Mr. Pessin to a person

8 named Michele Lax; is that correct?

9     A    Uh-huh.

10     Q    Is that right?

11     A    Yes.

12     Q    And Mr. Pessin sent Ms. Lax the

13 manuscript; is that right?

14     A    It appears so.

15     Q    Well, you knew he was going to do that,

16 didn't you?

17     A    My memory of, you know, the actual

18 people is, you know.  Did I ever meet this lady or

19 anything, no.  She's a person.

20     Q    Why was the manuscript sent to her?

21     A    I think she is, she had some contact

151

1  with the, some lady at the Dell Company, I believe

2  that's what the thing was but I'm not positive.

3      Q   Well, the idea was for Ms. Lax to try to

4  get someone at Dell interested in the manuscript?

5      A   I think that might, I think that may

6  have been the idea.

7      Q   Did Ms. Lax pass the manuscript on to

8  people at Dell?

9      A   I, I think so but I'm not positive.

10     Q   Now, by this time you had already

11  reached your deal with Mr. Pessin that he would get

12  a percentage of whatever you earned, correct?

13     A   Yes.

14     Q   Now, Mr. Pessin says in his letter I

15  hope you enjoy the book, and if you feel there is a

16  possibility that something can be done with it,

17  we'll both discuss our participation with the

18  author.  Did I read that correctly?

19     A   Uh-huh.

20     Q   Now, Mr. Pessin at this time in fact had

21  not reached any agreement with you about a

152

1  percentage, had he, Mr. Bond?

2      A    That's not true because he's discussing

3  it.

4      Q    He says here that if she likes the book

5  and feels there is a possibility, then you'll

6  discuss participation, correct?

7      A    Uh-huh.  But if he was going to share it

8  with somebody I think they, they, the two of them

9  were going to come to some sort of discussion, you

10  know, on, on how they would cut it or whatever.

11      Q    That's not what it says here, though, is

12  it, Mr. Bond?

13      A    Well --

14      Q    It says we'll both discuss our

15  participation with the author, doesn't it?

16      A    It clearly says that.

17      Q    And you were the author, right?

18      A    Yes.

19      Q    And your testimony earlier that you had

20  reached a deal with Mr. Pessin about a percentage

21  was false, wasn't it, Mr. Bond?

153

1    A    That is not false.

2    Q    It's not consistent with this letter,

3  though, is it, Mr. Bond?

4    A    I think it sure is.

5    Q    Mr. Bond, go a couple pages further on,

6  you'll see a February 16th letter from Mr. Pessin

7  to you.  Do you see that?

8    A    Uh-huh.

9    Q    This is a letter returning the

10  manuscript to you that was sent to Jacqueline

11  Cantor; is that correct?

12    A    It appears to be.

13    Q    Jacqueline Cantor was a person with Dell

14  Publishing; is that right?

15    A    I think so but I'm not positive.

16    Q    She also received a copy of your

17  manuscript; is that correct?

18    A    Which it, it appears she gave back.

19    Q    Did she receive a copy of your

20  manuscript, Mr. Bond?

21    A    She must have to give it back.

154

1    Q   Look at the next letter which is dated

2 May 6th, 1998, please.  This is the letter to you

3 from Mr. Pessin; is that correct?

4    A   Uh-huh.

5    Q   Yes or no?

6    A   Yes.

7    Q   And this letter deals with Mr. Atchity;

8 is that right?

9    A   Uh-huh.

10    Q   Yes or no, please.

11    A   Yes.

12    Q   And in this letter Mr. Pessin tells you

13 that it was Mr. Atchity's position that he wasn't

14 interested in doing any business with you, correct?

15    A   At that time.

16    Q   Mr. Atchity gave two reasons.  The first

17 was you refused to go in Atchity's direction

18 concerning the book.  Do you know what that refers

19 to?

20    A   I think I'm going to take the Fifth

21 Amendment on that.

155

1    Q   How about the second, the way your

2  relationship ended turned Atchity off to the extent

3  he doesn't even want to discuss the matter?  Do you

4  know what that refers to?

5    A   I'm going to take the Fifth also.

6    Q   Well, you threatened Mr. Atchity with

7  personal harm, didn't you, Mr. Bond?

8    A   I'm going to take the Fifth Amendment on

9  that.

10    Q   The fact is, Mr. Bond, that Mr. Atchity

11  felt misled by you, didn't he?

12    A   I'm going to take the Fifth Amendment on

13  that.

14    Q   You told Mr. Atchity that you were

15  writing this book from the perspective of a person

16  who had been rehabilitated, right, Mr. Bond?

17    A   I'm going to take the Fifth Amendment on

18  that.

19    Q   And in fact Mr. Atchity came to believe

20  that you had not been rehabilitated; isn't that

21  correct?

156

1    A   I take the Fifth Amendment on that.

2    Q   Mr. Atchity told you that he felt that

3  you didn't appreciate the enormity of the crime

4  you've committed; isn't that what he told you?

5    A   I'm going to take the Fifth Amendment on

6  that.

7    Q   You became enraged at Mr. Atchity's

8  attitude, didn't you, Mr. Bond?

9    A   I'm going to take the Fifth Amendment on

10  that.

11    Q   What's funny to you, Mr. Bond?

12       MR. SCHULMAN:  Don't, don't answer him.

13    Q   No, I'd like to know, you're laughing in

14  this deposition which I take very seriously.  I'd

15  like to know what's funny.  Can you tell me?  Is

16  this proceeding funny to you?  Can you tell me,

17  Mr. Bond?

18       (No response.)

19       THE VIDEOGRAPHER:  Excuse me.  This is

20  the end of tape number 1.  We're now going to tape

21  number 2.  Off the record at 5:05 p.m.

157

1        (Pause in the proceedings.)

2        THE VIDEOGRAPHER:  This is the beginning

3  of tape number 2.  We're back on the record at 5:06

4  p.m.

5        MR. RADDING:  If I may, Mr. McDaniel,

6  Mr. Schulman, I point out guideline 5 of the local

7  discovery rules, guideline 5D, it is presumptively

8  improper to instruct a witness not to answer a

9  question during the taking of a deposition unless

10  under the circumstances permitted by 30(b)(1) which

11  are basically privileged.

12        You had advised Mr. Bond just before the

13  break not to answer a question and I just wanted to

14  remind you of that guideline.  I'm sorry, Mr.

15  McDaniel.

16        MR. SCHULMAN:  I don't think that

17  guideline gives counsel a license to abuse the

18  witness.

19        MR. RADDING:  I don't think there was

20  any abuse.  He asked him why he was laughing in the

21  middle of a very serious deposition.  I would have

158

1 liked to know the answer to that too, sir.

2        MR. McDANIEL:  Mark this, please.

3          (Exhibit 6  marked.)

4    Q    Do you have in front of you, Mr. Bond,

5 what's been marked as Exhibit 6 for your

6 deposition?

7    A    It says exhibit --

8        MR. SCHULMAN:  I want to do one thing, I

9 want to withdraw.  Go ahead and answer his

10 question.

11        MR. McDANIEL:  No, Mr. Schulman --

12        MR. SCHULMAN:  No, you --

13        MR. McDANIEL:  No, please.

14        MR. SCHULMAN:  Go ahead and answer the

15 question.

16        MR. McDANIEL:  Mr. Schulman, please,

17 I've moved on.

18        MR. SCHULMAN:  No, I -- Mr. Radding's, I

19 don't think Mr. Radding is correct but I don't want

20 it to be suggested that I have instructed the

21 witness not to answer, so you can go ahead and

159

1 answer the question about why you were laughing.

2    MR. McDANIEL:  Mr. Schulman, you can ask

3 him later if you'd like.  I'd like to move on to

4 this exhibit.

5    MR. RADDING:  Mr. Schulman, stop

6 interrupting Mr. McDaniel's deposition, okay?

7    Q   What exhibit do you have in front of you

8 there, Mr. Bond?

9    A   I don't know.

10   Q   What's the -- well, can you take a look?

11   A   It says number 3 up here.

12   Q   Look down at the bottom.

13   A   Number 6.

14   Q   Exhibit 6 for this deposition.

15   A   Uh-huh.

16   Q   This is a letter from you to Mr. Kenneth

17 Blum.

18     MR. SCHULMAN:  I'd like to read the

19 document, please.

20     MR. McDANIEL:  Do you have a copy?  I

21 handed you a copy of the document, I thought.

160

1       MR. SCHULMAN:  I don't have a copy.

2       MR. McDANIEL:  I though I handed you

3   one.

4       THE WITNESS:  It's right there.  It's

5   underneath.

6       MR. SCHULMAN:  Oh, it's underneath of

7   that.  I'm sorry.

8       A   I've already answered questions about

9   this in the previous custody deposition.

10      Q   Mr. Bond, is this a letter from you to

11  Mr. Blum?

12      A   I take the Fifth Amendment to the whole

13  thing.

14      MR. MARTIN:  Fifth Amendment?

15      MR. SCHULMAN:  Are we playing by the

16  same rules?  I mean was he asked this question

17  before?

18      MS. GRIFFIN:  He didn't answer questions

19  at his other deposition at all, so.

20      MR. MARTIN:  He didn't answer any

21  questions.

161

1          MR. McDANIEL:  He took the Fifth like

2  he's taking now.

3          THE WITNESS:  And I'm going to take the

4  Fifth now.

5          MR. MARTIN:  Howard, I'd like an

6  explanation on this record as to why this letter

7  has anything to do with his ability to take the

8  Fifth Amendment in his criminal case, because it --

9          MR. SCHULMAN:  Well, I think what, I

10  think what he's concerned is that anything --

11          MR. MARTIN:  I don't care what his

12  concern is, I want you to focus on the Fifth

13  Amendment in his criminal case.

14          MR. SCHULMAN:  I'm going to focus on it,

15  all right?  It's his expectation that anything

16  that's said, anything that's looked at here will be

17  turned over by the defendants to the prosecutors.

18  Obviously there's been a continuing contact with

19  the prosecution.  We view one or more of the

20  defendants here in this room as, in a sense de

21  facto agents for the state, and we can anticipate

162

1  that anything that's said one way or the other will

2  be turned over potentially to the prosecution as

3  was the manuscript in question.

4      MR. MARTIN:  Howard, it doesn't matter

5  what's turned over to the prosecutor, the issue is

6  with respect to his Fifth Amendment privilege in

7  that case what is there in this letter, if you can

8  make a proffer, that would possibly, how he could

9  possibly even be incriminated by a letter he wrote

10  to Ken Blum in when, 1996?

11      MS. GRIFFIN:  Yes.

12      MR. McDANIEL:  Which has nothing to do

13  with --

14      MR. MARTIN:  Which has nothing to do

15  with this case.

16      MR. SCHULMAN:  It could very, it could

17  very well be used against him even in a sentencing

18  stage as well as --

19      MR. MARTIN:  Well, So could the Bible.

20      MR. SCHULMAN:  Or in some form

21  cross-examination.

163

1      MR. McDANIEL:  Well, Mr. Schulman --

2      MR. MARTIN:  I think this is an abuse of

3  the process to do this, Howard, and I'm, I'm just

4  going to have to do something about it.

5      MR. RADDING:  If I may, guideline 6 of

6  the local discovery guidelines, which are attached

7  to the local rules, Mr. Schulman, specifically

8  6(a)(1) and (2), speaks to the privilege and I

9  would suggest that you might want to read it

10  because, Mr. Schulman, the Fifth and other

11  privileges are to be asserted when there's a basis.

12  And like Mr. Martin and Mr. McDaniel, I cannot

13  understand the basis.  If you've got a basis, why

14  don't you proffer it?

15      THE WITNESS:  Howard?

16      MR. SCHULMAN:  I stated my basis and I

17  think that's sufficient.

18      MR. MARTIN:  Okay.

19   Q   Mr. Bond, turn if you would to page 9 of

20  your letter.

21   A   I'm not turning to any page, and I'm

164

1  taking the Fifth on that one.

2      Q    In this letter on page 9 you state that

3  you wrote an autobiography.  Is that a reference to

4  the book which is Exhibit 4?

5      A    I'm taking the Fifth on that.

6      Q    You state here you used a Hollywood

7  connection to get an agent for you.  Who is that

8  Hollywood connection?

9      A    I'm taking the Fifth.

10      Q    And who was the agent that you got?

11      A    Taking the Fifth.

12      Q    Did you give a copy of the manuscript to

13  Clifton Fadiman?

14      A    Taking the Fifth.

15      Q    You're taking the Fifth Amendment on

16  whether you gave a copy of the manuscript to

17  Clifton Fadiman?

18      A    Taking the Fifth.

19          MR. McDANIEL:  Well, Mr. Schulman,

20  you're going to permit this?

21      A    The prosecution has this letter.

165

1     Q    So what?  My question is --

2         MR. SCHULMAN:  Don't get in dialogue

3  with opposing counsel.

4     Q    My question is --

5         MR. SCHULMAN:  He has taken, he has

6  taken the Fifth and I'm instructing him to take the

7  Fifth.

8         MR. McDANIEL:  On whether he gave the

9  manuscript to Clifton Fadiman?  Okay.

10     Q    You gave the manuscript to Clifton

11  Fadiman, didn't you, Mr. Bond?

12     A    I'm taking the Fifth Amendment.

13     Q    You gave the manuscript to Paul Dinas,

14  D-I-N-A-S?

15     A    Taking the Fifth.

16     Q    You gave the manuscript to Kensington

17  Publishers; isn't that correct?

18     A    Taking the Fifth.

19     Q    Now, you state in here you had a single

20  patron.  You also gave the manuscript to your

21  patron; isn't that correct?

166

1    A    Taking the Fifth.

2    Q    Who was the patron to whom you gave the

3    manuscript, Mr. Bond?

4    A    I'm taking the Fifth.

5    Q    Mr. Bond, did you maintain a website

6    called Dear Bill?

7    A    I'm going to take the Fifth Amendment.

8        MR. McDANIEL:  Mark that, please.

9            (Exhibit 7  marked.)

10    Q    You have in front of you what's been

11    marked as Exhibit 7; is that correct?

12    A    Yes.

13    Q    These are excerpts from a website called

14    Dear Bill; is that right?

15    A    I'm going to take the Fifth Amendment.

16    Q    And this is a website that you put up on

17    the worldwide web; isn't that correct, Mr. Bond?

18    A    I'm going to take the Fifth Amendment.

19    Q    What you said on the website was my name

20    is Bill, I killed my father when I was 17, I went

21    to jail and then to a mental hospital; isn't that

167

1  correct?

2      A   I'm going to take the Fifth Amendment.

3      Q   And then you state that after you got

4  out of jail you spent about twelve years writing

5  and marketing your life story; isn't that correct?

6      A   I take the Fifth Amendment.

7      Q   You didn't say anywhere in this

8  worldwide web page that the story you were

9  marketing was fiction, did you, Mr. Bond?

10     A   I take the Fifth Amendment.

11     Q   In fact you presented it on your

12  worldwide web page as though it were a true story;

13  isn't that right?

14     A   I'm going to take the Fifth Amendment.

15     Q   You state in here that you had a

16  big-time Hollywood agent but nobody in the

17  publishing world wanted to give me money because I

18  told my story in the unremorseful point of view of

19  the person I was at the time of my father's death,

20  isn't that you put on the web?

21     A   I take the Fifth Amendment.

168

1    Q    You said in the website that you had,

2    which is Exhibit 7, that you thought that your

3    approach was an honest approach; isn't that

4    correct?

5    A    I take the Fifth Amendment.

6    Q    And you said you didn't want to take

7    what you call a phony apologetic approach; isn't

8    that right?

9    A    I take the Fifth Amendment.

10    Q    Now, you go on to say that your

11    experiences have helped your stepchildren; isn't

12    that what you said?

13    A    I'll take the Fifth Amendment.

14    Q    And you referred to your experiences as

15    facts about your life; isn't that correct?

16    A    I'll take the Fifth Amendment.

17    Q    Well, Mr. Bond, in light of this

18    wouldn't you agree with me that your testimony and

19    your affidavit in this case that this book was

20    fiction was perjury?

21    A    I take the Fifth Amendment.

169

1        MR. McDANIEL:  Would you mark that,

2  please?

3          (Exhibit 8  marked.)

4     Q   Mr. Bond, you have in front of you

5  Exhibit 8 to your deposition; is that correct?

6     A   Let me see.  Yep.

7     Q   This is a letter from you to Gerry

8  Messerman; is that right?

9     A   Yes.

10     Q   And in this letter you state that you

11  want legal documentation related, excuse me, to

12  certain criminal charges against you, correct?

13     A   Yep.

14     Q   And the criminal charges were the

15  charges about you murdering your father; isn't that

16  right?

17        MR. SCHULMAN:  Take the Fifth.

18     A   Take the Fifth.

19     Q   Well, you've offered, you're going to

20  offer this document in evidence, aren't you,

21  Mr. Bond?  Isn't that why it has this plaintiff's

170

1 exhibit number up top?

2        MR. SCHULMAN:  He's going to take the

3 Fifth and he's also, it's also the form of the

4 question, I think that's your problem here.

5        MR. McDANIEL:  Well, wait.  I'll correct

6 the form but if you're going to tell me he's going

7 to take the Fifth then what difference does the

8 form make?

9        MR. SCHULMAN:  Well, I'm not saying

10 that.

11        MR. McDANIEL:  I didn't think so.

12        MR. SCHULMAN:  Try the next question.

13        MR. McDANIEL:  Tell me what's wrong with

14 the form, Mr. Schulman.

15        MR. SCHULMAN:  Do you want to leave the

16 room?

17        MR. McDANIEL:  No, he doesn't have to

18 leave, he can hear you say it.

19        MR. SCHULMAN:  You keep referring to the

20 murder.  There has been no adjudication of murder,

21 there's been no factual finding of murder.

171

1    Q   Did you murder your father, Mr. Bond?

2        MR. SCHULMAN:  Take the Fifth.

3        MR. McDANIEL:  Well, the inference is

4  going to be drawn that he did, Mr. Schulman.

5        MR. SCHULMAN:  Well, that's --

6        MR. McDANIEL:  And so I'm therefore

7  entitled to ask the question with the word murder.

8  There's no doubt he murdered his father.  He may

9  find it amusing as we sit here today, I don't.

10       MR. SCHULMAN:  Take, take, take the

11  Fifth.

12   A   I'm taking the Fifth Amendment.

13   Q   Well, you wrote this letter to Mr.

14  Messerman; is that correct?

15   A   Yes.

16       MR. McDANIEL:  Well, you can't, Mr.

17  Schulman, take the Fifth on part of the letter and

18  not on other parts.  I mean this is what we mean by

19  your abuse of the privilege.

20       MR. SCHULMAN:  I don't think your

21  question has anything to do with this letter.

172

1        MR. McDANIEL:  I asked him if the

2 charges that he's referring to in here were the

3 murder charges placed against him when he beat his

4 father to death with a hammer.  That's what's

5 stated right in here.

6        MR. SCHULMAN:  He's going to take the

7 Fifth.

8    A   I take the Fifth Amendment.

9        MR. McDANIEL:  How can, Mr. Schulman,

10 can you tell me how you can offer this document

11 into evidence if he takes the Fifth on my

12 questions?  Can you address this inconsistency?

13       MR. SCHULMAN:  We'll do it on Tuesday.

14    Q   All right.  Now, you said you wanted

15 charging papers from Mr. Messerman; is that

16 correct?

17    A   I'm going to take the Fifth Amendment.

18    Q   You're going to take the Fifth Amendment

19 on all questions about this letter?

20    A   Yes.

21    Q   So I can ask you all the things you

173

1 asked for for Mr. Messerman and you wouldn't tell

2 me --

3     A   You could ask me if the colon is in

4 there and I would take the Fifth Amendment.

5     Q   Okay.  You're sure of that?

6         MR. SCHULMAN:  Well, let's confer.

7         MR. McDANIEL:  I'm going to move on.

8 You want to clear up --

9         MR. SCHULMAN:  I'm willing to confer, I

10 think you can get some answers, but.

11         MR. McDANIEL:  I want to move on.  He's

12 taken the Fifth.

13         MR. SCHULMAN:  You're not going to let

14 me confer with him?

15         MR. McDANIEL:  Mr. Schulman, you've

16 advised him to take the Fifth, he's taken it

17 repeatedly.  He told me he wouldn't even tell me if

18 there's a colon on the page.

19         MR. SCHULMAN:  Well --

20         MR. McDANIEL:  Are you going to let him

21 answer questions?

174

1        THE WITNESS:  I'll just take the Fifth

2   on it.

3        MR. SCHULMAN:  Let's go outside and

4   talk.

5        THE VIDEOGRAPHER:  Off the record at

6   5:19.

7           (Pause in the proceedings.)

8        THE VIDEOGRAPHER:  5:21 p.m.  We're back

9   on the record.

10     Q   Mr. Bond, anything you want to say?

11       MR. SCHULMAN:  I will instruct the

12   witness that he can answer all questions of counsel

13   other than as to what the underlying charges were

14   or any details concerning those underlying charges.

15   He can certainly otherwise inquire as to anything

16   else in here and we'll take it on a question by

17   question basis.

18     Q   Did you -- you state in this letter,

19   which is Exhibit 8, pursuant to our conversation on

20   August 15th in conference with Robert Grossbart.

21   Did you mean that you had a three-way telephone

175

1 conversation?

2     A   With Robert Grossbart, yes.

3     Q   And what did you discuss in that

4 conversation with Mr. Messerman?

5         MR. SCHULMAN:  You can answer generally.

6         MR. McDANIEL:  No, I want to know

7 specifically.  I don't want to know generally, I

8 want to know what he said and what Mr. Messerman

9 said what Mr. Grossbart said.

10     A   I don't have a direct memory of the

11 conversation.  Obviously the things that were put

12 in this letter were asked for.  I think that the,

13 whatever marketing that Grossbart had in mind was

14 discussed with Gerry and that's basically it.

15         MR. McDANIEL:  Mr. Schulman, what are

16 you doing?

17         MR. SCHULMAN:  I'm telling the witness

18 not to get into anything concerning legal advice

19 that was imparted by Mr. Messerman.

20     Q   Did Mr. Messerman give you legal advice

21 in this phone call?

176

1    A   I'm not going to answer that.

2    Q   No, you can answer it yes or no.  Did he

3  give you legal advice in the phone call?

4    A   I don't recollect.

5    Q   Why didn't you send a copy of this

6  letter to Mr. Grossbart?

7    A   I don't know.

8    Q   Did you obtain these documents that you

9  asked for from Mr. Messerman?

10   A   He has copies of these.

11   Q   Did you obtain these documents,

12  Mr. Bond, from Mr. Messerman?

13   A   No.

14   Q   So he never answered your letter?

15   A   Yes.

16   Q   He said he wouldn't send them to you?

17   A   He did answer it.

18   Q   Did he send you these documents?

19   A   Yes.

20   Q   I just asked you if you obtained them

21  and you told me no.

177

1    A   I think you asked me if he sent me a

2  letter or something.

3    Q   No, I said did you obtain these

4  documents from Mr. Messerman?

5    A   I think I'm going to take the Fifth on

6  that.

7    Q   Did you pass along these documents to

8  Mr. Grossbart?

9    A   I think I'm going to take the Fifth on

10  that.

11    Q   All of these documents you asked for

12  were in connection with the charges against you for

13  your beating your father to death with a hammer,

14  right?

15    A   I take the Fifth on that.

16        MR. McDANIEL:  Mark that, please.

17        (Exhibit 9  marked.)

18    Q   Do you have in front of you what's been

19  marked as Exhibit 9 for your deposition?

20    A   Okay.

21    Q   Do you have that in front of you, sir?

178

1     A   Yeah.

2     Q   I can't hear you.

3     A   Yeah.

4     Q   This is a letter from you to Mr. Pessin?

5     A   Yes.

6     Q   Did you send this letter?

7     A   Yes.

8     Q   You were upset with the lack of progress

9 being made by Mr. Pessin in selling your book?

10     A   I don't see the word upset.

11     Q   Well, you say appropriate progress is

12 not being made.  Was that your view?

13     A   At the time?  It must have been.

14     Q   Well, was it or wasn't it, Mr. Bond?

15     A   At the time it must have been.  I don't

16 have perfect recollection of, you know, what was

17 going on at that time.

18     Q   Do you have any recollection of what

19 your view was about the progress and the placement

20 of your book?

21     A   Well, it didn't get placed so there must

179

1 not have been any progress.

2    Q   Do you have any recollection as you sit

3 here today, Mr. Bond, about why you believe the

4 appropriate progress was not being made?

5    A   I can't remember why I formed that

6 opinion.

7    Q   Did Mr. Pessin return the manuscript to

8 you in response to this letter?

9    A   I believe whenever I saw him at one

10 point he gave me back the book.

11    Q   Then you sent him another copy of the

12 manuscript later?

13    A   Well, I would have given it to him, I

14 wouldn't have sent it to him.

15    Q   You later provided him with another copy

16 of the manuscript?

17    A   Yep.

18    Q   Yes?

19    A   Yep.

20    Q   And it was this second copy that you

21 gave him which was the expanded version; is that

180

1  correct?

2      A   Actually for some reason I think he's

3  still got the first copy, because obviously that's

4  what you have, so I don't, I don't know if he ever

5  got the second copy or whether he got the second

6  copy and mailed it off to Atchity and kept the

7  first copy or something, I don't know.

8      MR. McDANIEL:  Mark that, please.

9      (Exhibit 10  marked.)

10      Q   Do you have Exhibit 10 in front of you,

11  Mr. Bond?

12      A   Yeah.

13      Q   This is a letter to Mr. Pessin from

14  Jacqueline Cantor; is that right?

15      A   Uh-huh.

16      Q   And you were furnished with a copy of

17  this letter by Mr. Pessin?

18      A   I believe so.

19      Q   And in this letter Ms. Cantor returns

20  the manuscript that you wrote of a book called

21  Psycho Killer; is that right?

181

1    A    Uh-huh.

2    Q    Yes?

3    A    Yes.

4    Q    And at one time wasn't Psycho Killer the

5    title of your book?

6    A    I believe so.

7        MR. SCHULMAN:  At some point when it's

8    convenient I'd like to take a break.

9        MR. McDANIEL:  Okay.  In a couple

10    minutes.

11        Would you mark that, please?

12        (Exhibit 11  marked.)

13    Q    Mr. Bond, Exhibit 11 is in front of you;

14    is that right?

15    A    Yeah.

16    Q    This is a letter in the form of a

17    memorandum from you to Norman Pessin; is that

18    right?

19    A    Uh-huh.

20    Q    It's dated 9-29-96?

21    A    Right.

182

1    Q   You state down here in this document, I

2   think it has, I think the first page is, first two

3   pages are the same of this document.

4   A   Yeah.

5    Q   The way it was presented to us.  Now,

6   you, on the last page, I direct your attention to

7   the last page.

8   A   Yeah.

9      MR. SCHULMAN:  I should explain why, I

10   should explain why that was done.  The copying

11   service was supposed to have copied the exhibits

12   with the tags and they neglected to do so, so in

13   order to get the documents here as best we could in

14   a short period of time we did that, or my staff did

15   it.

16    Q   You state in the letter on the last

17   page, Mr. Bond, I would like to hire you as an

18   attorney to help me find investors to help me raise

19   50 thousand dollars in return for a 10 percent

20   stake in my story.  Is that what you said?

21    A   It seems that's what I said.

183

1     Q   Did you retain Mr. Pessin to help you

2 find investors?

3     A   Let's see, what year is this?

4     Q   1996.

5     A   I don't think that ever went anywhere

6 because I don't think I ever got 50 thousand

7 dollars.

8         MR. MARTIN:  That wasn't the question.

9         MR. McDANIEL:  Yeah.  Thank you, Jerry.

10     Q   Did you ever retain Mr. Pessin --

11     A   Excuse me, the question, the question

12 was did I ever get investors.

13     Q   No, no, Mr. Bond.  If you'd listen to

14 the question it was did you ever retain Mr. Pessin

15 to help you find investors.  That was the question.

16 Now, did you or didn't you?

17     A   Did I retain him.  Hmm.  I certainly

18 asked him.  I don't know if that, if that

19 qualifies.

20     Q   Did you hire him to do that?  You say

21 here I would like to hire you.  Did you in fact

184

1 hire him?

2    A    We discussed it.

3    Q    Did you in fact hire him to do that for

4 you?

5    A    As I said, the idea I don't think went

6 anywhere.

7    Q    So you did not hire Mr. Pessin to find

8 investors?

9    A    At that particular time I do not believe

10 so.

11    Q    Did you ever hire Mr. Pessin to find

12 investors for you?

13    A    To find, to find investors.  No, I don't

14 think so.

15        MR. McDANIEL:  Mark this, please.

16        (Exhibit 12  marked.)

17    Q    Do you have Exhibit 12 in front of you,

18 Mr. Bond?

19        MR. MARTIN:  What's the number on that

20 that Howard put on it?

21        MR. McDANIEL:  36 maybe.

185

1          MR. SCHULMAN:  3L.

2          MR. McDANIEL:  3L, okay.

3     Q    Do you have that in front of you,

4  Mr. Bond?

5     A    Uh-huh.

6     Q    This is a letter to Mr. Pessin from you

7  dated 4-9-98; is that correct?

8     A    Uh-huh.

9     Q    In this document you refer to your

10  introduction to Ken Atchity as having been made by

11  Paul Aratow; is that right?

12    A    Uh-huh.

13    Q    Did you provide a copy of the manuscript

14  to Mr. Aratow?

15    A    Hmm.  I don't think so.

16    Q    Did you provide a copy of the manuscript

17  to Steven de Sousa?

18    A    I believe he had a copy that he gave to

19  Ken Atchity.

20    Q    Mr. de Sousa?

21    A    Yes.

186

1    Q   In addition Mr. Pessin sent Mr. Atchity

2 a copy?

3    A   I think what Mr. Pessin gave him was

4 the -- I think maybe Pessin sent him the contract

5 when he looked at it.  I know Pessin sent Atchity

6 something.

7    Q   Where did Mr. de Sousa get his copy?

8    A   From a lady named Valerie Marzouca.

9    Q   And where did Valerie Marzouca get her

10 copy?

11    A   From me.

12    Q   And it says here Valerie wrote Steven?

13    A   Uh-huh.

14    Q   Who is Steven?

15    A   De Sousa.

16    Q   Okay.  So you gave a copy to Ms.

17 Marzouca?

18    A   Uh-huh.

19    Q   She gave it to Mr. de Sousa?

20    A   Yes.

21    Q   He gave it to Mr. Atchity?

187

1    A    Correct.

2    Q    None of those people being lawyers,

3  correct?

4    A    Paul Aratow might be a lawyer, I'm not

5  sure.

6    Q    He didn't get a copy though, did he?

7    A    I'm not sure whether it passed through

8  his hands or not, I really don't know.

9    Q    Well, a second ago you told me he

10  didn't.

11    A    I said I thought he didn't but I'm not

12  positive.

13    Q    Well, Mr. de Sousa, Ms. Marzouca, Mr.

14  Atchity, none of them are lawyers, right?

15    A    To the best of my knowledge.

16    Q    Did Jeff Herman ever have a copy of the

17  manuscript?

18    A    Jeff Herman, where is that in there?

19  His partner, Atchity's partner.  I don't know, I

20  have no idea.

21    Q    You state here that 27 publishers and

188

1  three film companies reviewed the book proposal,

2  yet all found the full manuscript to be flawed.  Do

3  you see that?

4      A   I do see it.

5      Q   Was your full manuscript sent out to 27

6  publishers and three film companies?

7      A   I'm not positive on those facts.

8      Q   That's what you wrote to Mr. Pessin,

9  correct?

10     A   Again, I'm not positive on those facts.

11     Q   That's what you wrote to Mr. Pessin,

12  right?

13     A   It appears that's what I wrote.

14     Q   Well, you say it appears that's what you

15  wrote, Mr. Bond.  Do you have some doubt that you

16  wrote that to Mr. Pessin?

17     A   Well, I don't see where I was under

18  perjury to sign this, this particular one.

19     Q   My question is do you have any doubt

20  that this is what you wrote to Mr. Pessin?

21     A   Did I send that to Mr. Pessin, yes.

189

1    Q    And you told him that the manuscript had

2  been sent to 27 publishers and three film

3  companies, didn't you?

4    A    Uh-huh.

5    Q    Right?

6    A    That's what I said in that letter.

7    Q    All right.  And then you're telling me

8  now that might have been a lie?

9    A    Strong, strong language.

10    Q    Are you telling me now that might have

11  been a lie, Mr. Bond?

12    A    I'm not going to answer that question.

13    Q    Why not?

14    A    I think you're being rude to me.

15    Q    Mr. Bond, I'm asking you whether your

16  letter here to Mr. Pessin was a lie or was true.

17  Could you answer it, please?

18    A    At the time I'm sure I felt that that

19  was true.

20    Q    Did you ever hire an editor or work with

21  an editorial consultant or ghostwriter on your

190

1  book?

2    A   No.

3    Q   Did you ever submit your manuscript to

4  any editorial consultants or ghostwriters?

5    A   No.

6      MR. McDANIEL:  Take a break?

7      THE VIDEOGRAPHER:  Off the record at

8  5 --

9      MR. SCHULMAN:  I just need 5 minutes.

10      MR. McDANIEL:  That's fine.

11      THE VIDEOGRAPHER:  Off the record at

12  5:35.

13        (Brief recess.)

14      THE VIDEOGRAPHER:  5:46 p.m.  We're back

15  on the record.

16    Q   Mr. Bond, I want to show you the text

17  part of what was marked as Exhibit 4, and I'm just

18  going to pick a page at random and show it to you

19  and ask you to tell me what page that is.

20    A   Can't tell.

21    Q   Read it to me, please.

191

1    A   Can't read it.

2    Q   Why can't you read it?

3    A   Because it's stenciled.

4        THE VIDEOGRAPHER:  Your microphone, Mr.

5   McDaniel.  Thank you.

6        MR. McDANIEL:  Welcome.

7    Q   Is that true of all the pages of Exhibit

8   4?

9    A   Yes.

10    Q   Do you contend that any of the

11   defendants copied exhibit, what is Exhibit 4?

12    A   No.

13        MR. SCHULMAN:  I'm going to object to

14   the form of the question.

15        MR. McDANIEL:  What's your basis?

16        MR. RADDING:  As to what?

17        MS. GOLDMAN:  It's too late.

18        MR. McDANIEL:  It's too late now, that's

19   right.

20    Q   Now, Mr., Mr. Bond, your counsel

21   produced some files, and maybe it's just quicker

192

1  for you to tell me, Mr. Schulman.  These files that

2  you produced which you've marked as exhibits, are

3  these Mr. Pessin's files relating to Alyson Slavin?

4      MR. SCHULMAN:  Yes.

5      MR. McDANIEL:  Okay.  Did you produce --

6      MR. SCHULMAN:  And I have the original

7  in my possession, if anybody cares to look at it,

8  so.

9    Q   You say you went to Mr. Pessin's and you

10  obtained his file about you, Mr. Bond?

11    A   Excuse me?

12    Q   You went to Mr. Pessin's office after he

13  died and obtained his file about you?

14    A   Correct.

15    Q   Did you destroy that file?

16    A   Yes.

17    Q   Why?

18    A   Just didn't think I'd have any future

19  need for it.

20    Q   What is it you obtained when you went

21  there?

193

1     A     Whatever suits that he handled for me

2  before.  There was a suit against this Kramer kid,

3  a suit about a car accident, that was it, some

4  miscellaneous things.

5     Q     Was there a file about the manuscript?

6     A     No, because I kept those things

7  separately.

8     Q     Was there a file that you obtained from

9  Mr. Pessin's secretary about your manuscript and

10  his representation of you in connection with that

11  manuscript?

12     A     Probably some of those letters came out

13  of the file that I got.  I don't have like the

14  manila envelope thing that you're seeing that

15  Alyson has.

16     Q     Was there such a file like you refer to

17  the manila envelope thing, that you obtained from

18  Mr. Pessin about the manuscript?

19     A     Yeah.

20     Q     And what did it say?

21     A     It was just copies of whatever letters

194

1  that we've, we've given.

2     Q    You saved those but you destroyed

3  everything else?

4     A    Right.

5     Q    Why?

6     A    Because I still had the book.

7     Q    And you destroyed the manila folder?

8     A    Right.  Well, it came, it was like, I

9  want to think that maybe they didn't come out of it

10  so easy or something.  It was like a, a, one of

11  these like brown expandable folders, and I think

12  the pockets were built into it, I think that's --

13  on this particular one.

14     Q    They weren't like these folders that

15  Alyson Slavin has?

16     A    Well, there was a folder in there like

17  that.

18     Q    Dedicated to your manuscript?

19     A    I think it was probably called Bill book

20  or something like that.

21     Q    And you removed the papers from it?

195

1    A   Right.

2    Q   And destroyed the folder?

3    A   Right.

4    Q   And why did you do that?

5    A   Because I didn't have a legal, my file

6 cabinets don't hold those size folders.

7    Q   And you kept everything that was in the

8 folder?

9    A   Uh-huh.

10    Q   Okay.

11       MR. McDANIEL:  I don't have anything

12 further.

13       MR. MARTIN:  Do you want to go, Andy?

14       MR. RADDING:  All right.  I'll go

15 briefly.

16       THE VIDEOGRAPHER:  If you'll take Mr.

17 McDaniel's microphone.

18       MR. RADDING:  Oh, sure.

19       MR. MARTIN:  Well, why don't I, let me

20 ask a couple of questions while you're putting the

21 microphone on.

196

1      MR. RADDING:  Go ahead.

2      EXAMINATION BY MR. MARTIN:

3    Q   Mr. Bond, you testified here today that

4  Mr. Hodgson stole your manuscript.  Do I have that

5  right?

6    A   I believe I said that.

7    Q   That's your opinion that he stole the

8  manuscript?

9    A   That's my opinion, yes.

10    Q   And you said you were damaged by his

11  theft of that manuscript because it led to the

12  criminal charges against you?

13    A   Clearly.

14    Q   Tell me how it led to the criminal

15  charges against you.

16      MR. SCHULMAN:  I'm going to instruct him

17  not to answer that question.

18      MR. MARTIN:  Wait a minute, Howard.

19  Give me a, give me a basis for that.  He can't, he

20  can't testify that it led to the criminal charges

21  and not tell me why he believes it led to the

1  criminal charges, that's just preposterous that you

2  could do that.  You can't claim the privilege that

3  way.

4

5          MR. SCHULMAN:  He'll be --

6          MR. MARTIN:  If he says A he has got to

7  tell me why he's saying A.  He's already said A and

8  you let him say it.

9          MR. SCHULMAN:  December 10th, 2001 is

10  why he's not going to answer that question.

11          MR. MARTIN:  Howard, I'm going to ask

12  for sanctions against both you and him.

13          MR. SCHULMAN:  You can --

14          MR. MARTIN:  You cannot claim this

15  privilege.

16          MR. SCHULMAN:  You go right ahead.

17      Q   And tell me something, Mr. Bond, if you

18  look at Exhibit 2 to your deposition, or, yeah,

19  exhibit, Exhibit 1 to your deposition, the last

20  page.  Do you think what you put on the last page

21  of that had anything to do with the criminal

198

1 charges that were brought against you?

2    A   I'll take the Fifth Amendment.

3    Q   I bet you will.

4        MR. MARTIN:  I don't have anything

5 further.

6        EXAMINATION BY MR. RADDING:

7    Q   Mr. Bond --

8        MR. RADDING:  Are you done?

9        MR. MARTIN:  (Nodding head indicating

10 yes.)

11    Q   -- do you remember your affidavit that's

12 been referred to here numerous times?

13    A   Yes, sir.

14    Q   Well, in paragraph 2 of your affidavit,

15 and I'm sure it's right in front of you there.

16    A   It's somewhere in the pile.  Can I just

17 find it, please?

18    Q   Sure.  Sure.

19    A   Okay.  Paragraph 2.

20    Q   Paragraph 2.  Have you got that?

21    A   Yes, sir.

199

1    Q    You say, the second line, Mr. Grossbart

2    also assisted me in developing a manuscript which

3    would be a fictionalized and embellished account of

4    my experience in Ohio as a juvenile in which I was

5    found delinquent in the death of my father.  Do you

6    see that sentence?

7    A    Yes, sir.

8    Q    I want to focus on the word developing.

9    What did you mean by developing a manuscript?

10    A    Well, you know, we've gone back and

11    forth here with a little bit of the time line, and

12    I think that the accurate thing is that when, when

13    Robert Grossbart in that previous letter with the

14    attorney and the conference call and all that

15    business, I don't think that there was a manuscript

16    per se that existed, I think there was an idea.

17    Okay?  So when he called his cousin in California,

18    who was some, quote/unquote, hotshot entertainment

19    kind of guy, you know, he was, he was trying to get

20    an idea of what might be a way to package that

21    story or pitch that story or, you know, any of the

200

1  things that those people do.  That's what I mean by

2  develop.

3     Q    Well, except your affidavit goes on, if

4  you want to read the rest of that paragraph 2, that

5  he was, he was getting, he assisted you in getting

6  information and advised about publication and a

7  publisher.  So it seems like in here, in paragraph

8  2, you're talking more than just finding someone to

9  pitch it to in California, you're talking about

10  developing the manuscript.

11     A    Yeah.  Well, that's what he, he was

12  through his cousin going to try to find both film

13  and print people.

14     Q    But you use the phrase developing a

15  manuscript.  You say later a manuscript didn't

16  exist but he was helping to develop it.  Did you

17  intend to say there that he was helping to

18  essentially create, give birth to the manuscript?

19     A    Well, you know, you can tell a story

20  many different ways and I think that was what I'm

21  referring to in the discussions with him and more

201

1  specifically his discussions with his relative who

2  was in the entertainment business.

3      Q   Well, but that is a discussion, that is

4  an attempt to find a publisher and consulting with

5  others, which you mentioned later.  Again, I'm

6  going back to what you say earlier, attempt to

7  develop a manuscript.  You're specifically

8  referring to develop and the manuscript at that

9  point.

10      A   Okay.  Robert Grossbart was, his expert

11  was going to be his cousin, okay, who, I think his

12  name is Jack Grossbart, I'm not positive on that,

13  and he was supposed to be some big guy, okay.  So

14  in developing it would be what, what would be, I

15  was always going to write a manuscript, Grossbart

16  was more interested I think in the film idea of it

17  than he was in the manuscript idea of it, but he

18  was interested in both, but he thought the film

19  thing would be quicker and easier, especially with

20  what he perceived to be his contact with his

21  cousin.  And so when you say develop, I mean --

202

1    Q   Well, I didn't, you did.

2    A   Right, but when you're asking me what

3 develop is, it's like, you know, all you have to do

4 is turn on the television and watch shows about

5 people making TV shows, I mean they have shows

6 about TV shows and they, you know, sit around a

7 table like this and talk about well, should the

8 character have blond hair, should the character

9 have black hair, whatever, that's developing.  So

10 his conversations were development conversations.

11    Q   Well, by that do you mean that he was

12 helping to develop the story that would be told or

13 the, or the facts that would be told or the

14 context, content rather?

15    A   Well, we certainly had discussions about

16 it.

17    Q   So you and Mr. Grossbart discussed what

18 would be the contents of the manuscript, the

19 contents of the narrative?

20    A   Robert Grossbart and I clearly had

21 discussions about what the story was about and how

203

1  the story should be told, and how the story should

2  be told are things that I think he asked his cousin.

3      Q   Okay.  But the discussions you had with

4  Mr. Grossbart on what the story was and how the

5  story should be told, and again, that's what I'm

6  focusing on here, you, did you tell him what your

7  take on the story was?

8      A   I think I did.

9      Q   Okay.  So you think you told Mr.

10  Grossbart what you remembered of what had happened?

11      A   Well, I wouldn't say that, I would say

12  that we discussed the story, and I think that's

13  about as much as I want to say about that

14  particular conversation.

15      Q   Well, I think you've started, I think

16  I'd like you to continue, sir.  So you discussed,

17  you and he discussed what you wanted the story to

18  be or what you wanted it to say.  What in

19  particular did you tell Mr. Grossbart you wanted

20  the story to say?

21      MR. SCHULMAN:  I'm going to instruct you

204

1  to take the Fifth.

2       MR. RADDING:  Howard, can I ask you the

3  basis, and again, I'll refer you to the local

4  discovery rules, the basis of the Fifth Amendment

5  advice in this context, especially with him now

6  having testified that he told Mr. Grossbart what he

7  wanted it to say, how this is incriminating, sir?

8       THE WITNESS:  I didn't never say --

9       MR. SCHULMAN:  Well, wait a minute.  I'm

10  instructing him to take the Fifth because there is

11  a trial on December 10th, 2001.  I don't know how

12  this will impact on him in that regard.

13  Anything --

14       (Pause in the proceedings.)

15       MR. SCHULMAN:  And so I think it's

16  clearly appropriate for him to invoke his Fifth

17  Amendment and his attorney-client privilege in

18  terms of the details of the discussions.

19       MR. RADDING:  Well, Howard, let me just

20  say, you just said the magic words, you don't know

21  how it will play into the trial on December 10th.

205

1  Yet my understanding of the Fifth Amendment, and

2  I've got an expert two seats to my right as well,

3  is that unless you have a justifiable apprehension

4  of prosecution based on that testimony, then you

5  can't invoke the Fifth.  Now, the prosecution as I

6  understand it on December 10th, although I don't

7  recall seeing the charging document, my

8  understanding is it's something to do with gun

9  possession.  I am asking only what he discussed

10  with Mr. Grossbart as him wanting to go into the

11  manuscript, the book, the tale, I am not asking

12  anything that has anything to do with the

13  prosecution on December 10th, so I don't frankly

14  understand the basis to the Fifth Amendment on my

15  question.

16       MR. SCHULMAN:  Here is my problem, or my

17  concern, my Fifth Amendment concern.  Mr. Hodgson

18  has already said that he has taken a copy of the

19  manuscript to the state police.  The charging

20  documents reflect it was a factor in having

21  Mr. Bond charged.  Ms. Griffin has had recent

206

1  contact with the prosecutor's office, as has had

2  Mr. Hodgson.  Anything I would suspect as I do

3  understand, that the documents from the domestic

4  proceeding have been turned over, lock, stock and

5  barrel to the prosecution and has also been turned

6  over to the, perhaps the state police.  And I think

7  that's the concern here.  The concern is that

8  you're looking for evidence and ways to, to somehow

9  ensure that Mr. Bond is prosecuted.  That's the

10  whole problem, and that's why he's going to assert

11  the Fifth Amendment privilege.  This is not a

12  circumstance where he's in a position where he

13  hasn't been charged and there's some potential

14  concern that there might be.

15        MR. McDANIEL:  The problem with that is

16  there's not a basis to assert the Fifth, that's the

17  problem.

18        MR. SCHULMAN:  Well, I think, I think it

19  is.

20        MR. RADDING:  Well, understand this, Mr.

21  Schulman.  I'm sitting here not because of any

207

1 domestic case or any criminal charge against your

2 client on December 10th. I am sitting here because

3 you have sued my law firm, and I want an answer to

4 these questions because you have sued us in a

5 copyright action and I have a lot of questions

6 about whether this lawsuit has any factual basis.

7 I don't care what's happening on December 10th, I

8 care what's happening Tuesday, and I want to know

9 the basis, the factual basis of this lawsuit you

10 filed and I am entitled to ask your client, the

11 plaintiff in that suit, these questions. If you

12 want to hide behind, and I will use that phrase,

13 the privilege, which I think everybody in this room

14 recognizes is invalid in this context, just advise

15 him again to take it, but I will tell you, I think

16 this is inappropriate.

17     MR. MARTIN: There's one other factor,

18 Mr. Schulman. The only reason that we're having

19 this hearing before the criminal trial is because

20 you asked for it, you asked for the injunction, so

21 now you're hiding behind the privilege. So we're

208

1  all here trying to get information that is relevant

2  to this hearing that's coming up next Tuesday and

3  you're hiding behind the privilege keeping us from

4  getting the information.  So in that context I

5  don't think your claim of privilege is valid.

6        MR. SCHULMAN:  On that particular point

7  to the extent it gets construed against him, I

8  think that's going to be your argument on Tuesday,

9  unfortunately for Mr. Bond he's in a rather

10  precarious position, but that's the way the chips

11  will fall.  He can answer generally as to what was

12  discussed with Mr. Grossbart, he can't get into the

13  specific communications, and those are my

14  instructions to him.

15        MR. RADDING:  And you're also denying at

16  this point that the answers he's given already

17  waive the privilege?

18        MR. SCHULMAN:  I'm not sure that you

19  waive a Fifth Amendment right in the same way you

20  might waive an attorney-client right, but, so I

21  don't, I don't agree with you.

209

1       MR. RADDING:  So since you're unsure

2 you're just going to deny us this topic?

3       MR. SCHULMAN:  No, I'm sure I'm doing

4 the appropriate thing, I'm one hundred percent sure

5 I'm doing the right thing.

6    Q   What's your address, Mr. Bond?  Your

7 residence address.

8    A   Huh?

9    Q   Your residence address.

10    A   4214 Greenway.

11    Q   And do you rent, own, what?

12    A   I own.

13    Q   You own it?

14    A   Uh-huh.

15    Q   Is there a mortgage?

16    A   Yes.

17    Q   Who holds the mortgage?

18    A   My wife and I.

19    Q   Your wife and you hold the mortgage, you

20 pay yourselves the mortgage?

21    A   Oh, oh.  I'm not understanding.

210

1  NationsBank.

2      Q    NationsBank.  And how much of a mortgage

3  is there?

4          MR. SCHULMAN:  I'm going to -- why don't

5  you step out and then maybe we can proffer what

6  this has to do with.

7          THE WITNESS:  Great.  Okay.

8      (Witness left the deposition room.)

9          MR. RADDING:  I'm trying to get some

10  background.

11          MR. MARTIN:  You can let him answer just

12  in the --

13          MR. RADDING:  I'm asking background, Mr.

14  Schulman.  I'm entitled to background.  My lawsuit,

15  my law firm has been in a lawsuit for about ten

16  days.  I haven't been in any domestic case or

17  anything of the like.  I want to know some

18  background on this man, you have been invoking the

19  Fifth, there have been questions unanswered.  I

20  think I'm entitled to get some basic historical

21  information.  I have never seen that denied in a

211

1 deposition.  If you want to create your own rules,

2 so be it.  I'm going to ask the questions, so you

3 can bring him back.  But I'm going to ask him his

4 historical and personal data.

5         MR. SCHULMAN:  I'm just going to say,

6 I'm going to give you a little bit --

7         MR. RADDING:  I don't want to debate

8 with you.  I'm going to ask him the questions.  I

9 don't think we need to debate.  Why do you want to

10 debate?

11         MR. SCHULMAN:  I don't want to debate

12 with you.

13         MR. RADDING:  Good.

14         MR. SCHULMAN:  But I do want to make a

15 statement for the record, if I could.

16         MR. RADDING:  No, no, no, no, no, sir.

17 Let's, you know, you're going to instruct him not

18 to answer or to answer, that, you know, you'll do

19 what you're going to do.  I don't want to waste our

20 time and the pages of this deposition.  Are you

21 going to pay my, my rate for the pages, are you

212

1  going to reimburse me for the pages you waste?

2      MR. SCHULMAN:  Could you read the

3  question back to me, please?

4      MR. RADDING:  The question is how much

5  are they paying on the mortgage, how much the

6  mortgage is, and then the next question is going to

7  be what are they paying and then there are going to

8  be some follow-up questions about that, Mr.

9  Schulman.  You don't have to waste her time, I can

10  tell you what the question is.

11      (Discussion held off the record.)

12      THE VIDEOGRAPHER:  Still on.

13      (Witness entered deposition room.)

14  Q   To save the rereading time I think the

15  last question was, and if it's not, it's a new

16  question, how much is your mortgage, what is your

17  total mortgage indebtedness?

18      MR. SCHULMAN:  You know --

19  A   I don't think I'm going to answer any

20  financial questions.

21      MR. SCHULMAN:  Just step out.  I would

213

1 like to try to get a protective order because I

2 think it's going beyond fair play.

3       MR. RADDING:  What?

4       MR. MARTIN:  Are you instructing him not

5 to answer, because you can't get your protective

6 order --

7       MR. SCHULMAN:  No, no, no, no.  I'm

8 going to try to, I'm going to try to --

9       MR. RADDING:  Mr. Schulman, this is,

10 this is your ploy.

11       MR. SCHULMAN:  Just step out.  I'm --

12       (Witness left the deposition room.)

13       MR. RADDING:  No.  Are you instructing

14 him not to answer, Mr. Schulman?

15       MR. SCHULMAN:  What I'd like to do is an

16 opportunity to try to --

17       MR. RADDING:  All of a sudden when the

18 court has probably gone home you're all of a sudden

19 going to ask for a protective order, Mr. Schulman?

20       MR. SCHULMAN:  I'm not --

21       MR. RADDING:  Mr. Schulman, I have

214

1  questions, why don't you do your objections, you

2  know, if you are going to instruct him, Mr.

3  Schulman, which you have accused all the rest of us

4  of doing, though nobody I don't, to my knowledge

5  has done it, but if you are going to instruct him

6  not to answer, you're going to do it, you'll suffer

7  the consequences.

8        MR. SCHULMAN:  Well, let me check the

9  local --

10        MR. RADDING:  Go, go right to it, sir.

11  Do you want a copy of the local --

12        MR. MARTIN:  Privilege is the only

13  reason.

14        MR. RADDING:  Do you have a copy of

15  that?  Do you want my copy of the local rules, sir?

16  I'll be happy to provide them to you.

17        (Pause in the proceedings.)

18        THE VIDEOGRAPHER:  We'll stay on the

19  record?

20        MR. RADDING:  Just stay on the record,

21  please.

215

1          (Pause in the proceedings.)

2          MR. SCHULMAN:  Here's my problem, Mr.

3    Radding.  Subparagraph D of guideline 5 states it

4    is presumptive, and this is the second sentence,

5    following the first sentence as I see it reads is

6    presumptively improper to instruct the witness not

7    to answer a question during the taking of a

8    deposition unless the circumstances permitted by

9    Federal Rule 30(d)(1) exists.  However, it's also

10   presumptively improper to ask questions clearly

11   beyond the scope of discovery permitted by the

12   Federal Rules of Civil Procedure 26(b)(1),

13   particularly of a personal nature.  Continuing to

14   do so after objection shall be evidence that the

15   deposition is being conducted in bad faith or in

16   such a manner as reasonably to annoy, embarrass or

17   impress it upon a party which is prohibited by

18   Federal Rules of Civil Procedure 30(d)(3).

19         Now, I'm willing to permit him to

20   respond to the question provided that all counsel

21   agree that the, this part of the deposition is to

216

1  be marked confidential and sealed pending a ruling

2  on the court after you've asked your questions

3  about whether the matter can be used in any other

4  proceeding, including the domestic proceeding,

5  because your firm wears two hats in this case, one,

6  you represent Mr. Blum as well as you represent Mr.

7  Slavin, and that's my concern, that you have, it

8  appears to me, violated the second part of a rule

9  that you quote.  So if you're agreeable to sealing

10  the deposition on a temporary basis until we can

11  get a ruling, I'm letting him answer, all right,

12  subject to a discovery ruling on this by either

13  Judge Garvis or any other judge that we can take

14  this up with.  In fact we don't even have to do it

15  until Tuesday with Judge Garvis or we can take it

16  to Magistrate Grimm (phonetic) or whoever is

17  available on Monday.  So if you're agreeable to an

18  interim order of confidentiality, and all parties,

19  all persons in this room agree by that, you can

20  knock your socks off, but unless you do that I

21  think it's inappropriate for you to continue.

217

1          MR. RADDING:  Well, that's nice, Mr.

2  Schulman, except 26(b)(1) allows me to ask any

3  question that is relevant to the case.  It does not

4  bar me from personal data or anything else.  You

5  have sued us, you're asking for damages, you're

6  asking for attorney's fees.  I am entitled, and,

7  you know, you have hidden behind, you have had your

8  client hide behind the Fifth Amendment all

9  afternoon.  I am entitled to try to determine

10  certain information on which I may base judgments

11  on damages, on the propriety of this lawsuit, on

12  the examination I want to conduct at trial.  I am

13  not willing to agree that anything should be

14  sealed.  I think the data I am asking and intend to

15  ask goes to admissible evidence, goes to evidence

16  that will be asked and will be admitted at the

17  trial and that I am entitled to know in perfecting

18  my case.  So I'm not agreeing to sealing anything.

19  I'm not --

20          MR. SCHULMAN:  All right.

21          MR. RADDING:  Let me finish.  I'm not

218

1  going to play your game.  I'm asking the questions.

2  If you don't want him to answer the question, you

3  do what you feel you gotta do and you take the

4  consequences, or you let him answer the question.

5  The choice is yours, sir.  But I'm not agreeing to

6  this other stuff, so get your client back in, do

7  what you're going to do, sir.

8       MR. SCHULMAN:  Well, what I'd like to

9  do --

10       MR. RADDING:  Do what you're going to

11  do, sir.

12       MR. SCHULMAN:  I'm not going to instruct

13  him not to answer, but I would like a ruling --

14       MR. RADDING:  Do what you're going to

15  do.

16       MR. SCHULMAN:  I would like to adjourn

17  the deposition so that I can --

18       MR. RADDING:  We're not adjourning this

19  deposition, we're here on 6 o'clock Friday, I do

20  not have time tomorrow, Sunday --

21       MS. GOLDMAN:  Yeah, and I --

219

1       MR. RADDING:  -- or Monday to do it and

2  in fact you're the one who invoked that discovery

3  ends tonight.  I am not adjourning this deposition.

4  There is another deposition scheduled at 9 o'clock

5  tonight, sir, I'm not adjourning it.

6       MS. GOLDMAN:  And I have some questions

7  I would like to ask when it's my turn.

8       MR. RADDING:  So let's get going.

9       MR. SCHULMAN:  I would like to try to

10  reach someone at the federal court.

11       MR. RADDING:  Let's get going, sir.

12       MR. MARTIN:  Howard, why don't you just

13  tell him to answer the questions if you are trying

14  to avoid the dilemma, and then if you think it's

15  improper then you can file your motion next week

16  and get Judge Garvis to rule on it, maybe he'll

17  seal it, maybe he won't.  Or tell him not to answer

18  the question, it's your choice, but.

19       MR. SCHULMAN:  Let me look at the Rule

20  26 first.

21       Mr. Radding, can you tell me how this

220

1  relates to the claim in the case?

2       MR. RADDING:  It relates to potential

3  damages, it relates to the relationship he has with

4  his wife, it relates to assets, it relates, you

5  know, the federal rules of discovery are pretty

6  liberal as long as you're not going far afield.

7  I'm asking him questions -- he is suing my law

8  firm, sir, and both, I have the right to inquire

9  about him and his background.  You're invoking the

10  Fifth over a large part of his background in this

11  case but I certainly have the right to some of his

12  background.  I have the right to know who's suing

13  us.

14       MR. SCHULMAN:  Okay.  Well, can you tell

15  me how it relates to the claim that's being

16  asserted for injunctive relief on Tuesday and why

17  you would not be able to have an opportunity to

18  depose him later on on the very same issues that --

19       MR. RADDING:  Sir, because I have no

20  doubt that there are going to be, that this case --

21  because I want to ask it tonight, sir, because I

221

1  don't want to have to waste another six hours,

2  seven hours, whatever it's going to be.  I want to

3  ask it tonight.  You started this, Mr. Schulman, we

4  didn't.

5        (Pause in the proceedings.)

6        MR. SCHULMAN:  All right.  This is what

7  I'm going to do.  I'm going to permit him to

8  answer, but there will be a motion for protective

9  order in court at 8:30 on Monday morning.  If you

10  use the information outside of this litigation I'm

11  going to suggest to you that we're going to seek an

12  order on Monday that would seal this record and

13  that I expect you as an officer of this court to

14  honor our opportunity to seek that and obtain that.

15  I would expect that if you use the, and I'm asking

16  you, I'm specifically asking you that you not use

17  the information directly or indirectly in the

18  domestic action which I suspect is what you really

19  want to do.

20        MR. RADDING:  All right.  Now, get this

21  straight, Mr. Schulman.  I'm litigating a case

222

1  representing my firm.  I am asking for discovery so

2  I can prepare for an expedited trial on Tuesday set

3  on your time limit.  I'm not agreeing to a darn

4  thing.  You want to file a motion, file a motion.

5  I'm representing my law firm that you have sued.

6  Don't put any constraints on me, fella, I am not

7  obligated under the rule to do that.  I'm going to

8  use what I got in any way I have to for my case.  I

9  don't speak for these other people in this room.  I

10  am doing discovery on my case.  Now, do what you

11  gotta do, fella, but let's get him back in here and

12  let's get this thing going.  You have delayed, we

13  must have been 15 minutes while you read the rule,

14  you've delayed this for hours, you were a half an

15  hour late to the depositions today.

16      MR. SCHULMAN:  You know why I was late.

17      MR. RADDING:  You know, I know why --

18  no, I don't know why you were late, sir.  I know I

19  got a call that you were going to be half an hour

20  late.  You said it had to do with putting together

21  stuff, well, sir, maybe you should have done it

223

1  before the end, I don't care, all I know, I was

2  delayed, I was delayed a half an hour.  I could be

3  half an hour ahead.

4          MR. SCHULMAN:  Then I would expect true

5  to your word you'll use it purely for this case

6  until I can see --

7          MR. RADDING:  Sir, I'm going to use it

8  for whatever I deem appropriate, okay, and so be

9  it, and I speak only for myself and this firm.  I'm

10  using it for what I deem appropriate.  You do what

11  you gotta do, and these other people have not asked

12  this question.  So let's get your client back in

13  here.

14          MR. SCHULMAN:  I think my comment is

15  directed to everybody in this room.

16          MR. RADDING:  You know, who, when did

17  the president give you the robe, Mr. Schulman?

18  You've got no basis for doing that.  Do you got any

19  rule there that says you can do that, sir?  I don't

20  think so.  I don't think so.

21          MR. SCHULMAN:  I'm just trying to make a

224

1  record, Mr. Radding.

2        MR. RADDING:  Well, Mr. Schulman --

3        MR. MARTIN:  Can we get him in here?

4  You're wasting time.

5        MR. SCHULMAN:  I want to make my

6  statement.

7        MR. RADDING:  Sir, you made your

8  statement, you made your statement.  How many more

9  statements do you have to make?  You made your

10  statement.

11        MR. SCHULMAN:  I would just like it

12  understood for the record that all parties and

13  persons in this room that I will seek an order

14  sealing the record, sealing this deposition first

15  thing on Monday morning and I would expect that

16  everybody honor that intent.

17        MR. RADDING:  Mr. Schulman, I suggest

18  that you go back to your office when this thing is

19  over and get it filed tonight, because your

20  statement has absolutely no meaning.  Now, why

21  don't you get your client in here.  I know you

225

1 don't want to miss your football game tomorrow,

2 Mr. Schulman, but maybe you're going to have to.

3 So why don't we get the client in here, Mr.

4 Schulman?  I'd hate to, you know, I'd hate to

5 interfere with your football game tomorrow, you

6 know, I had some plans for this evening with my

7 wife, okay, and I'm sitting here, and I had some

8 business meetings this afternoon and I'm sitting

9 here.  So Mr. Schulman, I'm tired of your fiats.

10 Would you get your client in here so we can

11 continue?  Can we tell how many minutes we've

12 wasted on this?

13        THE VIDEOGRAPHER:  (Shaking head

14 indicating no.)

15        MR. RADDING:  We can't tell at this

16 point?  Can you please get your client in here,

17 sir?  Would you please get your client in here, or

18 are you just going to sit here all night?

19        MR. SCHULMAN:  When you're done talking

20 I'll go get the client.  I want to hear what you

21 have to say.

226

1    MR. MARTIN:  Go get him.  Go get him,

2  please.  Come on.

3    (Pause in the proceedings.)

4    BY MR. RADDING:

5    Q   I believe you said NationsBank and Bank

6  of America hold your mortgage?

7    A   Yeah, but I am not going to answer any

8  questions about my finances, I'm just not going to

9  do it, okay.

10    Q   Who is on the mortgage?

11    A   I'm not going to answer any questions on

12  that.

13    Q   How much do you owe on the mortgage?

14    A   I'm not going to answer any questions

15  about the mortgage or the finances.

16    Q   How much is your monthly payment?

17    A   I'm not going to answer it.

18    Q   Well, whatever you are articulating can

19  you say loud enough for me to hear, sir?

20    A   You can hear me.

21    Q   No, I'm having real trouble hearing you.

227

1    A   I'm not going to answer any financial

2   questions which you're going to try to use in the

3   divorce case, custody case, criminal case, whatever

4   it is.

5    Q   Sir, I am involved in a case in federal

6   court.

7    A   Right.

8    Q   I personally do not -- well, I'm not

9   going to debate with you.

10    A   Okay.

11    Q   What is the source of funds of which,

12   with which you pay your mortgage?

13    A   Again, I'm not going to discuss my

14   personal finances with you.

15    Q   Okay, sir.  I was a bit confused before

16   so I'm going to go back to some questions earlier.

17   Did you or did you not graduate from high school?

18    A   I did.

19    Q   You did graduate from high school?

20    A   Uh-huh.

21    Q   And you grad, I think you said you

228

1  graduated from high school when you were 18.

2     A    Correct.

3     Q    Okay.  And what high school did you

4  graduate from?

5     A    And I took the Fifth Amendment on that

6  once.

7     Q    And I am going to look to your client,

8  that's what I thought I meant, I'm going to look to

9  your counsel and ask him, Mr. Schulman, in light of

10  the rules how can the name of the high school he

11  graduated possibly tend to incriminate him?

12        Mr. Schulman, I'm asking you that as an

13  officer of the court, and to consult with your

14  client on that privilege.

15        MR. SCHULMAN:  I don't think I have to

16  answer your question.

17        MR. RADDING:  Mr. Schulman, I am asking

18  you as an officer of the court to advise your

19  client that this is not an appropriate privilege.

20  You're staring at me, Mr. Schulman.  Does that mean

21  you're not going to respond to my request?  If you

229

1  can -- don't stare, just say you're not going to

2  respond.

3           MR. SCHULMAN:  I'm not, I'm not even

4  looking at you.

5           MR. RADDING:  Well, yeah, you were.

6           MR. SCHULMAN:  I'm sorry, I can't --

7           MR. RADDING:  I'm mistaken, factually

8  mistaken, you were looking at --

9           MR. SCHULMAN:  I was actually staring

10  off into space --

11           MR. RADDING:  You were looking at PSINet

12  Stadium.  Are you going to so advise him or not?

13           MR. SCHULMAN:  I'm not responding to

14  that.

15           MR. RADDING:  You're not responding,

16  okay, Mr. Schulman.

17           MR. SCHULMAN:  I have not, I'm not

18  instructing him not to answer.

19           MR. RADDING:  The record will reflect,

20  the record will reflect that you were doing nothing

21  about that invocation of a privilege regarding high

230

1 school.

2    Q    Did you go to school beyond high school,

3 Mr. Bond.

4    A    Yes.

5    Q    Where?

6    A    Towson State.

7    Q    Now, why is that not privileged and the

8 name of your high school privileged, sir?

9    A    Why?

10    Q    Uh-huh.

11    A    Because where I went to high school will

12 be relevant in the criminal trial.

13        MR. SCHULMAN:  Well, you don't have

14 to -- all right.  Answer if you can.  I don't know.

15        MR. RADDING:  Well, I think he did.

16    Q    And how will the fact of where you went

17 to high school be relevant in your criminal trial,

18 sir?

19    A    I'll take the Fifth Amendment.  And I

20 think that's the third time you've asked it, so can

21 we not ask it again, please?

231

1     Q   Sir, I'll decide what I'm going to ask

2  and not ask.

3     A   Okay.

4     Q   Okay, sir?

5     A   Okay.

6     Q   Thank you.  Now, sir, did you ever tell

7  anybody that you had made a study of other persons

8  who had written books about patricide?

9     A   I'll take the Fifth Amendment.

10     Q   Let me ask it a different way.  Did you

11  ever make a study --

12     A   I'll take the Fifth Amendment.

13     Q   Would you let me finish my sentence,

14  sir?  Thank you.

15         Did you ever make a study on persons

16  who, of persons who wrote books about patricide?

17     A   I'll take the Fifth Amendment.

18     Q   How would the fact of your making a

19  study tend to incriminate you, sir?

20     A   I'll take the Fifth Amendment.

21     Q   Are you employed?

232

1    A    I'll take the Fifth Amendment.

2    Q    How --

3    A    I'm not answering any financial

4    questions, period.

5    Q    I'm not asking financial questions.

6    A    That's a financial question.

7    Q    I'm asking if you're employed?

8    A    I'm not answering it.

9    Q    Where are you employed, sir?

10    A    I'm not answering it.

11    Q    And what is the basis of your not

12    answering it?

13                    (No response.)

14    MR. RADDING:  Mr. Schulman, would you

15    advise your client of the rules regarding whether

16    it is proper or improper to answer questions?

17    MR. SCHULMAN:  I don't think that's my

18    role.

19    MR. RADDING:  You don't think there's

20    such a rule?

21    MR. SCHULMAN:  I don't think that's my

233

1  role.

2      MR. RADDING:  You don't think -- you're

3  not his counsel?

4      You're not answering that question

5  either.  Now you're staring at the table.  Okay,

6  Mr. Schulman.

7      Q   You know, you know who Paul Dorf is, do

8  you not?

9      A   Me?  Yeah.

10     Q   Yes.  When did you first meet Paul Dorf?

11     A   When did I first meet Paul Dorf?  At my

12  deposition.

13     Q   You had never met him before?

14     A   I had heard of him before.

15     Q   That was not my question, sir.

16     A   I do not believe I ever met him before.

17     Q   To your knowledge did you ever speak

18  with him before that day?

19     A   I do not believe so.

20     Q   Did, what did Mr., what role did Mr.

21  Dorf play at your deposition, sir?

234

1    A    An interrupting one.

2    Q    An interrupting one?

3    A    Correct.

4    Q    And what does that mean, sir?

5    A    Apparently only one person can speak at

6  a deposition in that particular scenario.

7    Q    I still don't understand what you mean.

8    A    I just answered to the best of my

9  ability.

10    Q    What did he do?

11    A    He interrupted Caroline Griffin.

12    Q    He interrupted Caroline Griffin?

13    A    Correct.

14    Q    In what manner?

15    A    I just told you, he interrupted.

16    Q    No, you didn't.  You said he interrupted

17  her.  Tell me how he interrupted her.

18    A    Apparently only one person can ask

19  questions and there were two people asking

20  questions.

21    Q    Oh, he asked questions?

235

1    A    Correct.

2    Q    Did you answer the questions?

3    A    I don't know which questions you're

4  referring to.

5    Q    The ones he asked.

6    A    I don't know.

7    Q    Do you remember anything else about his

8  participation at the deposition?

9    A    Only that he talked about the mayor and

10  that he was an advisor of the mayor.

11    Q    That was during the deposition?

12    A    I think it was during a break maybe.

13    Q    When he was chatting with other people?

14    A    Well, we were all sitting there.

15    Q    But I'm talking about while the

16  deposition was ongoing, sir.

17    A    Nobody was chatting while the deposition

18  was going on.

19    Q    And how many times did he interrupt

20  Mrs. Griffin, Ms. Griffin, I'm sorry?

21    A    I don't know, I couldn't tell you.

236

1    Q    10, 20, 50, 100, a thousand?

2    A    I couldn't, I couldn't make a

3    guesstimate.

4    Q    1, 2?  I'm not asking you to guess, I'm

5    asking you to remember, it wasn't that long ago.

6    A    A lot has happened since then.  Several

7    times.  Okay?  That's the best I can do.

8    Q    More than five?

9    A    I'm not going to give a specific number.

10    Q    Are you armed today?

11    A    Pardon?

12    Q    Are you armed?

13    A    I'm a little warm in here.

14    Q    No, are you armed?

15    A    Armed?

16    Q    Yeah.

17    A    That's a ridiculous question.

18    Q    Well, maybe so.  Are you armed?

19    A    No.

20    Q    There was, there were punitive

21    objections because Mr. McDaniel, I believe they

237

1  were because Mr. McDaniel used the term murder.  If

2  the term patricide was used would you answer

3  questions about the death of your father?

4      A   I would take the Fifth Amendment.

5      Q   Were you prosecuted as a juvenile on

6  that case or treated as a juvenile on that case?

7      A   I'll take the Fifth Amendment.

8      Q   Mr. Schulman, how can you take the Fifth

9  Amendment on a closed, on a proceeding that's over?

10         MR. SCHULMAN:  I'm sorry, what did you

11  say?

12         MR. RADDING:  How can he take the Fifth

13  Amendment --

14         MR. SCHULMAN:  I can't hear you, speak

15  up, please.

16         MR. RADDING:  How can he take the Fifth

17  Amendment on a proceeding that is over, a

18  historical proceeding?

19         MR. SCHULMAN:  It's not my role to

20  answer your question.

21         MR. RADDING:  All right.  And you're I

238

1  take it declining to advise your client to answer

2  the question?

3      MR. SCHULMAN:  I don't have to respond

4  to that either.

5    Q   Now, sir, there was an area of

6  questioning by Mr. McDaniel that was left off but I

7  feel we've got to go back to it, and that's the

8  area of oath, of oath.  You filed an affidavit, you

9  have testified here today, but let me try to

10  ascertain some things about your testimony in those

11  contexts.  Do you, do you recall taking an oath?

12    A   Today?

13    Q   Yes.

14    A   Yes.

15    Q   Why have you refused to state what you

16  believe the oath requires of you?

17      A   I'll take the Fifth Amendment on that as

18  well.

19    Q   What about your understanding of the

20  oath could possibly incriminate you, sir?

21    A   I'll take the Fifth Amendment.

239

1    Q    Is it that you have not told the truth

2  today, sir?

3    A    I'm going to take the Fifth Amendment.

4    Q    So I am asking you flat out if you have

5  told a lie today and you are taking the Fifth; is

6  that correct?

7    A    Yes, and I already answered Mr.

8  McDaniel.

9    Q    Well, that's Mr. McDaniel's questioning.

10    A    And he got to go home.

11    Q    Now, you -- we're not going to debate,

12  sir.  You know, if you'd stop with the --

13    A    I answered your question.

14    Q    -- wisecracks we'll get out of here

15  earlier, okay?  Did you lie here today, sir?

16    A    I take the Fifth Amendment.

17    Q    Now let's be very clear.  I am asking

18  you if you have lied under oath today?

19    A    I've answered the question.

20      MR. SCHULMAN:  Let's just confer about

21  that question.

240

1    Q   You're taking the Fifth?

2        MR. SCHULMAN:  No, he's going to confer

3  with me.

4        THE VIDEOGRAPHER:  Off the record at

5  6:34.

6        (Pause in the proceedings.)

7        THE VIDEOGRAPHER:  6:35 p.m.  We're back

8  on the record.

9    A   And the answer is I've answered

10  truthfully to the best of my knowledge.

11    Q   Every question?

12    A   To the best of my knowledge.

13    Q   Every question?

14    A   To the best of my knowledge.

15    Q   You can't think of one question today in

16  the deposition today that your answer was not

17  truthful?

18    A   I've already answered the question.

19    Q   No, you haven't.  Repeat the question,

20  please.

21        MR. RADDING:  Repeat the question,

1  please.

2    (The reporter read the record as requested.)

3    A   That's correct.

4    Q   Have you ever lied under oath?

5       MR. SCHULMAN:  Take the Fifth Amendment.

6    A   I'll take the Fifth Amendment.

7    Q   Why are you taking the Fifth Amendment

8  on that?

9       MR. SCHULMAN:  Take the Fifth Amendment.

10    A   I'll take the Fifth Amendment.

11       MR. RADDING:  Well, Mr. Schulman, the

12  local guidelines allow me to inquire into it and

13  I'm going to.

14    Q   Why are you taking the Fifth Amendment

15  about whether you ever lied under oath?

16       MR. SCHULMAN:  Could you show me where

17  it says that?

18       MR. RADDING:  No, you got the book, look

19  it up yourself.

20       MR. SCHULMAN:  Take the Fifth Amendment.

21    A   I take the Fifth Amendment.

242

1    Q    Have you ever lied under oath in a court

2 proceeding, sir?

3        MR. SCHULMAN:  Take the Fifth Amendment.

4    A    I take the Fifth Amendment.

5    Q    Have you ever lied under oath in a

6 proceeding on delinquency?

7        MR. SCHULMAN:  Take the Fifth Amendment.

8    A    I take the Fifth Amendment.

9        MR. RADDING:  Mr. Schulman, since you

10 won't bother to look it up yourself, guideline

11 6(a)(2), after a claim of privilege has been

12 asserted the person seeking disclosure shall have

13 reasonable latitude during the deposition to

14 question the witness to establish other relevant

15 information concerning the assertion of privilege,

16 including the applicability of the particular

17 privilege being asserted, any circumstances which

18 may constitute an exception to the assertion of the

19 privilege, any circumstances which may result in

20 the privilege having been waived and any

21 circumstances that may overcome a claim of

243

1  qualified privilege.  And just to finish the

2  paragraph, in accordance with Federal Rules of

3  Criminal Procedure, Civil Procedure rather,

4  26(b)(5), the party asserting the privilege in

5  providing the aforegoing information shall not be

6  required to reveal the information which is itself

7  privileged or protected from disclosure.  So I

8  believe, sir, that gives me the right to inquire.

9      Q    Have you ever lied under oath in a

10  proceeding, sir?

11      MR. SCHULMAN:  Take the Fifth.

12      A    I'll take the Fifth Amendment.

13      Q    So you have lied in a proceeding; is

14  that correct?

15      MR. SCHULMAN:  Take the Fifth.

16      A    I take the Fifth Amendment.

17      Q    What proceeding have you lied in?

18      A    I take the Fifth Amendment.

19      Q    Well, if you have never lied in a

20  proceeding, sir, there's no reason to take the

21  Fifth, is there?

244

1        MR. SCHULMAN:  Take the Fifth.

2     A   I'll take the Fifth Amendment.

3     Q   Can you testify truthfully that you have

4   never lied in a proceeding under oath, sir?

5        MR. SCHULMAN:  Take the Fifth.

6     A   I'll take the Fifth Amendment.

7     Q   Can you testify under oath that you did

8   not lie in your affidavits that have been used in

9   this case, sir?

10     A   Can you repeat the question?

11     Q   Can you testify under oath that you have

12   not lied in any of your affidavits that have been

13   used in this case, sir?

14        MR. SCHULMAN:  Let's talk about that.

15        MR. RADDING:  Are you going to talk

16   about privilege, sir?

17        MR. SCHULMAN:  Sure am.

18        MR. RADDING:  Okay.  Please keep it to

19   that.

20        MR. SCHULMAN:  I follow the rules.

21        THE VIDEOGRAPHER:  Off the record at

245

1  6:39.

2          (Pause in the proceedings.)

3          THE VIDEOGRAPHER:  6:40.  We're back on

4  the record.

5          MR. RADDING:  I think he asked for the

6  question to be repeated.

7      (The reporter read back as requested.)

8      A   Yes.

9      Q   Okay.  So all your affidavits are

10  factually correct, sir?

11      A   Yes, to the best of my knowledge.

12      Q   Even when your affidavits contradict or

13  conflict with your testimony, they're both correct;

14  is that correct, sir?

15          MR. SCHULMAN:  Objection.

16      Q   You can answer.

17      A   Yeah, they're both correct.

18      Q   So even if the affidavit says one thing

19  and your testimony or a different affidavit says

20  something diametrically opposite, they're both

21  correct; is that correct, sir?

246

1        MR. SCHULMAN:  Objection.

2    Q   You can answer.

3    A   Yes.

4        MR. MARTIN:  Are you done?

5        MR. RADDING:  Give me just a moment.

6    Q   How much are you paying Mr. Schulman to

7  represent you in these proceedings?

8        MR. SCHULMAN:  Objection.

9    Q   You can answer.

10        MR. SCHULMAN:  Well --

11        THE WITNESS:  Isn't that attorney-client

12  privilege?

13        MR. RADDING:  No.

14        MR. MARTIN:  No.

15        THE WITNESS:  Everybody knows.

16        MR. MARTIN:  It's not.

17        THE WITNESS:  Do I have to answer it?

18        MR. SCHULMAN:  I'm not going to -- I

19  think that falls within the concerns I voiced

20  earlier.  Why don't you step out of the room.

21        THE WITNESS:  Okay.

247

1    (Witness left the deposition room.)

2        THE VIDEOGRAPHER:  Off the record at

3  6:42 p.m.

4        MR. RADDING:  Oh, no, please, keep this

5  on the record.

6        THE VIDEOGRAPHER:  Fair enough.  One

7  moment.  I thought they were both leaving.  One

8  moment.  6:43 p.m.  We're back on the record.

9        MR. RADDING:  Mr. Schulman.

10        MR. SCHULMAN:  Actually I think you're

11  entitled to know that, I have just reconsidered my

12  position.  I thought at first, my first reaction

13  was that it fell within the areas which I thought

14  were beyond claims and abusive before, but there is

15  a claim for attorney's fees, at least presently.

16  There may not be when the dust settles, but it

17  seems to me you're entitled to ask him that.

18        MR. RADDING:  So get him back.

19        MR. SCHULMAN:  Oh, I'm sorry.

20        THE VIDEOGRAPHER:  Still rolling.  We're

21  still on the record.

248

1        MR. SCHULMAN:  Mr. Bond, go ahead and

2   answer.

3        A    Okay.  Is it on?

4        THE VIDEOGRAPHER:  Yes, we're on the

5   record.

6        A    Oh.  I think so far I've paid him

7   between 20 and 25 thousand dollars.

8        Q    And that's purely for representation in

9   this federal proceeding, I'm sorry, regarding

10  copyright?

11       A    Correct.

12       Q    Okay.  And when you say you have paid

13  him, have these payments come out of your funds?

14       A    Yes.

15       Q    And where did you obtain those funds?

16       A    I told you I wasn't going to answer any

17  financial questions.

18       Q    Well, I believe there's a claim for

19  attorney's fees and I believe we're entitled to

20  this information.  Mr. Schulman, for the same

21  reasons I believe --

249

1    A   I've already told you I'm not going to

2  give --

3         MR. SCHULMAN:  I'm just going to

4  reiterate, I think that goes beyond what I had

5  stated when we were out of the room.

6    Q   Mr. Bond, has somebody else paid these

7  payments on your behalf?

8    A   No.

9    Q   Has any member of your family made these

10  payments?

11    A   No.

12    Q   Has anybody in your family or otherwise

13  given you the money to make these payments to Mr.

14  Schulman?

15    A   I already said no.

16    Q   Well, you didn't because it was a

17  different question.

18    A   Same question.

19    Q   Well, I'm asking it again.  Did your

20  mother give you the money to pay Mr. Schulman?

21    A   No.

250

1    Q    Did your brother give you the money to

2  pay Mr. Schulman?

3    A    No.

4    Q    Did your wife give you the money to pay

5  Mr. Schulman?

6    A    No.

7    Q    Did anybody else give you the money to

8  pay Mr. Schulman?

9    A    No.

10    Q    You say you've paid him between 20 and

11  25 thousand dollars, is there any more money that,

12  any more fee that has been accrued since the

13  payment of the 20 or 25 thousand?

14    A    I would think so.

15    Q    Now, when is, when did you pay him the

16  20 or 25 thousand dollars?

17    A    Let's --

18        MR. SCHULMAN:  I think this gets well

19  beyond what I had stated, but I'm not going to tell

20  him not to answer.  I'm objecting --

21        MR. RADDING:  I think you just did.

251

1        MR. SCHULMAN:  No, no, he's going to

2  answer.

3        MR. RADDING:  Oh, okay.

4        MR. SCHULMAN:  But I think this gets

5  well beyond what you would be entitled to learn

6  under any fee shifting arrangement.

7        MR. RADDING:  Huh?

8    Q    Mr. Bond, how much do you think you

9  owe -- when did you pay the 20 to 25?

10    A    I haven't paid November's bill yet

11  because I haven't gotten it, so --

12    Q    All right.  So what you're saying is you

13  paid through October?

14    A    Correct.

15    Q    And through October you had paid 20 to

16  25 thousand dollars?

17    A    Yeah, but part of that money is a 5

18  thousand dollar retainer, so in theory some of it

19  could come back some day.

20    Q    Oh, that's the retainer that's being

21  held until the end of the case?

252

1    A   Yes, sir.

2    Q   And you are on an hourly fee

3  arrangement?

4    A   Yes.

5    Q   And what hourly fee are you paying?

6    A   Well, I'm embarrassed to tell you I

7  don't know.

8    Q   You don't know?

9    A   I've never really looked at it that

10  closely.

11    Q   So you don't know how much you're paying

12  Mr. Schulman per hour?

13    A   It's quite high.

14    Q   500?

15    A   No, it's not.

16    Q   400?

17    A   It's not 400.

18    Q   300?

19    A   I think it's between 250 and 400,

20  somewhere in that range.

21    Q   That's a pretty broad range.  Why are

253

1  you coming up with those numbers?

2     A   Well, because I don't want you to come

3  back and say I lied about the number.

4     Q   I'm just asking about the number.

5     A   Off the top of my head 350 sounds right

6  but I don't want you to hold it to me, okay.

7     Q   And where are you getting these, the

8  funds to pay Mr. Schulman, sir?

9     A   Okay, I've already said I'm not going to

10  discuss my finances with you.

11     Q   Oh.  You said Mrs. Pessin hates you, or

12  words to that effect.

13     A   I think Mr. McDaniel said that.

14     Q   Well, then I'm asking you, do you

15  believe Mrs. Pessin hates you?

16     A   I would think that she would.

17     Q   And why would she?

18     A   Why would Mrs. Pessin hate me?  I can't

19  speak for Mrs. Pessin.

20     Q   Well, you just said you think she hates

21  you.  I'm asking you why you think that, sir.

254

1    A    Well, in reading Mr. Hodgkin's report --

2    Q    Hodgson?

3    A    How do you say it?

4    Q    Hodgson.

5    A    Hodg --

6    Q    Son.

7    A    Son.

8    Q    Yes.

9    A    Hodgson.

10        MR. SCHULMAN:  Hodgson.

11        MR. MARTIN:  Just answer the questions.

12 Jesus.

13    Q    From reading Mr. Hodgson's what?

14    A    Report on Miriam Pessin she didn't say

15 very complimentary things.

16    Q    So you think because of that she hates

17 you?

18    A    Yeah, that's my whole reason.

19    Q    That's your whole reason.  Okay.

20 Anybody else hate you?

21    A    I think I was asked that question before

255

1  and I took the Fifth Amendment on it.

2     Q    Yeah, and I don't understand your --

3     A    So I'll take the Fifth Amendment again.

4     Q    You know, just because you took it

5  before doesn't make it right.

6     A    Okay.

7     Q    What is your basis for taking the Fifth

8  about people who hate you, sir?

9     A    It could be used in my criminal trial.

10     Q    People who hate you could be used in

11  your criminal trial?

12     A    Correct.

13     Q    Could you explain that to me how that

14  could be --

15     A    No, I'm not going to explain it to you.

16     Q    Well, do people hate you because of

17  something you did that is taking place in your

18  criminal trial?

19     A    Oh, God.  I've already said I'm not

20  going to answer that question.

21     Q    What is your basis for not answering

256

1  that, sir?

2      A   Because I've already said I've taken the

3  Fifth on it, so any question related to it I'm

4  taking the Fifth on.  So I'll take the Fifth on

5  your question.

6      Q   Well, what, how could that incriminate

7  you, sir?

8      A   I'm not going to develop information for

9  the criminal trial.

10      Q   Well, do you think a lot of people in

11  the world hate you, sir?

12      A   I'll take the Fifth Amendment on that.

13      Q   I mean are there thousands of people

14  that hate you?

15      A   I'll take the Fifth Amendment.

16      Q   Are there millions of people that hate

17  you?

18      A   I'll take the Fifth Amendment on that.

19      Q   Is that funny?

20      A   Yes, you're humoring me.

21      Q   I'm humoring you?

257

1    A   Yes.

2    Q   Okay.  Well, I'm glad you're finding

3  this thing so entertaining, sir.

4    A   Uh-huh.

5    Q   Does Helena Burch (phonetic) hate you?

6    A   Who?

7    Q   Do you know a person named Helena Burch?

8    A   I don't know any such person.

9    Q   Do the people who brought the criminal

10  charges, is the Attorney General of the state of

11  Maryland hate you, does the Attorney General of the

12  state of Maryland hate you?

13    A   I'm going to take the Fifth Amendment.

14    Q   Does the state police hate you?

15    A   I take the Fifth Amendment.

16        MR. RADDING:  Anything else, guys?

17        (Pause in the proceedings.)

18        MR. RADDING:  Well, Mr., Mr. Bond has

19  not answered a slew of questions that I think

20  should be answered, I think it has been

21  inappropriate.  I am ending my questioning of him

258

1  tonight to give other people a chance and so we can

2  go home at a reasonable time, but I don't think I

3  am telling you that I am done with him because I'm

4  not.

5        MS. GOLDMAN:  Can I have the mic,

6  please?

7        MR. RADDING:  Yes, you may have the mic

8  and the M&Ms and the chips.

9        MS. GOLDMAN:  Thank you.

10        MR. SCHULMAN:  I'm going to excuse

11  myself for a minute, if I can, please.  I'll be

12  right back.

13        THE VIDEOGRAPHER:  Off the record at

14  6:51 p.m.

15           (Brief recess.)

16        THE VIDEOGRAPHER:  6:54 p.m.  We're back

17  on the record.

18        EXAMINATION BY MS. GOLDMAN:

19     Q   Mr. Bond, I have a couple of questions

20  about your discussions with Mr. Grossbart.  If I

21  understand your testimony correctly, you testified

259

1  that Mr. Grossbart helped you with regard to how to

2  tell your story.  Is that correct?

3      A   I think discussed would be a better

4  word.

5      Q   So you had discussions with him about

6  how the story should be told; is that correct?

7      A   I wouldn't even say should, I would use

8  the word could.

9      Q   How it could be told?

10     A   Correct.

11     Q   Did Mr. Grossbart make suggestions to

12  you about how you could tell your story?

13     A   Whatever discussions with Robert were, I

14  think really he would have been more repeating what

15  information he might have gotten from his cousin or

16  from this guy Mike Sager or something.  I'm not so

17  sure Robert had like, you know, his own opinions on

18  it.

19     Q   And did you take any notes with any

20  meetings with Mr. Grossbart --

21     A   No.

260

1    Q    -- concerning the telling of your story?

2    A    No.

3    Q    And did you take any notes after any

4 meetings with Mr. Grossbart?

5    A    No.

6    Q    And based on what Mr. Grossbart told

7 you, which would have been a parroting of things he

8 heard from others, is that a fair assessment?

9    A    Well, I don't know if I would use the

10 word parroting, but, you know, I think it would be

11 mostly what his cousin would have said or this

12 other gentleman would have said, but he might have

13 had his own, you know, thoughts on it too.

14    Q    So --

15    A    I mean he wasn't without thoughts, but I

16 would hardly call him, you know, a gigantic

17 creative director either, okay.

18    Q    Okay.  Okay.  But so he did have some

19 creative thoughts though, they just weren't

20 gigantic?

21    A    Yeah, he, I'm not claiming that he was,

261

1  you know, intensely involved over a long period of

2  time like Norman Pessin was, he was involved really

3  very briefly, you know, it wasn't a very long

4  thing.  Because his thing with the cousin didn't

5  work out and then he helped me get to the Mike

6  Sager guy and, you know, so for whatever period of

7  time that happened, say maybe a year, you know,

8  that was it, then there wasn't anything afterwards.

9      Q    But in that time period that he was

10  involved there was some minimal amount of creative

11  effort on his part with regard to your story?

12      A    Yeah, there was some creative effort.

13      Q    And did you start writing the manuscript

14  during the time that you were having these

15  discussions with Mr. Grossbart?

16      A    Well, no, this is the, this is one of

17  the things that we've discussed here today.  I

18  think, I think actually when he and I began the

19  discussions, the short stories were finished, but I

20  don't think much if any of the manuscript was

21  started in paper form, I mean it was in a

262

1   discussion form, but I don't think, you know, but

2   then it led to it, it led to a paper form because I

3   know that I gave one of the people that he referred

4   me to, the Mike Sager guy, paper form, but I, that

5   was afterwards.

6       Q   And did the, when you started creating

7   this paper form did you incorporate any of

8   Grossbart's creative suggestions?

9       A   Well, I don't, I don't think that any of

10  his, I mean there was nothing that happened with

11  Robert Grossbart that was any different than

12  probably what anybody else had to say, so I don't

13  think there was any revelation, you know, whatever

14  he provided wasn't any revelation from anybody

15  else.

16      Q   And what kind of creative suggestions

17  did he provide?

18      A   Well, I really, I can't really remember

19  because it was, it was very general in regards to

20  the point of view of the story and, you know, how

21  embellished it would be, et cetera.  Now, he was

263

1  more, he was more interested in trying to place it

2  than he was in creating it.

3      Q    Did you review with Mr. Grossbart any of

4  the story line that you ultimately developed and

5  reduced to writing?

6      A    I don't think so because I believe he

7  was out of it by that time.

8      Q    Did you ever see any written notes or

9  materials that were created by Mr. Grossbart with

10  respect to your manuscript?

11      A    No.

12      Q    Okay.  You testified that you believe

13  that Mrs. Pessin hates you based on the content of

14  Mr. Hodgson's report.  Did there come a time when

15  you had an altercation with Mrs. Pessin?

16      A    An altercation?

17      Q    Did you ever raise your voice at her?

18      A    Did I raise my voice at Mrs. Pessin?

19  No.

20      Q    Did you ever display any anger towards

21  Mrs. Pessin?

264

1    A   No.

2    Q   Okay.  Were you ever angry that you were

3  not included in Mr. Pessin's will?

4    A   No.

5    Q   Did you ever have any expectation of

6  being included in Mr. Pessin's will?

7    A   No.

8    Q   I noticed in some of the documentation

9  that has been attached to your affidavit that at

10  some point you used an address of 1501 Guilford

11  Avenue; is that correct?

12    A   Uh-huh.

13    Q   And is that a business address or a home

14  address?

15    A   It was first one then the other.

16    Q   And what business did you conduct at

17  1501 Guilford Avenue?

18    A   Well, I'm going to have to take the

19  Fifth on that because it's going to come into the

20  criminal trial.

21    Q   And when was it a business address, 1501

265

1 Guilford Avenue, what time frame?

2     A   I think I'm still going to take the

3 Fifth on that, if you don't mind.

4     Q   When did it cease to become a business

5 address and start to become a residence?

6     A   It never reverted back.

7     Q   Was it first a residence and then a

8 business?

9     A   Yes.

10     Q   And when did you first start residing in

11 1501 Guilford Avenue?

12     A   In 1988.

13     Q   And --

14     A   I believe '88, I believe.

15     Q   Pardon?

16     A   I said I believe, it could have been a

17 little earlier but I'm not positive.

18     Q   And when did you cease residing at 1501

19 Guilford Avenue?

20     A   In the early '90s.

21     Q   And that's when it became a business

266

1 address?

2    A    Correct.

3    Q    And was there any time when the address

4 1501 Guilford Avenue was both residence and

5 business?

6    A    I don't know.  I don't know.

7    Q    Did you own 1501 Guilford Avenue?

8    A    No.

9    Q    You were a renter at 1501 Guilford

10 Avenue?

11    A    Correct.

12    Q    And do you recall who your landlord was?

13    A    It was called C&H Realty.

14    Q    And when you resided at 1501 Guilford

15 Avenue did you reside there alone?

16    A    Mostly.

17    Q    And there were times when you were not

18 residing there alone?

19    A    Correct.

20    Q    And with whom did you live when you were

21 not alone?

1    A   Well, I'm going to take the Fifth on

2  that also.

3    Q   Okay.  At the time that 1501 Guilford

4  Avenue became a business address was anyone living

5  there?

6    A   I don't understand the question.

7    Q   When it became your business address was

8  there any person other than you living there at

9  that time?

10    A   I'm going to take the Fifth on the rest

11  of the 1501 questions because I believe it will

12  come up at trial.

13    Q   Uh-huh.  And when did 1501 cease to be a

14  business address for you?

15    A   I already said I take the Fifth on that.

16    Q   Okay.

17        MS. GOLDMAN:  Okay.  Those are all the

18  questions I have.

19        REEXAMINATION BY MR. MARTIN:

20

21    Q   One question based on what Ms. Goldman

268

1 said.  Your landlord at 1501 was C&H Realty; is

2 that right?

3    A    Correct.

4    Q    Who owns C&H Realty?

5    A    I'm going to take the Fifth on

6 everything else with that.

7    Q    Did you ever work for C&H Realty?

8    A    I'm going to take the Fifth on that.

9       MR. MARTIN:  No further questions.

10       THE WITNESS:  Okay.

11       MR. SCHULMAN:  Are we done?

12       MR. MARTIN:  Oh, no, we're just

13 starting, trust me.

14       MR. SCHULMAN:  All right.  Let me just

15 start, let's just say one thing for the record.  I

16 noticed one thing about the exhibit which was

17 marked as Exhibit 4.  It appears to have, I don't

18 think it affects any of the testimony or --

19       MR. MARTIN:  Exhibit 4 in what, in this

20 deposition?

21       MR. SCHULMAN:  Well, it's Exhibit 4 in

269

1  this morning's deposition, Mr. Grossbart's

2  deposition.

3        MR. MARTIN:  Yeah, it's your affidavit.

4        MR. SCHULMAN:  Yeah, but it appears it

5  may have some documents on it that were attached to

6  Mrs. Bond's affidavit, and that, but --

7        MR. MARTIN:  I can't speak to that.

8        MR. SCHULMAN:  I'm just saying that for

9  the record because I just noticed it.  It starts

10  with the May 14th, 1997 fax, but, I just wanted to

11  state that.

12        THE VIDEOGRAPHER:  Shall I conclude the

13  videotape?

14        MR. MARTIN:  Uh-huh.

15        MR. SCHULMAN:  Yes.

16        THE VIDEOGRAPHER:  This deposition is

17  concluded November 16th, 2001 at approximately 7:05

18  p.m.

19        MR. SCHULMAN:  And we're going to read

20  and sign.

21        MR. MARTIN:  Actually this portion of

270

1  his deposition is concluded.  He may have more.

2        THE VIDEOGRAPHER:  Hold on.  Fair

3  enough.  We're were back on at 7:05.  This

4  concludes today's portion of the deposition.

5        We're off the record at 7:06.

6   (Videotape deposition suspended at 7:06 p.m.)

7              *****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

271

1        CERTIFICATE OF DEPONENT

2

3

4

5

6

7        I hereby certify that I have read and

8    examined the aforegoing transcript, and the same is

9    a true and accurate record of the testimony given

10    by me.

11        Any additions or corrections that I feel

12    are necessary, I will attach on a separate piece of

13    paper to the original transcript.

14

15        _____
            William C. Bond
16

17

18

19

20

21

272

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

273

1  STATE OF MARYLAND, COUNTY OF CARROLL:

2      I, Sharon A. Beaty, a Notary Public in and

3  for the State of Maryland, County of Carroll, do

4  hereby certify the within named WILLIAM C. BOND

5  personally appeared before me at the time and place

6  herein set out and, after having been duly sworn by

7  me according to law, was interrogated by counsel.

8      I further certify that the examination was

9  recorded stenographically by me and then

10  transcribed from my stenographic notes to the

11  within typewritten matter in a true and accurate

12  manner.  I further certify that the stipulations

13  contained herein were entered into by counsel in my

14  presence.  I further certify that I am not of

15  counsel to any of the parties, nor an employee of

16  counsel, nor related to any of the parties, nor in

17  any way interested in the outcome of this action.

18      AS WITNESS my hand and notarial seal this
   16th day of November, 2001, at Baltimore, Maryland.
19

20      _____
           Sharon A. Beaty, Notary Public
21