**EXHIBIT # 3**

Case 1:01-cv-02600-MJG  Document 244-5  Filed 05/01/2007  Page 1 of 4

**129**

1  the plaintiff?
2  A. Yes, I do.
3  Q. Where did you meet Mr. Bond?
4  A. Bonnieview Country Club.
5  Q. What were the circumstances you met him at the country
6  club?
7  A. Socially.
8  Q. Did he retain you to prepare tax returns?
9  A. Yes.
10 Q. And where were you working at the time he retained you to
11 prepare?
12 A. 11 East Mount Royal Avenue.
13 Q. That was in your capacity as an accountant?
14 A. Yes.
15 Q. Were you an attorney at the time Mr. Bond retained you to
16 do tax work?
17 A. I was not.
18 Q. Did there come a time when Mr. Bond told you information
19 about his murdering his father back in Ohio?
20      MR. SCHULMAN: Objection, Your Honor.
21      THE COURT: What's the objection?
22      MR. SCHULMAN: To the term "murder."
23      THE COURT: All right. Kill. Kill. Murder's a
24 legal term. Kill.
25 BY MR. MCDANIEL:

**130**

1  Q. Okay. Did Mr. Bond tell you that he beat his father to
2  death with a hammer?
3  A. He did not.
4  Q. What did he tell you?
5  A. He indicated that he was involved in his father's death.
6  Q. Did he give you any other details?
7  A. Not really, no.
8  Q. Did he -- where were you when he imparted this information
9  to you?
10 A. In my accounting office on 11 East Mount Royal Avenue.
11 Q. Were you a member of the bar at the time he told you this?
12 A. I was not.
13 Q. Did Mr. Bond say anything to you about keeping this
14 information confidential?
15 A. I don't recall him saying that.
16 Q. Did Mr. Bond tell you that the story of his involvement in
17 his father's death was not true, was fictional?
18 A. No.
19 Q. Did Mr. Bond ask you to do anything on his behalf in
20 connection with this story about his involvement in his
21 father's death?
22 A. Well, he indicated he wanted to make either a book or a
23 movie. I think maybe a book, and I indicated I had a relative
24 who was in the movie industry.
25 Q. Who was that?

**131**

1  A. Jack Grossbart.
2  Q. And did Mr. Bond authorize to you speak to Mr. Jack
3  Grossbart about this matter?
4  A. Yes, he did.
5  Q. Did you?
6  A. Yes, I did.
7  Q. What did you and Jack Grossbart discuss?
8  A. Well, his name was never mentioned. What details Bill had
9  indicated to me, I related to him.
10 Q. To Jack?
11 A. Jack, yes.
12 Q. When you say his name was never mentioned, you mean you
13 kept Mr. Bond's name out of it?
14 A. Yes.
15 Q. What did Jack Grossbart say to you?
16 A. He said he couldn't do anything unless it had some kind of
17 authentication that the story was in fact true.
18 Q. Did you report that back to Mr. Bond?
19 A. Yes, I did.
20 Q. Did Mr. Bond tell you that he would authenticate that the
21 story was true?
22 A. He gave me some of the -- name of someone to contact who
23 could authenticate the story.
24 Q. Did you contact that person?
25 A. Yes, I did.

**132**

1  Q. Did that person provide you with any information to
2  corroborate the story?
3  A. None.
4  Q. Did you recall the person you communicated with that?
5  A. No.
6  Q. Was the person out of the State of Maryland?
7  A. Yes.
8  Q. Did you have anything further to do with Jack Grossbart
9  about this matter?
10 A. No.
11 Q. Did you have anything further to do about this story Mr.
12 Bond telling you other than making these two phone calls you
13 told us about?
14 A. Not to my recollection, no.
15 Q. Were you ever retained as an attorney by Mr. Bond in
16 connection with his story or manuscript or interest in making
17 a movie --
18 A. No.
19 Q. -- about his experiences in Ohio?
20 A. No.
21 Q. At any time, did Mr. Bond tell you that the information he
22 was imparting to you was to be kept confidential?
23 A. Those words were never stated.
24 Q. Did he ever give you any documents or papers that
25 indicated that it was to be kept confidential?

133

1  A. No.
2  Q. Did you ever have, Mr. Grossbart, a copy of a manuscript
3  prepared by Mr. Bond, and there are a couple versions in front
4  of you here, as exhibits. Did you have any of those?
5  A. No.
6  Q. Did you ever see any of those manuscripts that Mr. Bond
7  prepared?
8  A. No.
9  Q. Now, did there come a time when you spoke to a man named
10 Hodgson about Mr. Bond?
11 A. Yes.
12 Q. And this is Dudley Hodgson, who's here in the courtroom as
13 a defendant; is that correct?
14 A. That's correct.
15 Q. And when was this that you first spoke to Mr. Hodgson
16 about Mr. Bond?
17 A. My best guess, about a year and a half ago, a year ago.
18 Q. Mr. Hodgson came to you?
19 A. Yes.
20 Q. And what did Mr. Hodgson ask you to tell him?
21 A. If I knew anything.
22 Q. Now, at the time you spoke to Mr. Hodgson, in this
23 conversation, did you tell Mr. Hodgson anything about a book
24 or manuscript?
25 A. No.

134

1  Q. Did you tell Mr. Hodgson that Norman Pessin or Miriam
2  Pessin had possession of a book or manuscript?
3  A. No.
4  Q. Did you even know whether the Pessins had possession of a
5  book or manuscript?
6  A. I didn't even know there was a manuscript.
7  Q. So when you spoke to Mr. Hodgson, you were not aware that
8  a manuscript of this book existed?
9  A. Correct.
10 Q. What information did you tell Mr. Hodgson about Mr. Bond?
11 A. That he was from Cleveland. There was something happened
12 during while he was a juvenile that he might want to look
13 into.
14       Subsequently came to Baltimore. Had a short stay at
15 Shepherd Pratt. And then he was discharged.
16 Q. Now, you just said that he told Mr. Hodgson that something
17 happened involving Mr. Bond while Mr. Bond was a juvenile in
18 Ohio.
19       Were you any more specific than that with Mr.
20 Hodgson?
21 A. No.
22 Q. Did you believe you were providing information protected
23 by the attorney/client privilege when you spoke to Mr.
24 Hodgson?
25 A. No.

135

1  Q. Why did you have that belief?
2  A. I was told when I was not a lawyer.
3  Q. Did you believe you were providing information to Mr.
4  Hodgson that had been told to you in confidence in any way?
5  A. Not really, because he was trying to promote the story.
6  Q. Mr. Bond was?
7  A. Yes. It didn't -- wasn't consistent.
8  Q. You mean keeping the matter in confidence was not
9  consistent with the reason Mr. Bond had told you the story to
10 begin with?
11 A. Right. That didn't -- it wasn't consistent, those two
12 thoughts.
13       MR. MCDANIEL: Can I have one second, Your Honor?
14       (Pause.)
15       MR. MCDANIEL:. I'm looking for exhibit 7 for the
16 plaintiff, which I think is up here.
17       (Pause.)
18 BY MR. MCDANIEL:
19 Q. Let me show you, Mr. Grossbart, what was marked for
20 identification as plaintiff's exhibit number 7. Do you see
21 that?
22 A. Yes, I do.
23 Q. That is a letter from Mr. Bond to a lawyer in Ohio. Do
24 you see that?
25 A. Yes, I do.

136

1  Q. And the letter is dated in 1988; is that correct?
2  A. That's what the letter reports.
3  Q. And the letter -- let me look at it so I get this question
4  right. It says pursuant to our conversation on August 15th,
5  1998, in conference with Robert Grossbart, I am writing this
6  letter to formally request and obtain the necessary legal
7  documentation and so forth; is that what that says?
8  A. That's what it says.
9  Q. Do you recall being in conference with Mr. Bond in 1988
10 about this matter?
11       THE COURT: '98 or '88?
12       MR. MCDANIEL: '88, Your Honor.
13       THE COURT: '88?
14 BY MR. MCDANIEL:
15 Q. Do you recall being in conference with Mr. Bond in 1988 on
16 this matter of what happened to him in Ohio?
17 A. No.
18 Q. Do you recall ever being in a three-way phone call with
19 Mr. Bond and Mr. Pessin about what happened to Mr. Bond in
20 Ohio?
21 A. No.
22 Q. You're not copied on that letter; are you, Mr. Grossbart?
23 A. I am not.
24 Q. Now, let me show you exhibit what's been marked for
25 identification as exhibit 8.

**137**

1  MR. SCHULMAN: Your Honor, point of clarification.
2  Counsel keeps referring to these as marked for identification,
3  but I believe they're in evidence by virtue of their reference
4  under the local rule.
5  THE COURT: They can be in evidence. You can go
6  through the exhibits later and ask to exclude anything you've
7  overlooked. But, yes, you're right. They'll be in evidence.
8  Whatever's been mentioned is in evidence unless somebody
9  objects to it.
10  BY MR. MCDANIEL:
11  Q. Looking at exhibit number 8 there, that's a letter from
12  back to Mr. Bond; is that correct?
13  A. As it purports, yes.
14  Q. And it's dated in September of 1988, is that correct?
15  A. That's correct.
16  Q. It transmits certain documents to Mr. Bond relating to Mr.
17  Bond's legal trouble after his father got killed in Ohio; is
18  that correct?
19  A. That's what it states.
20  Q. It doesn't show in the copy of the letter to you?
21  A. That's correct.
22  Q. Was that information sent provided by you in any way?
23  A. Never.
24  THE COURT: Can I see that the letter?
25  MR. MCDANIEL: Yes, Your Honor.

**138**

1  THE COURT: All right. Mr. Schulman, any questions?
2  MR. SCHULMAN: Yes, very briefly.
3  CROSS-EXAMINATION
4  BY MR. SCHULMAN:
5  Q. Did you ever provide Mr. Hodgson office anything
6  concerning a woman by the name of Kohler?
7  A. I don't believe I did.
8  Q. Do you know anybody by the name of Kohler?
9  A. Yes.
10  Q. Did you represent Miss Kohler?
11  A. I invoke the attorney/client privilege on that.
12  Q. Do you represent Mr. Hodgson?
13  A. Invoke the attorney/client privilege on it as well.
14  Q. Have you ever stated that you represent Mr. Hodgson?
15  A. Attorney/client privilege as well.
16  Q. Do you recall whether you testified at deposition that you
17  represented Mr. Hodgson?
18  A. I don't recall, no.
19  Q. What was the name of the person you did speak with in
20  Ohio, do you recall that person's name?
21  A. Never knew the name.
22  Q. Did you at any time represent Mr. Bond? Strike that. Let
23  me withdraw the question.
24  Ever perform any legal services for him?
25  A. As an attorney?

**139**

1  Q. Yes.
2  A. No.
3  Q. Let me show you what's been marked as exhibit 2 A. Take a
4  look at exhibit 2 A. Did you prepare that letter?
5  A. Yes.
6  Q. Did you prepare the document that is attached to that
7  letter?
8  A. What do you mean by "prepare"?
9  Q. Did you draft it?
10  A. Most likely, yes.
11  Q. And did you send it to Mr. Bond with a letter that's on
12  the top, on top of that exhibit?
13  A. Apparently, yes.
14  THE COURT: Is this report -- Mr. Schulman, I don't
15  have any idea what you're talking about.
16  Q. What is that letter? Tell his honor what it is?
17  A. It's a letter dated seven days before I was admitted to
18  the bar from me to Bill Bond concerning his will, and Maryland
19  living will, and what instructions related to this, what he
20  should do to get it authorized and execute it.
21  Q. And when was it that you completed your law school work?
22  A. In late '86, I believe.
23  Q. And you were admitted on June 17th of 1986?
24  A. 7.
25  Q. 1997. Excuse me.

**140**

1  Is that correct?
2  A. That's correct.
3  Q. Now, look at exhibit 2 B, did you send that letter?
4  A. Apparently, yes.
5  Q. And who did you send it to?
6  A. To Mr. Bill Bond.
7  Q. And what's the nature of that letter?
8  A. It indicates Miss Kohler has signed a living will.
9  MR. SCHULMAN: Your Honor, if I could just have one
10  moment?
11  (Pause.)
12  BY MR. SCHULMAN:
13  Q. Mr. Grossbart -- if I could approach the witness, Your
14  Honor, show him the page?
15  THE COURT: Yes.
16  Q. Page 71.
17  MR. MARTIN: Of his deposition?
18  Q. Yes. Take a look, if you would, and read it to the Court
19  a starting at page 71, line 20, read that question to the
20  Court.
21  MR. MCDANIEL: Your Honor, I don't know what you're
22  refreshing his recollection. We're impeaching him? What are
23  we doing?
24  MR. SCHULMAN: Probably both.
25  THE COURT: Well, all right. That's fine. You can