IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

WILLIAM C. BOND,                      *

      Plaintiff *Pro Se*

    v.                              *    Civil Action No.: MJG-01-CV-2600

KENNETH BLUM, SR., et al.             *

    Defendants                      *

   *    *    *    *    *    *    *    *    *

## MEMORANDUM IN SUPPORT OF MOTION FOR FED. R. CIV. P. 60 (b) RELIEF FROM JUDGMENT OR ORDER

Now comes Plaintiff William C. Bond *Pro Se* and prays this Court Grant a Fed. R. Civ. P. Rule

60 (b) Relief from Judgment or Order in this Case, Vacate Judge Marvin J. Garbis' Ruling and

Order and Award of Attorneys' Fees, Award Sanctions and Attorney's Fees to Plaintiff, Order a

New Trial with Discovery Order, Award all other Equitable Relief to which Plaintiff is Entitled

or is Necessary for Justice, and Join Plaintiff's Independent Action.[1]

## JURISDICTION

This Court has already held jurisdiction to be proper. Plaintiff further states that Standard Oil Co.

of Cal. v. United States, 429 U.S. 17 (1976) places the District Court as the proper place to hear

this Rule 60 (b) Attack upon the Judgment.

_____

[1]Plaintiff's Independent Action is being filed seperatelty to these Motions.

## PROCEDURAL HISTORY[2]

This Court's own file will show that Plaintiff, through counsel, filed a Complaint for Copyright

Infringement against the Defendants on August 29, 2001 after Defendants reneged on an

agreement to return all copies of the stolen manuscripts in question. This Court Ordered

Expedited Discovery[3] which was not to be redundant of Discovery which had just taken place in

the underlying Custody Case, *Alyson Bond (Slavin) v. William H. Slavin,* in the Circuit Court for

Baltimore City. Defendants filed for Summary Judgement which was granted at Oral Hearing

before Judge Marvin J. Garbis on November 20, 2001. Judge Garbis denied Plaintiff any right in

his own property at issue, failing to order the return of the stolen manuscripts, and awarded the

individual Defendants Attorneys' Fees under the Copyright Act in the amount of $28,726.05 plus

interest. Judge Garbis stated that he would award the law firm Defendants their Attorneys' Fees

as well, but felt he lacked authority to do so. Defendant law firms appealed their denial of their

Attorneys' Fees to the 4th Circuit. Plaintiff then cross appealed. The 4th Circuit remanded the case

on the Attorneys' Fees issue to the District Court, who awarded the Defendant law firms

$153,018.09 plus interest. Plaintiff asked the 4th Circuit to Reconsider their Decision *En Banc,*

which was denied. The US Supreme Court denied Plaintiff's Petition for Certiorari.

Plaintiff then, premised upon the District and 4th Circuit Rulings that Plaintiff's claims lay in

State Torts, sued the Defendant's, Witnesses, Other Persons, and Attorneys in three separate law

---

[2]See attached lawsuits *Bond v. Messerman et al., Bond v. Kenneth Blum Sr., et al.,* and
*Bond v. Pessin et al.* (Exhibit #'s 1, 2, & 3). Although Defendants, Witnesses, Other Persons, and
Attorneys harp and cry about Plaintiff's multiple litigations, most of it, if not all, would have
been unnecessary had the Defendants not committed Fraud in the Copyright Case.

[3](See Exhibit # 4).

suits styled: (1) *William C. Bond v. Gerald A. Messerman, Robert N. Grossbart, and Sheppard Pratt Health Systems*; (2) *William C. Bond v. Kenneth Blum Sr., Dudley F.B Hodgson, William H. Slavin, William A. McDaniel, Caroline A. Griffin, McDaniel, Bennett, & Griffin, McDaniel & Griffin, Paul Dorf, Adelberg, Rudow, Dorf, & Hendler LLC, and Rent-a-Wreck of America* Inc.; (3) and *William C. Bond v. Miriam Pessin and David N. Pessin.* (Out of all these Defendants, only Sheppard Pratt had nothing to do with the Copyright Case.) All State Claims against all the Defendants in these cases relating to their illegal Conversion of the Manuscript(s) and their illegal Invasion of Plaintiff's Privacy Rights were summarily dismissed by Circuit Courts and/or had those dismissals upheld by Maryland Appellate Courts using the Copyright Ruling by Judge Garbis and/or the 4th Circuit Opinions as either *estoppel, res judicata,* or, as in the case of Miriam Pessin, **by implying that the State Action was preempted by the Federal Copyright Act.** Only Sheppard Pratt, who settled rather than defend at the Maryland Court of Appeals, and Grossbart, who settled Plaintiff's malpractice claims against him in Baltimore City Circuit Court[4], were held accountable.

## FACTS

Defendants, Witnesses, Other Persons, and Attorneys conspired to <u>steal</u> and then <u>stole</u> Plaintiff's

---

[4]Although Plaintiff is prohibited from commenting on the Grossbart settlement, Grossbart's insurance company felt no such compulsion, and filed documents in Baltimore City Circuit Court relating to the $100,000.00 paid to Plaintiff in that matter and the Copyright Defendants immediate garnishment of those monies as part of their efforts to collect Judge Garbis' Award of Attorneys' Fees in the underlying Copyright Case. The irony of this situation cannot be ignored: Grossbart settled – a recognized admittance of guilt to Plaintiff's charges of legal malpractice, etc., against him and a malpractice initiated by the COPYRIGHT DEFENDANTS – then those same Defendants took monies created wholly out of their illegal behavior for a Judgement created by their illegal behavior, almost the definition of RICO behavior!

Manuscript(s) from the law offices of his deceased attorney so that they could use it against

Plaintiff and his wife in their defense of the Custody Case and so that they could supply it to the

Maryland State Police in their efforts, which were later successful, to have Plaintiff arrested for

illegal handgun possession due to the fact that Plaintiff was committed to a psychiatric hospital

as part of an Ohio Juvenile Delinquency some twenty years prior. Defendants, Witnesses, Other

Persons, and Attorneys then conspired to commit perjury, suborned perjury, made false

declarations before the Court, obstructed justice, conspired to defraud the United States, violated

Plaintiff's civil rights in a myriad of ways, tampered with witnesses, committed fraud, infringed

Plaintiff's copyright both before and after it was registered, and in the process became a RICO

organization, all with the intent to Defile and Defraud the Court in the Copyright Case and at the

Hearing before Judge Garbis, to Defile and Defraud the Court in the Custody Case, and to Defile

and Defraud the Court in the Criminal Case.

Attorney Gerard P. Martin suborned perjury and obstructed justice, specifically instructing a

witness not to produce subpoenaed documents and instructing him to lie under oath about that

fact and more, many times. Martin violated Federal Rules by wrongly signing many Court

Documents. Plaintiff alleges and avers that Attorneys William A. McDaniel and Andrew

Radding were aware of and/or participated in Martin's illegal actions and presented signed

documents to the Court in knowing bad fath and in violation of the Federal Rules. Plaintiff

alleges and avers that Attorneys Paul Dorf and Caroline A. Griffin also participated in those

schemes. Witness and Attorney Robert N. Grossbart committed perjury, suborned perjury, and

obstructed Justice. Private Investigator and former FBI agent Dudley F. B. Hodgson committed

numerous acts of perjury, subornation of perjury, obstruction of justice, witness tampering, etc.

U.S. District Judge Marvin J. Garbis did not recuse himself, then refused to recuse himself, and

hid key elements of his relations with opposing counsel and a potential, and sure to be called,

material witness[5] in violation of 28 U.S.C. 445 (a) & (b) and other State and Federal Judicial

Canons. Plaintiff alleges and avers that Judge Garbis had other hidden relationships with

Defendants or Defendants' counsel which he hid and that Judge Garbis had actual contacts

during the Case with Gerard P. Martin, Gerald A. Messerman, and/or others with interests

affected by Plaintiff's charges.

Defendants, Witnesses, Other Persons, and Attorneys operated in an orchestrated scheme to

Defraud the Court on a matter of Public Import -- hiding the fact that the manuscript was stolen

from the sanctity of Plaintiff's former law firm, that Plaintiff's property was protected under the

Maryland Code of Professional Responsibility Rule 1.15, and that no one at that law firm,

whether the lawyer in question was alive or dead, was authorized to take Plaintiff's property from

that law firm, or even to know of its existence, for any reason, without the express permission of

Plaintiff. To this end, Defendants, Witnesses, Other Persons, and Attorneys purposely mislead

the Court into believing that "they just went to some random ladies's house who just happened to

have one of the only two copies in known existence of Plaintiff's Manuscript(s) and that the fact

that the deceased husband, who had been Plaintiff's attorney, and Plaintiff's wife's attorney in

the Custody Case, was just some wild coincidence." Defendants, Witnesses, Other Persons, and

---

[5]Plaintiff's attorney in his Juvenile Matter in Ohio was Gerald A. Messerman whom Plaintiff learned, after the Hearing before Judge Garbis, had been Judge Garbis' Georgetown University Graduate School room mate. See also attached Renewed Motion to Recuse.

Attorneys conspired to mislead the Court as to the contents of the box taken from the law firm's offices, how they learned of the existence of the manuscript, and where and how to go get it. Defendants, Witnesses, Other Persons, and Attorneys also conspired to try to spin the true nature of the relationship between Plaintiff and his deceased attorney from that of an attorney-client relationship to something less restrictive despite the mountains of evidence and witness testimony, including by two attorneys, to the contrary. Plaintiff alleges and avers that Defendants, Witnesses, Other Persons, and Attorneys concealed that they were acting as agents of the Maryland State Police, to skirt search and seizure laws, to obtain Plaintiff's manuscripts.

Judge Garbis had a clear conflict of interest in trying to protect his college room mate from having to come to testify at Trial in the Copyright Case, knowing full well that his college room mate was responsible for Plaintiff's arrest and criminal prosecution by the State of Maryland on illegal handgun possession and application charges which were a direct result of said college room mate's malpractice in Plaintiff's underlying juvenile case.[6] The very second that letters written to Messerman from Plaintiff and from Messerman to Plaintiff came into evidence in the Hearing before Judge Garbis, if not before, Judge Garbis should have immediately recused himself, as his impartiality was now a material issue to the Decision in the Case. Plaintiff alleges and avers that from that moment forward, if not before, Judge Garbis acted with ill will, spite, and hatred for Plaintiff and did everything he could in his power to sabotage Plaintiff's Case and violate Plaintiff's Civil Rights, including denying Plaintiff's Due Process right to his <u>own</u>

---

[6]Plaintiff had been told by Messerman many times, both verbally and in writing, that his Juvenile Record had been "expunged." Under Ohio Law at the times in question, any juvenile commitment to any institution would have been considered part of the "expungement."

property,[7] to protect his friend. Plaintiff alleges and avers that Judge Garbis, in conspiracy with some or all of the above Defendants, Witnesses, Other Persons, and Attorneys discussed Plaintiff's Criminal Case, which was pending in Baltimore City Circuit Court, with his old friend, first law partner, and the Judge who then had the Case, Judge Allen L. Schwait, in an effort to further deny Plaintiff his Civil Rights in that Case.[8]

## LAW I: RULE 60 (b)

The Federal Rules of Civil Procedure, Rule 60 (b) controls this action. Plaintiff seeks relief under (3) three subsections of Rule 60 (b): (1) "Fraud Upon the Court" by Officers of the Court, (2) "Fraud upon the Court" by an Orchestrated Effort to Defraud the Court on a Matter of Public Import, and (3) an "Independent Action," which is being submitted separately.

(1) **"FRAUD UPON THE COURT" by Officers of the Court is:**

'[T]ypically confined to the most egregious cases, such as bribery of a judge or juror, or improper

---

[7]This is as much as a *de facto* admission as to Judge Garbis' intent to "Defraud the Court" as we are, presumably, ever going to get. Converted property can never legally change hands, as the Court well knows. Plaintiff, and his property, was treated as if a WWII Jew by Nazis, a great irony given the players.

[8]Judge Schwait went above and beyond out of his way to hold onto Plaintiff's Criminal Case once scheduling conflicts prevented him from remaining in the Case, specifically asking to keep the case in spite of Baltimore Circuit Court Rules. Judge Schwait also denied Plaintiff all reasonable Civil Rights in his Defense of the Criminal Case in (2) two Motions Hearings and, among many other things, allowed the State to not only use Plaintiff's Juvenile Record, but Plaintiff's illegally produced Mental Health Records to convict Plaintiff, in blatant violation of Maryland Law. Further, he allowed the State to introduce Plaintiff's illegally seized manuscripts by the MSP from Plaintiff's home at Trial under the premise that because they were stored in Plaintiff's home office in a box with cancelled postage that the manuscripts were "mail!" It should be noted that even that slim argument would have failed had the Police not had the Manuscript(s) in the first place, courtesy of Miriam Pessin and Hodgson.

influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged. <u>Great Coastal Express, Inc., v. International Brotherhood of Teamsters,</u> 675 F. 2nd 1349 (4th Circuit 1982). "Fraud upon the court" should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication. Fraud inter partes, without more, should not be a fraud upon the court, but redress should be left to a motion under 60(b)(3) or to the independent action. <u>Great Coastal Express, Inc., v. International Brotherhood of Teamsters,</u> 675 F. 2nd 1349 (4th Circuit 1982).

IBT also takes exception to the district court's conclusion that fraud on the court requires involvement by attorneys. **Involvement of an attorney, as an officer of the court, in a scheme to suborn perjury would certainly be considered fraud on the court. (Emphasis added.)** <u>Great Coastal Express, Inc., v. International Brotherhood of Teamsters,</u> 675 F. 2nd 1349 (4th Circuit 1982). Other circuits have also recognized that fraud on the court can occur without the involvement of attorneys. See also <u>Toscano v. Commissioner,</u> 441 F.2d 930, 933-34 (9th Cir.1971); <u>Lim Kwock Soon v. Brownell</u>, 369 F.2d 808 (5th Cir. 1966). See also: <u>Hazel-Atlas Glass Co. v. Hartford-Empire Co.,</u> 322 U.S. 238 (1944), <u>In re Genesys Data Technologies Inc., v. Genesys Pacific technologies, Inc.,</u> 204 F 3rd. 124 (4th Circuit 2000), <u>Outen v. Baltimore County, Maryland </u>177 F.R.D. 346 (4th Circuit 1998).

Clearly, as listed above and in detail below, Attorneys Martin, Grossbart, Former FBI Agent and Licensed Private Investigator Hodgson, and Judge Garbis all suborned perjury and/or perpetrated

a "Fraud upon the Court." On information and belief the previously mentioned Attorneys and Officers of the Court and Attorneys Griffin, Dorf, Radding, McDaniel, and, later, at the 4th Circuit, William F. Ryan, either participated in this "Fraud," had knowledge of the "Fraud," or signed papers to the Court in knowing bad fath. This is more than enough under both U.S. Supreme Court and 4th Circuit precedent for this Court to grant Plaintiff the relief sought.

(2) **"FRAUD UPON THE COURT" by an Orchestrated Effort to Defraud the Court on a Matter of Public Import:**

The dissent by Judge Butzner in <u>Great Coastal Express, Inc., v. International Brotherhood of Teamsters,</u> 675 F. 2nd 1349 (4th Circuit 1982) illustrates this issue as clear as day:

In Hazel-Atlas, the defrauded litigant was mulcted of one million dollars, and the judgment had been entered eight years before it was challenged. The Court acknowledged that "in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered." 322 U.S. at 244, 64 S.Ct. at 1000. But there are exceptions to this general rule. Notwithstanding the eight-year delay, the opinion affirmed the power of federal courts to set aside a fraudulent judgment, saying: "But where the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable,' they have wielded the power without hesitation." 322 U.S. at 244-45, 64 S.Ct. at 1000-01 (citations omitted)... The Court said: 322 U.S. at 246, 64 S.Ct. at 1001, Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it

cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

322 U.S. at 246, 64 S.Ct. at 1001...

Hazel-Atlas requires proof of two elements to establish fraud on the court for the purpose of setting aside a civil judgment when the court itself has not been compromised by bribery or corruption. These two elements distinguish fraud on the court from the type of fraud that Rule 60(b) requires to be asserted within one year. **The first is that the judgment involves an issue "of great moment to the public ...." (Emphasis added.)** 322 U.S. at 246, 64 S.Ct. at 1001. A dispute that concerns only private litigants is not enough. See S & E Contractors, Inc. v. United States, 406 U.S. 1, 15, 92 S.Ct. 1411, 1419, 31 L.Ed.2d 658 (1972) (dictum).

The second requirement of Hazel-Atlas is best described in the words of the Court, 322 U.S. at 245-46, 64 S.Ct. at 1000-01: **This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of afterdiscovered evidence, is believed possibly to have been guilty of perjury. Here ... we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. (Emphasis added.)**

Here, in this case, at its base, we have a complaint for Copyright Infringement, an obvious matter of "public import." Further, the 4th Circuit Opinion, based upon the Defrauded District Court Ruling, is being used as Case Law throughout the United States, making this an obvious matter of **<u>great</u>** "public import."

Further, as is shown above and will be shown below by extensive evidence, circumstantial evidence, and also by what can naturally be inferred, the Defendants, Witnesses, Other Persons, and Attorneys "**deliberately planned and carefully executed a scheme to defraud not only the District Court, but also the 4th Circuit, in addition to the previously mentioned Custody and Criminal Cases. Further, Defendants carried their Fraud into the Circuit and Appellate Courts of Maryland to continue and defend their illegal gains.**

(3) **"FRAUD UPON THE COURT," An Independent Action**:

Plaintiff asks this Court to Join his Independent Action for Relief, which is being submitted subsequently, to this Action. As will be clear from this Motion and the Attached Complaint, Plaintiff below was denied by Defendants, Witnesses, Other Persons, and Attorneys by their Fraud from making valid claims and defenses and joining issues, including, but not limited to, Criminal Copyright Claims. See: Great Coastal Express, Inc., v. International Brotherhood of Teamsters, 675 F. 2nd 1349 (4th Circuit 1982).

## LAW II: COPYRIGHT

Title 17 & Title 18 of the U.S. Code controls the law regarding Plaintiff's underlying Copyright Claim:

(A) 17 U.S.C Sec.106.  Exclusive rights in copyrighted works:

 Subject to sections 107 through 122, the owner of copyright under this title has the **exclusive** (emphasis added) rights to do and to authorize any of the following:

(1) to **reproduce** (emphasis added) the copyrighted work in copies or phonorecords;

5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to **display** (emphasis added) the copyrighted work publicly; and

-11-

(B) 17 U.S.C. Sec. 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include–

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

**(2) the nature of the copyrighted work; (Emphasis added.)**

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work. The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

It is Plaintiff's <u>UNRELENTING</u> contention that the use of a **stolen**, unpublished work cannot be a "Fair Use" under the second factor of "Fair Use,"**the nature of the copyrighted work,** despite the recognized first factor exception of "Fair Use" for judicial proceedings.[9]  Any other interpretation would be to turn Justice and criminal laws and penalties on their head. As has been shown in this Motion and will be shown below, Defendants, Witnesses, Other Persons, and Attorneys conspired to **steal**, then **stole** Plaintiff's literary works from the law offices of his deceased attorney and then lied about that fact and committed Fraud to conceal their Crimes. Not only is this a *de facto* admission of guilt as to the theft, it is also a *de facto* admission that their purported "Fair Use" was bogus. Without doubt, Plaintiff's claims are not "frivolous" as Judge Garbis ruled!

---

[9]It should be noted that "Fair Use" of an unpublished work is a recent invention. Further, "Fair Use" analysis is supposed to be equitable. Making the victim of a stolen work pay the legal bills for "Fair Use" infringers insults logic and common sense.

(C)  Below, Defendants made many other bogus claims regarding Plaintiff's literary works

including that he had already "published" the works by attempting to find a publisher and that

somehow the works were in the rightful possession of the wife of Plaintiff's deceased attorney.

But see: 17 U.S.C Sec. 101. Definitions:

``Publication'' is the distribution of copies or phonorecords of a work to the public by sale or
other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or
phonorecords to a group of persons for purposes of further distribution, public performance, or
public display, constitutes publication. A public performance or display of a work does not of
itself constitute publication. To perform or display a work ``publicly'' means-- (1) to perform or
display it at a place open to the public or at any place where a substantial number of persons
outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit
or otherwise communicate a performance or display of the work to a place specified by clause (1)
or to the public, by means of any device or process, whether the members of the public capable
of receiving the performance or display receive it in the same place or in separate places and at
the same time or at different times.

Thus, there is no question that Plaintiff **did not** "publish" his works.[10]

A ``transfer of copyright ownership'' is an assignment, mortgage, exclusive license, or any other
conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights
comprised in a copyright, whether or not it is limited in time or place of effect, but not including
a nonexclusive license.

Defendants did not claim, nor could they, that Plaintiff transferred his copyright to the wife of

Plaintiff's deceased attorney to enable her to **display** it to anyone, or for her, even, to display it to

herself.[11]

---

[10]See Affidavit of William C. Bond which was attached as an exhibit to Memorandum in
Support of Plaintiff William C. Bond's Response to Defendant Robert N. Grossbart's Motion for
Summary Judgment on Counts IX – XII in *Bond v. Messerman et al.* for a complete accounting
of Plaintiff's literary efforts. (Exhibit # 5)

[11]Further, Plaintiff's literary works were in a box in the basement of Plaintiff's deceased
attorney's home, where the attorney maintained his primary office and conducted a thriving law
practice for over 20 years, in a box clearly marked "Book, Bill Bond." Therefore, there could not

(D) 17 U.S.C. Sec. 506. Criminal offenses (a) Criminal Infringement.

--Any person who infringes a copyright willfully either--

(1) for purposes of commercial advantage or private financial gain, or

(2) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000, shall be punished as provided under section 2319 of title 18, United States Code. For purposes of this subsection, evidence of reproduction or distribution of a copyrighted work, by itself, shall not be sufficient to establish willful infringement.

Plaintiff would state that there is no question that Defendants' infringement upon his literary

works were criminal, both before and after the registration, and that, clearly, there was financial

gain, which in this case, means anything of value (i.e., victory in the custody case, criminal case,

and copyright case, and subsequent cases), and that proof of the vast legal resources expended

toward those goals is proof of the gain of "**anything of value.**" Further, the value of the primary

Manuscript(s) in question was at least $50,000.00, the amount Plaintiff was offered by Paul

Dinas of Kensington Publishers in 1995.

E) 18 U.S.C. CHAPTER 113--STOLEN PROPERTY Sec. 2319. Criminal infringement of a copyright:

 (a) Whoever violates section 506(a) (relating to criminal offenses) of title 17 shall be punished as provided in subsections (b) and (c) of this section and such penalties shall be in addition to any other provisions of title 17 or any other law.

(b) Any person who commits an offense under section 506(a)(1) of title 17--

(1) shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies or phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500;

(2) shall be imprisoned not more than 10 years, or fined in the amount set forth in this title, or both, if the offense is a second or subsequent offense under paragraph (1); and

(3) shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both,

---

have been any dispute as to what was in the box or to whom it belonged!

in any other case.

(c) Any person who commits an offense under section 506(a)(2) of title 17, United States Code–

(1) shall be imprisoned not more than 3 years, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 10 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of $2,500 or more;
(2) shall be imprisoned not more than 6 years, or fined in the amount set forth in this title, or both, if the offense is a second or subsequent offense under paragraph (1); and

(3) shall be imprisoned not more than 1 year, or fined in the amount set forth in this title, or both, if the offense consists of the reproduction or distribution of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000.

(d)

(1) During preparation of the presentence report pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, victims of the offense shall be permitted to submit, and the probation officer shall receive, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, including the estimated economic impact of the offense on that victim.

(2) Persons permitted to submit victim impact statements shall include-- (A) producers and sellers of legitimate works affected by conduct involved in the offense; (B) holders of intellectual property rights in such works; and © the legal representatives of such producers, sellers, and holders.

(e) As used in this section--

(1) the terms ``phonorecord'' and ``copies'' have, respectively, the meanings set forth in section 101 (relating to definitions) of title 17; and

(2) the terms ``reproduction'' and ``distribution'' refer to the exclusive rights of a copyright owner under clauses (1) and (3) respectively of section 106 (relating to exclusive rights in copyrighted works), as limited by sections 107


THUS, it is patently clear, that Defendants, Witnesses, Other Persons, and Attorneys, conspired to **steal**, then **stole** Plaintiff's copyrighted works and committed Fraud both before and after its registration to defeat Plaintiff's enforcement of his **exclusive** rights. Neither, the District Court, not withstanding other Fraud claims against that Court, nor the 4th Circuit, could have reached their conclusions in any legally supported way given this missing information about the Defendants', Witnesses', Other Persons', and Attorneys' **actions** which have been discussed and

which will now be discussed in more detail below.

## THE MANUSCRIPT

Much has been made by the Defendants and the Court about Plaintiff's manuscripts.[12] While the intent and subject of Plaintiff's Manuscript(s) has been grossly mischaracterized by the Copyright Defendants and their press releases[13], *Self-Portrait of a Patricide*, *How if Feels to get Away with Murder* was actually an anti child abuse story based on the outline of Albert Camus' *The Stranger.* Plaintiff did not get away with murder. Further, there is no way for anyone except Plaintiff to know many of the details of the events which transpired during the events in question, and whether those details and events are true or false or somewhere in between.[14] The illegally obtained Juvenile Police Report from the Chief of Police from a small township in Ohio and from whom the investigation in the Juvenile Matter was relieved after only one day should not form the basis of any "purported facts" used by Defendants or the Court to somehow correlate the manuscript to Plaintiff's Juvenile Delinquency.[15] Plaintiff has repeatedly stated that the

------------

[12]Defendants have always purposely misstated the title of the main manuscript in question.

[13]Plaintiff alleges and avers that Defendants, Witnesses, Other Persons, and the Attorneys worked in tandem with public relations specialists to publicize Plaintiff's arrest, the Custody Case, and the Copyright Case to win favor with the judiciary and to pollute future jury pools.

[14]Defendants, in the Copyright Case as well as in State Tort Actions, mistakenly believe that line by line analysis of the manuscripts somehow defeats Plaintiff's rights in his own property. At best, these arguments belay morbid curiosity.

[15]Bainbridge, Ohio Chief of Police Jim Jiminson violated Ohio law by giving Hodgson an unredacted Juvenile Police Report concerning Plaintiff and which contained Plaintiff's Name, Juvenile Court Documents, and Mental Health Documents. Although Plaintiff has a valid Civil Rights claim against the Chief, he has not pursued it so as to spare his family in Ohio, who were greatly stirred up and troubled by Hodgson's actions, actions which used them as pawns for his

manuscript is a "highly embellished and fictionalized" story based upon his real life experience. Further, as Defendants already had the illegally obtained the Juvenile Police Report, what exactly were the **facts** in the manuscript that would have added anything more to what was all Defendants purportedly needed for their defense in the Custody Case? This very important question has never been answered for the very simple reason: Defendants have no legitimate answer! It is perfectly clear that Defendants wanted Plaintiff's manuscripts **entirely** for their "mode of expression" – to "smear" Plaintiff's and Plaintiff's wife's reputations in their community,[16] to humiliate Plaintiff and his wife, and to use, out of context, literary words and phrases as "truths" to make Plaintiff look bad.[17]

Likewise, letters Plaintiff wrote Defendant Blum mocking and humiliating his dysfunctional family and mirroring his extortion of Plaintiff that "Plaintiff could not marry his daughter unless Plaintiff assumed all financial obligation for her and her children,"[18] were represented by the Defendants to the Court as genuine "extortion" letters to Blum. It is a sure sign of Kenneth Blum Sr's paranoid and delusional manifestations, right out of DSM-IV, that he showed these letters to

greater purpose, from any more grief.

[16]Alyson Bond's children were greatly affected by Defendants, Witnesses, Other Persons, and Attorneys circulating information about the Manuscript(s) to their private school communities. For example, Witness and Attorney Robert N. Grossbart's daughter and wife actively participated in these disgusting activities by circulating information about the Manuscript(s) to the McDonogh School faculty and student body.

[17]Plaintiff was unable to defend the many distortions of the Manuscript(s) by the Defendants as they were holding him hostage, cowardly, with the Criminal Case, which ran concurrently with the Custody and Copyright Cases.

[18]An insulting and galling claim akin to a camel trader out of *The Book of One Thousand and One Nights. (Arabian Nights.)*

-17-

all, blind to how poorly they made him look, and played the victim, looking for false sympathy.

The intent of these letters, lacking the more profane explanation, was simply Plaintiff telling

Blum Sr. to "Go jump in the lake."[19]

## THE UNITED STATES ATTORNEY FOR MARYLAND

"The Blums are scum," so said the US Attorney's Office for Maryland.[20]


The US Attorney's Office for Maryland should know, having prosecuted Kenneth Blum Sr., Dr.

Oscar Camp, William H. Slavin, Alan S. Cohn, others, and the family business headed by Blum

Sr., United Healthcare (now Spectera), for attempting to fix a health care contract in Washington,

D.C. in the late 1980's. Kenneth Blum Sr's son-in-law, Alan S. Cohn, whom he had put through

law school, accepted a plea from the US Attorney for Maryland and was Convicted of

Racketeering in exchange for the investigation and prosecution of Blum Sr., and the others to

terminate. Cohn was subsequently disbarred.[21]

---

[19]Plaintiff and his wife fell in love almost immediately upon meeting in 1995. Later, Plaintiff was to find out about extreme parental violence perpetrated upon Plaintiff's wife by her father when she was in elementary school. Alyson Bond, nee Blum, was sent to school with a black eye, prompting a visit to the school nurse, whom Alyson told that "she fell down the stairs." The truth was that her father hit her repeatedly during her childhood. Alyson Bond was already blind in one eye when this beating occurred. Blum beat his wife, as well.

[20]See attorney William A. McDaniel's off the record description of Plaintiff during Plaintiff's deposition in this Case via attorney Howard J. Schulman's notes. When Schulman challenged the pugilistically challenged lawyer to put his comments on the record, McDaniel cowardly refused. (Exhibit # 6).

[21]It should surprise no one that Blum Sr. committed Racketeering to defeat the Racketeering charges against himself, paying Alan S. Cohn approximately three million dollars to accept the guilty plea even though it was Blum Sr. who orchestrated the entire scheme.

Plaintiff wrote then US Attorney for Maryland, Thomas M. DiBiagio, a letter in 2004 in response to DiBiagio's famous email reprinted in *The Sun*, detailing the same complaints as contained in this Motion. Almost immediately, Plaintiff was contacted by the US Attorney's Office and invited to meet in person, which Plaintiff did, twice. Plaintiff also supplied the US Attorney's Office many of the same exhibits attached to this Motion. Plaintiff was led to believe that his complaints were meritorious and that action would be taken, including moving the Trial to a different Venue because of the publicity the Trial would attract, assumptively because of the Public Officials and former Public Officials involvement. Then, after DiBiagio was forced out as US Attorney, Plaintiff was informed much later that no action would be taken by the Acting US Attorney's Office because of "discretion," but that the decision was not "easy." As Plaintiff was told, among many other things, by the US Attorney's Office, that "There is no question that you have 'right' on your side," and "You know they talked," referring to Messerman and Garbis; Plaintiff has been **exasperated** by the non action taken by the US Attorney's Office and alleges and avers that Political Pressure, as detailed by the recent multitude of news stories of White House/Republican Party interference with local US Attorneys' Offices was exerted to protect US Judge Marvin J. Garbis, former FBI Agent Dudley F. B. Hodgson, and/or former AUSA Gerard P. Martin and/or others unknown at this time.

Plaintiff has filed a FOIA Request with the DOJ for the US Attorney's Office for Maryland's complete files regarding their investigations into Plaintiff's complaint and referral. Plaintiff has also filed a FOIA Request with this Court for Judge Garbis' telephone and communications records relating to the time of the Copyright Case and for Motions relating to Gerard P. Martin's

disqualification in the "Bromwell" case before Judge Motz.

## THE GREEK TRAGEDY[22]

Defendants treated the underlying Copyright Case as an additional **criminal** prosecution of

Plaintiff, something this Court and the 4th Circuit condoned, and a blatant violation of Plaintiff's

Civil Rights and Maryland Code of Professional Responsibility, Rule 8.4. This Court and the 4th

Circuit abandoned the notion that Civil Courts have subpoena power and that criminal

investigators can obtain search warrants for information or property they desire. This Court and

the 4th Circuit also know that Discovery requests and subpoenas are not some magic wand, once

waved, that can produce any such thing desired.[23] Plaintiff was well within his rights to dispute

the taking of his Manuscript(s) from the law offices of his deceased attorney without his

knowledge or permission for any reason, but **especially** the use of it against himself in a criminal

prosecution and against his wife in a custody case. Therefore, some background on the history

and motivation of the actors is necessary:

Kenneth Blum Sr. is the son of a father who was a career criminal and a mother who abandoned

him as a child and placed him in a foster home. Later, he deserted from the US Navy. Upon

meeting and dating his wife, he was investigated by his future father-in-law, a prominent

Baltimore dental laboratory owner, for character questions. He spent most of his early adult life

---

[22]See *The Daily Record* front page feature article Wreckless for more background on the Blums. (Exhibit # 7).

[23]The Defendants in all three of Plaintiff's State Tort Claims spent considerable time and effort to thwart Plaintiff's further Discovery of their nefarious schemes, and were mostly successful in those efforts.

in shady businesses, many door-to-door, until he came up with a scheme to give union physicals to union organized industries on site, thus saving these companies money from employees taking time off from work to get their physicals. Blum's partner in this scheme was a doctor, who was the son of a major union organizer. They became very wealthy. The business was built on pay-offs and kick backs. This mentality resulted in the later prosecution of the company, as described above, by the US Attorney for Maryland for one of their many schemes.

Blum worships false idols – money – and seeks to control all under his influence, which includes, or included, almost every member of his large, extended  family, many of whom worked for him, down to choosing where they live and what color their car is. After the prosecution by the US Government, Blum sought to have his son-in-law, Alan S. Cohn, now a convicted criminal, continue in the operation of the company, in violation of SEC laws. This made his partner, Dr. Oscar Camp, and his other son-in-law, William H. Slavin, especially nervous, given what had happened, and they plotted ways to take control of the company from Blum in 1992. Leading up to this event was the brutal beating laid upon Slavin by the hands of Blum, a former boxer, and thirty years older than Slavin, when Blum questioned Slavin about his numerous extra-marital affairs and drug use discovered by yet another of Blum's private investigators.[24] Once Blum was forced out, Slavin fired all his relatives from the company, including Blum's son, Kenneth Blum Jr. Although, Plaintiff's wife, then Alyson Slavin, knew nothing of William Slavin's schemes,

---

[24]Blum, once Slavin insolently refused to answer Blum's enquiries into his liaisons, beat Slavin to a pulp in his Executive Offices, carpeted with very fine Persian rugs and *faux* Louis XVI furniture, breaking Slavin's nose, then, picking Slavin up, unconscious, by his designer collar and belt, both which he paid for, threw him out into the communal hallway of United Healthcare for all to see. A complete and total humiliation of Slavin by Blum, and, not unlike how a prison gang might operate.

happily, but naively choosing to remain disengaged from the family business that so royally supported her, the entire family from her father and mother down to middle school cousins held her responsible for William Slavin's betrayal. Once Dr. Camp had gained control of the company with the help of Slavin's betrayal of Blum, he fired him, less than six months after Slavin thought he had stuck it to Blum. Slavin has remained unemployed, for the most part, ever since. Alyson filed for divorce from Slavin in 1994.[25]

Enter Plaintiff in 1995. Plaintiff, almost immediately, brought his attorney, Norman E. Pessin into the mix and to serve as Alyson's attorney, as there were many odd things occurring.[26] Pessin consulted on matters of Alyson's divorce and her business relationship with her father, who still supported Alyson in a very generous fashion. Although, at first, Blum liked Plaintiff, he quickly changed his opinion when privileged, attorney-client information about Plaintiff's past from Attorney Robert N. Grossbart, Plaintiff's former accountant and lawyer, was communicated to Alan and Robin Cohn, their mutual friends, in 1995.[27] Thus began the persecution of Plaintiff in

---

[25]Recently, in *The Sun*, the former family business, Spectera, nee United Healthcare, was profiled. Not a word of founder Kenneth Blum Sr. was mentioned in two full pages. What was mentioned was that the company grossed **1.3 billion dollars last year**, a staggering testimonial to Blum's short sightedness, lack of self-control, and, probably, making his punches to Slavin's jaw the most expensive in recorded history! All to support his mania to be right and in control. Ironically, Blum now finds himself in the same position.

[26]Attorney Norman E. Pessin advised Plaintiff "never to get involved in business with Blum," whom he hated for "putting his family in harm's way." Pessin and Blum had several in person meetings at the 'Center Club' for lunch and spoke on the telephone numerous times. Blum knew Pessin was a lawyer representing Plaintiff and, later, Alyson, as he paid several of her legal bills.

[27]Attorney Norman E. Pessin worked with Grossbart on an accounting problem related to a financial dispute in which Pessin was representing Plaintiff in approximately 1987.

the family and the culmination of the family dispute into litigation. Blum's basic position was that Plaintiff should support his daughter in the lavish style **he** had accustomed her to, her children with Slavin -- who refused to support his children in any way -- and, even, spend his free time coaching all three children in tennis, despite the fact that the children had no interest in tennis.[28] The entire Blum family exhibited a perverse mix of arrogance, money worship, and debilitating dyslexia and ADHD. Plaintiff sought to have Alyson and her children treated for their emotional problems. Blum liked everyone just the way they were, weak and dependant on him.[29]

Blum has always claimed that Alyson's children were his focus in his actions from 2000 forward -- by backing Slavin in the custody case, even though he knew Slavin to be a crack cocain addict, by having the Maryland State Police raid his daughter's home, and by taking her children away from her, etc. But Blum's real motivation was his own distorted ego and maniacal desire to control those he claimed he loved, which, according to DSM-IV is a form of necrophilia when it manifests on the level of Blum's behavior.[30]

---

[28]Plaintiff was a former tennis professional and a member of two USTA National Champion High School Tennis Teams.

[29]Plaintiff also discovered, soon after meeting Alyson in 1995, that she had been victimized sexually by Slavin since she was twelve-years-old, under the eyes of Blum, who rewarded the almost 16-year-old Slavin, with a summer job. Later, Plaintiff was to learn how the most degrading and disgusting type of sexual and emotional abuse was heaped upon Alyson by Slavin for many years prior to the divorce. Blum was aware of, at least, some of these actions, yet did nothing to help his daughter. Slavin arrogantly and despicably attempted to use not only his statutory rape of Alyson as a minor against her in the Custody Case, but his later sexual abuse of her as well.

[30]Defendants, Witnesses, Other Persons, and Attorneys have relentlessly castigated Plaintiff for his Juvenile Past and Court ordered commitment to a psychiatric hospital. Plaintiff

The aftermath is not pretty.[31] The children were present for part of the Police raid on the family home – 17 MSP and Baltimore City Police Officers, some in riot gear, ransacked the family home in Guilford for over four hours. Alyson is still estranged from her oldest son, Ian, whom Blum used as confidential informant for the police investigation of Plaintiff.[32] Later, Alyson's two daughters were whisked away in the night, like the Baltimore Colts, to Florida so that Blum could have more control over them.[33] But, once he had what he wanted, Blum dropped his interest like a spoiled brat with a new Tonka truck, putting the children into sub-standard schools

_____

states that those events well equipped him for entry into the Blum family and for attempting to straighten out the mess which had been made of Alyson and her children by the greedy and evil treatment by Blum and Slavin. In fact, the emotional incest exhibited in the Blum extended family reminds Plaintiff of the movie *Chinatown*.

[31]In case this Court has any question, Plaintiff wishes he had never met, nor gotten involved with, the Blums -- events which ruined his marriage and caused much harm to the years and years of struggle it took for Plaintiff to regain his own life after the Juvenile Case.

[32]Ironically, Alyson initially interested Plaintiff in helping her son, Ian, as she believed Ian might **kill** his own father for the emotional abuse suffered at Slavin's hands. Plaintiff became a surrogate father to Ian, taking him boxing, on bike rides, to weekly dinners, shopping, attending his football games, etc. All things Slavin refused, including repeatedly forgetting his son's birthday for many, many years. It was Plaintiff who urged Alyson to send Ian to boarding school in Switzerland at age 16, a move, much criticized by Blum and Slavin at the time, which made the son's future. In spite of all that, Ian, at Blum's urging, became the MSP CI, giving probable cause for the police search of the family home, from Switzerland, speaking on his cell phone, a gift from Plaintiff!

[33]Alyson, during the Criminal Case, sent the daughters to live with Slavin under the premise that a "tough love" approach might stop Blum and Slavin's meddling in the Bond family household. But, Alyson was unprepared for Blum's full-court press, in which the children went to Alyson's sister's home, living with a federal felon, to Florida, to Slavin's brother's home, and on and on ...

and leaving them with various family members **for years** while Slavin went in and out of Drug Rehab over four (4) times in a three year period. Now, that the youngest daughter wants to move back to Baltimore to be with her mother,[34] she is handicapped by her schooling provided by Blum in Florida, and will either have to finish her last year of high school in Baltimore at a public school or repeat a year at the private school she left here in the ninth grade.[35]

Blum's son, Kenneth Blum II, nee Jr., was arrested, prosecuted, and criminally convicted for pulling a handgun on a process server when served with a subpoena during *Bond v. Grossbart* in 2004![36]

## THIEVES AND DEFILERS[37]

### A) THE THEFT:

---

[34]Alyson Bond has been diagnosed with terminal lymphoma since 2001.

[35]The youngest daughter spent her entire school years at the finest Baltimore private schools. It should be noted that Plaintiff and Alyson Bond spent thousands of hours making sure that the youngest daughter had the correct special schooling and tutoring at Jemicy School, a Baltimore school for dyslexia, a move hotly contested by Blum, who, rather than face his own deficiencies, hides them like a coward. The middle daughter, a McDonogh Scool graduate, attends what is, essentially, a community college in Boca Raton, Florida and is supported by Blum.

[36]Kenneth Blum Jr., is also a drug addict, alcoholic, and was charged with domestic violence. His first wife died under mysterious circumstances. Both *The Baltimore Sun* and *The Daily Record* ran stories on Blum Jr's criminal arrest and conviction. He has since sued *The Daily Record* and the former VP of the latest family business, Rent-a-Wreck of America – which they drove right into the ground and are currently being sued by several large stock holders – for, of all things, libel and slander!

[37]See Oral Hearing Transcript before Judge Marvin J. Garbis, November 20, 2001 (Exhibit #8).

**1) Witness & Widow Miriam Pessin – Perjury/Theft**[38]

Miriam Pessin made knowingly false statements in Federal TRO Motion Hearing before Judge

Marvin Garbis on 11/20/01 regarding what was in a box she gave Butch Hodgson, whether the

box was part of her late husband's legal practice, and whether she had read the manuscripts

which the box contained (Exhibit # 9). These statements are contradicted by Hodgson's own PI

———————————————

[38]Norman E. Pessin, Plaintiff's deceased attorney, left Plaintiff a small inheritance: a tennis racket of great sentimental value, which Plaintiff gave Norman on Father's Day in 1997 after Mr. Pessin was diagnosed with cancer, and a handgun, which Plaintiff had given Mr. Pessin for payment of a legal debt in 1995, a case which involved former US Attorney Jervis Finney.

It is well known that Norman Pessin loved Plaintiff and vice versa. Norman and Miriam Pessin had several pictures of Plaintiff alone and with Alyson on a special table in their living room in Laurel, Maryland reserved for family photos. Norman considered Plaintiff to be a part of his family and included him and Alyson at family and religious functions. Plaintiff was a pall bearer at Norman's funeral. Plaintiff was instrumental in getting Norman back on his feet and recovered after his major surgery, not once, but twice, using their shared love of tennis as therapy. Plaintiff took time from his own life to chauffeur Norman to chemotherapy, to doctor's visits, and to many lunches to cheer him up when his own children and wife would not.

After Norman's death, Plaintiff became disgusted with Miriam Pessin when, not only would she not grant the above items to Plaintiff, she bragged about using them herself. Further, the way Miriam Pessin treated Norman during the end of Norman's life disgusted Plaintiff and Alyson Bond, herself a registered nurse. No less than three sets of hospice nurses quit employment with Miriam Pessin while Norman died at home because of Miriam's treatment of Norman which included deprivation of food and water when Miriam asked for it, a clear violation of Maryland Law and God's Commandments. Plaintiff was so disturbed by this behavior that he immediately contacted a close friend of Norman's, Allen D. Greif. Mr. Greif was abhorred as to what he heard and contacted another close friend of Norman's, Frank Bond. Frank Bond and Norman were the founders of Holiday Spas. Frank Bond had a serious discussion about the matter with David Pessin, Norman's son. The end result, according to David, was that the family just wanted Norman to die "as soon as possible," because "he wasn't going to make it anyway." Both Mr. Greif and Plaintiff were very unhappy with this news. Further, Mr. Greif, Frank Bond, and Plaintiff were all, as were many, many other friends of Norman's, very upset that Miriam Pessin chose such a substandard location for the treatment of and surgery for Norman's cancer when Frank Bond was able to place him with the finest treatment at Johns Hopkins Hospital and had many conversations with Norman about how he was letting Miriam make very bad decisions for him.

report (Exhibit # 10), his handwritten notes on Miriam Pessin (Exhibit # 11), and telephone interviews with Mrs. Pessin conducted by Richard M. Karceski and Drake Zaharris (Exhibit # 12). Further, Mrs. Pessin was well aware of her husband's representation of Plaintiff and Plaintiff's manuscript (Exhibit #13).

Plaintiff alleges and avers that someone spoke to Mrs. Pessin before her testimony and persuaded her to give false testimony.[39] <u>As Hodgson did not produce his notes regarding Pessin, and other important documents, until well after the hearing before Judge Garbis, both Plaintiff and the Court were severely impaired in their prosecution and adjudication of Plaintiff's claims.</u>

## B) OFFICERS OF THE COURT: PART I:

### 2a) Witness & Attorney Robert N. Grossbart -- Non Production of Documents/ Obstruction/ Perjury [40]

Robert N. Grossbart denied in the Copyright Case that he had any documents pertaining to his former legal and accounting client, William C. Bond (Exhibit #'s 14, 15, &16). Grossbart denied in *Bond v. Messerman et al (Grossbart)* that he had any documents pertaining to William Bond (Exhibit #'s 17, 18, & 19). Suddenly though --and only when it was convenient for a defense to

---

[39] While it is crystal clear what Miriam did, it is not yet clear who made Miriam do what she did?

[40] Plaintiff speculates that Grossbart betrayed Plaintiff, his former client, and conspired with the felonious Cohns all in an effort to prevent his teen age daughter from sleeping over at Plaintiff's and Plaintiff's wife's home while visiting Alyson's middle daughter, who was her class mate at McDonogh School. Apparently, having a man-to-man conversation never occurred to Grossbart. Ironically, although, Grossbart knew about Plaintiff's past for many years, it didn't prevent Grossbart from letting Plaintiff give his father-in-law multiple free tennis lessons or from playing tennis with Plaintiff for free himself.

his case – and almost half way through *Bond v. Messerman et al (Grossbart)*, Bond's files fell

from the skies. To quote Grossbart: "... (the files) fell in front of them (his secretaries)" (Exhibit

#"s 20 & 21). Yet, Hodgson's original interview with Grossbart (Exhibit # 57) contains

information only available in these files.

But see Hodgson testimony at his deposition in *Bond v. Messerman et al (Grossbart)* (Exhibit #

22):

"And Mr. Grossbart made me believe that he didn't really know very much about Mr. Bond. But

he was talking to somebody that did. And I didn't want to press him to reveal to me who he was

talking to.... And I always got the impression that he was going back to -- I would ask him a

question and he would say I don't know but I'll get back to you or call me tomorrow or call me in

a couple of days and I'll see if I can find out for you. So it was like he was talking to somebody."

**The only explanation for this is that he was going to Plaintiff's file to get answers for**

**Hodgson. Otherwise he would have produced his own informant to defend Plaintiff's legal**

**malpractice claim against him in *Bond v. Messerman et al (Grossbart)*.**

## 2b) Witness & Attorney Robert N. Grossbart -- Perjury

Robert N. Grossbart lied in his deposition in the Copyright Case about whether he was

supervised in the drafting of Plaintiff's will by Engle & Engle (Exhibit # 23). Maryland Rules of

Professional Conduct 5.5 forbade it. And the bill he presented was signed by him. Grossbart lied

about knowing that Norman Pessin was a lawyer or was involved with Plaintiff's manuscript

(Exhibit # 24). Yet he specifically told Hodgson to go to Pessin. He also told Hodgson "That he (Bond) had written a book and was trying to get it published." (Exhibit # 25). All this is contradicted by Grossbart's own answers to Interrogatories in *Bond v. Messerman et al (Grossbart)* (Exhibit # 26) and in letters to Grossbart from Norman Pessin (Exhibit # 27). Mr. Grossbart lied many times under oath  about whether Plaintiff had ever been to the law offices of Engle & Engle (Exhibit # 28). Attorney Timothy M. Gunning interviewed Attorney Lon Engle who told him that he distinctly remembered Plaintiff being at his offices. Mr. Grossbart lied about when he did Plaintiff's taxes (Exhibit # 29). Mr. Gunning proved this answer to be false in his deposition of Mr. Grossbart in *Bond v. Messerman et al (Grossbart)* and in his Answer to Motion for Summary Judgement (Exhibit #'s 30 & 31). Grossbart lied about knowing anyone in the Blum family or Robin Cohn (Exhibit #32). Grossbart says the same for his then wife, Lisa. Yet, Robert & Lisa Grossbart and Alan S. Cohn were high school classmates. They later had meetings where Grossbart referred Hodgson to Alan Cohn for Kenneth Blum Sr's use (Exhibit #'s 33, 34, 35, & 36).

At Federal TRO Motion Hearing before Judge Garbis: Grossbart again lied about Bond ever coming to the offices of Engle and Engle (Exhibit # 37). Again, Mr. Engle can refute that statement. Grossbart lied about never having Bond's manuscripts or papers (Exhibit # 38). He also lied about this fact in his affidavit for the Copyright Case (Exhibit # 39). Then, in his Interrogatories and deposition in *Bond v. Messerman et al (Grossbart)*, he suddenly had Bond's manuscripts which he forwarded to a writer named Mike Sager (Exhibit #'s 40, 41, & 42). Finally, Grossbart lied again about his knowledge of Norman Pessin and the Manuscripts

-29-

(Exhibit #'s 26, 27, & 43).

Grossbart's answer to Interrogatory #4 in *Bond v. Messerman et al (Grossbart)* contradicts his Copyright Case deposition re: what he told Jack Grossbart (Exhibit #'s 44 & 45).

Grossbart was the initial source for the Blums. He helped them hire Hodgson to investigate his former client while serving as the confidential source for the Hodgson's investigation, using Plaintiff's file as his private rolodex. Grossbart's lies about and concealment of his activites, including his conspiracy with a Federal Felon, to dupe the Court are despicable and call for Criminal and Ethical Sanctions of the most severe nature.

### 3a) Defendant, Former FBI Agent, and Licensed Private Investigator Dudley F.B. "Butch" Hodgson -- Non Production of Documents/Obstruction

Hodgson was subpoenaed or ordered to produce his complete file on Bond three (3) separate times (Exhibit #'s 46, 47, & 48). His lawyer even asked him in his Copyright Case deposition whether his PI report on Bond is "Complete?" (Exhibit # 49) Judge Garbis issued an oral order to go with his written order for discovery in advance of the TRO Hearing in the Copyright Case which stated, in part, "The discovery in the Custody Case was to be the basis of discovery in the TRO Hearing." There could be no redundancy (Exhibit # 50). Therefore, the facts presented in the Custody Case were the basis for facts in the Copyright Case TRO Hearing.

But Hodgson testified falsely, repeatedly, in the Custody Case under oath about his files pertaining to Bond. He claimed to have no notes, that the notes were transferred to the written

report, and that the PI notes were destroyed (Exhibit # 51). Hodgson was asked directly (Exhibit # 52):

Q: "Have you produced today your complete file on this matter, other than the box?"

A: "Right."

He was asked again (Exhibit # 53):

Q: "Are there any documents that are part of your file that you have not produced today?"

A: "No."

Hodgson, though, had many, many handwritten notes and other documents which he did not produce, (Exhibit # 11) being just one example. And Hodgson and his attorney, Gerard P. Martin, failed to keep supplying documents as the ongoing nature of Discovery required.


Hodgson's attorney, Gerard P. Martin, represented Hodgson and Blum Sr. in the Custody Case. He represented them both plus William Slavin and Blum Jr. in the Copyright Case. He represented Hodgson, Blum Sr., and Slavin in *Bond v. Blum Sr. et al* in Baltimore City Circuit Court. He also represented Kenneth Blum Jr. on his handgun charges in Baltimore County. There is no question that Martin has been molding the testimony of his clients through out subsequent cases. It is highly relevant in Hodgson's deposition in *Bond v. Messerman et al (Grossbart)* that Martin proffered, off the record, a disingenuous explanation as to why Hodgson had suppressed so much evidence in the Custody Case and I quote, "... because no one asked for it."


In his deposition in *Bond v. Messerman et al (Grossbart)*, Hodgson claims that he's given all his

documents pertaining to Bond to his lawyer (Exhibit # 54). Yet, many records still have not been

produced, such as billing records, interviews with law enforcement officers, etc. In the same

deposition, Hodgson is directly asked whether he prepared an interview report on Grossbart

(Source #1) (Exhibit # 55).[41] His answer was "no." Later, though, in the same deposition, he

produces the report he claimed not to have written (Exhibit #'s 56 & 57). Still later, in the

deposition of Asst. AG Brian Deleonardo, more Hodgson documents are produced (Exhibit #

58). Yet, Hodgson stated in his Copyright Case deposition that he had prepared no documents for

the AG's office and had no plans to meet with them (Exhibit #'s 59 & 60). To say that Mr.

Hodgson plays fast and loose with the truth is a gross understatement.[42]

### 3b) Defendant, Former FBI Agent, and Licensed Private Investigator Dudley F.B. "Butch" Hodgson -- Perjury

Hodgson lied in his depositions in the Custody Case and the Copyright Case on who referred him

to Blum Sr. (Exhibit #'s 61 & 62). Suddenly, though, at the Federal TRO Motion Hearing he

remembers that it was Convicted Felon Alan S. Cohn who referred him to Blum Sr. (Exhibit #

63). Later, in *Bond v. Messerman et al (Grossbart),* Hodgson produced his lead sheet which

stated the referral was from Grossbart (Exhibit # 64).

---

[41]Hodgson met Grossbart when Hodgson's divorce attorney hired Grossbart, who specializes in bankruptcy matters, to advise on Hodgson's divorce. One can only sympathize with Mrs. Hodgson and the predicament he left her in.

[42]It is unclear when Hodgson became a liar? But, sometime during his life, maybe while schooling at Boy's Latin and the Citadel, maybe as an Army Major in Vietnam, maybe as an FBI Agent, then under-cover FBI Agent, maybe working for Judge Bennett during the US House of Representatives Investigation of Clinton, Hodgson embraced the lie. Plaintiff wonders how many innocent victims of Hodgson's lie in the ground and in prisons across the United States?

Hodgson lied in his deposition in the Custody Case and under oath at the Federal TRO Motion hearing about his knowledge about whether Norman Pessin was Bill Bond's lawyer.

Hodgson stated in his Custody Case deposition that he knew Norman Pessin was a lawyer only after he talked to Mrs. Pessin (Exhibit #65). Yet his source, Grossbart, knew Pessin was a lawyer and that he represented Bond (Exhibit # 27). Ken Blum Sr. also knew Norman Pessin was a lawyer who represented Bond.

Hodgson's Interview Notes on Miriam Pessin (Exhibit # 11 ),which he suppressed until after the Custody and Copyright Cases, show that Miriam Pessin told Hodgson that **"Norman Pessin handled a couple of cases for Bill."** Yet, earlier, in his Custody Case deposition (Exhibit # 66), Hodgson was asked :

Q: "And did Mrs. Pessin also tell you that her husband had been Bill Bond's attorney?"

A: "No."[f]

Q: "Did there come a time when you ever learned that Norman Pessin had been Bill Bond's attorney?"

A: "Not until today."

Later, Hodgson directly lied at Federal TRO Motion Hearing when he claimed that when he called Miriam Pessin that there was **no** discussion that Norman Pessin had been Bond's attorney (Exhibit #'s 67, 11, 27).  Richard Karceski's telephone interview with Miriam Pessin states that Miriam told Hodgson at the time of his visit that her "husband represented Bond." It also shows that Hodgson asked for "legal files." (Exhibit # 12)

Hodgson also stated that only Blum Sr. & Jr. were present at their meetings (Exhibit # 68), an event which was highly unlikely given the fact that he was referred by Alan S. Cohn. More likely, Alan Cohn was protected to keep the trail from leading back to Grossbart and from revealing Grossbart's communications with the Cohns. But none of the parties can keep their stories straight. Kenneth Blum Sr. testified in his Custody Case deposition that Alan Cohn was at those meetings (Exhibit # 74).

Hodgson denied knowing who the attorneys in the Custody Case were until the Copyright litigation came up (Exhibit # 69). Earlier, in his Copyright deposition Hodgson was directly asked (Exhibit # 70):

Q: "And did you understand who the attorneys were in that (Custody) case?"
A: "No."

Yet, in his Custody Case deposition, Hodgson testified that he had one conversation with attorneys Griffin and Dorf "when the custody matter came up." (Exhibit # 71) Hodgson also produced a document in *Bond v. Messerman et al (Grossbart)* with Paul Dorf and Carolyn Griffin's names and telephone numbers dated 5/15/01 (Exhibit # 72), a date well before the Copyright Case.

Although there is no other explanation than Robert Grossbart being the original and only source of all information to the Blums and Hodgson, Hodgson continued to try to protect and downplay

Grossbart's involvement. At Federal TRO Motion Hearing Hodgson was asked what Grossbart told him about Bond.

Q: "Well, he didn't really tell you anything, though."

A: "Yeah. He told me that there was something that happened in the Cleveland, Ohio area, and I said I was aware of that."

Q: "And that's the extent of the information he gave you?"

A: "At that time, yes."

This is contradicted by Hodgson's interview, later produced, with Grossbart (Exhibit # 57) and Grossbart's Interrogatories in *Bond v. Messerman et al (Grossbart)* (Exhibit # 73). There is a strong similarity to the information Grossbart gave Hodgson and that contained in Grossbart's recently found file on Bond.

### 4) Defendant, Attorney and former Baltimore Circuit Court Judge Paul Dorf – Perjury

Former Judge Paul Dorf claimed in his Copyright Case deposition that he didn't know where Hodgson got Bond's manuscript (Exhibit # 75). It strains credibility that he would not ask this question of Blum Sr., nor that he would wait over four months to learn the answer. More likely, he knew for certain that Norman Pessin was a lawyer and that it was highly unethical for Blum Sr. and him to send Hodgson to the offices of another law firm.[43]

Paul Dorf also lied about his contacts with the Attorney General's office (Exhibit # 76). Yet,

---

[43]See Alyson Bond's Affidavit in the Underlying Copyright Case. Also, Attorney Norman Pessin arbitrated and/or mediated at least one domestic case under the arbitration/mediation of Dorf.

former Asst. AG Brian Deleonardo testified in his deposition in *Bond v. Messerman et al*

*(Grossbart)* that Dorf met with him and others in person at the AG's offices (Exhibit # 77).

## 5) Attorney Carolyn Griffin – Perjury

Carolyn Griffin claims never to have seen Hodgson's PI Report or to have communicated with

Hodgson about Bond (Exhibit # 78). Again, like Paul Dorf, Griffin had made repeated attempts

to downplay communications with Hodgson because she knows his *ex parte* contacts with the

law offices of Norman Pessin were unethical and prohibited contacts.

Both Dorf and Griffin offer no explanation to Hodgson's contacts with them. (Exhibit #'s 71 &
72).

## 6) U.S. Judge Marvin J. Garbis – "Fraud Upon the Court," Tampering, etc.

The Court treated this Case as subjectively as a dog show, allowing Defendants, Witnesses,

Other Persons, and the Attorneys to influence the Court, passively and/or actively, to ignore

Plaintiff's Civil Rights (see Md Rule 8.4), to turn the Hearing into a circus about Plaintiff's past,

and to ignore Plaintiff's legitimate interests protected by the Copyright Act. Plaintiff stipulates

that no more proof is needed than the outcome of the Case, the Court Ordered deprivation of

Plaintiff's rights in his own property, to prove that corruption of the Court occurred. The proof is

in the pudding, and this pudding tastes like ...


The Rules provide that a Judge should avoid even the perception of impartiality. Full disclosure

is a must. Although Judge Garbis made a brief and self-serving reference to Gerald A.

Messerman in the Federal TRO Motion Hearing at the end of the Hearing while making his

<u>Ruling</u>, he failed to disclose that he had been college room mates with Mr. Messerman at Georgetown University, that they had traveled and entertained each other, and that they had worked on cases together later on in life. Judge Garbis also failed to disclose that he had been a law partner with defense counsel Gerard P. Martin. Clearly Judge Garbis violated 28 U.S.C. 455 (a) & (b)(1), (b)(2).

Plaintiff would argue that Judge Garbis violated  28 U.S.C. 455 (b)(5)(i),(iii), & (iv) as well. To men of Judge Garbis' generation, a college room mate may be emotionally more important than a spouse, as many of these men from this generation have had multiple wives. Plaintiff knows of many men of this generation for whom this type of relationship is paramount.[44]

Clearly, Judge Garbis was utterly dishonest in his Reply to Plaintiff's first Motion to Recuse, and what should have been an ethically self-activating action by the Judge under 28 U.S.C 455 (e).[45] In fact, Judge Garbis proves Plaintiff's point on page (2) two of his Answer to Recusal, stating, "When assigned this instant case in August of 2001, I noted that Plaintiff's criminal counsel in Cleveland had been Mr. Messerman. **This fact was of no moment to me whatsoever**." (Emphasis added.) As stated in Plaintiff's Renewed Motion to Recuse, Plaintiff wonders how Judge Garbis even knew about Messerman being Plaintiff's Juvenile Counsel as Plaintiff's

---

[44]For example, Plaintiff's high school tennis coach and Director of the Upper School at Cleveland's prestigious University School was George Steinbrenner's room mate at Williams College and procured Plaintiff a signed Yankees cap during Plaintiff's juvenile troubles in 1981 at the snap of a finger.

[45]See Renewed Motion to Recuse.

Copyright Complaint was devoid of any mention of Messerman?[46]

But, regardless of when Judge Garbis discovered that his college room mate was in trouble with Plaintiff, the gravamen of Plaintiff 's point is that Judge Garbis knew well in advance of a potential question of impartiality and not only made no disclosure as provided and required in 28 U.S.C. 455 (e), (see definitions, "shall"), he continued to hide what to any reasonable person would be a severe challenge to impartiality. This continued resistence and denial of obvious conflict is very compelling circumstantial proof and causes any reasonable person to infer other unethical behavior. Plaintiff is positive that further Discovery into Judge Garbis' relationships concerning this case will reveal more troubling facts.[47]

TITLE 28--JUDICIARY AND JUDICIAL PROCEDURE PART I--ORGANIZATION OF COURTS CHAPTER 21--GENERAL PROVISIONS APPLICABLE TO COURTS AND JUDGES Sec. 455. Disqualification of justice, judge, or magistrate judge

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as

---

[46]This is a question of great import for the Judge to answer.

[47]For example, is this Court to believe that Judge Garbis did not attend Messerman's successful argument before the US Supreme Court in 1966, while Garbis was a Trial Attorney in the Tax Division for DOJ in Washington, D.C.? Or that they did not socialize during Messerman's United States Court of Appeals Case for the District of Columbia in 1996? Or that none of the persons connected to this Case attended his daughter's bat mitzvah? Etc.

counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person: (i) Is a party to the proceeding, or an officer, director, or trustee of a party; (ii) Is acting as a lawyer in the proceeding; (iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; (iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(e) No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

The Copyright Case was one with no precedent, involved stolen property, and was by no means frivolous. Yet, Judge Garbis issued Summary Judgment to the Defendants, effectively rewriting the law. When asked to reconsider his Ruling, Judge Garbis would not even order the return of the Copyrighted Materials at the conclusion of the litigation which initiated the Case. Later, he sanctioned, essentially, Plaintiff over $181,000. None of this makes any sense unless the relationships are considered. Gerald Messerman was well aware that he was going to be the subject of a civil suit for his malpractice committed in the representation of Plaintiff over 20 years ago. Messerman was to be a witness at the Copyright Trial. His testimony would have been very damaging to himself. How very convenient that his testimony was not ultimately required! There is no question that telephone records, which Plaintiff has made a FOIA Request for and, also, plans to subpoena, will show that Garbis and Messerman communicated, something Garbis, when he was formally asked to recuse, denied. There also could have been simultaneous and

concurrent, either coordinated or not, contacts between Garbis and Gerard Martin and/or parties

acting on Martin's behalf.


Certainly, presiding over a case in which his former partner is an attorney and his former college

room mate, with whom he also practiced law, will be a material witness provides ample reason

for the disqualification of the Judge. <u>Plaintiff alleges and avers that Judge Garbis committed</u>

<u>"Fraud Upon the Court" by not disqualifying himself in this Case, thus unfairly prejudicing</u>

<u>Plaintiff. Why else deny Plaintiff his Due Process right to his own property, something Judge</u>

<u>Grarbis had to do to stick Plaintiff with Defendants' Attorneys' Fees</u>?


## C) DEFENDANTS, WITNESSES, and OTHER PERSONS:

### 7) Defendant Kenneth Blum Sr. -- Perjury/ Obstruction

Kenneth Blum Sr. lied in his Custody Case deposition about who referred Hodgson to him

(Exhibit # 79). We already know from Hodgson (Exhibit # 63) that Alan S. Cohn referred

Hodgson to him, a fact he was unlikely to forget.


Blum Sr. lied about whose idea it was to contact the MSP. In his Custody Case deposition he

says that this was Hodgson's idea (Exhibit # 74). Hodgson said the same thing in his Custody

Case deposition (Exhibit # 80). Hodgson also says in his Copyright case deposition that going to

the MSP was his idea (Exhibit # 81). Yet, Hodgson's files, later produced (Exhibit 82), show that

he called Blum Sr. In Florida to get his **permission** to go to the MSP. Hodgson stated the same in

his deposition in *Bond v. Messerman et al (Grossbart)* (Exhibit # 83). While careful reading will

prove these to be small differences, they are not if put in context. During the Custody Case, Blum

Sr. and Slavin were tying to guard against any charge of <u>Abuse of Process</u>, which they were later

sued for in *Bond v. Blum Sr. et al* in the Circuit Court for Baltimore City, and thus did everything

in their power to deflect their involvement in Plaintiff's arrest. They tried to spin it as something

they had no involvement with and as something completely initiated by Hodgson.

Blum Sr. also lied about his knowledge of Plaintiff's legal relationship with Norman Pessin (see

entire Blum depositions in Custody and Copyright Cases). But Drake Zaharris, a lawyer who

dealt with Blum Sr. on repeated occasions, testified in Federal TRO Motion Hearing that Blum

Sr. acknowledged Bond's attorney-client relationship with Norman Pessin on many occasions.

(Exhibit # 84).

**8) Defendant Kenneth Blum Jr. – Perjury/Obstruction**

Hodgson testified in his Copyright Case deposition that Blum Jr. told him to go interview Robert

N. Grossbart, "...because Mr. Grossbart had had a lot of contact with his family and might know

more detailed information about Mr. Bond." (Exhibit # 85). Yet, Blum Jr. in his own Copyright

Case deposition denied any knowledge of Grossbart. (Exhibit # 86). He also wrote Attorney

Richard M. Karceski a letter stating the same. (Exhibit # 87).

**9) Witness and Attorney Robert N. Grossbart/ Convicted Felon Alan S. Cohn/ Robin Cohn
-- Perjury (Exhibit # 88)**

Hodgson's PI Report says, "Mr. Blum stated that he is especially wants to pursue <u>rumors</u> he has

heard that <u>Bond</u> may have <u>harmed</u> his parents in the State of Ohio as a juvenile (Exhibit # 89).

Although all parties have denied earlier contacts with Grossbart, this sounds exactly like what Robert Grossbart told to his cousin Jack Grossbart (Exhibit # 45).

A logical inference can be made that the Grossbarts and the Cohns were communicating much earlier about Bond than their testimony reflects (Exhibit # 90). None of the parties have produced any witness other than Grossbart who knew this information about Bond. Surely, they would have if there was such a witness.

Hodgson stated  in his Custody Case Depo (Exhibit # 90) that "Blum Jr. knew about Bond's juvenile past before Hodgson was hired and that they knew about SEPH too." This information could only have come from Grossbart, yet Grossbart and the Cohns deny all earlier contact.

Alyson Bond confronted Robin Cohn and Lisa Grossbart in 1998 about earlier conversations they were having about Plaintiff and his past. Lisa Grossbart made extraordinary efforts to avoid testifying under oath in *Bond v. Messerman et al (Grossbart)*, even though Robert Grossbart admitted that he had conversations with her about Plaintiff. Plaintiff alleges and avers that there are other witnesses, known and unknown, who can provide similar evidence.

## D) OFFICERS OF THE COURT: PART II – "Phineas T. Bluster"

### 10) Attorney Gerard P. Martin a.k.a. "Mr. Bluster"

Attorney Gerard P. Martin has served as Kenneth Blum Sr's *consiglierei* since the late 1980's when the two conspired to throw Blum's son-in-law, disbarred attorney Alan S. Cohn, under the train to save Blum's hide from prosecution and prison. Since then, Martin has been behind the

scenes in all the Blum family sagas. Concerning Plaintiff, Martin, while serving insincerely on

the MSBA's Ethics Board, orchestrated, attended, and pontificated for Plaintiff's **conviction** and

**incarceration way above the sentencing guidelines** in the underlying Criminal Case, *State of*

*Maryland v. William C. Bond,* by lobbying the Attorney General's Office of Maryland for a

private meeting and then attending said meeting in blatant violation of Maryland Ethics Rules

and Grievance Case Law by seeking to use the threat of Criminal Conviction in the Criminal

Case to win an unrelated case (i.e. The Custody Case, which was ongoing at exactly the same

time.) A blatant and wanton Abuse of Process.[48]

We now know, courtesy of *The Baltimore Sun*, that Martin was accused by Judge Motz, in the

'Bromwell Case,' set for September 2007 Trial, of "bullying" the Judge. Plaintiff can stipulate

that this is not new to Martin. In open Court before Judge Murdock of Baltimore City Circuit

Court, in defense of the Blums in *Bond v. Blum Sr., et al,* Martin accused, and alluded, on the

record that Judge Themelis, who earlier had dismissed the criminal charges against Plaintiff,

manufactured by the Team Blum, didn't know the law and didn't know what he was doing!

We also now know that Judge Motz disqualified the attorneys in the 'Bromwell Case' because of

**Attorney Misconduct**. On information and belief, Plaintiff states that Gerard P. Martin was one

of those attorneys and that the reason for disqualification was that the attorneys engaged in

---

[48]This Court's review of *Bond v. Blum Sr. et al* in the Circuit Court for Baltimore City
will show that Plaintiff alleged Abuse of Process by Defendants in the Criminal Case, *State of*
*Maryland v. William C. Bond*. Blum Sr., Slavin, Dorf, Griffin, McDaniel, Martin and/or others
orchestrated an audience with the prosecuting AG's supervisor to lobby for Plaintiff's conviction
and a sentence of ten years in prison for possession charges they manufactured. The Asst. AG
prosecuting Plaintiff also used to work for Dorf.

'**witness tampering**' and other crimes. Presumably, when the 'Bromwell Case' concludes, these

attorneys will be charged criminally with crimes. **Plaintiff requests that this Court take notice**

**of Martin's disqualification in 'Bromwell' and allow those Motions, which have been**

**requested under FOIA by Plaintiff, to become part of this Motion.**


Which brings us to this case: A member of the Maryland State Bar Association's Ethic's

Commission should not be telling Hodgson not to produce documents, especially when he was

counsel in the Copyright Case. The following transcript is from Hodgson's deposition in

*Grossbart*. (Martin gave a much fuller, "Mr. Bluster-style," explanation for his client's non

production of documents off the record in the Hodgson deposition, which was basically, they

didn't produce the documents, so now, "What are you gonn'a do about it?")


52

10   Q.   You were deposed in connection with the
11   custody case?
12       A.   Right.

13       Q.   And you were deposed in connection with
14   the copyright case?
15       A.   Yes.
16       Q.   Did you receive for both of those
17   depositions, or either one of them, a document
18   similar to Exhibit No. 1 here today, the amended
19   notice of deposition duces tecum, which instructed
20   you to bring your entire file pertaining to the
21   matters of this investigation?


53

1       A.   Gerry?
2       **MR. MARTIN:  I don't know what it said.  I**
3   **know you had to bring something.  I don't know what**
4   **it said.**
5       A.   Yes.  I know that I had to bring some

6   documents.  Whether it was my entire file or not I
7   don't recall.
8       Q.  And certainly if they had requested that
9   you bring everything pertaining to the
10   investigation or some variation on that theme, you
11   would have certainly produced them and brought
12   them?
13      A.  I would have, right.
14      Q.  Next I'd like to show you --
15      **MR. MARTIN:  I'm going to make an**
16   **objection.  He may not have, on my advice.  I may**
17   **--**
18       MR. GUNNING:  Excepting matters of
19   privilege, et cetera, et cetera.
20      **MR. MARTIN:  And I also may have had**
21   **agreements with the people who issued the**

54

1   **subpoena**.
2       Q.  I show you Exhibit No. 12, again
3   recovered from your file, can you tell me what that

Plaintiff stipulates to this Court that Martin had no such agreements with counsel in the Custody

or Copyright Cases not to produce anything! Further, the Rules require a deponent to identify

each privilege they are asserting, etc. What Martin is sub consciously alluding to here, is that, in

fact, it was the **prosecutor** in the Attorney General's Office with whom he had agreements with,

a *de facto* admission that not only were Hodgson and Martin Agents of the State, but that the

manuscript was obtained under the direction of the State, in leu of a search warrant, which they

had no basis to obtain.

It is clear that Gerard P. Martin was the primary leader and orchestrator of the "Fraud Upon the

Court" perpetrated by Team Blum.

## SANCTIONS

The law regarding Copyright, Conversion, Invasion of Privacy, etc. is clear. So is the concept that Attorneys may not pilfer the law offices of opposing parties and witnesses. The Defendants, in the case below, knew their case was without merit, which is why they initially agreed to return Plaintiff's works. But then, lured by Blum's riches, they hatched their scheme. The information presented so far clearly shows a dishonest motive and dishonest actions, thus making every representation to the Court, not only in the District Court, but also the 4th Circuit, a violation of Fed. Civ. R. P. Rule 11 and Maryland Code of professional Responsibility Rules 3.1 & 8.4.

Clearly, the Defendants, Witnesses, Other Persons, and Attorneys violated Fed. Civ. R. P. Rule 26 in regards, at least, to Hodgson and Grossbart. Kenneth Blum Sr., filed a false affidavit, "stating that he did not intend to make any other use of Plaintiff's works outside of the 'Custody Case'"[49] when, in fact, he gave them to numerous known and unknown persons and had Hodgson having discussions with *The Washington Post* within days of Judge Garbis' Ruling.[50] These actions, along with the numerous false statements under oath in Discovery and at the Hearing before Judge Garbis violate Fed. Civ. R. P. Rule 34, Rule 37 and Rule 56(g).

Defendants, Witnesses, Other Persons, and Attorneys, all working in a concerted effort to

---

[49]See Exhibit # 91.

[50]Alan Wagner, former VP, Rent-a-Wreck of America, Inc., was given Plaintiff's Manuscript(s) to read while on a drive with Blum Sr. to Manheim, PA., for an auto auction. Blum laughed when Wagner, a former Baltimore City Police Officer, asked how he obtained the Manuscript(s)! Blum gave the manuscripts to many others to read.

See also, Hodgson notes re: *Washington Post* (Exhibit # 1, attached to Motion for Permanent Injunction and Restraining Order and Request for Hearing).

manipulate the Justice System to obtain the goals of Team Blum, should not generate any sympathy with the Court despite their many pleas about saving the "children from the killer" in the Cases below. Further, Plaintiff has been pursued, as in *Les Miserables*,[51] by Defendants with their garnishment efforts for over (5) years and has, essentially, been bankrupted and unable to have any property in his own name. Defendants have collected almost $120,000.00 of their knowingly, illegally obtained Judgement. Further, Plaintiff has spent almost $150,000.00 in the Copyright and Garnishment Proceedings. Plaintiff urges the Court that here, not only should the Sanctions fit the Crime, but, as the Defendants, Witnesses, Other Persons, and Attorneys scheme was to make a mockery of the Court itself, that extra consideration should be taken into account as to the severity of Sanctions Awarded.[52]

## **CONCLUSION**[53]

---

[51]Miriam Pessin, in her defense of Plaintiff's State Tort has repeatedly stated, contrary to all known literary criticism, that some how Jean Valjean had it coming to him, rather than seeing him as a victim of persecution!

[52]In a collateral case to the Custody Case, in the Circuit Court for Baltimore City Case Nos. 24-D-01-003359 and 24-D-95-249006, as well as in *Bond v. Slavin*, 157 Md. App. 340 (2004), the illegal use of a subpoena and coercion by Griffin and Slavin to obtain Plaintiff's banking records from Bank of America in violation of the Md. Fin. Inst. Codes and the release of those banking records of William C. Bond and Alyson Bond in violation of the confidentiality provisions of the Maryland Financial Institutions Act, Maryland Court of Special Appeals Chief Judge Murphy ruled from the bench that this case, and the related cases, has had a "tortured history" and that the Bank and Griffin had violated the Act in regard to Plaintiff. On remand for Damages to the Circuit Court for Baltimore City, Judge Ross found in favor of Plaintiff and that Caroline A. Griffin and the Bank of America had "stubbornly" refused to follow the law.

[53]On December 14, 2001, Judge Audrey P. Carrion, ruling from the bench in the Custody Case, found the Manuscript, as it was never shown to the children at issue by this Plaintiff, to be a non-factor and moot in regard to the Custody Issues concerning Plaintiff's wife's children. Ironically, it is these Copyright Defendants, Witnesses, Other Persons, and Attorneys who publicized the Manuscript(s), thus bringing the contents to the attention of the children and their

Defendants here are like children who, having gotten caught with their hands in the cookie jar, lie

with a straight face to their mother while swallowing whole the evidence of their misdeeds.

While there is no question that Defendants, Witnesses, Other Persons and the Attorneys wanted

to cause harm to Plaintiff and his wife in the Custody, Criminal, and Copyright Cases by

obtaining the manuscripts to attempt to use Plaintiff's embellished and fictionalized words

against him, despite the ridiculousness of that premise, the basic fact remains that they did not

and could not legally have the Manuscript(s) to do so! And so began, what has sadly been

accounted, the complete and total Defiling of the Court in these proceedings. A Defiling so total

and complete that it reached the 4th Circuit and the Maryland Circuit and Appellate Courts.


Defendants below repeatedly referred to Plaintiff's Juvenile past as a Criminal past and invoked

the Ten Commandments in their persecution of Plaintiff in blatant violation of Md. Code of Pro.

Res. Rule 8.4. The obvious irony here is that Defendants, Witnesses, Other Persons, and the

Attorneys violated, in their persecution of Plaintiff, both the Eighth Commandment, "You shall

not bear false witness," and the Tenth Commandment, "You shall not covet your neighbor's

goods."


Defendants, Witnesses, Other Persons, and Attorneys conspired to **steal** Plaintiff's literary works,

then **stole** Plaintiff's literary works, then committed perjury, obstruction, and other crimes to get

---

communities. Hardly in "the best interests of the children," but a great way to run a negative
political ad campaign, the result being a deluded grandfather separating his grandchildren from
their mother, his daughter. Again, echos of *Chinatown.*

away with their deed, all the while consciously denying Plaintiff his Civil Rights in the Federal and Maryland State Courts.

Defendants, Witnesses, Other Persons, and Attorneys own words and actions are *de facto* admissions of the **theft** of Plaintiff's manuscripts and are *de facto* admissions that their **use was knowingly unfair**. Why else lie?

***"Falsus in uno, Falsus in omnibus"* demands Plaintiff's Relief be Granted. Justice cannot be respected when it is gained through unjust means.**

The Judgment rendered by Judge Marvin J. Garbis is "manifestly unconscionable" and must, in "the interests of justice" and "equity" be vacated and a New Trial Ordered *post haste.*

WHEREFORE, for the aforementioned reasons Plaintiff prays this Court grant a Fed. Civ. R. P. Rule 60 (b) Relief from Judgment or Order in this Case, vacate Garbis' Ruling and Order and Award of Attorneys' Fees, Award Sanctions and Attorney's Fees to Plaintiff, Order a New Trial with Discovery Order, Award all other Equitable Relief to which Plaintiff is Entitled or is Necessary for Justice, and Join Plaintiff's Independent Action.

WILLIAM C. BOND
*Pro Se*
309 Suffolk Road

-49-

Baltimore, Maryland 21218
(410) 243-8152
(410) 467-9177 FAX

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of April, 2007, copies of Plaintiff's
MEMORANDUM IN SUPPORT OF MOTION FOR FED. R. CIV. P. 60 (b) RELIEF FROM
JUDGMENT OR ORDER were mailed FedEx, postage prepaid, to William F. Ryan, Jr., Esquire,
Amy E. Askew, Esquire, Whiteford, Taylor & Preston, LLP, Suite 1400, 7 St. Paul Street,
Baltimore, Maryland 21202-1626, attorneys for McDaniel, Bennett & Griffin; Gerard P. Martin,
Esquire, Thy C. Pham, Esquire, Rosenberg, Martin, Funk & Greenberg LLP, 25 South Charles
Street, Suite 2115, Baltimore, Maryland 21201-3322, attorneys for Defendants, Dudley F. B.
Hodgson, Kenneth Blum, Sr. and Kenneth Blum, Jr.;  Andrew Radding, Esquire, Michael R.
Severino, Esquire, Adelberg, Rudow, Dorf & Hendler, LLC, 600 Mercantile Bank & Trust
Building, 2 Hopkins Plaza, Baltimore, Maryland 21201-2927, attorneys for Defendant, Adelberg,
Rudow, Dorf & Hendler, LLC; and Kathryn Miller Goldman, Esquire, Jiranek, Goldman &
Minton, LLC, Suite 401, 19 E. Fayette Street, Baltimore, Maryland 21202-3316, attorneys for
William Slavin.

_____
WILLIAM C. BOND