**EXHIBIT # 3**

WHITEFORD, TAYLOR & PRESTON
L.L.P.

SEVEN SAINT PAUL STREET
BALTIMORE, MARYLAND 21202-1626
410 347-8700
FAX 410 347-9420
www.wtplaw.com

210 WEST PENNSYLVANIA AVENUE
TOWSON, MARYLAND 21204-4515
TELEPHONE 410 852-2000
FAX 410 852-2015

20 COLUMBIA CORPORATE CENTER
10420 LITTLE PATUXENT PARKWAY
COLUMBIA, MARYLAND 21044-3528
TELEPHONE 410 884-0700
FAX 410 884-0719

1025 CONNECTICUT AVENUE, NW
WASHINGTON, D.C. 20036-5405
TELEPHONE 202 659-6800
FAX 202 331-0573

1317 KING STREET
ALEXANDRIA, VIRGINIA 22514-2928
TELEPHONE 703 836-5742
FAX 703 836-0265

AMY E. ASKEW
DIRECT NUMBER
410 347-8778
aaskew@wtplaw.com

July 7, 2004

**VIA HAND DELIVERY**

Clerk's Office
Circuit Court for Baltimore City
Courthouse East
111 North Calvert Street
Baltimore, Maryland 21202

> Re:  *William C. Bond v. Kenneth Blum, Sr., et al.*
> Case No.: **24-C-04-002976**

Dear Sir or Madam:

Enclosed for filing in the above-captioned matter please find an original and one copy of Defendants, William A. McDaniel, Jr., Caroline A. Griffin, McDaniel, Bennett & Griffin and McDaniel & Griffin's:

- Motion to Dismiss;
- Memorandum of Grounds and Authorities in Support of McDaniel Defendants' Motion to Dismiss Plaintiff's Complaint and Request for Hearing; and
- proposed Order.

Please date-stamp the copies and return them to me with our messenger.

July 7, 2004
Page 2


Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Amy E. Askew

AEA:cmc
Cc:    Howard J. Schulman, Esquire
       Gerard P. Martin, Esquire
       T. Christine Pham, Esquire
       Pamela A. Bresnahan, Esquire
       Elizabeth T. Simon, Esquire

1564696

WILLIAM C. BOND                    *  IN THE

    Plaintiff                     *  CIRCUIT COURT

v.                                 *  FOR

KENNETH BLUM, SR. ET AL.           *  BALTIMORE CITY

    Defendant                     *  Case No:      24-C-04-002976

      *    *    *    *    *    *    *    *    *    *    *

## MOTION TO DISMISS

Defendants, William A. McDaniel, Jr., Caroline A. Griffin, McDaniel, Bennett & Griffin and McDaniel & Griffin (collectively the "McDaniel Defendants"), file this Motion to Dismiss the Complaint of Plaintiff, William C. Bond ("Plaintiff" or "Bond"), pursuant to Rules 2-311 and 2-322(b) of the Maryland Rules of Civil Procedure, on the grounds that Counts I, II, III and IV fail to state a claim upon which relief can be granted. Moreover, pursuant to Maryland Rule 1-341, the McDaniel Defendants respectfully request the award of attorneys' fees and costs for responding to this frivolous lawsuit. Pursuant to Rule 2-311 (c) of the Maryland Rules of Civil Procedure, the McDaniel Defendants attach their Memorandum of Grounds and Authorities in Support of Defendants' Motion to Dismiss, filed contemporaneously herewith.

_____
William F. Ryan, Jr.
Amy E. Askew
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
(410) 347-8700

Attorneys for Defendant,
WILLIAM A. MCDANIEL, JR.,
CAROLINE A. GRIFFIN,
MCDANIEL, BENNETT & GRIFFIN
AND MCDANIEL & GRIFFIN.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _____ day of July, 2004, a copy of the

foregoing Motion and Memorandum was served:


**VIA HAND DELIVERY UPON:**
Howard J. Schulman
Schulman & Kaufman, LLC
One Charles Center, Suite 600
100 North Charles Street
Baltimore, Maryland 21201
 *Attorney for Plaintiff, William C. Bond*


**VIA FIRST CLASS MAIL, POSTAGE PREPAID UPON:**
Gerard P. Martin
T. Christine Pham
Rosenberg Martin Funk Greenberg, LLP
25 South Charles Street
Suite 2115
Baltimore, Maryland 21201
 *Attorneys for Defendants, Kenneth Blum, Sr., Dudley F.B.*
 *Hodgson and William H. Slavin*

**AND**

Pamela A. Bresnahan
Elizabeth T. Simon
Vorys Sater Seymour and Pease LLP
1828 L Street, NW
11th Floor
Washington, D.C. 20036
 *Attorneys for Defendants, Paul A. Dorf and*
 *Adelberg, Rudow, Dorf & Hendler, LLC*


_____
Amy E. Askew

| | |
|---|---|
| WILLIAM C. BOND | * IN THE |
| Plaintiff | * CIRCUIT COURT |
| v. | * FOR |
| KENNETH BLUM, SR. ET AL. | * BALTIMORE CITY |
| Defendant | * Case No:    24-C-04-002976 |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OF GROUNDS AND AUTHORITIES IN SUPPORT OF MCDANIEL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

Defendants, William A. McDaniel, Jr., Caroline A. Griffin, McDaniel, Bennett & Griffin and McDaniel & Griffin (collectively the "McDaniel Defendants"), submit this Memorandum of Grounds and Authorities in support of their Motion to Dismiss the Complaint filed by Plaintiff, William C. Bond ("Plaintiff" or "Bond"), and as grounds state as follows:[1]

## I.    INTRODUCTION.

This case is one of numerous baseless and retaliatory lawsuits brought by Plaintiff in federal and state courts against the named Defendants, as well as others. *See William C. Bond v. Kenneth Blum Sr., Kenneth Blum Jr., Dudley F.B. Hodgson, William Slavin, McDaniel, Bennett & Griffin and Adelberg, Rudow, Dorf & Hendler*, 317 F.3d 385 (4th Cir. 2003), *cert. denied*, 124 S. Ct. 103, 2003 U.S. LEXIS 5614 (2003); *William C. Bond v. Gerald Messerman, Esq., Sheppard Pratt Health Systems, Inc. and Robert N. Grossbart, Esq.*, Circuit Court for

---

[1]    The McDaniel Defendants also incorporate by reference the arguments submitted by their Co-Defendants in their respective motions to dismiss and memoranda of points and authorities as if fully set forth herein.

Baltimore City, Case No. 24-C-03-000690 OT PM; *William C. Bond v. Miriam S. Pessin and David N. Pessin, Esq.*, Circuit Court for Baltimore City, Case No. 24-C-04-003197 OT PM. These various vexatious suits arise out of the child custody case of *Slavin v. Slavin* in which Plaintiff's wife, Alyson, sued her former husband, Co-Defendant William H. Slavin, for exclusive custody of their three children in the Circuit Court for Baltimore City, Case No. 24-D-95-249006 DA.

In support of his counter-petition for exclusive custody, Co-Defendant Slavin introduced into evidence as a deposition exhibit an autobiographical manuscript, authored by Plaintiff, to show that the home of Alyson and Plaintiff was not a suitable place for the three children to exclusively reside. [2] The manuscript, entitled "Self-Portrait of a Patricide: How I Got Away With Murder," was to be marketed to publishers for profit and, in the words of the United States Court of Appeals for the Fourth Circuit:

> describes in horrific detail how Bond planned and committed the murder of his father with a hammer, and how his dying father attempted to raise himself off the floor of the garage before Bond delivered the final blows to his neck and head. (…) Most sinister of all, it depicts a remorseless individual who brags about fooling the police and the juvenile system to "get away scot-free" and even collecting, as planned, the money from his father's estate.

*Bond v. Blum*, 317 F.3d 385, 390 (4th Cir. 2003).[3]

In an unwarranted effort to "[prevent] further use of the manuscript in the proceedings before the Baltimore City Circuit Court, Bond registered a copy of his

---

[2]    In this regard, the Fourth Circuit found that there was "no evidence in the record to indicate that the defendant's use of the manuscript was anything more than the presentation of evidence in a child-custody proceeding to prove the unsuitability of Bond's home as a place for the children." *Bond v. Blum*, 317 F.3d at 393.

[3]    A copy of the Fourth Circuit's opinion has been attached as Exhibit 1 as a courtesy to the Court.

manuscript with the Copyright Office, "and immediately thereafter filed suit in the United States District Court for the District of Maryland claiming copyright infringement and requesting an injunction prohibiting the use of the manuscript and requiring return of all copies. *Bond*, 317 F.3d at 391.

After an evidentiary hearing, the Honorable Marvin J. Garbis found that the document was not confidential, Plaintiff was making efforts to get it published, that the document was not stolen and that Defendants' use of the manuscript was a "fair use." *Id.* at 391-92. Judge Garbis thus denied Plaintiff's motion for an injunction and granted summary judgment in favor of all the defendants he sued in that case. *Id.* at 392.

Plaintiff, in turn, appealed Judge Garbis's decision to the Fourth Circuit where "at oral argument he conceded that the document was not confidential." *Id.* at 395. The Fourth Circuit affirmed Judge Garbis's decision. In so doing, the Fourth Circuit also remanded the case to Judge Garbis authorizing the district court to award attorneys' fees and costs. The district court has awarded attorneys' fees in favor of all Defendants, specifically over $150,000 to the law firm defendants and over $15,000 to the individual defendants.

## II.    STANDARD OF REVIEW.

A motion to dismiss for failure to state a claim is proper and should be granted where, as here, the allegations in a complaint, while accepted as true, together with the inferences properly drawn therefrom, fail to afford the plaintiff relief if proven. *See Berman v. Karvounis*, 308 Md. 259, 264-65, 518 A.2d 726, 728-29 (1987). In deciding a motion to

dismiss for failure to state a claim pursuant to Maryland Rule 2-322, the circuit court must determine whether the facts alleged in the complaint are legally sufficient to state a cause of action. *Sharrow v. State Farm Mut. Ins. Co.*, 306 Md. 754, 768, 511 A.2d 492, 499 (1986). "Merely conclusory charges" are insufficient to state a complaint. *See Parker v. The Columbia Bank*, 91 Md. App. 346, 351 n. 1, 604 A.2d 521, 523, *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992).

Additionally, when reviewing a motion to dismiss, a court may take judicial notice of matters of record in proceedings in other cases in the same court. *See Irby v. State*, 66 Md. App. 580, 585-586, 505 A.2d 552, 555 (1986), *cert. denied*, 308 Md. 270, 518 A.2d 732 (1987); *Lerner v. Lerner Corp.*, 132 Md. App. 32, 40, 750 A.2d 709, 713 (2000), *cert. denied*, 360 Md. 275, 757 A.2d 810 (2000); Md. R. Civ. Pro. 5-201 (f) ("Judicial notice may be taken at any stage of the proceeding."). *See also Judicial Watch, Inc. v Rossotti*, 217 F. Supp. 2d 618, 622 (D. Md. 2002) (in deciding a motion to dismiss under Rule 12(b)(6), a court may consider matters of public record and other similar materials that are subject to judicial notice). The doctrine of judicial notice "substitutes for formal proof of a fact when formal proof is clearly unnecessary to enhance the accuracy of the factfinding process." *Lerner*, 132 Md. App. at 40, 750 A.2d at 713.

The allegations in Plaintiff's Complaint, together with the public records of related criminal and civil cases involving the same facts set forth in the instant matter, make clear that Plaintiff fails to set forth any claim upon which relief may be granted.

III.    ALLEGATIONS RELEVANT TO THE MCDANIEL DEFENDANTS.

Alyson Bond (*nee* Blum) met Plaintiff in 1995 (whom she eventually married in 2001), a year after being separated from her husband, Co-Defendant Slavin. (Plaintiff's Complaint at ¶ 5).[4] Alyson and Co-Defendant Slavin divorced in 1996. (¶ 5). In 2000, Alyson sought exclusive custody of her minor children from Co-Defendant Slavin in the domestic case encaptioned *Alyson Slavin, Plaintiff/Counter-Defendant v. Willaim H. Slavin, Defendant/Counter-Plaintiff,* Case No. 24-D-95-249006 DA in the Circuit Court for Baltimore City. (¶ 5). Defendant law firm McDaniel, Bennett & Griffin (later McDaniel & Griffin), specifically attorney Caroline Griffin, represented Co-Defendant Slavin in the child custody suit. (¶ 6).

Plaintiff admits that he kept five firearms at his residence. (¶ 7). Plaintiff also concedes that he was adjudicated a delinquent in 1981 in Ohio. (¶ 7). What he fails to mention, but what is found in the public records in his criminal file, identified in Paragraph 10 of his Complaint as Case Nos. 201176015 & 16 in the Circuit Court for Baltimore City[5], was that as a result of his adjudication, in 1981 Plaintiff was committed to Sheppard and Enoch Pratt Hospital for psychological treatment approximately nine months for the murder of his father.[6] Plaintiff's mental health confinement, coupled with

---

[4]    Paragraphs in Plaintiff's Complaint will hereinafter be referenced as "(¶___)."

[5]    A statement of charges was previously issued by the Circuit Court for Baltimore City on May 23, 2001 (Case No. 5B01372264) (¶ 8) and merged into the criminal information filing in the Circuit Court for Baltimore City, Case Nos. 201176015 & 16. (¶ 10).

[6]    The McDaniel Defendants request that this Court take judicial notice of the proceedings against Plaintiff in the Circuit Court for Baltimore City and of the resultant orders, memoranda and ultimate disposition of the case, as reflected in those records. *See* Memorandum Opinion and Order issued by the

- 5 -

his possession of firearms was the reason why he was charged with violating then 27 Md. Code, § 445,[7] for which he was arrested on May 25, 2001. (¶¶ 8, 9 and 11). An additional criminal information was filed in the Circuit Court for Howard County, Case No. 13-K-01-040511, on July 5, 2001 and Plaintiff was arrested again on July 10, 2001. (¶ 11). The Complaint does not allege that the McDaniel Defendants had any involvement in bringing the charges against him.

Plaintiff alleges that after he was arrested in 2001, while the criminal charges were still pending in the Circuit Courts of Baltimore City and Howard County, the McDaniel Defendants "meddled in the prosecution of the Plaintiff and lobbied for the selective prosecution of the Plaintiff...." (¶ 15). Specifically, Plaintiff asserts that the McDaniel Defendants, retained to represent Co-Defendant Slavin in the custody dispute of his minor children, allegedly wrote letters to the Assistant Attorney General handling the case opposing any plea agreement that would not entail imprisonment and/or met with the Assistant Attorney General requesting extended periods of incarceration for Plaintiff. (¶ 15). Moreover, Plaintiff alleges that Defendant Griffin telephoned the Assistant Attorney General "to emphasize the need for a disposition in view of the December 10, 2001 trial date in the domestic case concerning Alyson Bond's custody petition." (¶ 15).

---

Honorable Allen L. Schwait of this Court in *State v. Bond*, Criminal Case Nos. 201176015 & 16 on March 8, 2002. *See also Bond*, 317 F.3d at 390.

[7]    Then § 445 prohibited an individual who had been confined to a mental health facility for more than 30 days from possessing a firearm. *See* Md. Code Ann., Pub. Saf. § 5-133 (b)(7) (2004) (formerly 27 Md. Code, § 445).

Plaintiff also alleges in a conclusory fashion that during a deposition in the domestic case, Defendant Griffin asked Bond questions for the purpose of eliciting incriminating information from him to use against him in a criminal proceeding. (¶ 7). However, entirely absent from the complaint is any allegation as to what incriminating information was elicited, much less an allegation describing the nature of the alleged incriminating information or how such information was ever used.

Plaintiff alleges that the charges in Baltimore City were "dismissed on motion" on April 22, 2002 and the Howard County charges were placed on the stet docket on May 3, 2002. (¶¶ 12-13). Plaintiff does not allege that the charges were dismissed due to a lack of probable cause nor does he offer to this Court the basis for the dismissal.

Plaintiff alleges that Co-Defendant Dudley F.B. Hodgson obtained "private papers" from Miriam Pessin without his knowledge or authorization. (¶ 8). Plaintiff also contends that Defendant Griffin "placed some of Bond's private papers in a public court file." (¶ 26). Plaintiff alleges that McDaniel Defendants knew that the "private papers" were taken without his knowledge or authorization. (¶ 8). While Plaintiff does not reveal to the Court the nature of these "private papers" (but it is a matter of public record), the allegedly private document at issue was the autobiographical manuscript written by Plaintiff entitled, "Self-Portrait of a Patricide: How I Got Away With Murder," which was offered to the circuit court judge in the custody matter by the McDaniel Defendants. *See* Case No. 24-D-95-249006 DA and Case Nos. 201176015 &16 in the Circuit Court for Baltimore City. Significantly, Plaintiff's wife was seeking <u>exclusive</u> custody. (¶ 5).

Moreover, the use of this document in the child custody matter has already been determined by the Fourth Circuit to be "fair use," with Plaintiff unsuccessfully seeking review up to the United States Supreme Court. *See Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003), *cert. denied*, 124 S. Ct. 103, 2003 U.S. LEXIS 5614 (2003).

## IV.    ARGUMENT.

### A.    *Malicious Prosecution.*

This cause of action has long been disfavored by Maryland courts and should be carefully guarded against. *Herring v. Citizens Bank & Trust Co.*, 21 Md. App. 517, 538, 321 A.2d 182, 194 (1974). *See also Palmer Ford, Inc. v. Wood*, 298 Md. 484, 499, 471 A.2d 297, 304 (1984) ("'The courts have always distrusted malicious prosecution actions, and have retained a strong hand over them.'"). It is equally well founded that "[p]rosecution for crimes is necessary for the peace and good order of society, and a sound public policy requires protection be accorded to the citizen who causes the prosecution of another in good faith and on reasonable grounds." *Stansbury v. Luttrell*, 152 Md. 553, 137 A. 339, 342 (1927).[8]  For this reason, Plaintiff must plead and prove <u>all</u> of the following underlying elements of malicious prosecution or else his claim will fail:

1. the institution or continuation of a criminal proceeding by the McDaniel Defendants against Plaintiff;

2. ~~the absence of probable cause;~~

3. the prosecution was instituted with malice or with a purpose other than bringing the offender to justice; and

---

[8]    For similar policy reasons, Maryland has long recognized the presence of an absolute privilege for defamatory statements made during the course of judicial proceedings or contained in documents directly related to judicial proceedings. *See Caldor, Inc. v. Bowden*, 330 Md. 632, 648-49, 625 A.2d 959, 966-67 (1993).

4. the termination of the proceeding was in favor of plaintiff.

*See Montgomery Ward v. Wilson*, 339 Md. 701, 714, 664 A.2d 916, 922 (1995); *Caldor, Inc. v. Bowden*, 330 Md. 632, 656, 625 A.2d 959, 970 (1993) (citations omitted); *Herring*, 21 Md. App. at 539, 321 A.2d at 194.  The Complaint does not allege and Plaintiff cannot prove any of these elements.

The Complaint makes clear that the McDaniel Defendants did not instigate[9] the criminal proceedings against Plaintiff.  There is no allegation that there was any communication between the McDaniel Defendants and the prosecuting authorities that led to the arrest of Plaintiff.  The only allegations concerning the McDaniel Defendants are that comments were made to the Assistant Attorney General as to their view of the appropriate punishment for Plaintiff <u>after</u> he had been arrested and while the charges were still pending.  (¶ 15)  Thus, Plaintiff's allegations demonstrate that the McDaniel Defendants did not institute criminal proceedings.

The Complaint is devoid of any factual support as to the allegation that there was a lack of probable cause in the arrest of Plaintiff, nor can there be.  Probable cause has been defined as a "reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing that the accused is guilty."

_____

[9]    Moreover, "continuing" the prosecution has been defined as when the defendant has "himself initiated criminal proceedings against another or procured their institution, upon probable cause and for a proper purpose, and thereafter takes an active part in pressing the proceedings after he has discovered that there is no probable cause for them." *Restatement (Second) of Torts*, §655 cmt. b.

*Palmer Ford*, 298 Md. at 493, 471 A.2d at 301-302.    Additionally, when determining

whether there is the existence of probable cause in a malicious prosecution suit, the focus

is on the "facts known to and genuinely believed by one initiating or continuing

prosecution when it is initiated or continued." *Id.* at 495, 471 A.2d at 302-303.

It is anticipated that Plaintiff will argue that the dismissal of the charges on motion

is evidence of a lack of probable cause.  Such a contention is without merit.  Where the

facts illustrating probable cause are not contradicted or in dispute, the ultimate dismissal

of the charges "before trial cannot operate as evidence of probable cause sufficient to take

this case to the jury." *Palmer*, 298 A.2d at 510, 471 A.2d at 310.  Accordingly, even though

the charges were ultimately dismissed in the Circuit Court for Baltimore City,[10] Plaintiff

cannot avoid the burden of pleading and proving a want of probable cause.

It is uncontradicted that Plaintiff possessed guns and that he was confined for

more than 30 days to a mental health facility, the basis for a violation of §445. These two

facts by themselves are sufficient to warrant a reasonable belief of guilt.  The legal

sufficiency of the uncontradicted facts and circumstances relied upon to constitute

probable cause is properly before this Court, as it is a question of law.  *See Exxon Corp. v.*

*Kelly*, 281 Md. 689, 697, 381 A.2d 1146, 1151 (1978).  There is not a single reference or

allegation in the entire Complaint that any of the Defendants or the prosecuting

---

[10]    Additionally, under Maryland law a charge that is placed on the "stet" docket is not considered
termination in favor of the plaintiff. *See State v. Meade*, 101 Md. App. 512, 647 A.2d 830 (1994).  Therefore,
one of the resultant charges has not terminated in favor of Plaintiff and for this reason he fails to state a cause
of action under Maryland law.

authorities lacked probable cause. A mere conclusory allegation is insufficient to properly plead this essential element and therefore warrants dismissal of the claim.

Plaintiff's attempt to avoid the requirement of pleading (and ultimately proving) probable cause by distracting this Court with accusations of malice are unavailing. So long as probable cause exists for the institution of the criminal proceedings against Plaintiff, the motives of the McDaniel Defendants, much less any of the Defendants, are immaterial. *See Herring*, 21 Md. App. at 545, 321 A.2d at 197. For these additional reasons, Plaintiff's Complaint fails and the claim against the McDaniel Defendants should be dismissed.

While Plaintiff makes broad sweeping comments regarding the motives of all Defendants, none are specific as to the McDaniel Defendants. Instead, Plaintiff makes conclusory statements, in pertinent part, that his arrest was in retaliation for Alyson Bond seeking exclusive custody.[11] As previously noted, the relevant conduct of the McDaniel Defendants (much less any of the other defendants) consists of a few communications after the arrest, while the matter was still pending, suggesting the appropriate punishment and a telephone call requesting the status of the proceedings. (¶ 15). Bald assertions of ill will are insufficient and Plaintiff's claim therefore fails.

Therefore, as a matter of law, Plaintiff has failed to set forth a cause of action for malicious prosecution and this Court should dismiss Count I in favor of the McDaniel Defendants.

---

[11]    This is the only purpose alleged by Plaintiff in Paragraph 17 that seems remotely connected to any of the law firms or the attorneys.

B.    *Abuse of Process.*

As with this entire Complaint, the allegations relevant to this count also fail to state a claim and should be dismissed.  Abuse of process is properly pled where there are sufficient allegations that the McDaniel Defendants had an ulterior purpose and that there was a deliberate act on their part in the use of the process not proper in the regular conduct of the proceeding. *K-mart Corp. v. Salmon*, 76 Md. App. 568, 587-88, 547 A.2d 1069, 1078 (1988).  To establish this tort, "there must be a definite act or threat aimed at an objective outside the purpose of the process and no liability is imposed where a defendant has merely carried out the process to its authorized conclusions, even though with bad intentions." *K-mart Corp.*, 76 Md. App. at 587-88, 547 A.2d at 1078.

The general assertions contained in the Complaint with respect to this count allege nothing more than all Defendants wanted Plaintiff to be incarcerated.  (¶ 21)  There has been no allegation that the McDaniel Defendants "used" process to threaten Bond. The only allegation that is even related to the criminal process was the opinion offered as to the appropriate punishment (something that was contemplated by the use).  Moreover, it is entirely proper, in the representation of a parent in a child custody case, to observe and monitor the actions of a putative step parent living with the mother requesting exclusive custody.  Even if the Court were to assume that the McDaniel Defendants, on behalf of their client, sought to influence the prosecution as to the appropriate punishment, Plaintiff's claim still fails.  The Plaintiff must show that the process was used to accomplish "'some end which is without the regular purview of the process or which

- 12 -

compels the party against whom it is used to do some collateral things which he could not legally or regularly be compelled to do.'" *Herring*, 21 Md. App. at 532, 321 A.2d at 191 (quoting *Coplea v. Bylee*, 8 N.E.2d 55, 59 (Ill. App.)).  The removal of Plaintiff from his home and potential incarceration is a contemplated end of an arrest.  *See Carter v. Aramark Sports and Entertainment Services, Inc.*, 153 Md. App. 210, 835 A.2d 262 (2003) (stating the tort occurs when a party willfully misuses a criminal process after it has been issued to obtain a result not contemplated by law).  "An action for abuse of process cannot be maintained where the process was employed to perform no other function than that intended by law." *Herring*, 21 Md. App. at 534, 321 A.2d at 192.

Finally, even if there is an ulterior motive sufficiently alleged by Plaintiff, the facts must demonstrate a "willful act" on the part of the McDaniel Defendants. *Berman*, 308 Md. at 264-65, 518 A.2d at 728-29.  This requires a definite act or threat.  *See id.* at 265, 518 A.2d at 729.  An example would be to use the criminal process to collect a civil debt.  *See id.*  It is clear under Maryland law that "neither an ulterior motive nor a bad intention is sufficient to establish the tort...." *Herring*, 21 Md. App. at 534, 321 A.2d at 192.  As already stated, Plaintiff has failed to allege any willful conduct by the McDaniel Defendants, much less an illegitimate motive.  Therefore, Count II of Plaintiff's Complaint should be dismissed.

### C. *Invasion of Privacy.*

Although Plaintiff's Complaint does not specifically set forth under which of the four privacy torts recognized in Maryland the claim is brought, Plaintiff's allegations

suggest the claim is for the publication of private facts. *See Bailer v. Erie Ins. Exchange*, 344 Md. 515, 526, 687 A.2d 1375, 1380 (1997) (citations omitted) (the tort of an invasion of privacy is not one tort, but rather four separate torts). In order to establish the publication of private facts, the claimant must be able to prove that a <u>private</u> matter was disclosed to the public by the McDaniel Defendant. *See Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 166-67, 502 A.2d 1101, 1118 (1986) (citation omitted). Plaintiff must also plead a desire to keep the fact private. *See Taylor v. NationsBank, N.A.*, 365 Md. 166, 172, 776 A.2d 645, 649 (2001). Additionally, Plaintiff must show that the "'matter publicized is of a kind which (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.'" *Furman v. Sheppard*, 130 Md. App. 67, 77, 744 A.2d 583, 588 (2000) (quoting *Klipa v. Board of Educ. of Anne Arundel County*, 54 Md. App. 644, 654-55, 460 A.2d 601 (1983)).

Plaintiff encounters numerous problems in establishing this claim. First, it is important to note that a criminal past is not a private fact and therefore does not fall within the purview of this tort. *See Pemberton*, 66 Md. App. at 166, 502 A.2d at 1118. Furthermore, Plaintiff already conceded to the Fourth Circuit that the document was not confidential. *See Bond v. Blum*, 317 F.3d at 395. Indeed, as the Fourth Circuit has already recounted, Plaintiff has attempted to market the manuscript to get it published. *Id.* In that regard, "'there is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public.'" *Furman*, 130 Md. App. at 78, 744 A.2d at 588 (quoting *Pemberton*, 66 Md. App. at 167, 502 A.2d 1101)). The Complaint

merely alleges that Defendant Griffin placed the "private papers" in a public court file. As already mentioned, this issue has been raised by Plaintiff before the Fourth Circuit <u>without success</u>. Plaintiff is estopped from once again trying to litigate this point to a contrary, inconsistent result.

Moreover, the public policy favoring the use of the manuscript clearly outweighs any potential injury that could possibly have occurred to Plaintiff's privacy rights. It is of the utmost importance that a trial judge in an exclusive custody dispute, imposed with the duty of deciding the "best interest" of minor children, have all potentially relevant information regarding the households in which the minors might reside. Without a doubt, disclosure of such a fact is a legitimate public concern and a trial judge should have every right to consider the importance of such facts, particularly when the man that could potentially be residing with the minor children pled guilty to murder and then wrote a book bragging about it.

For these reasons, Plaintiff's Invasion of Privacy claim should be dismissed.

D.    *Conversion.*

Plaintiff sets forth conclusory allegations that "the Defendants exercised dominion over the personal property of Plaintiff without his knowledge or authorization and, therefore, converted Plaintiff's property that Defendant Hodgson acquired from Miriam Pessin." (¶29). Under Maryland law, a "'conversion is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his

right or inconsistent with it.'" *Vaughn v. Vaughn*, 146 Md. App. 264, 272, 806 A.2d 787, 791 (2002) (quoting *Interstate Ins. Co. v. Logan*, 205 Md. 583, 588-89, 109 A.2d 904 (1954)).

There is no allegation in the complaint that the McDaniel Defendants are claiming ownership of the manuscript. The <u>only</u> exertion of dominion or control over any of the Plaintiff's property was the use of the manuscript by the McDaniel Defendants in the child custody litigation. There has been no allegation that any use outside of litigation has been employed by the McDaniel Defendants. As previously noted, this "use" has already been litigated and determined by a federal court to be <u>permissive</u> and <u>fair</u>. *See Bond v. Blum*. Plaintiff is estopped from alleging that the McDaniel Defendant's "dominion" over his property was illegal, as such a determination would yield inconsistent results.

Moreover, the conversion claim is preempted by the copyright claim previously filed and decided. *See Brown v. McCormick*, 23 F. Supp. 2d 594, 608 (D. Md. 1998). "The Copyright Act preempts state law claims that are "equivalent" to the rights that the Copyright Act provides." *Brown*, 23 F. Supp. 2d at 608 (where the court held that the plaintiff's conversion claim was preempted by the Copyright Act, as the plaintiff attempted to vindicate the same rights and there was no qualitative difference). As noted, it is the same use and the same exercise of dominion without permission that was at issue and decided in the copyright litigation. The Complaint does not allege otherwise. Therefore, the claims fails as a matter of law and should be dismissed.

## V.    CONCLUSION.

The foregoing reasons compel the conclusion that this action, in total, must be dismissed. Even after drawing all inferences in favor of Plaintiff, there are no facts that are available that could support any of the set forth causes of action. Plaintiff's claims should therefore be DISMISSED.

Respectfully submitted,

William F. Ryan, Jr.
Amy E. Askew
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
(410) 347-8700

Attorneys for Defendant,
WILLIAM A. MCDANIEL, JR.,
CAROLINE A. GRIFFIN,
MCDANIEL, BENNETT & GRIFFIN
AND MCDANIEL & GRIFFIN.

## REQUEST FOR HEARING

Defendants, William A. McDaniel, Jr., Caroline A. Griffin, McDaniel, Bennett & Griffin and McDaniel & Griffin, hereby request a hearing on their Motion to Dismiss Plaintiff's Complaint.

Respectfully submitted,

William F. Ryan, Jr.
Amy E. Askew
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626
(410) 347-8700

Attorneys for Defendant,
WILLIAM A. MCDANIEL, JR.,
CAROLINE A. GRIFFIN,
MCDANIEL, BENNETT & GRIFFIN
AND MCDANIEL & GRIFFIN.

- 18 -

Westlaw.

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
(Cite as: 317 F.3d 385)

Page 1

**H**
Briefs and Other Related Documents

United States Court of Appeals,
Fourth Circuit.

William C. BOND, Plaintiff-Appellant,
v.
Kenneth BLUM, Sr.;  Kenneth Blum, Jr.;  Dudley
F.B. Hodgson;  Mcdaniel,
Bennett & Griffin;  Adelberg, Rudow, Dorf &
Hendler, LLC;  Christopher W.
Nicholson;  William Slavin, Defendants-Appellees.
William C. Bond, Plaintiff-Appellee,
v.
Adelberg, Rudow, Dorf & Hendler, LLC, Defendant-
Appellant,
and
Kenneth Blum, Sr.;  Kenneth Blum, Jr.;  Dudley F.B.
Hodgson;  McDaniel,
Bennett & Griffin, Defendants.
William C. Bond, Plaintiff-Appellant,
v.
Adelberg, Rudow, Dorf & Hendler, LLC, Defendant-
Appellee,
and
Kenneth Blum, Sr.;  Kenneth Blum, Jr.;  Dudley F.B.
Hodgson;  McDaniel,
Bennett & Griffin, Defendants.
William C. Bond, Plaintiff-Appellee,
v.
McDaniel, Bennett & Griffin, Defendant-Appellant,
and
Adelberg, Rudow, Dorf & Hendler, LLC;  Kenneth
Blum, Sr.;  Kenneth Blum, Jr.;
Dudley F.B. Hodgson, Defendants.

**Nos. 02-1139, 02-1219, 02-1231, 02-1288.**

Argued Oct. 31, 2002.
Decided Jan. 24, 2003.

Copyright holder brought infringement action
against law firm and its clients. The United States
District Court for the District of Maryland, Marvin J.
Garbis, J., granted summary judgment for defendants.
Copyright holder appealed. The Court of Appeals,
Niemeyer, Circuit Judge, held that: (1) use of
copyrighted manuscript in child custody lawsuit for

evidentiary value of its content insofar as it contained
admissions that copyright holder may have made
against his interest when he bragged about his
conduct in murdering his father, in taking advantage
of juvenile justice system, and in benefiting from his
father's estate, was fair use; (2) court did not abuse its
discretion by awarding attorney fees to defendants;
and (3) court could, but was not required to, award
attorney fees to law firms who were defendants.

Affirmed in part, and vacated in part and remanded.

West Headnotes

**[1] Copyrights and Intellectual Property** 🔑1
99k1 Most Cited Cases

Copyright Act is intended to motivate the creative
activity of authors and inventors by the provision of a
special reward, and to allow the public access to the
products of their genius after the limited period of
exclusive control has expired;  the reward to the
owner is a secondary consideration that serves the
primary public purpose of inducing release to the
public of the products of the author's or artist's
creative genius.  17 U.S.C.A. § 107.

**[2] Copyrights and Intellectual Property** 🔑53.2
99k53.2 Most Cited Cases

The copyright monopoly, i.e., the bundle of exclusive
rights to publish, copy, and distribute a work, is
limited and subject to a list of statutory exceptions,
including the exception for fair use.  17 U.S.C.A. § §
106, 107.

**[3] Copyrights and Intellectual Property** 🔑53.2
99k53.2 Most Cited Cases

The reasonableness of a use under the fair use
doctrine is determined on a case by case basis
applying an equitable rule of reason analysis.  17
U.S.C.A. § 107.

**[4] Copyrights and Intellectual Property** 🔑53.2
99k53.2 Most Cited Cases

The statutory fair use factors are not meant to be
exclusive, but rather illustrative, representing only
general guidance about the sorts of copying that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**EXHIBIT 1**

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
(Cite as: 317 F.3d 385)

courts and Congress most commonly have found to be fair uses; because a particular use must be examined for its reasonableness in determining whether it is a fair use, any per se rule is inappropriate. 17 U.S.C.A. § 107.

[5] Copyrights and Intellectual Property ☜53.2
99k53.2 Most Cited Cases

A fair-use analysis bears relevance only when a challenged use violates a right protected by the Copyright Act, but the statutorily protected rights are themselves limited in that a copyright does not secure an exclusive right to the use of facts, ideas, or other knowledge; rather, a copyright gives an author exclusive rights only with respect to his manner of expression. 17 U.S.C.A. § 107.

[6] Copyrights and Intellectual Property ☜4.5
99k4.5 Most Cited Cases

Even though the Copyright Act will protect even the minimal quantum of originality, e.g., independent creation plus a modicum of creativity, the public has an interest in retaining in the public domain the right to discover facts and exchange ideas freely; thus, copyright protection does not extend to ideas or facts even if such facts were discovered as the product of long and hard work. 17 U.S.C.A. § 107.

[7] Copyrights and Intellectual Property ☜56
99k56 Most Cited Cases

Use of copyrighted manuscript in child custody lawsuit for evidentiary value of its content insofar as it contained admissions that copyright holder may have made against his interest when he bragged about his conduct in murdering his father, in taking advantage of juvenile justice system, and in benefiting from his father's estate, was fair use. 17 U.S.C.A. § 107.

[8] Copyrights and Intellectual Property ☜53.2
99k53.2 Most Cited Cases

The use of a copyrighted work for a commercial purpose tends to weigh against a finding that the challenged use is a fair use; the crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. 17 U.S.C.A. § 107(1).

[9] Copyrights and Intellectual Property ☜53.2
99k53.2 Most Cited Cases

If a challenged use of a copyrighted work is noncommercial, the party alleging infringement must demonstrate either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work. 17 U.S.C.A. § 107(1).

[10] Copyrights and Intellectual Property ☜56
99k56 Most Cited Cases

Use of copyrighted manuscript in child custody lawsuit for evidentiary value of its content, insofar as it contained admissions that copyright holder may have made against his interest when he bragged about his conduct in murdering his father, in taking advantage of juvenile justice system, and in benefiting from his father's estate, was not for profit or for any commercial purpose, in context of fair use analysis, since those facts were relevant to custody decision, and their use did not draw on copyright holder's mode of expression. 17 U.S.C.A. § 107(1).

[11] Copyrights and Intellectual Property ☜56
99k56 Most Cited Cases

Use of copyrighted manuscript in child custody lawsuit for evidentiary value of its content insofar as it contained admissions that copyright holder may have made against his interest when he bragged about his conduct in murdering his father, in taking advantage of juvenile justice system, and in benefiting from his father's estate, did not harm potential market for his manuscript, in context of fair use analysis, even though copyright holder lost the right to control release of it as "private" document. 17 U.S.C.A. § 107(1).

[12] Copyrights and Intellectual Property ☜1
99k1 Most Cited Cases

The protection of privacy is not a function of the copyright law; to the contrary, the copyright law offers a limited monopoly to encourage ultimate public access to the creative work of the author. 17 U.S.C.A. § 107(1).

[13] Copyrights and Intellectual Property ☜53.2
99k53.2 Most Cited Cases

The nature of the copyrighted work factor in the fair

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
(Cite as: 317 F.3d 385)

use analysis focuses attention on the extent to which a work falls at the core of creative expression; thus, for example, a fictional work might be closer to the core of copyright than a factual work. 17 U.S.C.A. § 107(2).

[14] Copyrights and Intellectual Property 🗝56
99k56 Most Cited Cases

Use of unpublished, copyrighted manuscript in child custody proceeding weighed in favor of finding of fair use; there was no evidence that use of manuscript would have adversely affected potential market for manuscript, use of work was not related to its mode of expression, but rather to its historical facts, and societal benefit of having all relevant information presented in judicial proceeding was important one and should have been furthered if doing so would not have unduly undermined author's rights with regard to his creative work. 17 U.S.C.A. § 107(2).

[15] Copyrights and Intellectual Property 🗝53.2
99k53.2 Most Cited Cases

As a general matter, as the amount of the copyrighted material that is used increases, the likelihood that use will constitute a fair use decreases, but this is an imperfect generalization because the extent of permissible copying varies with the purpose and character of the use. 17 U.S.C.A. § 107(3).

[16] Copyrights and Intellectual Property 🗝56
99k56 Most Cited Cases

Use of all, or nearly all, of copyrighted work in child custody proceeding did not undermine protections granted by Copyright Act, but only served important societal interest in having evidence before factfinder, since sole purpose and intent of introducing manuscript was to obtain admissions of fact against copyright holder's interest in effort to prove that his home would not have been suitable place for custody of children. 17 U.S.C.A. § 107(3).

[17] Copyrights and Intellectual Property 🗝56
99k56 Most Cited Cases

The effect of the defendants' use of a copyrighted manuscript upon the potential market for, or value of, the copyrighted work factor is the single most important element of fair use because it touches most closely upon the author's ability to capture the fruits

of his labor and hence his incentive to create; under this core inquiry, a court determines whether the defendants' introduction of a manuscript in evidence would materially impair the marketability of the work and whether it would act as a market substitute for it. 17 U.S.C.A. § 107(4).

[18] Copyrights and Intellectual Property 🗝56
99k56 Most Cited Cases

Use of copyrighted manuscript in child custody lawsuit for evidentiary value of its content, insofar as it contained admissions that copyright holder may have made against his interest when he bragged about his conduct in murdering his father, in taking advantage of juvenile justice system, and in benefiting from his father's estate, did not adversely affect its marketability, in context of fair use analysis. 17 U.S.C.A. § 107(4).

[19] Copyrights and Intellectual Property 🗝90(2)
99k90(2) Most Cited Cases

Use of copyright infringement suit to attempt to bar introduction of facts disclosed in manuscript as admissions against copyright holder's interest in child custody proceeding warranted award of attorney fees against copyright holder, even though copyright holder asserted that he was only seeking to protect his rights under Copyright Act and that his rights should not have been chilled by assessment of attorneys fees. 17 U.S.C.A. § 505.

[20] Federal Courts 🗝830
170Bk830 Most Cited Cases

Court of Appeals reviews a district court's award of attorneys fees under the Copyright Act for abuse of discretion, reversing subsidiary factual findings only if they are clearly erroneous. 17 U.S.C.A. § 505.

[21] Copyrights and Intellectual Property 🗝90(2)
99k90(2) Most Cited Cases

District court could, but was not required to, award attorney fees to law firms who were defendants in copyright infringement lawsuit, if court determined, in its discretion, to do so, even though law firms were each represented by member attorney. 17 U.S.C.A. § 505.

[22] States 🗝215

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385

2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601

(Cite as: 317 F.3d 385)

360k215 Most Cited Cases

A state's own attorneys representing the state may be awarded attorney fees under a fee-shifting statute.

*389 ARGUED: Howard J. Schulman, Schulman & Kaufman, L.L.C., Baltimore, Maryland, for Appellant. William Fitts Ryan, Jr., Whiteford, Taylor & Preston, L.L.P., Baltimore, Maryland; Andrew Radding, Adelberg, Rudow, Dorf & Hendler, L.L.C., Baltimore, Maryland, for Appellees. ON BRIEF: Amy E. Askew, Whiteford, Taylor & Preston, L.L.P., Baltimore, Maryland; J. Andrew McKinney, Adelberg, Rudow, Dorf & Hendler, L.L.C., Baltimore, Maryland; Gerard P. Martin, Thy C. Pham, Martin, Snyder & Bernstein, P.A., Baltimore, Maryland; Kathryn M. Goldman, Jiranek, Goldman & Minton, L.L.C., Baltimore, Maryland, for Appellees.

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed in part and vacated and remanded in part by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WILLIAMS and Judge MICHAEL joined.

## OPINION

NIEMEYER, Circuit Judge.

On a motion for summary judgment filed in this copyright infringement action, the district court held that the defendants' copying of a copyrighted manuscript for introduction into evidence in a state-court child-custody proceeding constituted a "fair use" of the manuscript under the Copyright Act, 17 U.S.C. § 107, when the substance of the manuscript was relevant to the issues in the child-custody proceeding and the defendants' use of the manuscript was solely for its content and not for its mode of expression. The district court also awarded attorneys fees, under 17 U.S.C. § 505, to the prevailing *individual* defendants but not to the law-firm defendants because the law firms were represented by a member of the firm and thus were acting *pro se.*

*390 For the reasons given in this opinion, we affirm the district court's summary judgment and its award of attorneys fees to the individual defendants, and we remand for reconsideration of the law-firm defendants' motion for attorneys fees.

I

In the child-custody case of *Slavin v. Slavin,* commenced in July 2000 and pending in the Circuit Court for Baltimore City, Case No. 95249006/CE 201677, Alyson Slavin Bond sued her former husband, William Slavin, for exclusive custody of their three children. William Slavin filed a cross-petition for exclusive custody and, in support of his position, introduced into evidence an autobiographical manuscript written by Alyson's current husband, William Bond, to establish that the home of Alyson and William Bond would not be a suitable place for the three children. Bond's manuscript was entitled *Self-Portrait of a Patricide: How I Got Away with Murder.*

In June 1981, when William Bond, who was formerly known as William Rovtar, was 17, he beat his father to death with a hammer in his grandparents' garage in Bainbridge Township, Ohio. After Rovtar was arrested and detained in a juvenile detention facility in Ohio, he entered into a guilty-plea agreement in juvenile court with the result that in September 1981 he was transferred to the Sheppard & Enoch Pratt Hospital in Baltimore, Maryland, for psychological treatment. Rovtar was released in 1982, and after his release, he legally changed his name to William Bond. He remained in Maryland and thereafter became employed as a tennis instructor at a country club, a bicycle salesman, and a bodyguard, among other things.

In 1987, Bond began to write *Self-Portrait of a Patricide: How I Got Away with Murder,* "the true story of and by William Bond," which he hoped to market to publishers for profit. The manuscript describes in horrific detail how Bond planned and committed the murder of his father with a hammer, and how his dying father attempted to raise himself off the floor of the garage before Bond delivered the final blows to his neck and head. It describes Bond wiping away his fingerprints, scrubbing the garage floor, cleaning blood, flesh, and bone from his clothes, and stuffing his father's dead body in his car's trunk. Most sinister of all, it depicts a remorseless individual who brags about fooling the police and the juvenile system to "get away scot-free" and even collecting, as planned, the money from his father's estate. Although verifiable facts of the murder are consistent with the details provided in the manuscript, Bond has now stated in an affidavit that the manuscript is "a highly fictionalized and stylized work," based on his "juvenile experience." Bond

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
(Cite as: 317 F.3d 385)

circulated his manuscript directly and through agents in order to find a publisher, asking for a seven-figure advance. His efforts, however, were unsuccessful. After some revisions, Bond also gave a copy of the manuscript to Norman Pessin, an attorney who had represented Bond in various unrelated matters, to help him get the manuscript published, but his efforts, too, failed. Although Pessin thereafter died, his widow retained a copy of the manuscript.

Bond met Alyson Slavin in early 1995, after Alyson was separated from her husband, William Slavin. Bond and Alyson continued to see each other until they married in May 2001. In 1996, shortly after Bond and Alyson met, Bond wrote a lengthy letter to Alyson's father, Kenneth Blum, Sr., indicating that he intended to marry Alyson and become the stepfather of her children. The letter offered an analysis of individual members of Blum's family and purported to offer "solutions" to correct perceived deficiencies in the *391 Blum-Slavin extended family. In addition, the letter set forth an expansive financial plan, pursuant to which Bond demanded from Blum a dowry, a salary, establishment of an investment account, purchase of a studio apartment in addition to a house, and a severance package should Bond's marriage with Alyson not work out. Bond stated to Blum, "You can pay me now or pay me later." In this letter, Bond also made reference to his personal history, stating that he "had a past," and that, although it was "none of [Blum's] business," it makes "interesting reading."

Blum not only found this letter very disconcerting, considering it to be an attempt to extort money from him, but he also became concerned for the safety of Alyson and her children. In June 2000, just before the state custody action was commenced, Blum hired a private investigator, Dudley F.B. Hodgson, to look into Bond's background. At their first meeting, Blum gave Hodgson an overview of his dealings with Bond and expressed his concern over both the safety of his grandchildren and Bond's effort to "shake him down" for money. Blum gave Hodgson a copy of the letter that Bond had sent him and told Hodgson that he had heard that Bond may have had some problems with his family involving violence in Ohio.

In the course of his investigation, Hodgson learned about the murder of Bond's father and contacted the Bainbridge, Ohio police department, obtaining copies of the police report and other documents relating to the homicide investigation. Hodgson reported these findings to Blum, and at Blum's request, Hodgson went to the home of Miriam Pessin, the widow of

Norman Pessin, believing that Bond had also tried to "shake Pessin down" for money before he died. When Hodgson interviewed Miriam Pessin in April 2001 and asked her if she had any information that would be helpful in his investigation of Bond, she told Hodgson that she did have, stored in a box, a loose-leaf copy of a manuscript that Bond authored. Mrs. Pessin stated that Bond had given a copy of the manuscript to her husband for him to read for the purposes of locating a publisher. She later testified that this box of materials was not part of Pessin's legal files, which he carefully kept separate, and that Bond had also given her portions of the manuscript to read. Not wanting to retain the manuscript in her home, Mrs. Pessin gave it to Hodgson. Hodgson made a copy of the manuscript and gave copies to Alyson's ex-husband, William Slavin, and the attorneys representing him in the state custody action. William Slavin's attorneys made the manuscript an exhibit during the deposition of Alyson in July 2001 and intended to make it a part of the custody litigation in the Circuit Court for Baltimore City, in which a hearing was scheduled for December 10, 2001. For the sole purpose of preventing further use of the manuscript in the proceedings before the Baltimore City Circuit Court, Bond registered a copy of his manuscript with the Copyright Office in August 2001.

Immediately after registering the manuscript, Bond commenced this action for copyright infringement, naming as defendants Blum, Bond's son, Hodgson, William Slavin, and Slavin's attorneys. He requested a preliminary and permanent injunction prohibiting the use of the manuscript by the defendants for any purpose and requiring the return of all existing copies.

At the hearing on Bond's motion for a preliminary injunction, the district court heard testimony from Alyson Bond, Blum, Hodgson, and Mrs. Pessin, among others. Following the hearing, the court found that Bond had written the manuscript and had delivered it to Pessin and others in an effort to get it published. The court found *392 that Pessin's efforts to get the book published were not "part of [Pessin's] legal practice, because he wasn't doing this as a lawyer." The court concluded that the document was not "a confidential document in any kind of privileged sense." In addition, the court found that Hodgson did not steal the document but was given the document by Pessin's wife.

On the merits of the copyright infringement issue, the court evaluated the defendants' defense of "fair

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
**(Cite as: 317 F.3d 385)**

use" by applying the four factors set forth in 17 U.S.C. § 107. The court concluded that (1) the purpose and character of the defendants' anticipated use of the manuscript was not one against which the Copyright Act sought to protect; (2) the nature of the manuscript did not weigh against the finding of a "fair use"; (3) the defendants were seeking to introduce the entire manuscript, which weighed against a finding of fair use; and (4) the use would have "absolutely zero" detrimental effect on the potential market for the copyrighted work and could, "in a perverse way," actually increase its market value. Based on these conclusions, the court held that the challenged use was a "fair use." The court thus denied Bond's motion for a preliminary injunction, and then, based on the undisputed facts, granted summary judgment in favor of the defendants on November 20, 2001. [FN*]

> FN* Counsel for the parties state that at the custody hearing on December 10, 2001, in state court, William Slavin's attorneys in fact introduced the manuscript into evidence.

When Bond filed a motion to alter or amend the judgment, the district court denied the motion, finding that Bond was again "blurring the distinction between the copyright protection afforded the mode of expression in a written work and the ideas and facts in the public domain which are expressed in the work." The court observed that Bond had not established any likelihood that the defendants intended to utilize the manuscript in any way other than that deemed by the court to be a fair use, and that, in the event they tried to use it for other purposes, they would do so "at the risk of being sued as a wil[l]ful infringer."

Pursuant to motions filed by the defendants, the district court awarded attorneys fees to the individual defendants under 17 U.S.C. § 505, but not to the law-firm defendants because the law firms were representing themselves *pro se*. The court also denied the law-firm defendants' motions for sanctions against Bond pursuant to Federal Rule of Civil Procedure 11.

Bond filed an appeal from the district court's summary judgment entered on November 27, 2001, and the court's subsequent order awarding attorneys fees. The law-firm defendants cross-appealed from the district court's denial of their motions for attorneys fees and for Rule 11 sanctions.

II

Bond contends that the district court adopted a *per se* rule that use of copyrighted material as evidence in a legal proceeding is always a "fair use," "overriding" the analysis for finding "fair use" required by 17 U.S.C. § 107. Acknowledging that the court might be able to find the fair-use doctrine applicable to the use of copyrighted material as evidence, Bond maintains that the court erred in doing so in this case by not considering all of the statutorily prescribed factors.

The defendants note that the district court did in fact consider the factors set forth in § 107 and that the consideration of those factors correctly demonstrated that "the non-commercial use of the manuscript in the child custody litigation did not result in any commercial exploitation of the work or adversely affect its marketability."

**\*393** The undisputed facts show that the defendants introduced a copy of Bond's copyrighted manuscript into evidence in a state child-custody proceeding to prove that Bond's household would not be a suitable place for the children of Bond's wife. The work, written by Bond and circulated by him in an effort to publish it, describes how Bond, when 17, planned and committed the murder of his father with a hammer, fooled the police about his mental state, used the juvenile system to obtain merely a "slap on the wrist," and recovered the proceeds of his father's estate, all without remorse. In the manuscript, he stated, "I wanted my father's money." The defendants made copies of the manuscript to use its content as evidence in the child-custody litigation, and there is no evidence of any intent to exploit the book's manner of expression for any purpose, commercial or otherwise. Indeed, there is no evidence in the record to indicate that the defendants' use of the manuscript was anything more than the presentation of evidence in a child-custody proceeding to prove the unsuitability of Bond's home as a place for children. Moreover, there is no evidence that this use adversely affected Bond's interests in the copyright.

Applying the four factors stated in 17 U.S.C. § 107, the district court held that the defendants' use of the work fell within the "fair use" exception established in 17 U.S.C. § 107, principally because the "[p]urpose and character of [the defendants'] use has nothing whatsoever to do with any interest that the copyright law was designed to protect. The copyright

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385                                                                                                              Page 7
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
(Cite as: 317 F.3d 385)

law was never designed to protect content as distinguished from mode of expression." The court also concluded that "the effect of the [defendants'] use on the potential market for value of the copyrighted work is absolutely zero."

We review the district court's summary judgment *de novo,* applying the same standard that the district court was required by law to apply for granting the motion for summary judgment. _Beverati v. Smith, 120 F.3d 500, 503 (4th Cir.1997)._

[1] The Copyright Act, enacted on the authority of Article I, § 8, of the Constitution, confers on creators of original works a limited monopoly in their works of authorship to advance an important public purpose. "It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." _Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)._ The reward to the owner is "a secondary consideration" that serves the primary public purpose of "induc[ing] release to the public of the products of [the author's or artist's] creative genius." _Id._ (quoting _United States v. Paramount Pictures, Inc., 334 U.S. 131, 158, 68 S.Ct. 915, 92 L.Ed. 1260 (1948)); see also Harper & Row Publishers, Inc. v. Nation Enterprises. 471 U.S. 539, 546, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)._

[2] The copyright "monopoly"--i.e., the "bundle of exclusive rights ... to publish, copy, and distribute" the work, _Harper & Row, 471 U.S. at 546-47, 105 S.Ct. 2218_--is limited and subject to a list of statutory exceptions, including the exception for fair use provided in 17 U.S.C. § 107. _See_ 17 U.S.C. § 106; _Sony, 464 U.S. at 447, 104 S.Ct. 774._ Section 107 provides explicitly that "the fair use of a copyrighted work ... is not an infringement of copyright."

[3][4] The fair-use doctrine is a longstanding common-law principle, now codified in § 107, that was "traditionally defined as 'a privilege in others than the owner of the copyright to use the copyrighted *394 material in a reasonable manner without his consent.' " _Harper & Row, 471 U.S. at 549, 105 S.Ct. 2218_ (quoting H. Ball, _Law of Copyright and Literary Property_ 260 (1944)). The reasonableness of a use is determined on a case-by-case basis applying an "equitable rule of reason analysis." _Sony, 464 U.S. at 448, 104 S.Ct. 774; see also Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577- 78, 114 S.Ct. 1164, 127 L.Ed.2d 500_

(1994). To guide the determination of whether a particular use is a fair use, § 107 provides that a court must consider four factors among any others relevant:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These factors are "not meant to be exclusive," _Harper & Row, 471 U.S. at 560, 105 S.Ct. 2218,_ but rather "illustrative," representing "only general guidance about the sorts of copying that courts and Congress most commonly have found to be fair uses," _Campbell, 510 U.S. at 577-78, 114 S.Ct. 1164._ Because a particular use must be examined for its reasonableness in determining whether it is a "fair use," any *per se* rule is inappropriate. _Id._ at 577, 114 S.Ct. 1164 ("The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis"); _id._ at 585, 114 S.Ct. 1164 ("The Court of Appeal's elevation of one sentence from _Sony_ to a per se rule thus runs as much counter to _Sony_ itself as to the long common-law tradition of fair usage adjudication"); _Sundeman v. Seajay Soc'y, Inc., 142 F.3d 194, 202 (4th Cir.1998)_ (noting that fair use demands a case-by-case inquiry).

[5][6] A fair-use analysis bears relevance only when a challenged use violates a right protected by the Copyright Act. But the statutorily protected rights are themselves limited in that a copyright does not secure an exclusive right to the use of facts, ideas, or other knowledge. Rather, a copyright gives an author exclusive rights only with respect to his manner of expression. _See, e.g., Baker v. Selden, 101 U.S. 99, 102, 25 L.Ed. 841 (1879); Superior Form Builders, Inc. v. Chase Taxidermy Supply Co., 74 F.3d 488, 492 (4th Cir.1996)_ (noting that "the originality inherent in each author's expression is the essence of the proprietary interest protected"). In _Superior Form Builders,_ we noted that even though the Copyright Act will protect even the minimal quantum of originality--"independent creation plus a modicum of creativity," _Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 346, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)_--the public has an interest in retaining in the public domain "the right to discover facts and exchange ideas freely. Thus, copyright protection does not extend to ideas or facts even if

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
(Cite as: 317 F.3d 385)

such facts were discovered as the product of long and hard work. *Superior Form Builders,* 74 F.3d at 492 (internal citation omitted).

[7] With these general principles of copyright law in hand, we now turn to the question before us of whether the defendants' use of Bond's copyrighted manuscript as evidence in the child-custody proceeding was subject to the fair-use exception defined in § 107. To make that determination, we apply the four factors set forth in § 107.

A

[8][9] The first § 107 factor directs the inquiry into the "purpose and character of *395 the [defendants'] use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The use of a copyrighted work for a commercial purpose "tends to weigh against a finding" that the challenged use is a "fair use." *Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218. The "crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Id.* If a challenged use of a copyrighted work is noncommercial, the party alleging infringement must demonstrate "either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Sony,* 464 U.S. at 451, 104 S.Ct. 774.

[10] Application of this factor weighs heavily against Bond's infringement claim. The defendants' use of Bond's copyrighted manuscript is not for any commercial purpose; the defendants are not seeking to exploit the copyrighted material without paying the customary price. Indeed, the defendants' use is indifferent to Bond's mode of expression. Rather, the narrow purpose of defendants' use of the manuscript is for the evidentiary value of its content insofar as it contains admissions that Bond may have made against his interest when he bragged about his conduct in murdering his father, in taking advantage of the juvenile justice system, and in benefiting from his father's estate. These are all facts relevant to the custody decision, and their use does not draw on Bond's mode of expression.

[11][12] Because the challenged use is noncommercial, Bond must demonstrate that the use of the manuscript as evidence in the litigation would harm the potential market for his manuscript. Neither

in his brief nor at oral argument has Bond been able to identify any harm or potential harm to his work against which the law of copyrights protects. The only harm that we can discern from his arguments is a claim that he has lost the right to control the release of a "private" or "confidential" document. But at oral argument, he conceded that the document was not confidential. Indeed, it is apparent that Bond has circulated the document in an effort to have it published. But more importantly, the protection of privacy is not a function of the copyright law. *See, e.g., New Era Publications Int'l ApS v. Henry Holt & Co.,* 695 F.Supp. 1493, 1504-05 (S.D.N.Y.1988) (Leval, J.). To the contrary, the copyright law offers a limited monopoly to encourage ultimate *public access* to the creative work of the author. If privacy is the essence of Bond's claim, then his action must lie in some common-law right to privacy, not in the Copyright Act. *See, e.g., Lawrence v. A.S. Abell Co.,* 299 Md. 697, 475 A.2d 448, 450-51 (1984).

B

[13] We next consider the second factor, "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor focuses attention on the extent to which a work falls at the core of creative expression. *See Campbell,* 510 U.S. at 586, 114 S.Ct. 1164. Thus, for example, a fictional work might be closer to the core of copyright than a factual work. *See, e.g., Stewart v. Abend,* 495 U.S. 207, 237-38, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990).

[14] That Bond's manuscript is unpublished and contains a stylized mode of expressing his feelings about historical facts weigh against a finding of fair use. *See Harper & Row,* 471 U.S. at 564, 105 S.Ct. 2218. But, as *Campbell* instructs, we do not consider the § 107 factors "in isolation, one from another," but we weigh them together "in light of the purposes of copyright." *396 510 U.S. at 578, 114 S.Ct. 1164. Where, as here, the use of the work is not related to its mode of expression but rather to its historical facts and there is no evidence that the use of Bond's manuscript in the state legal proceedings would adversely affect the potential market for the manuscript, one cannot say the incentive for creativity has been diminished in any sense. And because the societal benefit of having all relevant information presented in a judicial proceeding is an important one, it should be furthered if doing so would not unduly undermine the author's rights with regard to his creative work.

C

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[15] Under the third § 107 factor, we examine the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). As a general matter, as the amount of the copyrighted material that is used increases, the likelihood that the use will constitute a "fair use" decreases. But this is an imperfect generalization. Compare Harper & Row, 471 U.S. at 569, 105 S.Ct. 2218 (holding that publication of only some 300 words from unpublished memoirs of President Ford was not a fair use given the quality of the quoted language), with Campbell, 510 U.S. at 594, 114 S.Ct. 1164 (holding that even qualitatively substantial copying in a parodical song is fair use when such copying serves the necessary function of "conjuring up" the original song to advance the parody). "The extent of permissible copying varies with the purpose and character of the use." Campbell, 510 U.S. at 586-87, 114 S.Ct. 1164.

[16] It is conceded that the defendants' challenged use of the manuscript in the state-court proceeding involved all, or nearly all, of the copyrighted work. Its use, however, was not for its expressive content, but rather for its allegedly factual content. The sole purpose and intent of introducing Bond's manuscript was to obtain admissions of fact against his interest in an effort to prove that his home would not be a suitable place for custody of children. The use of the copyrighted material in this context, even the entire manuscript, does not undermine the protections granted by the Act but only serves the important societal interest in having evidence before the factfinder. See Fogerty v. Fantasy, Inc., 510 U.S. 517, 526, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) ("We have often recognized the monopoly privileges that Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good"). Because the manuscript was not used to undermine any right conferred by the Copyright Act, Bond can derive little benefit from this factor in the context of this case.

D

[17] Finally, we consider the effect of the defendants' use of Bond's copyrighted manuscript "upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor is "undoubtedly the single most important element of fair use." Harper & Row, 471 U.S. at 566, 105 S.Ct. 2218. This is so because it touches most closely

upon the author's ability to capture the fruits of his labor and hence his incentive to create. Under this core inquiry, we determine whether the defendants' introduction of the manuscript in evidence would materially impair the marketability of the work and whether it would act as a market substitute for it.

[18] On this factor, there is no evidence that the admission into evidence of Bond's manuscript would adversely affect its marketability. Indeed, the district court made the observation: "Ironically, if *397 anything, [the defendants' use] increases the value of the work in a perverse way, but it certainly doesn't decrease it."

E

In sum, we conclude that the district court did not err in concluding that the defendants' use of the manuscript as evidence in the state-court proceeding fell within the scope of fair use authorized by § 107 of the Copyright Act. To the contrary, we agree with the district court when it stated:

Purpose and character of [the defendants'] use has nothing whatsoever to do with any interest that the copyright law was designed to protect. The copyright law was never designed to protect content as distinguished from mode of expression.

* * *

It was certainly never intended to utilize, to keep from the public the ability to state the facts in a document as compared to the mode of expression.

* * *

[Moreover], the effect of [defendants'] use on the potential market for value of the copyrighted work is absolutely zero.

III

[19] Bond also contends that the district court erred in awarding attorneys fees to the individual defendants as prevailing parties, under 17 U.S.C. § 505. The district court awarded $6,675.45 each to the defendants Dudley Hodgson, Kenneth Blum, Jr., and Kenneth Blum, Sr., and $8,699.70 to William Slavin.

Bond does not contest the amount of the awards, but he argues that the district court's findings on the factors relevant to an award of attorneys fees were not justified. He argues that he was only seeking to protect his rights under the Copyright Act and that his rights should not be chilled by an assessment of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385                                                                 Page 10

2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601

**(Cite as: 317 F.3d 385)**

attorneys fees. He argues expansively that the question of whether the introduction of a copyrighted work into evidence was a fair use is a close question, particularly when there are no controlling authorities on point.

[20] We review the district court's award of attorneys fees under 17 U.S.C. § 505 for abuse of discretion, reversing subsidiary factual findings only if they are clearly erroneous. *Diamond Star Bldg. Corp. v. Sussex Co. Builders, Inc., 30 F.3d 503, 506 (4th Cir.1994).*

The Copyright Act provides:

[T]he court in its discretion may allow the recovery of full costs by or against any party.... Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505. To determine whether an award of attorneys fees should be made to a party under § 505, we have articulated four factors for consideration: "(1) the motivation of the parties, (2) the objective reasonableness of the legal and factual positions advanced, (3) the need in particular circumstances to advance considerations of compensation and deterrence, and (4) any other relevant factor presented." *Diamond Star,* 30 F.3d at 505 (quoting *Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 234 (4th Cir.1993) (internal quotation marks omitted)).

In applying these factors to the circumstances before it, the district court found that Bond's motivation in bringing his copyright infringement action was "to block potentially relevant evidence from being presented" in the child custody proceeding. In essence, the court stated that Bond misused the Copyright Act and that he was motivated by a desire to suppress the underlying facts of his copyrighted work rather than to safeguard its creative **\*398** expression. Assessing the reasonableness of the legal positions advanced by Bond, the court concluded that the fair-use question presented by Bond's complaint was "not a close one" and that Bond's position was "frivolous," although the court recognized that frivolousness was not essential to an award of attorneys fees. The court concluded that it was unreasonable for Bond to use a copyright infringement action to attempt to bar introduction of facts disclosed in the work as admissions against his interest, particularly when the information was relevant to child-custody issues. Finally, the court stated that Bond and others in a position similar to him "should be deterred from bringing meritless

actions."

We conclude that the district court, in reaching these conclusions, did not clearly err in its factfinding and, in applying the *Rosciszewski* factors to award attorneys fees to the prevailing individual defendants, did not abuse its discretion.

IV

[21] The two law-firm defendants--McDaniel, Bennett & Griffin and Adelberg, Rudow, Dorf & Hendler, LLC--also sought attorneys fees under 17 U.S.C. § 505, but the district court denied them because it concluded that the firms were acting *pro se* and therefore were not entitled to fees. The law firms cross-appealed, arguing that the district court erred in applying to them the *pro se* exception, as stated in *Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991) (holding that an attorney representing himself is ineligible for attorneys fees under 42 U.S.C. § 1988).

Because of the absence of judicial precedents and in view of the insight provided by our decision in *Doe v. Board of Education of Baltimore County,* 165 F.3d 260 (4th Cir.1998) (denying statutory fees to an attorney-parent of a child with a disability who was a prevailing party under 20 U.S.C. § 1415(i)(3)(B)), the district court believed that it could not award fees under 17 U.S.C. § 505 to a prevailing law firm when members of that law firm represent the firm. The district court held conditionally that if it had been given "discretion to award counsel fees to the law firm defendants, it would do so," but it would have awarded "substantially less than the amount claimed because ... had there been independent counsel being paid by the law firm Defendants, the matter would have been handled at far less cost than is sought from the Plaintiff."

The law firms contend that the district court erred in concluding that the law firms were proceeding *pro se* and that the cases of *Kay* and *Doe* preclude an award of fees to them under § 505. They state that they are "legal entities represented by attorneys," albeit attorneys within the firm. They argue that the Supreme Court's statement in *Kay* that "an organization is not comparable to a *pro se* litigant" is dispositive on this issue. *Kay,* 499 U.S. at 436 n. 7, 111 S.Ct. 1435. They argue additionally that Local Rule 101.1(a) of the District of Maryland states that "[o]nly individuals may represent themselves." They maintain that a law firm using members to represent the firm is more analogous to a State or a corporation

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
**(Cite as: 317 F.3d 385)**

represented by its own in-house counsel. In each of the situations, they note, the attorney-client relationship is created between the organization and the attorney, just as it was between the law firms and the members representing them.

This is an issue of first impression in our circuit, but its resolution may readily be derived from the Supreme Court's decision in _Kay_ and our decision in _Doe._

The principle that a _pro se_ litigant who is _not_ a lawyer is not entitled to attorneys fees authorized by a fee-shifting statute is *399 not disputed. _See, e.g.,_ _Gonzalez v. Kangas,_ 814 F.2d 1411 (9th Cir.1987); _Smith v. DeBartoli,_ 769 F.2d 451 (7th Cir.1985); _Owens-El v. Robinson,_ 694 F.2d 941 (3d Cir.1982). The question more analogous to the facts before us-- whether a _pro se_ litigant who is _also_ an attorney would be entitled to such fees--was addressed by the Supreme Court in _Kay._ In _Kay,_ the Court held that a plaintiff who was also an attorney and who prevailed in a civil rights action was nonetheless not entitled to fees under 42 U.S.C. § 1988(b), which authorizes attorneys fees to the prevailing party, notwithstanding the fact that the attorney "obviously handled his professional responsibilities ... in a competent manner." 499 U.S. at 435, 111 S.Ct. 1435. The Supreme Court rested its conclusion on three principles. First, as a textual matter, it concluded that an "attorney," whose fees would be reimbursable under § 1988, "assumes an agency relationship, and it seems likely that Congress contemplated an attorney-client relationship as a predicate for an award under § 1988." _Id._ at 436, 111 S.Ct. 1435. Second, the Court focused on the purpose of fee-shifting statutes "to enable potential plaintiffs to obtain the assistance of competent counsel in vindicating their rights." _Id._ And third, an award of fees to only those litigants who have retained independent counsel ensures "the effective prosecution of meritorious claims." _Id._ at 437, 111 S.Ct. 1435. Explaining this more fully, the Court stated:

Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgement of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The

adage that "a lawyer who represents himself has a fool for a client" is the product of years of experience by seasoned litigators.
_Id._ at 437-38, 111 S.Ct. 1435 (footnote omitted).

In _Doe,_ we applied the principles of _Kay_ to a fee-shifting provision in the Individual with Disabilities Education Act ("IDEA"), denying a parent, who was also an attorney, a right to collect fees under the statute for his representation of his child. 165 F.3d at 265. Even though a parent who was also an attorney was distinct from and therefore an agent for the prevailing child, who would otherwise be entitled to fees under IDEA, 20 U.S.C. § 1415(i)(3)(B), we concluded that "[l]ike attorneys appearing _pro se,_ attorney-parents are generally incapable of exercising sufficient independent judgment on behalf of their children to ensure that 'reason, rather than emotion' will dictate the conduct of the litigation." _Id._ at 263 (quoting _Kay,_ 499 U.S. at 437, 111 S.Ct. 1435). Because a parent-attorney's representation of his child was akin to _pro se_ representation, we employed the rationale of _Kay_ to find that the parent-attorney representation of a child in an IDEA case fell within the "special circumstances" exception barring fees where such an award would be unjust. _See Hensley v. Eckerhart,_ 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

[22] But the principles of _Kay_ and _Doe,_ which were applied to deny a prevailing party attorneys fees under fee-shifting statutes, do not apply in circumstances where entities represent themselves through in-house or _pro bono_ counsel. In _Kay,_ the Supreme Court explained the distinction: "[A]n organization is not comparable to a _pro se_ litigant because the organization is always represented by *400 counsel, whether in-house or _pro bono,_ and thus, there is always an attorney-client relationship." 499 U.S. at 436 n. 7, 111 S.Ct. 1435. When a member of an entity who is also an attorney represents the entity, he is in an attorney-client relationship with the entity and, even though interested in the affairs of the entity, he would not be so emotionally involved in the issues of the case so as to distort the rationality and competence that comes from independent representation. Accordingly, a State's own attorneys representing the State may be awarded attorneys fees under a fee-shifting statute. _See Wisconsin v. Hotline Indus., Inc.,_ 236 F.3d 363 (7th Cir.2000). And in-house counsel representing the corporation for whom they work may also be awarded attorneys fees. _See Textor v. Bd. of Regents of Northern Ill. Univ.,_ 711 F.2d 1387, 1396 (7th Cir.1983) ("Defendants chose to hire in-house

317 F.3d 385
2003 Copr.L.Dec. P 28,566, 65 U.S.P.Q.2d 1601
**(Cite as: 317 F.3d 385)**

Page 12

counsel because that was the most efficient means of handling a large amount of legal work.... [F]or every hour in-house counsel spent on this case, defendants lost an hour of legal services that could have been spent on other matters").

Though representation of a law firm by one of its members presents an increased risk of emotional involvement and loss of independence, the law firm still remains a business and professional entity distinct from its members, and the member representing the firm as an entity represents the firm's distinct interests in the agency relationship inherent in the attorney-client relationship. Although a given representation of a law firm by one or more of its members could suffer from a lack of independence, there is no indication in this case of a relationship that tended to distort independent judgment, as existed in *Doe.*

Because the district court indicated that it was inclined to award the law-firm defendants fees, although not all the fees requested, and would have done so but for the *pro se* prohibition, we now remand this case to authorize, but not require, the district court to award § 505 fees if it determines, in its discretion, to do so.

V

The law-firm defendants also contend that the district court erred in denying their motion for sanctions under Federal Rule of Civil Procedure 11. In denying their motion, the district court stated, "It appears well settled that unless a Rule 11 motion is filed in accordance with the 21 day 'safe harbor' warning provision, it cannot be granted." The court, however, did not have the benefit of our decision in *Rector v. Approved Fed. Savings Bank,* 265 F.3d 248 (4th Cir.2001), which had been decided only shortly before the court ruled. In *Rector,* we held that the safe harbor provision was not jurisdictional and could be waived if not properly asserted.

Without expressing any opinion on how the motion for sanctions should be decided, we remand this issue to the district court for further consideration of the motion, taking into account our decision in *Rector.*

Accordingly, the judgment of the district court is

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART.*

317 F.3d 385, 2003 Copr.L.Dec. P 28,566, 65

U.S.P.Q.2d 1601

Briefs and Other Related Documents (Back to top)

* 02-1288 (Docket) (Mar. 14, 2002)

* 02-1231 (Docket) (Mar. 04, 2002)

* 02-1219 (Docket) (Feb. 28, 2002)

* 02-1139 (Docket) (Feb. 06, 2002)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

WILLIAM C. BOND            *   IN THE

     Plaintiff                *   CIRCUIT COURT

v.                      *   FOR

KENNETH BLUM, SR. ET AL.      *   BALTIMORE CITY

     Defendant           *   Case No:     24-C-04-002976

     *     *     *     *     *     *     *     *     *     *     *

## ORDER

Upon consideration of the Motion to Dismiss of Defendants, William A. McDaniel, Jr., Caroline A. Griffin, McDaniel, Bennett & Griffin and McDaniel & Griffin (the "McDaniel Defendants"), and any Opposition thereto, it is this _____ day of _____ _____, 2004, hereby

     **ORDERED**, that the McDaniel Defendants' Motion to Dismiss be, and the same hereby is **GRANTED**, and it is further

     **ORDERED**, that Plaintiff's Complaint against the McDaniel Defendants in this matter be, and the same hereby is **DISMISSED WITH PREJUDICE**; and it is further

     **ORDERED**, that the McDaniel Defendants are awarded _____ for attorneys' fees and costs for preparation of this motion.

 

                             _____

                             Judge, Circuit Court for Baltimore City

William F. Ryan, Jr.
Amy E. Askew
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1626

Howard J. Schulman
Schulman & Kaufman, LLC
One Charles Center, Suite 600
100 North Charles Street
Baltimore, Maryland 21201

Gerard P. Martin
T. Christine Pham
Rosenberg Martin Funk Greenberg, LLP
25 South Charles Street
Suite 2115
Baltimore, Maryland 21201

Pamela A. Bresnahan
Elizabeth T. Simon
Vorys Sater Seymour and Pease LLP
1828 L Street, NW
11th Floor
Washington, D.C. 20036

*1563512*