**EXHIBIT # 1**

# News & Publications
## 2006

April 28 and May 5, 2006

**Anatomy of a Trial, Parts 8 & 9: Observations on Opening Statements**

Hon. Marvin J. Garbis | *The Daily Record*

[Hon. Marvin J. Garbis is United States District Judge for the District of Maryland. This column is excerpted from a new book by Paul Mark Sandler, *Anatomy of a Trial: Theory in Practice*, forthcoming from The Maryland Institute for Continuing Professional Education of Lawyers. The book discusses a particular case, *United States of America vs. David Rosen*, to illustrate practice pointers on opening statement, direct and cross examination, and closing argument. To read the opening statements discussed below, click here. ]

*The renowned appellate lawyer John W. Davis once remarked that if fish could talk, who would ask an angler how to catch a fish? He added that since judges could talk why ask a lawyer how to persuade? In the spirit of contributing to the education of the trial lawyer, the Hon. Marvin J. Garbis, U.S. District Judge, District of Maryland, accepted my invitation to render observations on opening statements and, in particular, the opening statements presented in* United States v. Rosen.
*– Paul Mark Sandler*

As a United States District Judge, I have presided over dozens of federal trials. During my career as a trial attorney, I represented "white collar" defendants in federal courts throughout the country. I have, accordingly, had the privilege of being counsel or judge in federal trials with some of the best and, inevitably, some of the other, trial practitioners.

A study of the trial of *United States v. Rosen* affords the opportunity to consider and critique (with the benefit of 20-20 hindsight) some of the decisions made by highly skilled trial lawyers in a case challenging to both sides.

Government opening
In broad terms, the function of the prosecution's opening statement is to build credibility for the Government's case and set the stage for conviction. The prosecutor should present a clear theory of the case by means of which the jury will want to convict and have a logical and inevitable path toward conviction. In sum, when the prosecutor finishes an effective opening, the jury should be ready — if called upon to deliberate then and there — to return a prompt verdict for the Government.

Inasmuch as the Government opening is the first step in the case, the prosecutor will not know precisely what the defense will say but should, to the extent possible, anticipate and diffuse the defense opening.

In Rosen, Government counsel presented a fine opening but, at least as to one witness, left an opening that defense counsel was able to exploit.

At the beginning of his opening statement Mr. Zeidenberg avoided a typical prosecution error. He did not, as I like to put it, "waste the honeymoon," that is to provide nothing useful in the first minute or two when the jury is particularly focused.

So many prosecutors — possibly to overcome nervousness and start with a comfortable litany — begin by introducing themselves and others (sometimes it seems everyone in the courtroom). As a result, the first precious minute or two is squandered to inform the name

of the prosecutor, who is that person sitting in front of the courtroom with a black robe, what exactly is the court reporter doing with the small keyboard, where the witnesses will be seated and on and on ad tedium until, at long last, something is actually said about the case to be tried.

In sharp contrast, Mr. Zeidenberg started with a bang:

"In August of 2000 Hillary Clinton's campaign for the United States Senate in New York was entering the stretch run. She was up against a well-financed challenger. The polls were tight. Money was tight. Running for the United States Senate in the United States is a very expensive proposition. Campaigning in a large, expensive media state like New York is particularly expensive. The responsibility for raising money for Hillary Clinton's campaign fell to this man seated at counsel table. His name is David Rosen."

Right off the bat, the jury knew that it was involved in an important trial that would transport them into the world of political fund raising in a high profile case. There is no doubt that the jury's attention was riveted on Mr. Zeidenberg.

The prosecutor went on to do an effective job of explaining the nature of the case, making it clear that there was no contention that the donations were in and of themselves illegal but that the charges related to the false reporting of the costs of an in kind donation consisting of underwriting a political fund raiser for Hillary Clinton.

Mr. Zeidenberg laced his opening statement with references to the glamorous people and life style associated with the fund raising event. The jury heard about planning for a $25,000 per couple dinner, name talent like Cher, Diana Ross, invitees like Brad Pitt, John Travolta, and Muhammad Ali, private jets and all the rest.

The jury was told that costs got out of control and rose to an amount in excess of a million dollars. According to the Government, Mr. Rosen knew of the actual cost but deliberately caused substantially understated cost reports to be provided to Hillary Clinton's campaign headquarters. Therefore, he caused the filing of false reports with the Federal Election Commission.

The prosecutor knew that he had to establish a motive for Rosen to have understated the costs. He, therefore, had to explain why it made a difference whether Rosen accurately reported the costs. Mr. Zeidenberg put it this way:

"You might rightly ask yourselves, while you are sitting there, what's the big deal if [a donor] is paying for all this stuff? Isn't it free?
"You will hear, ladies and gentlemen, that there are something called soft money and hard money,
* * *
"hard money is what the campaign wanted and needed.
* * *
"under the law a certain percentage of money from that hard money account needs to be transferred from the hard money account to the soft money account.
* * *
"So that [a part of time] $1.1 million that was the cost of the event would have to be transferred from the campaign's hard money account to the soft money account.
* * *
"and David Rosen knew that there was going to be a negative impact on that hard money fund by taking a massive in-kind soft money donation . . . so he wanted that report to be smaller."

Narrow focus
Finally, the prosecution — wisely — distanced its case from any accusation against Hillary Clinton and focused the jury solely upon David Rosen:

"As his Honor told you, this case has nothing to do with Hillary Clinton. It is about David Rosen. You will hear no evidence that Hillary Clinton was involved in this in any way, shape or form. In fact, it's just the opposite. The evidence will show that David Rosen was trying to keep this information from the campaign because he was afraid if they found out how much he had spent he would be fired.
* * *
"This case is about one question, and one question only: Did David Rosen deliberately cause a false filing and statement to be made to the federal election commission concerning the in-kind donations made to that gala on August 12th, 2000?"

The Government's opening statement was a good one. However, as discuss in the next section, the prosecutor did give the defense an opening exploit to cast doubt on the government case.

The Defense
In contrast to the prosecution's objective to hypothetically prevail if the verdict were rendered immediately after its opening statement, usually the defense can go no further than to persuade the jury to defer judgment until all of the evidence is presented. After all, the Government should start the trial with a rather solid theory of the case. On the other hand, the defense typically is not certain as to what will occur at trial and must, at all costs, avoid making promises to the jury that will not be kept. Furthermore, in many criminal cases, the defense is well advised to avoid making opening statement disclosures that will help the Government fine-tune its presentation.

Thus, in many cases, the defense should find a way subtly to prepare the jury to be receptive to its theory without being unduly specific and, hence, without restricting the defense's flexibility to respond to trial developments. Moreover, the bottom line is that the defense opening statement, the evidence and the final argument should be an effective, consistent and confidence building unitary presentation. Because the defense will, inevitably, make the opening statement without knowing precisely what will occur at trial, the opening statement should be flexible without being too general.

Like the prosecutor, defense counsel avoided the mistake of starting off with purely empty verbiage. However, unlike the prosecutor, Mr. Sandler chose not to begin his opening statement by addressing the case. Rather, he elected to commence with what is to me (but presumably not to juries) the shopworn "whole hand" cliché:

"If I were to show you my hand and ask you if you see it, some of you would say, sure I see your hand; but in reality, you don't. You don't see my hand until I turn it all the way around. Then and only then do you see my hand.
"So like this case, you have not seen this case. All we have heard is what the prosecutor says he's going to prove."

(I must confess that I typically use the "whole hand" cliché in my initial instructions to the jury so that I simply don't have to listen to it from counsel any more.)

'What this case is really about'
Mr. Sandler then, after a sentence introducing himself and co-counsel, presented the electrifying statement that in my view should have been the first thing he said:

> "We would like to tell you what this case is really about. It's about David Rosen's fight against the injustice of his being wrongfully accused of something he never did. I will prove to you in this case he is innocent. He is a victim, an innocent victim, of other people's motives, and I will prove this. I will prove to you that David Rosen never knew, never knew the cost of the production and concert expenses for this Hollywood gala."

This unusual defense posture — taking on the burden to prove innocence — was effective and, realistically, had little down side. As a practical matter neither the prosecution in argument nor the judge in the instructions was going to try to shift the burden of proof to the defense. Moreover, the judge was, inevitably, going to repeatedly remind the jury that the Government's burden was to prove guilt beyond a reasonable doubt. Yet, defense counsel was able to exhibit an extreme level of confidence in the innocence of his client. He carried this level of confidence throughout the opening statement.

Mr. Sandler proceeded to deflect an essential ingredient of the government's theory of the case — a motive for Rosen to have committed the crime.

The prosecution, as noted above, contended that Rosen hid the costs from the campaign because he was concerned about being fired.

Defense counsel — not quite meeting this head on (probably because he could not, but possibly because the point was better avoided than directly confronted) — stated in this regard:

> "The evidence will show, and I will prove this to you, he gained not one penny from this under reporting.
> * * *
> "I will prove to you and I will say to you that the Government must concede this point, folks: the Hillary Clinton campaign gained no economic benefit from this at all. And to say that the campaign was coming into a stretch and money was tight and things were desperate is to be inaccurate. I will prove that to you."

Defense counsel also, of course, humanized the defendant with a review of his sympathetic personal background — a high school dropout who got a GED, worked at basic jobs flipping hamburgers at McDonald's, delivering pizzas to work his way through college. Then, he worked in various jobs and, eventually, was thrilled to find himself working for Hillary Clinton. Mr. Sandler, however, made sure that the jury didn't have the impression that Mr. Rosen was enjoying a high life style, even though working as a fund raiser.

> "Where did he live? The evidence will show he did not live in the White House. He lived in a little room in New York City that was no bigger than a postage stamp."

Thus, the jury was presented with a solid working guy with whom they could relate. Nevertheless, the defense did not lack for problems.

Dealing with difficult facts
Defense counsel had to deal with the difficult fact that Mr. Rosen had been given luxurious hotel accommodations while in Los Angeles working on the campaign, but did not report the cost of this as a donation.

As the prosecutor put it:

> "David Rosen incurred over $13,000 in hotel bills in the weeks leading up to the event. It's easy to rack up $13,000 in hotel bills when you're staying in hotels like The

Hermitage and The Beverly Hills Hotel that charge $300 to $350 a night. He incurred those initially on his own credit card, never reported those expenses to the FEC as he was required to do. Later he tried to get someone, anyone, to pay them off. And you will hear he approached more than one individual trying to get them to pay off his bills. Eventually he settled on Aaron Tonken. And by pestering him for long enough, Aaron Tonken finally agreed to pay off that hotel bill. It's legal for a donor to pay off a hotel bill, but it has to be reported to the Federal Election Commission as an in-kind donation."

Mr. Sandler's response — delivered with supreme confidence:

"Now, when David Rosen stayed at the Beverly Hills Hotel, he will tell you he did not consider that a campaign contribution at all. He considered that this – this individual … was going to treat him because he was working hard, and he also loaned him his Porsche to drive back and forth during his work.
* * *
"[A]nd it was very exciting for him, and he thought it was a nice idea. It didn't make him a criminal. It doesn't make him doing something wrong. He did not consider this to be a campaign contribution to the campaign, but for him, and this is how he conducted himself and he didn't hide it.
* * *
"There is no reason for him to have reported something that he thought was a personal gift to him. There was nothing that he did wrong in that, and he did not conceal it or hide it and did not intend this to be an evil deed."

Well, all I can say is that the hotel bill problem was smoothed over and presumably faded into the background during the course of the trial.

Developing a theme
Mr. Sandler knew that he had to shift the blame for the under-reporting of costs from Mr. Rosen to the donors. Thus, the defense had to develop the theme that the donors, Aaron Tonken and Peter Paul, hid the true costs from Rosen. Mr. Sandler used the tactic of pinning a label on them and never letting the jury forget that they were the "concealers:"

"I will prove to you that David Rosen never knew, never knew the cost of the production and concert expenses for this Hollywood gala.
"And why didn't he know it, folks? The evidence will show he did not know it because those costs were concealed from him. They were hidden from him by two individuals: Peter Paul, who you can see on the screen, and Aaron Tonken.
* * *
"He met [at an event] three people for the first time in person: Peter Paul, one of the concealers; Aaron Tonken, another of the concealers; and Bretta Nock, joined at the hip with Aaron Tonken.
* * *
"I will show you a letter from the concealer, Tonken...
***
"I will also prove to you that no one, except the concealers and those that were with them, knew what these costs were."

Exploiting an opening
The Government's opening statement provided an opportunity for the defense by not adequately addressing the fact that it was relying upon a "cooperating" witness. The prosecutor could have "drawn the sting" from the inevitable defense contention that the jury should not rely upon "bought and paid for" testimony from an admitted criminal. However, the prosecutor simply stated:

"Now, after the event, ladies and gentlemen, the FBI began investigating and they began questioning people. And David Rosen had a conversation with a witness, who you will hear from, and he told this witness that he wasn't worried. He said, it's their word against ours: Peter Paul, Aaron Tonken. They are liars. No one will believe them over me. And so he decided to ride it out."

This left an opening for Mr. Sandler to condition the jury to distrust an important Government witness and, by implication, all of the prosecution case. He did so with alacrity:

"Well, you're going to hear testimony from one of his friends, a Mr. Jim Levin. The Court [sic] will call him. And this individual is going to say, David Rosen and I, we knew about this, and David told me that he was going to hide things and we'll keep it all secret. But the – you won't believe that, and I will prove to you that it's not credible. That individual, Mr. Jim Levin, just two days ago signed a plea agreement, because he has his own criminal problems. And in order to get benefit for himself he is coming to Court, and he will talk to you about what David Rosen supposedly said to him. That's the type of evidence that you will hear from the Government."

Risky tactic
Finally, I note a most controversial tactical decision by Mr. Sandler. He made the jury a rarely heard promise:

"I will prove to you, through our witnesses, that David Rosen is innocent. And I will tell you this: David Rosen will testify. I am pledging that to you now. He will come to the witness stand. He will tell the Judge, he will tell you, the jury, exactly why he did not do this and exactly what did occur. He will tell you that he is innocent and will relate to you in his own words, answering all the questions Mr. Zeidenberg puts to him, under oath, and explain to you that he did not do this."

It may be difficult to hypothecate a tactical axiom in criminal trial advocacy that can be stated in absolute terms. If there is one, it is that the defense should never promise the jury in opening that the defendant will testify.

Typically, the most difficult decision for the defense in a criminal case is whether to have the defendant testify even though the defendant professes innocence. Experienced defense counsel well know the hazards of a defendant's testimony and that often inroads made in cross-examination of Government witnesses can render the defendant's testimony unnecessary.

In my view, Mr. Sandler made a tactical error by promising the jury that Rosen would testify. He closed the door to the opportunity to decide that the case was going sufficiently well to avoid the risk of putting Rosen on the stand. He also ran the risk — one that criminal defense counsel can never fully foreclose — that some unforeseen trial development — for example, an unexpected document, will make it difficult if not impossible for the defendant to testify effectively. Mr. Sandler could have had essentially the same benefit through a promise to "show," to "refute," to "answer the government's allegations," etc. Had he used such a tack, he could have — if it became beneficial or necessary — kept Mr. Rosen off the witness stand without failing to live up to an unequivocal promise made to the jury.

Conclusion
The defense opening provides a splendid illustration of the trial lawyer's art. If, as I believe, Mr. Sandler varied from what experience has taught me is best, he may well have demonstrated that there are times when the lawyer fighting in the arena of the trial

courtroom knows what to do better than any spectator. He may also, however, have proven that while every trial lawyer can make mistakes, a good one can often get away with them. I leave the wisdom *vel non* of Mr. Sandler's promising to call the defendant for the endless debates over tactics that trial lawyers seem to love so well.

In sum, applaud Mr. Sandler's opening statement which provided the foundation for the successful defense of Mr. Rosen as can be seen as we examine the presentation of evidence and the final arguments.

back >>

### About Raising the Bar

Litigation partner Paul Mark Sandler is the author of "Raising the Bar," a regular column on trial advocacy that appears in the Friday edition of *The Daily Record* and other Dolan Media newspapers around the country.